# 14-1588-cr

## United States Court of Appeals

*for the*

## Second Circuit

───────── ◆ ─────────

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

DEJVID MIRKOVIC, AKA Dave Mirkovic,
AKA David Mirkovic, AKA Dejuid Mirkovic,

*Defendant,*

JOSEPH ROMANO,

*Defendant-Appellant.*

───────────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## APPENDIX

UNA DEAN, ESQ.
UNITED STATES ATTORNEY'S OFFICE,
    EASTERN DISTRICT OF NEW YORK
*Attorney for Appellee*
271 Cadman Plaza East
Brooklyn, New York 11201
(718) 254-7000

DANIEL S. NOOTER, ESQ.
*Attorney for Defendant-Appellant*
1380 Monroe Street, NW #427
Washington, DC 20010
(202) 215-0512

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... A-1

Indictment, filed November 7, 2012 ......................... A-20

Affidavit of Joseph Romano, Defendant, in Support
    of Motion to Suppress, dated February 19, 2013... A-28

Excerpts of Hearing Transcript, dated July 9, 2013... A-30

Opinion and Order of the Honorable John F.
    Keenan, dated September 18, 2013 ...................... A-49

Excerpts of Trial Transcript ....................................... A-65

    Government's Trial Exhibit GX101 – Statement
        of Joseph Romano.................................................. A-160

Joseph Romano's Proposed Entrapment Charge,
    dated January 20, 2014 with attached Exhibit A ... A-164

Government's Proposed Entrapment Charge, dated
    January 20, 2014 with Attached Exhibit A ............ A-170

Opinion and Order of the Honorable John F.
    Keenan, dated March 27, 2014 .............................. A-176

Judgment, dated April 14, 2014, Appealed From ...... A-189

Notice of Appeal, filed April 25, 2014...................... A-193

A-1

APPEAL

# U.S. District Court
## Eastern District of New York (Brooklyn)
## CRIMINAL DOCKET FOR CASE #: 1:12-cr-00691-JFK-1

Case title: USA v. Romano et al
Magistrate judge case number: 2:12-mj-00929-ARL

Date Filed: 11/07/2012
Date Terminated: 04/16/2014

Assigned to: Visiting Judge VJ-John F.
Keenan

**Defendant (1)**

**Joseph Romano**
*TERMINATED: 04/16/2014*

represented by **Daniel S. Nooter**
1380 Monroe Street N.W.
#427
Washington, DC 20010
202-215-0512
Email: dannooteresq@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**George R. Goltzer**
200 West 57th Street
Suite 900
New York, NY 10019
(212) 608-1260
Fax: (212) 980-2968
Email: george@goltzer.com
*TERMINATED: 09/19/2014*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Harry Conrad Batchelder , Jr.**
Law Offices of Harry C. Batchelder, Jr.
40 Wall Street, 28th Floor
New York, NY 10005
212-502-0660
Fax: 212-502-6669
Email: lubiyanka@aol.com
*TERMINATED: 05/21/2013*
*LEAD ATTORNEY*

A-2

*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Joseph F. Kilada**
Law Offices of Joseph F. Kilada
100 Quentin Roosevelt Blvd.
Suite 208
Garden City, NY 11530
516-222-0454
Fax: 516-908-4266
Email: JFK@LaborLawFirm.org
*TERMINATED: 04/29/2013*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Michael K. Bachrach**
276 Fifth Avenue
Suite 501
New York, NY 10001
212-929-0592
Fax: 866-328-1630
Email: michael@mbachlaw.com
*TERMINATED: 09/19/2014*
*ATTORNEY TO BE NOTICED*

| **Pending Counts** | **Disposition** |
|---|---|
| Conspiracy to Murder An Employee of the United States (1-2) | Incarceration: Life on each count. Counts are to run concurrently with each other and consecutively with sentence imposed under #09 Cr 170. Special Assessment: $200 |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|

A-3

18:1117.F

**Plaintiff**

**USA**                                          represented by   **Marshall L. Miller**
                                                                  United States Attorneys Office
                                                                  Eastern District of New York
                                                                  271 Cadman Plaza East
                                                                  Brooklyn, NY 11201-1820
                                                                  718-254-6421
                                                                  Fax: 718-254-6320
                                                                  Email: marshall.miller@usdoj.gov
                                                                  *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Una A. Dean**
                                                                  United States Attorneys Office
                                                                  271 Cadman Plaza East
                                                                  Brooklyn, NY 11201
                                                                  718-254-6473
                                                                  Fax: 718-254-6076
                                                                  Email: una.dean@usdoj.gov
                                                                  *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/05/2012 | 1 | SEALED COMPLAINT as to Dejvid Mirkovic (1), Joseph Romano (2). (Imrie, Robert) [2:12-mj-00929-ARL] (Entered: 10/10/2012) |
| 10/09/2012 | 4 | Order to Unseal Case as to Dejvid Mirkovic, Joseph Romano. Ordered by Magistrate Judge Gary R. Brown on 10/9/2012. (Brienza, Lauren) [2:12-mj-00929-ARL] (Entered: 10/19/2012) |
| 10/09/2012 | 5 | Arrest Warrant Returned Executed on 10/9/2012 in case as to Joseph Romano. (Brienza, Lauren) [2:12-mj-00929-ARL] (Entered: 10/19/2012) |
| 10/09/2012 | 6 | CJA 23 Financial Affidavit by Joseph Romano. (Brienza, Lauren) [2:12-mj-00929-ARL] (Entered: 10/19/2012) |
| 10/09/2012 | 7 | CJA 20 as to Joseph Romano: Appointment of Attorney Joseph F. Kilada for Joseph Romano. Ordered by Magistrate Judge Gary R. Brown on 10/9/2012. (Brienza, Lauren) [2:12-mj-00929-ARL] (Entered: 10/19/2012) |
| 10/09/2012 | 8 | Minute Entry for proceedings held before Magistrate Judge Gary R. Brown: Dft present in custody with CJA counsel Joseph Kilada. Govt: AUSA John Durham. Initial Appearance as to Joseph Romano held on 10/9/2012, Arraignment as to Joseph Romano (2) Count Complaint held on 10/9/2012. Preliminary hearing waived. Order |

A-4

| | | |
|---|---|---|
| | | of detention entered. (Brienza, Lauren) [2:12-mj-00929-ARL] (Entered: 10/19/2012) |
| 10/09/2012 | 9 | ORDER OF DETENTION as to Joseph Romano. Ordered by Magistrate Judge Gary R. Brown on 10/9/2012. (Brienza, Lauren) [2:12-mj-00929-ARL] (Entered: 10/19/2012) |
| 11/07/2012 | 11 | INDICTMENT as to Joseph Romano (1) count(s) 1-2, Dejvid Mirkovic (2) count(s) 1-2. (Attachments: # 1 Criminal Information Sheet) (Marziliano, August) (Entered: 11/13/2012) |
| 11/08/2012 | 12 | ORDER as to Joseph Romano, Dejvid Mirkovic: It having been determined that, pursuant to 28 U.S.C. § 455(a), the UnitedStates District Judges of the Eastern District of New York are disqualified from presiding in this case, 12-cr-691, it will therefore be requested that the Chief Judge of the Second Circuit Court of Appeals designate a judge from outside the Eastern District of New York but from within the Second Circuit, pursuant to 28 U.S.C. § 292(b), to perform the duties of United States District Judge temporarily for the Eastern District of New York for this specific case, United States of America v. Joseph Romano and Dejvid Mirkovic, Case No. 12-cr-0691, and all related matters. Ordered by Chief Judge Carol Bagley Amon on 11/8/2012. (DCP) (Entered: 11/13/2012) |
| 11/08/2012 | 13 | Pursuant to 28 U.S.C. § 292(b), the Honorable John F. Keenan, United States District Judge for the Southern District of New York, is designated to perform the duties of United States District Judge temporarily for the Eastern District of New York for the specific case United States of America v. Joseph Romano and Dejvid Mirkovic, Case No. 12-cr-0691 and all related matters. By Chief Judge USCA, Dennis Jacobs. In accordance with the Administrative Order 12 and this designation, District JudgeLeonard D. Wexler is no longer assigned and District Judge John F. Keenan isassigned for all matters in this case following the attached designation from theChief Judge of the US Court of Appeals for the Second Circuit. (DCP) (Marziliano, August) (Entered: 11/13/2012) |
| 11/08/2012 | 14 | NOTICE OF ATTORNEY APPEARANCE Marshall L. Miller appearing for USA. (Marziliano, August) (Entered: 11/13/2012) |
| 11/09/2012 | 15 | NOTICE OF ATTORNEY APPEARANCE Una A. Dean appearing for USA. (Marziliano, August) (Entered: 11/13/2012) |
| 11/13/2012 | | Minute Entry for proceedings held before Visiting Judge VJ-John F. Keenan: Defendant Joseph Romano present with attorney Joseph Kilada; Defendant Dejvid Mirkovic present with attorney Susan Kellman. AUSA Marshall Miller present. Plea entered by Joseph Romano, Dejvid Mirkovic Not Guilty on all counts. Time excluded between 11/13/12 and 12/17/12. Defendants continued detained. Status Conference set for 12/17/2012 at 03:00 PM in Courtroom 4G North before Visiting Judge VJ-John F. Keenan. (Fernandez, Erica) (Entered: 11/13/2012) |
| 11/14/2012 | 16 | First MOTION for Discovery *Rule 16 Disclosure* by Joseph Romano. (Kilada, Joseph) (Entered: 11/14/2012) |
| 12/03/2012 | 18 | Letter *regarding discovery* as to Joseph Romano (Dean, Una) (Entered: 12/03/2012) |

A-5

| | | |
|---|---|---|
| 12/12/2012 | 20 | Letter *regarding draft transcripts stipulation* as to Joseph Romano, Dejvid Mirkovic (Dean, Una) (Entered: 12/12/2012) |
| 12/17/2012 | | Minute Entry for proceedings held before Visiting Judge VJ-John F. Keenan:Pretrial Conference as to Joseph Romano and Defendant Dejvid Mirkovic held on 12/17/12. Deft Joseph Romano present with attorney Joseph Kilada. Defendant Dejvid Mirkovic present with attorney Susan Kellman. AUSA Marshall Miller present. Defense motions due: 2/19/13. Government response by 3/5/13. Defendant reply due by 3/11/13. Oral Argument date set: March 18, 2013 at 3:00 p.m. Jury Trial set for 5/20/2013 at 10:00 AM before Visiting Judge VJ-John F. Keenan. Time excluded between 12/17/12 and 5/20/13. Both Defendants cont'd detained. (Fernandez, Erica) (Entered: 12/17/2012) |
| 12/18/2012 | 21 | SCHEDULING ORDER as to Joseph Romano, Dejvid Mirkovic; The firm trial date for this case is May 20, 2013. Motion are to be filed by February 19, 2013. Responses are due on March 5, 2013, and any replies are due on March 11, 2013. Any oral arguments on these motions will be held on March 18, 2013 at 3:00PM. Finally, because April 20, 2013 is a Saturday, motions made in connection with Rule 404(b) are instead due on April 22, 2013. Ordered by Visiting Judge VJ-John F. Keenan on 12/17/2012. (Fernandez, Erica) (Entered: 12/18/2012) |
| 01/15/2013 | 22 | Certificate of Service by USA as to Joseph Romano by USM285 form of indictment dtd. 12/17/12 (Bollbach, Jean) (Entered: 01/15/2013) |
| 01/23/2013 | 23 | Letter *regarding proposed protective order* as to Joseph Romano (Dean, Una) (Entered: 01/23/2013) |
| 01/29/2013 | 25 | Letter *regarding discovery* as to Joseph Romano (Dean, Una) (Entered: 01/29/2013) |
| 02/05/2013 | 27 | Letter *regarding stipulation and protective order* as to Joseph Romano, Dejvid Mirkovic (Attachments: # 1 Proposed Order Romano, # 2 Proposed Order Mirkovic) (Dean, Una) (Entered: 02/05/2013) |
| 02/14/2013 | 28 | Letter *regarding proposed protective order* as to Joseph Romano, Dejvid Mirkovic (Attachments: # 1 Proposed Order, # 2 Proposed Order) (Dean, Una) (Entered: 02/14/2013) |
| 02/19/2013 | 29 | Letter *notice pursuant to Fed. R. Evid. 609* as to Joseph Romano, Dejvid Mirkovic (Dean, Una) (Entered: 02/19/2013) |
| 02/19/2013 | 30 | MOTION in Limine *for anonymous jury and other related protective measures* by USA as to Joseph Romano, Dejvid Mirkovic. (Attachments: # 1 Memorandum in Support) (Dean, Una) (Entered: 02/19/2013) |
| 02/19/2013 | 31 | First MOTION for Release of Brady Materials , MOTION to Sever Defendant , MOTION to Suppress by Joseph Romano. (Attachments: # 1 Notice of Motion, # 2 Affidavit in Support, # 3 Affidavit in Support) (Kilada, Joseph) (Entered: 02/19/2013) |
| 02/21/2013 | 32 | STIPULATION AND ORDER 16(d)(1) Protective Order as to Joseph Romano; It is hereby stipulated and agreed by and between the undersigned attorneys and the deft Joseph Romano through his attorney and Ordered by the Court, pursuant to FRCP 16(d). (see order for further details). Ordered by Visiting Judge VJ-John F. Keenan on |

A-6

Eastern District of New York - LIVE Database V6.1          https://ecf.nyed.uscourts.gov/cgi-bin/DktRpt.pl?806920622244616-L_1_0-1

| | | |
|---|---|---|
| | | 2/20/2013. (Fernandez, Erica) (Entered: 02/21/2013) |
| 02/26/2013 | 34 | NOTICE OF ATTORNEY APPEARANCE: Michael K. Bachrach appearing for Joseph Romano (Bachrach, Michael) (Entered: 02/26/2013) |
| 03/04/2013 | 35 | Letter *regarding expert notice* as to Joseph Romano, Dejvid Mirkovic (Dean, Una) (Entered: 03/04/2013) |
| 03/05/2013 | 37 | MEMORANDUM in Opposition re 30 MOTION in Limine *for anonymous jury and other related protective measures* (Bachrach, Michael) (Entered: 03/05/2013) |
| 03/05/2013 | 38 | MEMORANDUM in Opposition re 31 First MOTION for Release of Brady Materials MOTION to Sever Defendant MOTION to Suppress (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F) (Dean, Una) (Attachment 1 replaced on 3/6/2013) (Marziliano, August). (Attachment 3 replaced on 3/6/2013) (Marziliano, August). (Entered: 03/05/2013) |
| 03/07/2013 | 39 | Letter *regarding government opposition brief* as to Joseph Romano (Dean, Una) (Entered: 03/07/2013) |
| 03/11/2013 | 40 | REPLY TO RESPONSE to Motion re 30 MOTION in Limine *for anonymous jury and other related protective measures* (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Dean, Una) (Entered: 03/11/2013) |
| 03/11/2013 | 41 | MOTION for Psychiatric Exam by Joseph Romano. (Kilada, Joseph) (Entered: 03/11/2013) |
| 03/13/2013 | 42 | RESPONSE to Motion re 41 MOTION for Psychiatric Exam (Attachments: # 1 Proposed Order) (Dean, Una) (Entered: 03/13/2013) |
| 03/13/2013 | 43 | REPLY TO RESPONSE to Motion re 41 MOTION for Psychiatric Exam (Kilada, Joseph) (Entered: 03/13/2013) |
| 03/14/2013 | 45 | RESPONSE in Opposition re 41 MOTION for Psychiatric Exam (Dean, Una) (Entered: 03/14/2013) |
| 03/15/2013 | 46 | REPLY TO RESPONSE to Motion re 41 MOTION for Psychiatric Exam (Bachrach, Michael) (Entered: 03/15/2013) |
| 03/18/2013 | | Minute Entry for proceedings held before Visiting Judge VJ-John F. Keenan:Pretrial Conference as to Joseph Romano held on 3/18/2013. Defendant Joseph Romano present with attorneys Joseph Kilada. and Michael Bachrach. AUSA Una Dean present. Trial date remains set for May 20, 2013 at 10:00 a.m. Defendant cont'd detained. (Fernandez, Erica) (Entered: 03/18/2013) |
| 03/18/2013 | 47 | Letter *regarding discovery* as to Joseph Romano (Dean, Una) (Entered: 03/18/2013) |
| 03/19/2013 | 48 | Letter *regarding competency evaluation* as to Joseph Romano (Dean, Una) (Entered: 03/19/2013) |
| 03/20/2013 | 49 | Letter *regarding unavailability for trial* as to Joseph Romano (Dean, Una) (Entered: 03/20/2013) |

| | | |
|---|---|---|
| 03/20/2013 | 50 | MOTION for Leave to File *objections to the Government's proposed experts in the event the parties cannot reach agreement by Thursday, March 21, 2013, at noon* by Joseph Romano. (Bachrach, Michael) (Entered: 03/20/2013) |
| 03/20/2013 | 51 | MOTION for Leave to File *Reconsideration* by Joseph Romano. (Attachments: # 1 Exhibit) (Kilada, Joseph) (Entered: 03/20/2013) |
| 03/20/2013 | 52 | ORDER granting 41 Motion for Psychiatric Exam as to Joseph Romano (1); Upon application for a psychiatric or psychological and clinical evaluation pursuant to Title 18, United States Code Sections 4241 and 4247(b)-(c), it is hereby ORDERED that a psychiatric or psychological examination be conducted on the defendant JOSEPH ROMANO to determine whether or not he is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, pursuant to Title 18, United States Code, Section 4241(b); (see order for details). Ordered by Visiting Judge VJ-John F. Keenan on 3/19/2013. (Fernandez, Erica) (Entered: 03/20/2013) |
| 03/20/2013 | 53 | RESPONSE in Opposition re 51 MOTION for Leave to File *Reconsideration* (Dean, Una) (Entered: 03/20/2013) |
| 03/21/2013 | 54 | Letter *informing court that the parties have agreed that Dr. Barry Rosenfeld should be appointed to perform the competency examination of the defendant* as to Joseph Romano (Bachrach, Michael) (Entered: 03/21/2013) |
| 03/21/2013 | 55 | ORDER & OPINION: For the reasons stated above, the Government's motion 30 for an anonymous jury and other protective measures is granted. Defendant's motion for early disclosure of Jencks Act material is denied 31 . His motion to direct the Government to disclose Rule 404(b) evidence earlier than the Court has already directed is denied. His motion to direct the Government to provide the names of expert witnesses and a summary of their testimony 50 is denied at this time. With respect to Giglio material, the Government is directed to complete any disclosures one week before the commencement of trial. Defendant's motions for severance and to join in the motions of co-Defendant Mirkovic 31 are denied as moot. His motion to recuse Assistant United States Attorneys Marshall Miller and Una Dean is denied. Ordered by Visiting Judge VJ-John F. Keenan on 3/20/2013. (Fernandez, Erica) (Entered: 03/21/2013) |
| 03/21/2013 | 56 | REPLY TO RESPONSE to Motion re 51 MOTION for Leave to File *Reconsideration* (Kilada, Joseph) (Entered: 03/21/2013) |
| 03/21/2013 | 57 | ORDER re Joseph Romano (1); Upon consent of the parties, the Court hereby appoints Dr. Barry Rosenfeld, Ph.D., to perform the competency evaluation of Defendant Joseph Romano, pursuant to Title 18, United States Code, Sections 4241 and 4247(b)-(c). In the event that Dr. Rosenfeld believes that Defense counsel should be present during all or part of his examination of the Defendant, counsel is directed to notify the Court. Defense counsel's request to withdraw their application for leave to file objections to the Government's proposed experts is granted. Ordered by Visiting Judge VJ-John F. Keenan on 3/21/2013. (Fernandez, Erica) (Entered: 03/21/2013) |

| | | |
|---|---|---|
| 03/25/2013 | 58 | ORDER as to Joseph Romano; In light of the Court's order dated 3/21/13, this request is denied as moot. Ordered by Visiting Judge VJ-John F. Keenan on 3/25/2013. (Fernandez, Erica) (Entered: 03/25/2013) |
| 03/25/2013 | 59 | Letter *Inform Court of Cured Conflict* as to Joseph Romano (Kilada, Joseph) (Entered: 03/25/2013) |
| 03/26/2013 | 60 | Letter dated 3/26/13 from Judge John F. Keenan to Dr. Barry Rosenfeld, Ph.D. re Joseph Romano advising that a firm trial date of 5/20/13 in the above captioned case has been set. Prior to the trial, a hearing regarding admissibility of statements needs to be held and cannot be scheduled until Dr. Rosenfeld's report is received. The Court would appreciate the report on an expedited basis. (Fernandez, Erica) (Entered: 03/26/2013) |
| 04/08/2013 | 61 | Letter *updating court on status of competency report and requesting permission to be present at competency examination* as to Joseph Romano (Bachrach, Michael) (Entered: 04/08/2013) |
| 04/08/2013 | 62 | ORDER as to Joseph Romano re 61 Letter; Defense counsel requests permission to accompany Dr. Rosenfeld during his follow-up examination of the deft on 4/10/13 at MDC Brooklyn. Ordered by Visiting Judge VJ-John F. Keenan on 4/8/2013. (Fernandez, Erica) (Entered: 04/08/2013) |
| 04/15/2013 | 63 | Letter *regarding discovery* as to Joseph Romano (Dean, Una) (Entered: 04/15/2013) |
| 04/18/2013 | 64 | MOTION in Limine *regarding prior bad acts* by USA as to Joseph Romano. (Dean, Una) (Entered: 04/18/2013) |
| 04/23/2013 | 66 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Joseph Romano, Dejvid Mirkovic held on 12/17/12, before Judge Keenan. Court Reporter/Transcriber Rudolph, Telephone number 718-613-2538. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/14/2013. Redacted Transcript Deadline set for 5/24/2013. Release of Transcript Restriction set for 7/22/2013. (Rudolph, Gene) (Entered: 04/23/2013) |
| 04/29/2013 | 67 | ORDER as to Joseph Romano; The C.J.A. attorney assigned to this case Joseph Kilada. Esc. is hereby ordered substituted and the representation of the defendant in the above captioned matter is assigned to Harry Batchelder. Esa. NUNC-PRO-TUNC: April 23, 2013. Ordered by Visiting Judge VJ-John F. Keenan on 4/29/2013. (Fernandez, Erica) (Entered: 04/29/2013) |
| 04/29/2013 | | Attorney update in case as to Joseph Romano. Attorney Harry Conrad Batchelder, Jr for Joseph Romano added. Attorney Joseph F. Kilada terminated. (Fernandez, Erica) (Entered: 04/29/2013) |
| 04/30/2013 | 68 | ORDER as to Joseph Romano; Defendant Romano's counsel Michael K. Bachrach and Harry C. Batchelder, request permission to file interim CJA payment vouchers; Application granted. Ordered by Visiting Judge VJ-John F. Keenan on 4/29/2013. (Fernandez, Erica) (Entered: 04/30/2013) |

A-9

Eastern District of New York - LIVE Database V6.1                    https://ecf.nyed.uscourts.gov/cgi-bin/DktRpt.pl?806920622244616-L_1_0-1

| 05/21/2013 | | Minute Entry for proceedings held before Visiting Judge VJ-John F. Keenan:Status Conference as to Joseph Romano held on 5/21/2013. Harry Batchelder relieved as counsel. CJA George Goltzer is appointed to represent Mr. Romano. Suppression hearing set for 7/9/2013 at 10:30 AM before Visiting Judge VJ-John F. Keenan. Trial date remains set for 12/2/13 at 10:00 AM. Time excluded between 5/21/13 and 12/2/13. Deft cont'd detained. (Fernandez, Erica) (Entered: 05/21/2013) |
| --- | --- | --- |
| 05/21/2013 | | Attorney update in case as to Joseph Romano. Attorney George R. Goltzer for Joseph Romano added. Attorney Harry Conrad Batchelder, Jr terminated. (Fernandez, Erica) (Entered: 05/21/2013) |
| 05/21/2013 | 70 | ORDER as to Joseph Romano; The C.J.A. attorney assigned to this case Harty Batchelder. Esa. is hereby ordered substituted and the representation of the defendant in the above captioned matter is assigned to George Goltzer. Esq, NUNC-PRO-TUNC: May 21 2013.. Ordered by Visiting Judge VJ-John F. Keenan on 5/21/2013. (Fernandez, Erica) (Entered: 05/21/2013) |
| 06/21/2013 | 73 | MEMORANDUM in Opposition re 64 MOTION in Limine *regarding prior bad acts* (Bachrach, Michael) (Entered: 06/21/2013) |
| 07/08/2013 | 76 | REPLY TO RESPONSE to Motion re 64 MOTION in Limine *regarding prior bad acts* (Dean, Una) (Entered: 07/08/2013) |
| 07/09/2013 | 77 | Letter *regarding disclosures to defendant* as to Joseph Romano (Dean, Una) (Entered: 07/09/2013) |
| 07/09/2013 | | Minute Entry for proceedings held before Visiting Judge VJ-John F. Keenan:Suppression Hearing as to Joseph Romano held on 7/9/2013. Defendant Joseph Romano present with attorney George Goltzer. AUSA Una Dean present. Decision reserved. Submissions from defense counsel and AUSA are due July 30, 2013 by 5:00 p.m. (Fernandez, Erica) (Entered: 07/10/2013) |
| 07/10/2013 | 78 | STIPULATION AND RULE 16 (d)(1) PROTECTIVE ORDER as to Joseph Romano, Dejvid Mirkovic;. Ordered by Chief Judge Carol Bagley Amon on 7/9/2013. (Fernandez, Erica) (Entered: 07/10/2013) |
| 07/23/2013 | 79 | Letter *regarding Rule 16 disovery* as to Joseph Romano (Dean, Una) (Entered: 07/23/2013) |
| 07/24/2013 | 83 | MOTION for Extension of Time to File *post-hearing briefs on August 5, 2013* by Joseph Romano. (Bachrach, Michael) (Entered: 07/24/2013) |
| 07/30/2013 | 84 | ORDER granting 83 Motion for Extension of Time to File as to Joseph Romano (1); Deft requests a one-week extension for both parties to file their post-hearing briefs to 8/5/13. Ordered by Visiting Judge VJ-John F. Keenan on 7/26/2013. (Fernandez, Erica) (Entered: 07/30/2013) |
| 08/02/2013 | 85 | MOTION for Leave to File Excess Pages *(Motion to file oversized post-hearing memorandum of law)* by Joseph Romano. (Bachrach, Michael) (Entered: 08/02/2013) |
| 08/02/2013 | 87 | ORDER as to Joseph Romano ; The conference previously set for 8/16/13 at 10:00 AM is hereby cancelled. Ordered by Visiting Judge VJ-John F. Keenan on 8/2/2013. |

A-10

| | | |
|---|---|---|
| | | (Fernandez, Erica) (Entered: 08/02/2013) |
| 08/05/2013 | 88 | MEMORANDUM in Support re 31 First MOTION for Release of Brady Materials MOTION to Sever Defendant MOTION to Suppress *(Post-Hearing Memorandum of Law in Support of Defendant's Motion to Suppress Statements)* (Bachrach, Michael) (Entered: 08/05/2013) |
| 08/05/2013 | 89 | MEMORANDUM in Opposition re 31 First MOTION for Release of Brady Materials MOTION to Sever Defendant MOTION to Suppress (Miller, Marshall) (Entered: 08/05/2013) |
| 08/07/2013 | 90 | Letter *requesting leave to file response* as to Joseph Romano (Tucker, Richard) (Entered: 08/07/2013) |
| 08/16/2013 | 94 | ORDER as to Joseph Romano: The Court does not accept pro se applications, in any form, from Defendants who are represented. Accordingly, having received a letter from Defendant Joseph Romano, the Court refers it to Messrs. Goltzer and Bachrach so that they can take whatever action they deem appropriate. Ordered by Visiting Judge VJ-John F. Keenan on 8/15/2013. (Fernandez, Erica) (Entered: 08/16/2013) |
| 08/21/2013 | 95 | Letter *regarding discovery* as to Joseph Romano (Dean, Una) (Entered: 08/21/2013) |
| 08/26/2013 | 96 | RESPONSE in Opposition re 31 First MOTION for Release of Brady Materials MOTION to Sever Defendant MOTION to Suppress -*supplemental brief* (Dean, Una) (Entered: 08/26/2013) |
| 08/26/2013 | 97 | RESPONSE in Support re 31 First MOTION for Release of Brady Materials MOTION to Sever Defendant MOTION to Suppress (Bachrach, Michael) (Entered: 08/26/2013) |
| 08/27/2013 | 98 | ORDER re 64 Motion in Limine as to Joseph Romano (1); For the reasons stated above, evidence regarding both of Defendant/s coin fraud schemes is admissible as direct evidence of the charged conspiracy. Evidence about Defendant's alleged hiring of purported "hit men" to assault a witness is also admissible as direct evidence. Evidence regarding Defendant's alleged witness tampering, escape attempt, and violation of pretrial release is not admissible as direct evidence of the charged crimes, nor is it admissible under Rule 404(b) to demonstrate preparation and plan. This Opinion contains no ruling on whether Defendant's statements regarding the other acts are admissible under Rule 404(b) to establish his relationships with his co-conspirators. Ordered by Visiting Judge VJ-John F. Keenan on 8/27/2013. (Fernandez, Erica) (Entered: 08/27/2013) |
| 08/29/2013 | 99 | Letter *to Government requesting discovery* as to Joseph Romano (Bachrach, Michael) (Entered: 08/29/2013) |
| 09/09/2013 | 100 | RESPONSE in Support re 64 MOTION in Limine *regarding prior bad acts providing exhibits* (Miller, Marshall) (Entered: 09/09/2013) |
| 09/18/2013 | 101 | OPINION AND ORDER as to Joseph Romano; For the reasons stated above, Defendant's motion to suppress his statements is denied. Any statements made by Defendant after he was advised of his rights are admissible in the Government's case in chief at trial. Ordered by Visiting Judge VJ-John F. Keenan on 9/18/2013. |

A-11

Eastern District of New York - LIVE Database V6.1                    https://ecf.nyed.uscourts.gov/cgi-bin/DktRpt.pl?806920622244616-L_1_0-1

| | | |
|---|---|---|
| | | (Fernandez, Erica) (Entered: 09/18/2013) |
| 09/27/2013 | 102 | Letter *providing supplemental discovery* as to Joseph Romano (Miller, Marshall) (Entered: 09/27/2013) |
| 10/13/2013 | 103 | Letter *providing supplemental discovery* as to Joseph Romano (Miller, Marshall) (Entered: 10/13/2013) |
| 10/16/2013 | 104 | MOTION to Continue *jury selection and trial* by Joseph Romano. (Attachments: # 1 Exhibit A (Discovery Spreadsheet #1), # 2 Exhibit B (Discovery Spreadsheet #2)) (Bachrach, Michael) (Entered: 10/16/2013) |
| 10/16/2013 | 105 | Letter *opposing request for adjournment* as to Joseph Romano (Attachments: # 1 Exhibit) (Miller, Marshall) (Entered: 10/16/2013) |
| 10/17/2013 | 106 | ORDER as to Joseph Romano: The Government is therefore directed to submit a letter setting forth (1) which specific lines of each conversation it wishes to admit; and (2) the rationale for doing so, under Rule 404(b) or otherwise, as to each portion. The Government's brief is due to the Court no later than Friday, November 1, 2013. Defense counsel will then have up to fourteen days following its receipt of the Government's brief to notify the Court of any objections to the Government's proffered sections. The defense may also identify portions it wishes to admit under Rule 106. Ordered by Visiting Judge VJ-John F. Keenan on 10/16/2013. (Fernandez, Erica) (Entered: 10/17/2013) |
| 10/17/2013 | 107 | REPLY TO RESPONSE to Motion re 104 MOTION to Continue *jury selection and trial* (Bachrach, Michael) (Entered: 10/17/2013) |
| 10/23/2013 | 108 | ORDER TO CONTINUE - Ends of Justice as to Joseph Romano Time excluded from 10/23/13 until 1/6/14. Ordered by Visiting Judge VJ-John F. Keenan on 10/23/2013. (Fernandez, Erica) (Entered: 10/24/2013) |
| 10/23/2013 | | Minute Entry for proceedings held before Visiting Judge VJ-John F. Keenan:Pretrial Conference as to Joseph Romano held on 10/23/2013. AUSA Marshall Miller present. Deft present with counsel George Goltzer. Deft continued detained. Trial set for 1/6/2014 at 10:00 AM before Visiting Judge VJ-John F. Keenan. (Fernandez, Erica) (Entered: 10/24/2013) |
| 11/01/2013 | 109 | RESPONSE in Support re 64 MOTION in Limine *regarding prior bad acts* (Miller, Marshall) (Entered: 11/01/2013) |
| 11/14/2013 | 110 | RESPONSE in Opposition re 64 MOTION in Limine *regarding prior bad acts* (Bachrach, Michael) (Entered: 11/14/2013) |
| 11/19/2013 | 111 | REPLY TO RESPONSE to Motion re 64 MOTION in Limine *regarding prior bad acts* (Dean, Una) (Entered: 11/19/2013) |
| 11/22/2013 | 112 | OPINION AND ORDER as to Joseph Romano; The Court has now reviewed the parties' submissions, and its rulings on admissibility are set forth below. The page and line numbers correspond to the versions of the transcripts submitted by the Government on November 1, 2013 (see order for details). Ordered by Visiting Judge VJ-John F. Keenan on 11/21/2013. (Fernandez, Erica) (Entered: 11/22/2013) |

| | | |
|---|---|---|
| 12/02/2013 | 113 | MOTION for Extension of Time to File Response/Reply - *requesting, upon consent, one week extension of time, until December 9, 2013, to comply with this Court's Order, dated, November 22, 2013 (ecf #112)* by Joseph Romano. (Bachrach, Michael) (Entered: 12/02/2013) |
| 12/06/2013 | 114 | Letter *regarding revised stipulation* as to Joseph Romano (Dean, Una) (Entered: 12/06/2013) |
| 12/06/2013 | 115 | ORDER granting 113 Motion for Extension of Time to File Response/Reply as to Joseph Romano (1). Ordered by Visiting Judge VJ-John F. Keenan on 12/2/2013. (Fernandez, Erica) (Entered: 12/06/2013) |
| 12/09/2013 | 116 | Letter *regarding discovery* as to Joseph Romano (Dean, Una) (Entered: 12/09/2013) |
| 12/16/2013 | 117 | MOTION in Limine *to preclude cross-examination* by USA as to Joseph Romano. (Dean, Una) (Entered: 12/16/2013) |
| 12/17/2013 | 118 | Letter *regarding trial discovery material* as to Joseph Romano (Dean, Una) (Entered: 12/17/2013) |
| 12/18/2013 | 119 | Letter *regarding trial discovery protective order* as to Joseph Romano (Dean, Una) (Entered: 12/18/2013) |
| 12/18/2013 | 120 | Stipulation and Protective Order as to Joseph Romano. Ordered by Visiting Judge VJ-John F. Keenan on 12/18/2013. (Brown, Marc) (Entered: 12/19/2013) |
| 12/23/2013 | 121 | Letter *regarding discovery* as to Joseph Romano (Dean, Una) (Entered: 12/23/2013) |
| 12/23/2013 | 122 | Letter *requesting ministerial change to indictment* as to Joseph Romano (Attachments: # 1 Exhibit) (Miller, Marshall) (Entered: 12/23/2013) |
| 12/24/2013 | 123 | Letter *regarding trial discovery* as to Joseph Romano (Dean, Una) (Entered: 12/24/2013) |
| 12/26/2013 | 124 | Letter *providing discovery* as to Joseph Romano (Miller, Marshall) (Entered: 12/26/2013) |
| 12/30/2013 | 125 | ORDER as to Joseph Romano re 122 Letter; The unopposed application is granted. Ordered by Visiting Judge VJ-John F. Keenan on 12/27/2013. (Fernandez, Erica) (Entered: 12/30/2013) |
| 12/30/2013 | 126 | Letter *regarding production of exhibits* as to Joseph Romano (Dean, Una) (Entered: 12/30/2013) |
| 01/02/2014 | 127 | Proposed Voir Dire by Joseph Romano (Bachrach, Michael) (Entered: 01/02/2014) |
| 01/02/2014 | 128 | Proposed Voir Dire by USA as to Joseph Romano (Attachments: # 1 Exhibit A and B) (Dean, Una) (Entered: 01/02/2014) |
| 01/02/2014 | 129 | ORDER granting 117 Motion in Limine as to Joseph Romano (1); The Government has filed a motion in limine to preclude the defense from cross examining Detective John Wighaus regarding his involvement in an April 1996 arrest and a related civil lawsuit. The defense has advised that they do not oppose the motion. Accordingly, the motion is granted and the defense may not cross-examine Detective Wighaus on that |

A-13

Eastern District of New York - LIVE Database V6.1                    https://ecf.nyed.uscourts.gov/cgi-bin/DktRpt.pl?806920622244616-L_1_0-1

| | | topic. Ordered by Visiting Judge VJ-John F. Keenan on 1/2/2014. (Fernandez, Erica) (Entered: 01/02/2014) |
|---|---|---|
| 01/02/2014 | 130 | Proposed Jury Instructions by Joseph Romano (Bachrach, Michael) (Entered: 01/02/2014) |
| 01/02/2014 | 131 | Letter *regarding production of exhibits* as to Joseph Romano (Dean, Una) (Entered: 01/02/2014) |
| 01/03/2014 | 132 | Proposed Jury Instructions by USA as to Joseph Romano (Dean, Una) (Entered: 01/03/2014) |
| 01/03/2014 | 133 | Letter *motion for jury instruction and to preclude cross examination* as to Joseph Romano (Attachments: # 1 Exhibit A) (Dean, Una) (Entered: 01/03/2014) |
| 01/03/2014 | 134 | Letter *requesting discovery of evidence and information pursuant to Brady v. Maryland, Giglio v. United States, Kyles v. Whitley, and their progeny, including, but not limited to, United States v. Mahaffy.* as to Joseph Romano (Bachrach, Michael) (Entered: 01/03/2014) |
| 01/03/2014 | 135 | Letter *regarding production of discovery* as to Joseph Romano (Dean, Una) (Entered: 01/03/2014) |
| 01/03/2014 | 136 | Letter *regarding disclosure pursuant to Giglio and Rule 806* as to Joseph Romano (Dean, Una) (Entered: 01/03/2014) |
| 01/04/2014 | 137 | Letter *regarding trial discovery* as to Joseph Romano (Dean, Una) (Entered: 01/04/2014) |
| 01/05/2014 | 138 | Letter *-memorandum in opposition to the Government's motion in limine, dated, January 3, 2014 (ecf #133)* as to Joseph Romano (Bachrach, Michael) (Entered: 01/05/2014) |
| 01/05/2014 | 139 | Letter *providing formal notice of entrapment defense, moving in limine for the admission of evidence, and withdrawing, to the extent necessary, Defendant's opposition to the Government's Rule 404(b) motion* as to Joseph Romano (Bachrach, Michael) (Entered: 01/05/2014) |
| 01/06/2014 | | Minute Entry for proceedings held before Visiting Judge VJ-John F. Keenan:Jury Selection as to Joseph Romano held on 1/6/2014. Defendant Joseph Romano present with attorney George Goltzer. AUSA Marshall Miller present. Jury selection continued to 1/7/2014. Defendant continued detained. (Fernandez, Erica) Modified on 1/10/2014 (Marziliano, August). (Entered: 01/07/2014) |
| 01/07/2014 | 140 | Letter *(supplemental letter) in opposition to Government's motion in limine (ecf #133)* as to Joseph Romano (Bachrach, Michael) (Entered: 01/07/2014) |
| 01/07/2014 | | Minute Entry for proceedings held before Visiting Judge VJ-John F. Keenan:Jury Trial as to Joseph Romano held on 1/7/2014, ( Jury Trial set for 1/8/2014 09:30 AM in Courtroom 6A South before Visiting Judge VJ-John F. Keenan.) (Court Reporter Gene Rudolph.) (Marziliano, August) (Entered: 01/10/2014) |

| | | |
|---|---|---|
| 01/08/2014 | 141 | Letter *replying to opposition to govt's motion in limine* as to Joseph Romano (Miller, Marshall) (Entered: 01/08/2014) |
| 01/08/2014 | 142 | MEMORANDUM OPINION & ORDER as to Joseph Romano. The Government's motion to preclude the defense from impeaching Machacek on the basis of his recorded statements is granted. The Court will deliver a limiting instruction to the jury advising them that Machacek's statements on the recording are offered only for context and not for their truth. The defense remains free to call Machacek as its own witness. The defense also remains free to argue in its summation that the jury should draw an adverse inference from the Government's decision not to call Machacek. So Ordered by Visiting Judge VJ-John F. Keenan on 1/8/2014. (Lee, Tiffeny) (Entered: 01/08/2014) |
| 01/08/2014 | 143 | Letter *regarding discovery* as to Joseph Romano (Dean, Una) (Entered: 01/08/2014) |
| 01/08/2014 | 144 | Letter *requesting preliminary instruction* as to Joseph Romano (Dean, Una) (Entered: 01/08/2014) |
| 01/08/2014 | 145 | Proposed Voir Dire by Joseph Romano (Bachrach, Michael) (Entered: 01/08/2014) |
| 01/08/2014 | | Minute Entry for proceedings held before Visiting Judge VJ-John F. Keenan:Jury Trial as to Joseph Romano held on 1/8/2014, ( Jury Selection set for 1/9/2014 09:30 AM in Courtroom 6A South before Visiting Judge VJ-John F. Keenan.) (Court Reporter Sherry Bryant.) (Marziliano, August) (Entered: 01/10/2014) |
| 01/09/2014 | 146 | ORDER as to Joseph Romano; Both sides agreeing the transcripts may be made available to the press just before the tapes are played. Otherwise the application is denied. Ordered by Visiting Judge VJ-John F. Keenan on 1/9/2014. (Fernandez, Erica) (Entered: 01/09/2014) |
| 01/09/2014 | 147 | Letter *regarding discovery* as to Joseph Romano (Dean, Una) (Entered: 01/09/2014) |
| 01/09/2014 | | Minute Entry for proceedings held before Visiting Judge VJ-John F. Keenan:Jury Selection as to Joseph Romano held and completed on 1/9/2014, Jury Trial Begun as to Joseph Romano held on 1/9/2014 and Jurors swprn, ( Jury Trial set for 1/10/2014 09:30 AM in Courtroom 6C South before Visiting Judge VJ-John F. Keenan.) (Court Reporter Sherry Bryant.) (Marziliano, August) (Entered: 01/10/2014) |
| 01/10/2014 | | Minute Entry for proceedings held before Visiting Judge VJ-John F. Keenan:Jury Trial as to Joseph Romano held on 1/10/2014, ( Jury Trial set for 1/13/2014 09:30 AM in Courtroom 6C South before Visiting Judge VJ-John F. Keenan.) (Court Reporter Sherry Bryant.) (Marziliano, August) (Entered: 01/10/2014) |
| 01/10/2014 | 148 | ORDER as to Joseph Romano; Having conferred with counsel, and recognizing the qualified right of access to judicial materials, audio recordings may be made available to the media once the corresponding exhibit is offered. However, for security reasons, the video recordings will not be made available.. Ordered by Visiting Judge VJ-John F. Keenan on 1/10/2014. (Fernandez, Erica) (Entered: 01/10/2014) |
| 01/11/2014 | 149 | Letter *regarding discovery* as to Joseph Romano (Dean, Una) (Entered: 01/11/2014) |

A-15

| | | |
|---|---|---|
| 01/12/2014 | 150 | Letter *regarding trial discovery* as to Joseph Romano (Dean, Una) (Entered: 01/12/2014) |
| 01/13/2014 | 151 | Letter *requesting additional discovery of evidence and information pursuant to Brady v. Maryland, Giglio v. United States, Kyles v. Whitley, and their progeny, including, but not limited to, United States v. Mahaffy.* as to Joseph Romano (Bachrach, Michael) (Entered: 01/13/2014) |
| 01/13/2014 | | Minute Entry for proceedings held before Visiting Judge VJ-John F. Keenan:Jury Trial as to Joseph Romano held on 1/13/2014. Defendant Joseph Romano present with attorney George Goltzer. AUSA Marshall Miller present. Jury Trial set for 1/14/2014 at 10:00 AM in Courtroom 6A South before Visiting Judge VJ-John F. Keenan. (Court Reporter Charleane Heading, Gene Rudolph, and Richard Barry.) (Fernandez, Erica) (Entered: 01/15/2014) |
| 01/14/2014 | | Minute Entry for proceedings held before Visiting Judge VJ-John F. Keenan:Jury Trial as to Joseph Romano held on 1/14/2014. Defendant Joseph Romano present with attorney George Goltzer. AUSA Marshall Miller present. Jury Trial set for 1/15/2014 at 10:00 AM in Courtroom 6A South before Visiting Judge VJ-John F. Keenan. (Court Reporter Allan Sherman, Michele Nardone, and Marie Foley.) (Fernandez, Erica) (Entered: 01/15/2014) |
| 01/15/2014 | | Minute Entry for proceedings held before Visiting Judge VJ-John F. Keenan:Jury Trial as to Joseph Romano held on 1/15/2014. Defendant Joseph Romano present with attorney George Goltzer. AUSA Marshall Miller present. Jury trial continues. Jury Trial set for 1/16/2014 at 10:00 AM in Courtroom 6A South before Visiting Judge VJ-John F. Keenan. (Court Reporter Richard Barry and Nicole Canales.) (Fernandez, Erica) (Entered: 01/15/2014) |
| 01/16/2014 | 152 | Letter *motion for permission to treat Gerald Machacek as a hostile witness under Fed.R.Evid. 611(c)(2)* as to Joseph Romano (Bachrach, Michael) (Entered: 01/16/2014) |
| 01/16/2014 | | Minute Entry for proceedings held before Visiting Judge VJ-John F. Keenan:Jury Trial as to Joseph Romano held on 1/16/2014. Counsel for parties present. Defendant Joseph Romano present with attorney George Goltzer. AUSA Marshall Miller present. Jury trial continues. Trial to continue January 21, 2014 at 10:00 a.m. in Courtroom 6A South before Visiting Judge VJ-John F. Keenan. (Court Reporter Nicole Canales, Richard Barry, Victoria Torres Butler.) (Fernandez, Erica) (Entered: 01/17/2014) |
| 01/20/2014 | 153 | Proposed Jury Instructions by Joseph Romano (Attachments: # 1 Exhibit A) (Bachrach, Michael) (Entered: 01/20/2014) |
| 01/20/2014 | 154 | Letter *responding to proposed additional jury instruction* as to Joseph Romano (Attachments: # 1 Exhibit) (Miller, Marshall) (Entered: 01/20/2014) |
| 01/21/2014 | | Minute Entry for proceedings held before Visiting Judge VJ-John F. Keenan:Jury Trial as to Joseph Romano held on 1/21/2014. Defendant Joseph Romano present with attorney George Goltzer. AUSA's Una Dean and Marshall Miller present. Jury trial cont's. Government summation delivered by Ms. Dean. Defense summation by Mr. Goltzer. Government rebuttal summation by Mr. Miller. Trial to continue January 23, |

A-16

Eastern District of New York - LIVE Database V6.1             https://ecf.nyed.uscourts.gov/cgi-bin/DktRpt.pl?806920622244616-L_1_0-1

| | | |
|---|---|---|
| | | 2014 at 10:00 a.m. in Courtroom 6A South before Visiting Judge VJ-John F. Keenan. (Court Reporter Holly Driscoll and Anthony Frisolone.) (Fernandez, Erica) (Entered: 01/22/2014) |
| 01/23/2014 | | Minute Entry for proceedings held before Visiting Judge VJ-John F. Keenan:Jury Trial as to Joseph Romano held on 1/23/2014. Defendant Joseph Romano present with attorney George Goltzer. AUSA Marshall Miller present. Jury trial continues and concludes. Jury finds defendant guilty on counts one and two. PSI ordered. Sentencing set for 3/31/2014 at 10:30 AM in Courtroom 6A South before Visiting Judge VJ-John F. Keenan. (Court Reporter Holly Driscoll.) (Fernandez, Erica) (Entered: 01/23/2014) |
| 01/23/2014 | 155 | JURY VERDICT as to Joseph Romano (1) Guilty on Count 1-2. (Fernandez, Erica) (Entered: 01/23/2014) |
| 01/27/2014 | 156 | SCHEDULING ORDER as to Joseph Romano: The sentence in this case has been rescheduled from 3/31/14 to 4/2/2014 at 10:30 AM in Courtroom 6A South before Visiting Judge VJ-John F. Keenan. Ordered by Visiting Judge VJ-John F. Keenan on 1/27/2014. (Fernandez, Erica) (Entered: 01/27/2014) |
| 01/29/2014 | 158 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Joseph Romano held on May 21, 2013, before Judge Keenan. Court Reporter/Transcriber Ronald E. Tolkin, Official Court Reporter, Telephone number 718-613-2647. Email address: ronald_tolkin@nyed.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/19/2014. Redacted Transcript Deadline set for 3/3/2014. Release of Transcript Restriction set for 4/29/2014. (Tolkin, Ronald) (Entered: 01/29/2014) |
| 02/20/2014 | 160 | MOTION for Judgment NOV *pursuant to Fed.R.Crim.P. 29(c)* by Joseph Romano. (Bachrach, Michael) (Entered: 02/20/2014) |
| 03/10/2014 | 162 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Joseph Romano held on January 8, 2014, before Judge Keenan. Court Reporter/Transcriber Sherry Bryant, Telephone number 718-613-2636. Email address: sbryant102@verizon.net. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/31/2014. Redacted Transcript Deadline set for 4/10/2014. Release of Transcript Restriction set for 6/9/2014. (Bryant, Sherry) (Entered: 03/10/2014) |
| 03/10/2014 | 163 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Joseph Romano held on January 9, 2014, before Judge Judge Keenan. Court Reporter/Transcriber Sherry Bryant, Telephone number 718-613-2636. Email address: sbryant102@verizon.net. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/31/2014. Redacted Transcript Deadline set for 4/10/2014. Release of Transcript Restriction set for 6/9/2014. (Bryant, Sherry) (Entered: 03/10/2014) |

A-17

Eastern District of New York - LIVE Database V6.1          https://ecf.nyed.uscourts.gov/cgi-bin/DktRpt.pl?806920622244616-L_1_0-1

| | | |
|---|---|---|
| 03/10/2014 | 164 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Joseph Romano held on January 10, 2014, before Judge Judge Keenan. Court Reporter/Transcriber Sherry Bryant, Telephone number 718-613-2636. Email address: sbryant102@verizon.net. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/31/2014. Redacted Transcript Deadline set for 4/10/2014. Release of Transcript Restriction set for 6/9/2014. (Bryant, Sherry) (Entered: 03/10/2014) |
| 03/11/2014 | 165 | MEMORANDUM in Opposition re 160 MOTION for Judgment NOV *pursuant to Fed.R.Crim.P. 29(c)* (Miller, Marshall) (Entered: 03/11/2014) |
| 03/24/2014 | 166 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Joseph Romano held on 1/6/14, before Judge Keenan. Court Reporter/Transcriber G. Rudolph, Telephone number 718-613-2538. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/14/2014. Redacted Transcript Deadline set for 4/24/2014. Release of Transcript Restriction set for 6/23/2014. (Rudolph, Gene) (Entered: 03/24/2014) |
| 03/27/2014 | 167 | SENTENCING MEMORANDUM by Joseph Romano (Attachments: # 1 Exhibit A (mitigation letter from Karen Romano), # 2 Exhibit B (additional mitigation letters)) (Bachrach, Michael) (Entered: 03/27/2014) |
| 03/28/2014 | 168 | OPINION AND ORDER denying 160 Motion for Judgment NOV as to Joseph Romano (1); For the reasons stated above, Defendant's Rule 29 Motion is denied. Sentencing will proceed on 4/2/14 at 10:30 AM as scheduled. Ordered by Visiting Judge VJ-John F. Keenan on 3/27/2014. (Fernandez, Erica) (Entered: 03/28/2014) |
| 03/28/2014 | 169 | Letter *regarding sentencing* as to Joseph Romano (Dean, Una) (Entered: 03/28/2014) |
| 04/02/2014 | | Minute Entry for proceedings held before Visiting Judge VJ-John F. Keenan: Status conference held. Defendant Joseph Romano present with attorney George Goltzer; AUSA Marshall Miller present. Probation Officer Michael Dorra present. Sentencing is adjourned to 4/14/2014 at 10:30 AM in Courtroom 6A South before Visiting Judge VJ-John F. Keenan. (Court Reporter Allan Sherman.) (Fernandez, Erica) (Entered: 04/02/2014) |
| 04/14/2014 | | Minute Entry for proceedings held before Visiting Judge VJ-John F. Keenan:Sentencing held on 4/14/2014 for Joseph Romano (1), Count(s) 1-2. Defendant Joseph Romano present with attorney George Goltzer. AUSA Marshall Miller present.Incarceration: Life on each count. Counts are to run concurrently with each other and consecutively with sentence imposed under #09 Cr 170. Special Assessment: $200. (Court Reporter Mary Agnes Drury.) (Fernandez, Erica) (Entered: 04/16/2014) |
| 04/16/2014 | 171 | JUDGMENT as to Joseph Romano (1), Count(s) 1-2, Incarceration: Life on each count. Counts are to run concurrently with each other and consecutively with sentence imposed under #09 Cr 170. Special Assessment: $200. Ordered by Visiting Judge VJ-John F. Keenan on 4/14/2014. copies distributed electronically (Fernandez, Erica) |

| | | |
|---|---|---|
| | | (Entered: 04/16/2014) |
| 04/18/2014 | 173 | COURT EXHIBITS re Joseph Romano (Attachments: # 1 Court Exhibit April 14, 2014, # 2 Cour Exhibit April 2, 2014) (Fernandez, Erica) (Entered: 04/18/2014) |
| 04/25/2014 | 174 | NOTICE OF APPEAL by Joseph Romano re 171 Judgment, No fee paid. Appellant represented by CJA Attorney. Service done electronically. (Bachrach, Michael) Modified on 4/25/2014 to reflect CJA attorney and service. (McGee, Mary Ann). (Entered: 04/25/2014) |
| 04/25/2014 | | Electronic Index to Record on Appeal as to Joseph Romano sent to US Court of Appeals 174 Notice of Appeal - Final Judgment Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (McGee, Mary Ann) (Entered: 04/25/2014) |
| 05/30/2014 | 176 | TRANSCRIPT REQUEST by Joseph Romano as to Joseph Romano, Dejvid Mirkovic for proceedings held on April 2, 2014 & April 14, 2014 before Judge The Honorable John F. Keenan, (Bachrach, Michael) (Entered: 05/30/2014) |
| 05/30/2014 | | First Supplemental Electronic Index to Record on Appeal as to Joseph Romano sent to US Court of Appeals 174 Notice of Appeal - Final Judgment 176 Transcript Request - FORM B. (McGee, Mary Ann) (Entered: 05/30/2014) |
| 07/08/2014 | 177 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Joseph Romano held on 04-14-2014, before Judge Keenan. Court Reporter/Transcriber Mary Agnes Drury. Email address: mad78910@yahoo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/29/2014. Redacted Transcript Deadline set for 8/8/2014. Release of Transcript Restriction set for 10/6/2014. (Drury, Mary) (Entered: 07/08/2014) |
| 07/09/2014 | 178 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Joseph Romano before Judge Keenan. Court Reporter/Transcriber Mary Agnes Drury. Email address: mad78910@yahoo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/30/2014. Redacted Transcript Deadline set for 8/11/2014. Release of Transcript Restriction set for 10/7/2014. (Drury, Mary) (Entered: 07/09/2014) |
| 09/15/2014 | 179 | Letter *regarding violation of protective order* as to Joseph Romano (Attachments: # 1 Proposed Order, # 2 Exhibit A, # 3 Exhibit B) (Dean, Una) (Entered: 09/15/2014) |
| 09/15/2014 | 180 | Letter *regarding violation of protective order-unsealed without exhibits* as to Joseph Romano (Attachments: # 1 Proposed Order) (Dean, Una) Modified on 9/22/2014 (Marziliano, August). (Entered: 09/15/2014) |
| 09/19/2014 | 181 | ORDER as to Joseph Romano; The Second Circuit relieved Defendant's trial attorneys, George Goltzer and Michael Bachrach, and assigned Daniel Nooteras new |

A-19

Eastern District of New York - LIVE Database V6.1          https://ecf.nyed.uscourts.gov/cgi-bin/DktRpt.pl?806920622244616-L_1_0-1

| | | |
|---|---|---|
| | | counsel. See United States v. Romano, No. 14-1599, ECF Nos. 35 and 36 . As such, the clerk shall amend the docket in this action to reflect that (1) Mr. Goltzer and Mr. Bachrach no longer represent Mr. Romano; and (2) Mr. Nooter currently represents Mr. Romano. Mr. Nooter has until the close of business on September 22, 2014 to respond to the Government's September 15, 2014 letter. Ordered by Visiting Judge VJ-John F. Keenan on 9/18/2014. (Fernandez, Erica) (Entered: 09/19/2014) |
| 09/19/2014 | | Attorney update in case as to Joseph Romano. Attorney Michael K. Bachrach and George R. Goltzer terminated. (Fernandez, Erica) (Entered: 09/19/2014) |
| 09/22/2014 | 182 | RESPONSE in Opposition re 180 MOTION for Protective Order (Attachments: # 1 Exhibit 1 - Amended Protective Order.pdf, # 2 Exhibit 2 - Newsday article.pdf) (Marziliano, August) (Entered: 09/22/2014) |
| 09/23/2014 | 183 | REPLY TO RESPONSE to Motion re 180 MOTION for Protective Order *Motion for Sanctions* (Attachments: # 1 Exhibit A) (Dean, Una) (Entered: 09/23/2014) |
| 09/24/2014 | 184 | REPLY TO RESPONSE to Motion re 180 MOTION for Protective Order (Marziliano, August) (Entered: 09/24/2014) |
| 09/25/2014 | 185 | ORDER as to Joseph Romano; In view of the serious nature of the crimes that Mr. Romano was convicted of and his clear violation of the plain terms of the Court's Protective Order, the Court grants the relief requested by the Government. (see order for details). Ordered by Visiting Judge VJ-John F. Keenan on 9/24/2014. (Fernandez, Erica) (Entered: 09/25/2014) |
| 10/20/2014 | 186 | CJA 20 appointing Daniel S. Nooter to represent the Defendant Joseph Romano.. Ordered by Visiting Judge VJ-John F. Keenan on 9/19/2014 Nunc Pro Tuct Date. (Marziliano, August) (Entered: 10/20/2014) |
| 11/20/2014 | 187 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 25, receipt number 0207-7349103. by Joseph Romano. (Attachments: # 1 Exhibit Certificate of Good Standing, # 2 Proposed Order) (Nooter, Daniel) (Entered: 11/20/2014) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 01/27/2015 13:35:20 | | |
| **PACER Login:** | dannooteresq:3567836:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:12-cr-00691-JFK |
| **Billable Pages:** | 14 | **Cost:** | 1.40 |

JJD:MPC
F.#2012R01316

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

JOSEPH ROMANO and
DEJVID MIRKOVIC,
    also known as
    "Dave Mirkovic,"
    "David Mirkovic" and
    "Dejuid Mirkovic,"

               Defendants.

- - - - - - - - - - - - - - - - - -X

I N D I C T M E N T

Cr. No.

(T. 18, U.S.C., §§
981(a)(1)(G)(iii),
1117 and 3551 et seq.;
T. 21, U.S.C., § 853(p);
T. 28, U.S.C., § 2461(c))

THE GRAND JURY CHARGES:

<u>COUNT ONE</u>
(Conspiracy to Murder An Employee of the United States)

    1.    On or about and between February 1, 2012 and

October 9, 2012, both dates being approximate and inclusive,

within the Eastern District of New York and elsewhere, the

defendants JOSEPH ROMANO and DEJVID MIRKOVIC, also known as "Dave

Mirkovic," "David Mirkovic" and "Dejuid Mirkovic," together with

others, did knowingly and intentionally conspire to kill an

officer and employee of the United States and of an agency in a

branch of the United States Government, to wit: a United States

District Judge for the Eastern District of New York, whose

identity is known to the Grand Jury (the "Judge"), while such

officer and employee was engaged in, and on account of the

performance of, official duties, contrary to Title 18, United States Code, Section 1114.

2.   In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants JOSEPH ROMANO and DEJVID MIRKOVIC, also known as "Dave Mirkovic," "David Mirkovic" and "Dejuid Mirkovic," together with others, did commit and cause to be committed, among others the following:

<u>OVERT ACTS</u>

a.   On or about August 21, 2012, ROMANO held a meeting at the Nassau County Correctional Center (the "NCCC") with an individual posing as a hitman, who in fact was an undercover police officer (the "UC").

b.   On or about September 5, 2012, ROMANO directed MIRKOVIC to call the UC to set up a meeting.

c.   On or about September 10, 2012, ROMANO met with the UC at the NCCC.

d.   On or about September 14, 2012, MIRKOVIC delivered $1,500 to an individual posing as an associate of the UC, but who in fact was another undercover police officer.

e.   On or about September 25, 2012, MIRKOVIC flew from Florida to New York.

f.   On or about September 25, 2012, MIRKOVIC paid the UC $1,500.

-2-

A-22

g.   On or about September 25, 2012, MIRKOVIC and ROMANO met at the NCCC.

h.   On or about September 25, 2012, MIRKOVIC paid $12,000 to the UC.

i.   On or about September 25, 2012, MIRKOVIC indicated to the UC that the $12,000 was a partial down payment for the murders of the Judge and an Assistant United States Attorney for the Eastern District of New York, whose identity is known to the Grand Jury (the "AUSA").

j.   On or about October 2, 2012, MIRKOVIC flew from Florida to New York.

k.   On or about October 2, 2012, MIRKOVIC paid $10,000 to the UC.

l.   On or about October 2, 2012, MIRKOVIC indicated to the UC that the $10,000 was a final down payment for the murders of the Judge and the AUSA.

m.   On or about October 5, 2012, MIRKOVIC withdrew $9,800 from a bank account.

n.   On or about October 9, 2012, MIRKOVIC stored $18,000 in a safe at his residence.

(Title 18, United States Code, Sections 1117 and 3551 et seq.)

-3-

<u>COUNT TWO</u>
(Conspiracy to Murder An Employee of the United States)

3.    On or about and between February 1, 2012 and October 9, 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JOSEPH ROMANO and DEJVID MIRKOVIC, also known as "Dave Mirkovic," "David Mirkovic" and "Dejuid Mirkovic," together with others, did knowingly and intentionally conspire to kill an officer and employee of the United States and of an agency in a branch of the United States Government, to wit: the AUSA, while such officer and employee was engaged in, and on account of the performance of, official duties, contrary to Title 18, United States Code, Section 1114.

4.    In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants JOSEPH ROMANO and DEJVID MIRKOVIC, also known as "Dave Mirkovic," "David Mirkovic" and "Dejuid Mirkovic," together with others, did commit and cause to be committed the overt acts set forth in Count One of this Indictment, which are fully incorporated by reference.

(Title 18, United States Code, Sections 1117 and 3551 <u>et seq</u>.)

<u>CRIMINAL FORFEITURE ALLEGATION</u>

5.    The United States hereby gives notice to the defendants that, upon conviction of the above-charged offenses,

-4-

the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(G)(iii) and Title 28, United States Code, Section 2461(c)(1), which require the forfeiture of all assets, foreign or domestic, derived from, involved in, or used or intended to be used to commit any Federal crime of terrorism (as defined in Title 18, United States Code, Section 2332b(g)(5)), namely violations of Title 18, United States Code, Sections 1114 and 1117, against the United States, citizens or residents of the United States or their property, including but not limited to:

      a.    All funds or other monetary instruments on deposit or credited to or through Wells Fargo Bank, Account Number 2000054050266 held in the name of UNIVERSAL COIN COLLECTIONS, INC., including the amount of $100,268.03 seized on October 9, 2012 and all proceeds traceable thereto;

      b.    All funds or other monetary instruments on deposit or credited to or through REGIONS BANK, Account Number 0128662008 held in the name of UNIVERSAL COIN COLLECTIONS, INC./DEJUID MIRKOVIC, including the amount of approximately $48,000 seized on October 11, 2012 and all proceeds traceable thereto;

      c.    United States currency in the sum of forty three thousand dollars and no cents ($43,000.00) which was seized from the defendant DEJVID MIRKOVIC in the following increments:

-5-

$1,500 seized on or about September 14, 2012; $13,500 seized on or about September 25, 2012; $10,000 seized on or about October 2, 2012 and $18,000 seized on or about October 9, 2012;

      d.   One 2012 Honda Accord, VIN 1HGCP2F8XCA082272 registered to the defendant DEJVID MIRKOVIC and Jane Doe, an individual whose identity is known to the Grand Jury, seized on October 9, 2012;

      e.   One 2012 Mercedes C-Class, VIN WDDGJ7HB6CF776859, registered to the defendant DEJVID MIRKOVIC seized on October 9, 2012;

      f.   One Kel Tec Kahr 9mm semi-automatic handgun, serial number 56044; one Finar rifle, serial number 319MP05602; one Springfield Arms Socom 16 rifle, serial number 241812; and one Mossberg 500 shotgun, serial number T545186, all seized on or about October 9, 2012; and

      g.   United States currency in the sum of nine thousand dollars and no cents ($9,000) which was seized from Jane Doe on or about October 9, 2012.

      6.   If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

      a.   cannot be located upon the exercise of due diligence;

      b.   has been transferred or sold to, or deposited with, a third party;

-6-

A-26

        c.    has been placed beyond the jurisdiction of the Court;

        d.    has been substantially diminished in value; or

        e.    has been commingled with other property, which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c)(1), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

        (Title 28, United States Code, Section 2461(c); Title 18, United States Code, Section 981(a)(1)(G)(iii); Title 21, United States Code, Section 853(p))

                              A TRUE BILL

                              FOREPERSON

LORETTA E. LYNCH
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

No.

# UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

## CRIMINAL DIVISION

## THE UNITED STATES OF AMERICA

*vs.*

JOSEPH ROMANO and DEJVID MIRKOVIC,
also known as "Dave Mirkovic,"
"David Mirkovic" and "Dejuid Mirkovic,"

Defendants.

## INDICTMENT

T. 18, U.S.C., §§ 981(a)(1)(G)(iii), 1117
and 3551 et seq.; T. 21, U.S.C., § 853(p);
T. 28, U.S.C., § 2461(c)

_____
                                                        *Foreman*

*A true bill.*

_____

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 20* _____

_____
                                                        *Clerk*

*Bail,* $ _____

**Michael P. Canty, Assistant United States Attorney, (631) 715-2874**

F.#2012R01316
FORM DBD-34
JUN. 85

A-28

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------X

UNITED STATES OF AMERICA

    -  against  -                            **AFFIDAVIT**

JOSEPH ROMANO,                     **CR 12-691 (JFK)**

                   Defendant.

---------------------------------------------------X
STATE OF NEW YORK    )

                       )     ss.:

NASSAU COUNTY       )

       Joseph Romano, being duly sworn, deposes and says:

1. I am the defendant in the above captioned case.

2. I submit this affidavit in support of the requested relief in my motion to suppress statements sought to be used at my upcoming trial.

3. My attorney, Joseph Kilada, Esq., has prepared this affidavit for me but the facts contained herein are true.

4. On October 9, 2012, I was visited by members of Federal and State Law Enforcement at the GEO detention facility in Queens, New York.

5. I was placed in handcuffs and told that I was being arrested for a plot to kill a judge and a prosecutor and that I would be facing a lengthy prison term unless I cooperated.

6. I was very scared and confused as to what was going on and told my interrogators that I wanted a lawyer.

7. I was taken from the GEO facility in handcuffs and placed in a police car. During this time even though I had requested an attorney, I was still subjected to many questions.

Case 14-1588, Document 52, 02/04/2015, 1430314, Page31 of 195

A-29

Case 1:12-cr-00691-JFK   Document 31-3   Filed 02/19/13   Page 2 of 2 PageID #: 147

8. I was told that I should cooperate and that now was my chance to cooperate against who would ultimately be my co-defendant, Dejuid Mirkovic, otherwise, I would face a severe criminal sentence

9. The questions continued non-stop as I was driven from the GEO detention center to the F.B.I. offices in Melville, New York.

10. After we arrived in Melville, the agents continued to ask me, where is Mirkovic, and why does Mirkovic hate the judge and prosecutor?

11. I was told that if I talked to them, then everything would go the right way.

12. The questions continued as I was asked if I knew of any other criminal activity. I was very scared and confused as the questioning continued nonstop.

13. At some point during the questioning which by this point had continued for some time, I was given a Miranda waiver to sign. I did as law enforcement instructed, and signed the card. I was later brought to court.

14. I did not knowingly waive my Miranda rights and I did not knowingly and voluntarily make statements to the police.


Dated: Nassau County, New York

   February 19, 2013


Joseph Romano

J.R. Cox - Direct/Ms. Dean                    24

1  answering him and he told him that David Mirkovic was in the

2  same situation as him; that there were agents in Florida

3  arresting him, also.

4  EXAMINATION BY

5  MS. DEAN:

6  (Continuing.)

7  Q    You said that when the defendant was initially taken

8  into your custody at Queens G.E.O., he wasn't specifically

9  told why he was being taken into custody or what was

10 happening.

11               In the car ride at any point was he, in fact,

12 told what was happening?

13 A    It was clear that from Agent Heslin's description that

14 he was -- the good news and bad news -- that he had been

15 meeting with an undercover regarding the plot to kill the

16 judge; that he was under arrest, and at some point we thought

17 -- I think, in the beginning, we had a warrant for him.

18 Q    Now, did the issue of cooperation come up during that

19 car ride?

20 A    Yes.

21 Q    How did it come up?

22 A    When Mr. Romano was talking, Agent Heslin said, "You

23 know, we're going to go back to our office, I think the best

24 thing to do would be cooperative in this case.  We really

25 have all the evidence."  As I said, we were meeting with an

J.R. Cox - Direct/Ms. Dean                    25

1   undercover, that you had been meeting with an undercover so

2   we already know all the facts and circumstances of the case.

3   Q    Did the defendant ask any questions about cooperation?

4   A    I don't remember anything specifically.

5   Q    Did the defendant participate in that part of the

6   conversation regarding cooperation?

7   A    He did because I remember Agent Heslin telling him, "You

8   know, listen I don't care what you do.  At the end of the

9   day, I'm going out with my wife later.  I have tickets to a

10  Broadway show, you know, so what you did doesn't matter to me

11  as long as we get out of here on time."

12  Q    And did the defendant respond?

13  A    Later in the conversation, I think it was after five or

14  ten minutes had past or later in the car ride, he said to

15  Agent Heslin, "So what show are you going to?"

16  Q    What show meaning the tickets that --

17  A    Right.

18  Q    -- that Special Agent Heslin referred to?

19  A    That he was going to with his wife.

20  Q    Did Special Agent Heslin respond?

21  A    Yes, he said, "War Horse" at Lincoln Center.

22  Q    Now, what was special agent --

23       Can you describe Special Agent Heslin's

24  demeanor during this part of the conversation when

25  cooperation was being spoken about?

J.R. Cox - Direct/Ms. Dean                    26

1   A    Again, he was very calm, matter of fact, threw it out

2   there.  Sort of like shrugged his shoulders, you know, I

3   don't really care what you do but this is what I think, you

4   know, this is one of your options.

5   Q    Was the defendant told that he had no other choice but

6   to cooperate?

7   A    No.

8   Q    Was the defendant pressured to cooperate?

9          MR. GOLTZER:  Objection.

10         THE COURT:  Just tell us what you or the other two

11  law enforcement agents did or said.

12         MS. DEAN:  I'll withdraw that question, your Honor.

13  Q    Was the defendant promised anything if he did cooperate?

14  A    No.

15  Q    And, again, can you describe the tone of the

16  conversation between Special Agent Heslin and the defendant?

17         MR. GOLTZER:  Objection, repetitive.

18         THE COURT:  Overruled.

19  A    It was very calm.

20  Q    Now, you mentioned that the defendant appeared calm;

21  that the tone seemed conversational.  At any point during the

22  car ride, did the defendant get upset or animated?

23  A    He got a little more animated when he talked about his

24  unfair treatment, that he felt he got unfair treatment from

25  the courts in his underlying coin case.

J.R. Cox - Cross/Mr. Goltzer                     57

1    A    I don't follow.

2    Q    He was given information about the cooperation process?

3    A    Yes.

4    Q    What information did Agent Heslin give him about the

5    cooperation process in the automobile?

6    A    He was told that we were going back to the FBI office in

7    Melville.  And we got there, we sit down, we'd like him to be

8    cooperative, and we thought that that would be the best

9    avenue for Mr. Romano to take.

10   Q    Did Mr. Romano say anything such as, "Why would that be

11   good for me?"

12   A    I don't remember that in the car.

13   Q    Did Mr. Romano -- did he ever say anything?

14   A    I'm not sure.  I don't recall specifically.

15   Q    Did Mr. Romano ever ask, "What's in it for me if I

16   cooperate?"

17   A    I think during the interview at Melville he had asked

18   about that.

19   Q    What did he ask?

20   A    You know, what can I cooperate with and, basically, was

21   there any information he might about other crimes.

22   Q    What did he ask?  What's in it for me, I'm already doing

23   15 years what can I get for this?

24   A    No.

25   Q    Never said it?

```
                J.R. Cox - Cross/Mr. Goltzer              58

1    A    No.

2    Q    Anybody ever tell him what he was facing for the

3    conspiracy to kill a federal judge?

4    A    No.

5    Q    No one ever mentioned sentence to him?

6    A    No.

7    Q    No one ever told him that he could spend the rest of his

8    life in Terra Haute, Indiana?

9    A    No.

10   Q    Did anyone ever told him what benefit he could get from

11   cooperation?

12   A    Only that it would be made known to the prosecutors and

13   the judge.

14   Q    And did he ask you what the judge could do for him about

15   his 15-year sentence?

16   A    No.

17   Q    Did he ask you what the prosecutor could do for him

18   about his 15-year sentence?

19   A    No.

20   Q    Anybody ever mention a 5K letter?

21   A    No.

22   Q    Anybody ever tell him that he needed to make his

23   decision before the guy went to the theater?

24   A    No.

25   Q    When Agent Heslin said, "I don't care what you do but I
```

```
                  J.R. Cox - Cross/Mr. Goltzer              64
```

1    A    Yes.

2    Q    You don't text either?

3    A    Generally, no.

4    Q    But there was nothing to prevent you from making notes

5    in the car ride conversations when you got back to Melville?

6    A    Correct.

7    Q    In fact, there were FBI 302s prepared over a month and a

8    half after the interviews at Melville; right?

9    A    I'm not sure.

10   Q    Weren't they prepared November 27th concerning an

11   October 9th interview?

12   A    I don't know the date.

13   Q    But it was some time ago that they finally typed up the

14   302s?

15   A    I'm not sure when they typed them up.  I would have to

16   look.

17   Q    But it wasn't the same day?

18   A    No.

19   Q    And you've seen the 302s?

20   A    Yes.

21   Q    The cooperation issue came up during the car ride?

22   A    Yes.

23   Q    It came up again during the Melville interview?

24   A    Yes.

25   Q    And it came up as part of the three-page signed

J.R. Cox - Cross/Mr. Goltzer                    65

1   statement?

2   A    Yes.

3   Q    You were asked about a three-page signed statement on

4   direct examination by the prosecutor.

5              You were present when that statement was

6   physically prepared?

7   A    No.  Well, I was present with Mr. Romano.  Agent Heslin

8   left the room and wrote the statement and then brought it

9   back and reviewed it with Mr. Romano.

10  Q    That was going do be my next question.

11             With respect to the three-page statement, it

12  was not written in Mr. Romano's hand?

13  A    Correct.

14  Q    With respect to the three-page statement, Mr. Romano

15  wasn't even with Agent Heslin when he composed it?

16  A    Correct.

17  Q    You're sure that Agent Heslin composed the three-page

18  statement?

19  A    That's my understanding.  I wasn't there when he

20  actually wrote it out.

21  Q    Did you have a chance to read it prior to the time that

22  Mr. Romano signed it?

23  A    I did not.  However, it was reviewed with Mr. Romano and

24  I think I read it out loud.

25  Q    But the language in it, to your knowledge, was

J.R. Cox - Cross/Mr. Goltzer                    66

1    Agent Heslin's language?

2    A    Correct.

3    Q    And we'll come back to that but let me back up for a

4    minute.  There came a point when you got to the Melville

5    headquarters that the Miranda warnings were read to

6    Mr. Romano?

7    A    Yes.

8    Q    And they were read to him by Agent Heslin?

9    A    Yes.

10   Q    And you were asked by the prosecutor to read them to the

11   Court for purposes of this record at this hearing; is that

12   correct?

13   A    Yes.

14   Q    And would it be fair to say that Agent Heslin read them

15   in substantially the same manner and pace that you read them

16   to Judge Keenan?

17   A    Yeah, it was very deliberate.  I can't say it was --

18   approximately.

19   Q    A little slower perhaps?

20   A    Maybe.

21   Q    Maybe not.

22             Would you agree that it took you about a

23   minute to read those statements?

24   A    Yes.  Maybe two.

25   Q    The first notation on the timing is 9:14 in the morning?

J.R. Cox - Cross/Mr. Goltzer                    80

1   the document to refresh your recollection I'm sure there is

2   no objection from the Government or the Court.

3              You've indicated that the language of this

4   three-page statement was composed by Special Agent Heslin in

5   your absence?

6   A    Correct.

7   Q    To your knowledge, it was done without consultation with

8   you?

9   A    Correct.

10  Q    And it was done without consultation in your presence

11  with Mr. Romano?

12             MS. DEAN:  Objection.

13             THE COURT:  Could you read that back, please, to me

14  I was looking at something.

15             (The requested portion of the record was read back

16  by the Official Court Reporter.)

17             THE COURT:  Overruled.  You may answer.

18             THE WITNESS:  I don't understand the question.

19  Q    In other words, there were conversations with Mr. Romano

20  for a period of about an hour?

21  A    Yes.

22  Q    In that interview room?

23  A    Yes.

24  Q    And then Agent Heslin left the room?

25  A    Prior to that hour, it was some time in that time period

```
                    J.R. Cox - Cross/Mr. Goltzer              81
```

1    maybe a half hour or so.

2    Q    But he left the room without a written statement?

3    A    Correct.

4    Q    He left Mr. Romano in the room while he left?

5    A    Correct.

6    Q    And he came back with a written statement?

7    A    Yes.

8    Q    So it was obvious that Mr. Romano and he didn't discuss

9    the composition of the written statement?

10   A    Correct.  They discussed what's in the statement

11   beforehand.

12   Q    Okay.

13            And, in the statement, would you agree that

14   there are some references to the term "cooperation"?

15   A    Yes.

16   Q    For example, in the third numbered paragraph, do you

17   recall whether it states, "I have agreed to cooperate with

18   the FBI and provide statements about crimes I know about and

19   crimes in which I was personally involved."

20   A    Yes.

21   Q    Would you agree that on the second page it says, under

22   Roman numeral five, "I am willing to provide information I

23   acquired while incarcerated regarding," something?

24   A    Yes.

25   Q    Would you agree that under Roman numeral six it says in

J.R. Cox - Cross/Mr. Goltzer                    82

1   writing, if you recall, "I am willing to provide information

2   about other," and then there's more --

3   A    Mm-hmm.

4   Q    -- substantive information; right?

5   A    Correct.

6   Q    And under Roman numeral seven, "I am willing to provide

7   information about," and there is more substantive

8   information; is that correct?

9   A    Yes.

10            THE COURT:  Could I get something straight?  I just

11  want to make sure I understand.

12               Agent Heslin wrote what is on Defense Exhibit

13  A for identification.

14            THE WITNESS:  Yes.

15            THE COURT:  That's the one that's in front of you;

16  right?

17            THE WITNESS:  Yes.

18            THE COURT:  Heslin wrote that; right?

19            THE WITNESS:  Yes.

20            THE COURT:  Okay.  He wrote that after the Advice

21  of Rights Form was signed; right?

22            THE WITNESS:  Correct.

23            THE COURT:  Okay.

24               How long after the Advice of Rights Form was

25  signed by the defendant and you and Heslin, as best you

J.R. Cox - Cross/Mr. Goltzer                    83

1   remember, was it that Heslin left the room and wrote that?

2           THE WITNESS:  I would say maybe half hour,

3   40 minutes but it's a guesstimate.  I didn't notate the time.

4           THE COURT:  In the period between the ending of the

5   Advice of Rights Form and Heslin leaving the room, that's

6   when the defendant was questioned about the case before us

7   here; right?

8           THE WITNESS:  Yes.

9           THE COURT:  Okay.  Thank you.

10  EXAMINATION BY

11  MR. GOLTZER:

12  (Continuing.)

13  Q    But prior to the time that Mr. Romano was questioned

14  about the case here, there were discussions with him about

15  cooperation?

16  A    Yes.

17  Q    And the discussions about cooperation began in the car?

18  A    Yes.

19  Q    And the discussions about cooperation began in the car

20  during an hour-long ride between G.E.O. and Melville?

21  A    Yes.

22  Q    And the discussions about cooperation took place prior

23  to the provision of any of the so-called Miranda warnings;

24  right?

25  A    Correct.

J.R. Cox - Cross/Mr. Goltzer                    84

1   Q    And then there were discussions about cooperation that

2   continued after the Miranda warnings were given?

3   A    Correct.

4   Q    So cooperation was discussed during the hour in the car?

5   A    Yes.

6   Q    Cooperation was discussed during the period of time --

7            By the way, how long was he in the room before

8   he was given the Miranda waiver?

9   A    Just a few minutes.

10  Q    During that few minutes, were there any conversations?

11  A    No.

12  Q    And the discussions about --

13  A    Excuse me.  There was -- he asked me to see the arrest

14  warrant, and I showed him the arrest warrant.

15  Q    And that was before the Miranda warnings were provided?

16  A    Yes.

17  Q    And you can't recall all of the conversations that took

18  place about cooperation in the car?

19  A    The cooperation in the car was offered as an avenue he

20  could take.  There weren't specifics because we didn't

21  discuss specifically what he might have until we interviewed

22  him.

23  Q    But the concept of cooperation to help himself was

24  discussed in the car?

25  A    Yes.

J.R. Cox - Cross/Mr. Goltzer                    85

1   Q    And you don't recall whether he asked any questions

2   about it, he being Mr. Romano?

3   A    I recall him answering questions but I believe he

4   probably did.

5   Q    You believe that Mr. Romano asked questions about the

6   cooperation process in the car before he was Mirandized?

7   A    Yeah, he certainly may have.  I just don't have a

8   recollection of it.

9   Q    So there are conversations between Mr. Romano and

10  Special Agent Heslin in the car about cooperation that you

11  simply don't recall and didn't write anything about?

12  A    As I said, what I recall is Mr. Heslin floating it out

13  there as an avenue he could take to hopefully help himself

14  because, as far as our case went, we pretty much had it

15  wrapped up.

16  Q    But that's as much as you recall?

17  A    Yeah.

18  Q    And you now remember that there are things you probably

19  don't recall about cooperation being discussed?

20  A    Yeah, I actually don't recall anything else being

21  discussed.

22  Q    But you're not disputing that there probably were things

23  discussed about cooperation that you didn't note?

24  A    I didn't note anything in the car because there was

25  nothing significant.

J.R. Cox - Redirect/Ms. Dean                90

1              THE WITNESS:  Yes.

2              MR. GOLTZER:  For identification.

3              THE COURT:  Yes, for identification.

4     EXAMINATION BY

5     MS. DEAN:

6     (Continuing.)

7     Q    And references to the defendant agreeing to cooperate in

8     that three-page written statement.

9                     Do you recall those questions?

10    A    Yes.

11    Q    And you testified that this written statement was

12    drafted outside of your presence and outside of the

13    defendant's presence?

14    A    Yes.

15    Q    Prior to the statement being drafted, did the defendant,

16    in fact, agree to cooperate with law enforcement?

17    A    Yes, he was being cooperative at the time and

18    thereafter.

19    Q    And did the defendant agree to cooperate with law

20    enforcement or express a desire to cooperate?

21    A    Yes.

22    Q    As opposed to being cooperative?

23    A    He was being cooperative and that led to him cooperating

24    in the interview.

25    Q    And when you say, "He expressed a desire to cooperate,"

J.R. Cox - Redirect/Ms. Dean                    91

1   what do you mean?

2   A    Those were your words.  He was being cooperative was

3   during the interview and he wanted to cooperate with anything

4   any other crimes that he knew about.

5   Q    And he said that he wanted to cooperate about any other

6   crimes that he knew about?

7   A    Yes.

8   Q    Now, you were also asked about Government Exhibit 1, the

9   Advice of Rights Form, that the defendant signed.

10           Prior to the defendant signing this form, were

11  there any questions asked of him about the murder plot?

12  A    No.

13  Q    Now -- sorry to be jumping back and forth -- we're going

14  to this three-page written statement.

15           You said it was approximately 30 to 40 minutes

16  after the defendant was Mirandized that this statement was

17  drafted; is that correct?

18  A    That's my best guesstimate because I didn't know the

19  time.

20  Q    Okay.

21           Based on what information was this written

22  statement drafted?

23  A    Based on the information that Mr. Romano had given after

24  we Mirandized him up until the point Mr. Heslin left the room

25  to write the statement.

J.R. Cox - Recross/Mr. Goltzer                92

1        MR. GOLTZER:  I'm going to move to strike the

2   answer because it calls for the operation of Agent Heslin's

3   mind and he's not present.

4        THE COURT:  I'll let the answer stand.  None of

5   this going s going to come in at trial anyhow.

6            Go ahead.

7        MS. DEAN:  One moment, your Honor.

8        THE COURT:  Okay.

9        MS. DEAN:  Nothing further.

10       MR. GOLTZER:  May I briefly recross?

11       THE COURT:  Yes.

12  RECROSS-EXAMINATION

13  BY MR. GOLTZER:

14  Q    There is a process known as "The Cooperation Process"?

15  A    Correct.

16  Q    You are familiar with it?

17  A    Yes.

18  Q    You have sat through many proffers?

19  A    Yes.

20  Q    You know the difference between being cooperative by

21  answering questions and in engaging in a process of

22  cooperation with an Assistant United States Attorney and his

23  or her office?

24  A    Correct.

25  Q    That requires a series of proffers?

J.R. Cox - Recross/Mr. Goltzer                    93

1   A    Generally, yes.

2   Q    And it results in, hopefully, a cooperation agreement

3   for the defendant?

4   A    Yes.

5   Q    And one cannot enter into a cooperation agreement with

6   law enforcement?

7   A    Correct.

8   Q    One can only enter into an agreement with a

9   prosecutorial office?

10  A    Yes.

11  Q    Was that process explained to Mr. Romano in the car, if

12  you recall?

13  A    No.

14  Q    In the interrogation room?

15  A    No.

16  Q    I ask you, again, whether Mr. Romano was told about any

17  benefit that could accrue to him during the ride, if you

18  recall?

19  A    Just that it would be made known during the ride or

20  later on?

21  Q    During the ride?

22        THE COURT:  He said during the ride.

23  A    No.

24  Q    Was he told to what end any benefit?

25  A    That would be made known to the prosecutor and the judge

```
                 J.R. Cox - Recross/Mr. Goltzer              94
```

1    eventually.

2    Q    For what purpose?

3    A    If he was cooperative.

4    Q    For what purpose?

5    A    I think that was understood.  I don't think anybody said

6    to.

7    Q    Did he ask?

8    A    I don't recall him asking.

9              MR. GOLTZER:  Nothing further.

10             THE COURT:  Anything else.

11             MS. DEAN:  No, your Honor.

12             THE COURT:  Thank you.  Does the Government have

13   any other witnesses?

14             MS. DEAN:  No, your Honor, the Government rests.

15             THE COURT:  All right.  Go ahead.

16             MR. GOLTZER:  Defense rests.

17             THE COURT:  Defense rests.  All right.

18                 You can step down.

19             (Witness takes the witness stand.)

20             MR. GOLTZER:  It might be useful to submit a

21   memorandum.

22             THE COURT:  You want to?  All right.  We'll do it

23   contemporaneously, not one side and then the other.  How long

24   do you need?

25             MR. GOLTZER:  Mr. Bachrach is the one who loves to

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------X
UNITED STATES OF AMERICA      :
                              :
     -against-                :        No. 12 Cr. 691 (JFK)
                              :        **OPINION & ORDER**
JOSEPH ROMANO,                :
                              :
              Defendant.      :
-----------------------------X

APPEARANCES

FOR UNITED STATES OF AMERICA
Eric H. Holder, Jr.
  Attorney General of the United States
William J. Hochul, Jr.
  United States Attorney, Western District of New York
By:  Marshall L. Miller
     Una A. Dean

FOR DEFENDANT JOSEPH ROMANO
George R. Goltzer
Michael K. Bachrach


**JOHN F. KEENAN, United States District Judge:**

     Before the Court is Defendant Joseph Romano's motion to
suppress his post-arrest statements.  For the reasons that
follow, the motion is denied.


                    **I.   Background**

     Defendant has been charged with conspiracy to murder a
United States District Judge (the "Judge") and an Assistant
United States Attorney (the "AUSA") in violation of Title 18,
United States Code, Sections 1114 and 1117.  The Government
alleges that Defendant planned to hire one or more purported

                              1

"hit men" to murder the Judge, who had sentenced Defendant for his participation in a fraud relating to the telemarketing and sale of coins, as well as the AUSA, who had prosecuted the coin fraud case.  Defendant's trial is scheduled to begin on December 2, 2013.

### A.   Defendant's Suppression Motion and Affidavit

On February 19, 2013, as part of his pretrial omnibus motions, Defendant moved to suppress "any and all statements allegedly made by him to law enforcement." (Def. Mot. of Feb. 19, 2013 at 8.)  He asserted that the agents who arrested him on October 9, 2012 "refus[ed] to cease questioning after he made an unequivocal statement that he wished to remain silent." (Id. at 11.)  In connection with this motion, Defendant submitted a sworn affidavit, which states in relevant part:

> 5.  I was placed in handcuffs and told that I was being arrested for a plot to kill a judge and a prosecutor and that I would be facing a lengthy prison term unless I cooperated.
> 6.  I was very scared and confused as to what was going on and told my interrogators that I wanted a lawyer.
> 7.  I was taken from the GEO facility in handcuffs and placed in a police car.  During this time even though I had requested an attorney, I was still subjected to many questions.
> [...]
> 9.  The questions continued non-stop as I was driven from the GEO detention center to the F.B.I. offices in Melville, New York.

2

> 10.  After we arrived in Melville, the agents
> continued to ask me, where is Mirkovic,[1] and why does
> Mirkovic hate the judge and prosecutor?

(Def. Aff. of Feb. 19, 2013.)  The affidavit concludes by

stating that although Defendant signed the waiver of his <u>Miranda</u>

rights, which the affidavit describes as a "card," he "did not

knowingly waive [his] Miranda rights and [he] did not knowingly

and voluntarily make statements to the police." (<u>Id.</u>)

Soon after Defendant's omnibus motions were filed, former

defense counsel raised the issue of Defendant's competence to

assist in his own defense. (ECF No. 41.)  Ultimately, Defendant

was examined by an expert selected by the parties, clinical

psychologist Barry Rosenfeld, who issued two reports deeming

Defendant fully competent to stand trial and to assist in his

own defense.  Neither the Government nor the defense objected to

the reports, and the Court made the finding that Defendant was

competent to stand trial and to assist his attorneys. (Evid.

Hearing Tr. at 5.)

### B.  The Evidentiary Hearing

This Court held an evidentiary hearing on Defendant's

suppression motion on July 9, 2013.  The Government called James

Randolph Cox, a Criminal Investigator with the U.S. Attorney's

Office for the Eastern District of New York.  Along with FBI

───────────────

[1] Dejvid Mirkovic, Defendant's alleged co-conspirator, has pleaded
guilty.

3



Special Agent Edward Heslin and FBI Task Force Officer George Davis, Investigator Cox participated in Defendant's arrest and interview, and was present at all times relevant to Defendant's motion.  Cox testified that about 8:00 A.M. on October 9, 2012, the agents arrived at the Queens Private Detention Facility (sometimes referred to as "Queens G.E.O." or "the G.E.O. facility") where Defendant was incarcerated in connection with his coin fraud conviction.  Shortly thereafter, the agents arrested Defendant and took him into their custody. (Evid. Hearing Tr. at 15.)  Cox testified that at that time, Defendant was told nothing about the new charges against him, nor was he questioned at all about the charges. (Id. at 16-17, 52.)  Cox did hear a short exchange between Defendant and Officer Davis while Davis handcuffed Defendant.  He believed that they were discussing the placement of Defendant's handcuffs. (Id. at 48.)

After the agents took Defendant into their custody, they drove him to the FBI field office in Melville, which took from about 8:10 A.M. to shortly after 9:00 A.M. (Id. at 18, 53.) According to Cox, it was during this drive that Defendant asked what was going on; Special Agent Heslin replied that Defendant "had been meeting an undercover agent in the jail," and that the agents had uncovered the charged conspiracy. (Id. at 19.)  Cox characterized Defendant's reaction to this revelation as "very calm, nonplussed," and stated that Defendant did not appear to

4

be confused or nervous. (Id. at 20.)  After a period of silence
during the drive, Cox testified to sporadic conversations
between Defendant and the agents, the topics of which included
Defendant's co-conspirator, David Mirkovic; Defendant's
perceptions of unfair treatment during his coin fraud
prosecution; and even the Broadway show that Agent Heslin
planned to see later that evening with his wife.

Cox also recalled some discussion of the potential for
Defendant to cooperate.  According to him, "Agent Heslin said,
'You know, we're going to go back to our office, I think the
best thing to do would be [to be] cooperative in this case.  We
really have all the evidence.'" (Id. at 24.)  After some
conversation, Agent Heslin said, "'You know, listen I don't care
what you do.  At the end of the day, I'm going out with my wife
later.  I have tickets to a Broadway show, you know, so what you
did doesn't matter to me as long as we get out of here on
time.'" (Id. at 25.)  Cox testified that the agents did not
promise Defendant anything in exchange for his cooperation, (id.
at 26), but did tell him that any cooperation "would be made
known to the prosecutors and the judge," (id. at 58).  Cox
characterized the tone of this exchange as "very calm." (Id. at
26.)

Cox testified unequivocally that the agents did not ask
Defendant any questions regarding the charged conspiracy, nor

5

did they attempt to elicit any admissions from him, during the
car ride. (Id. at 27.)  He also stated that Defendant never
asked for an attorney during this period. (Id. at 28.)  Indeed,
Cox described Defendant's demeanor in the car as consistently
calm, except for one instance when Defendant became "a little
more animated," and "angry" while talking about his treatment in
the coin fraud case. (Id. at 26-27.)  Defendant made no
admissions to the agents, either during his remarks about the
underlying coin case or at any other time during the ride. (Id.
at 27.).

     After they arrived at the FBI field office in Melville,
Defendant was uncuffed and escorted to an interview room.  Cox
testified that Defendant asked to see a copy of his arrest
warrant, which Cox showed to him. (Id. at 29, 84.)  Defendant
was then given a Miranda warning, which was memorialized on a
FBI "Advice of Rights" form that was received into evidence at
the hearing. (Id. at 29-30.)  At the top of the form, Heslin
wrote in "10/9/12," "LIRA," denoting the Long Island field
office, and "9:14 a.m."  The form then lists the Miranda rights.
Cox testified that Defendant appeared to read each of these
rights to himself, and that each line was also read aloud to
Defendant by Heslin, who "asked Mr. Romano if he understood and
asked him to initial it if he did." (Tr. at 33.)  Defendant's
initials appear next to each right.  The form then reads, "I

have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." Defendant's signature appears directly beneath this acknowledgment, followed by the signatures of Heslin and Cox as witnesses, and another time, "9:21 a.m.," filled in by Heslin. Cox testified that the 9:14 notation reflects the time that the agents began to review the form with Defendant, and that 9:21 refers to the time after Defendant had fully reviewed and signed the form. (Tr. at 68.) Cox further testified that Defendant did not ask the agents any questions about his rights before signing it, and did not ask to speak to a lawyer.

After Defendant was Mirandized, the agents questioned him for "about an hour." (Id. at 37.) According to Cox, the tone of the questioning was "calm" and "conversational." (Id. at 37–38.) Cox stated that Defendant admitted to his role in the charged conspiracy during this interview. Soon thereafter, Heslin left the interview room and hand-wrote a statement for Defendant to sign that memorialized his admissions, while Cox stayed in the interview room with Defendant. (Id. at 65.) Heslin returned with the statement and reviewed it aloud with Defendant, who signed it.

The statement acknowledges and incorporates by reference the FBI Advice of Rights form that Defendant signed. It also

7

states Defendant's intention "to cooperate with the FBI and provide statements about crimes I know of and crimes in which I was personally involved."  The statement goes on to list several purported crimes, and acknowledges Defendant's role in the charged conspiracy.  Each paragraph of the statement is initialed by Defendant.  The document then acknowledges:  "I make this statement freely and voluntarily, without threats, rewards or promises of immunity in return for it."  Directly underneath that acknowledgement is Defendant's signature and that of two witnesses, Davis and Heslin.

After the questioning was over and the statement had been signed, Defendant's arrest was processed.  At about 11:40 A.M., Cox and Davis left with Defendant for the federal courthouse in Central Islip.  Cox testified that during this drive, Defendant still appeared calm except when discussing his earlier coin fraud case. (Tr. at 40-41.)

At the conclusion of Investigator Cox's testimony, the Government rested.  The defense did not call any witnesses and also rested after Cox was finished on the stand.

## II.  Discussion

### A.  Legal Standard

"An arrested suspect, under the Fifth Amendment as interpreted in <u>Miranda</u>, has a right to silence and a limited

8

right to counsel to protect that right." United States v. Stern,
313 F. Supp. 2d 155, 165 (S.D.N.Y. 2003). See generally Miranda
v. Arizona, 384 U.S. 436 (1966).  Indeed, "[t]he purpose of the
Miranda warning is to ensure that the person in custody has
sufficient knowledge of his or her constitutional rights
relating to the interrogation and that any waiver of such rights
is knowing, intelligent, and voluntary." United States v.
Carter, 489 F.3d 528, 534 (2d Cir. 2007) (citing Miranda, 384
U.S. at 444-45).  The Government bears the burden of proving by
a preponderance of the evidence that a defendant made a valid
waiver of his rights. United States v. Iodice, 525 F.3d 179, 192
(2d Cir. 2008).  It must show "(1) that the relinquishment of
the defendant's rights was voluntary, and (2) that the defendant
had a full awareness of the right being waived and of the
consequences of waiving that right." United States v. Jaswal, 47
F.3d 539, 542 (2d Cir. 1995) (per curiam).  "Only if the
totality of the circumstances 'reveals both an uncoerced choice
and the requisite level of comprehension may a court properly
conclude that the Miranda rights have been waived.'" United
States v. Male Juvenile, 121 F.3d 34, 40 (2d Cir. 1997) (quoting
Moran v. Burbine, 475 U.S. 412, 421 (1986)).  Where the
defendant asserts that his confession was the product of
coercion, the court should consider "the accused's
characteristics, the conditions of interrogation, and the

9

conduct of law enforcement officials." <u>United States v.</u>
<u>Anderson</u>, 929 F.2d 96, 99 (2d Cir. 1991).

### B.   Analysis

In his post-hearing brief, Defendant argues that his
statements must be suppressed for two reasons:  first, because
the Government failed to establish that he did not request an
attorney; and second, because even if he did not request an
attorney, his statements were coerced and involuntary.  As
explained below, neither contention has merit, and Defendant's
statements will not be suppressed.

### 1. Defendant Did Not Request an Attorney

First, the Court finds that Defendant did not request an
attorney at any time on the morning of October 9, 2012.  The
Court makes this finding after carefully reviewing Defendant's
affidavit, Investigator Cox's testimony, and the submissions of
both sides.  The Court found Cox's testimony at the evidentiary
hearing to be straightforward and credible.  He testified
consistently that Defendant never asked for an attorney — not at
the Queens detention facility, not in the car, and not at the
Melville field office.  Additionally, with respect to the ride
between Queens and Melville, Investigator Cox stated that (1)
the agents did not ask Defendant any questions regarding the
charged conspiracy; (2) the agents did not attempt to elicit any
admissions from him; and (3) Defendant made no admissions to the

10

agents at that time.  The Court credits this testimony, although
it notes that the Government is not seeking to admit anything
Defendant said in the car for its case in chief at trial.  See
Evid. Hearing Tr. at 8; Gov. Letter Br. of Aug. 5, 2013 at 1
n.1.

 In contrast to Investigator Cox's testimony, Defendant's
version of events is not credible.  To begin with, Defendant
exercised his right not to testify at the evidentiary hearing,
which means that "the assertions in his affirmation can neither
be tested by cross-examination nor corroborated by the Court's
observation of his demeanor." United States v. Thompson, No. 10
Cr. 94, 2010 WL 3069668, at *5 (S.D.N.Y. July 29, 2010); see
United States v. Chisholm, No. 07 Cr. 795, 2008 WL 5453242, at
*2 (E.D.N.Y. Oct. 29, 2008).  Although Defendant's initial
motion papers repeatedly assert that he "made an unequivocal
statement that he wished to remain silent and wanted an
attorney," (Def. Mot. of Feb. 19, 2013 at 10-11), the defense
now suggests in its post-hearing brief that Defendant may have
quietly asked for an attorney only once, during a brief exchange
with Officer Davis while Davis was securing Defendant at the
Queens facility.  That conjecture is not only far-fetched; it is
also belied by the testimony at the hearing, where Investigator
Cox credibly stated his belief that they were simply talking
about the placement of the handcuffs.  Additionally, it is

inconsistent with the established timeline of events, because the agents did not even mention the new charges to Defendant until after they had all left the Queens facility. It follows that, were Defendant to ask for a lawyer, it likely would not have been until he learned of the charges in the car on the way to Melville.

Although Investigator Cox's account is inconsistent with Defendant's sworn affidavit, the Court notes that the affidavit strains credulity in several respects. Most notably, it avers that the agents repeatedly asked Defendant, "where is Mirkovic, and why does Mirkovic hate the judge and prosecutor?" (Def. Aff. of Feb. 19, 2013 ¶ 10.) It is exceedingly unlikely that the agents inquired as to the whereabouts of Defendant's alleged co-conspirator, Dejvid Mirkovic, given that other FBI agents had already arrested Mirkovic in Florida. (Evid. Hearing Tr. at 12-14.) This was known to the agents interviewing Defendant, because according to Investigator Cox, they intentionally waited to arrest Romano until after they received word that Mirkovic was in custody. (Id.) The apparent falsity of Defendant's sworn assertion further buttresses the Court's finding that the affidavit is not credible in the face of Cox's testimony at the hearing. See Thompson, 2010 WL 3069668, at *5 & n.1.

In sum, the Court finds that Defendant did not ask for an attorney on the morning of October 9, 2012. His statements

cannot be suppressed on the basis of a request that he did not make.

### 2. Defendant's Statements Were Voluntary and Not Coerced

Defendant argues that even if he never requested an attorney, his statements must nevertheless be suppressed because they were involuntary and coerced by the agents.  However, the record is clear that Defendant understood his rights and freely chose to waive them.  His knowing and voluntary waiver is evidenced not merely by the waiver form that he admits initialing and signing, but by the totality of the circumstances on October 9, 2012.

As explained by Investigator Cox in his testimony at the evidentiary hearing, Defendant was not questioned by the agents until he had arrived at the FBI field office and had been given the Miranda warnings orally and in writing.  Cox testified that he did not observe any external signs of confusion on Defendant's part; Defendant appeared to be calm and to understand what was happening. (Evid. Hearing Tr. at 37-38.) The Court credits this testimony.  First, as previously noted, the Court found Cox to be worthy of belief at the hearing. Second, Cox's testimony on this point is more plausible than the Romano affidavit's assertion that he was so "scared and confused" as to not know what was happening. See Chisholm, 2008 WL 5453242, at *2 ("Absent [defendant's] live testimony and the

13

opportunity for cross-examination, the Court cannot assess his credibility or truthfulness.  As a result, I credit the testimony of the live witnesses over the contents of defendant's affidavit where a conflict exists.").  Third, Cox's testimony is consistent with the Court's own observations of Defendant over the past several months at various conferences in this case, at which Defendant has regularly demonstrated his keen understanding of, and engagement with, the proceedings.

In the face of the Miranda waiver and Investigator Cox's credible testimony, the defense offers two arguments to support its position that Defendant's statements were involuntary or coerced.  First, the defense makes much out of the fact that the waiver bears the time 9:14 a.m. at the top and 9:21 a.m. on the bottom.  During this window, each of the rights on the form was read to Defendant, he initialed each one, and he signed the acknowledgement.  Cox testified to his belief that he and Agent Heslin signed the form as witnesses during this time as well, and he did not recall any other exchanges between Agent Heslin and Defendant in this window. (Evid. Hearing Tr. at 71, 73, 75.) There is absolutely nothing in the record to indicate that anything occurred that would undermine the waiver's validity. Cf. Stern, 313 F. Supp. 2d at 158 (identical waiver of rights form with sixteen-minute gap between the times written on top and bottom).

14

Second, the defense argues that the agents tricked
Defendant into making admissions by leading him to believe that
he was entering into a formal cooperation agreement with the
Government.  The Court rejects this argument as unsupportable
both by the facts of this case and the law of the Second
Circuit.  As an initial matter, there is simply no evidence
whatsoever of deceit by the agents.  Moreover, although the
agents suggested that cooperation would be in Defendant's best
interests because "it would be made known to the prosecutors and
the judge," (Evid. Hearing Tr. at 58), this falls far short of
coercion under established Second Circuit precedent, see United
States v. Awan, 384 F. App'x 9, 15 n.2 (2d Cir. 2012) (summary
order) (noting that "law enforcement agents are free to discuss
with a defendant the evidence against him and the reasons why he
should cooperate") (citation and alterations omitted); Jaswal,
47 F.3d at 542 ("Generally, promises of leniency will not render
a confession involuntary."); United States v. Guarno, 819 F.2d
28, 31 (2d Cir. 1987) (noting that "a confession is not
involuntary merely because the suspect was promised leniency if
he cooperated with law enforcement officials").  Summarily,
there is no legitimate basis to suppress Defendant's statements
on the grounds that they were the product of coercion.

15

### III. Conclusion

For the reasons stated above, Defendant's motion to suppress his statements is denied.  Any statements made by Defendant after he was advised of his rights are admissible in the Government's case in chief at trial.

**SO ORDERED.**

Dated:    New York, New York
          September  18 , 2013

                                        John F. Keenan
                              United States District Judge

16

WILLIAM HESSLE-DIRECT-DEAN                    706

1          MS. DEAN:  May I have a moment, Your Honor?

2          THE COURT:  Yes.

3          MS. DEAN:  (Confers with Mr. Miller.)

4    BY MS. DEAN:

5    Q    Mr. Hessle, are you aware of any dispute between the

6    defendant and Milennium Custom Auto?

7    A    I am.

8    Q    Can you explain what that dispute is about?

9          MR. GOLTZER:  Objection; hearsay.

10          THE COURT:  Sustained, probably, but I mean, until I

11   hear it, it's going to be hard to rule.  It sounds like it's

12   going to be hearsay, yes.  Is it going to be hearsay?

13          MS. DEAN:  I can work around the hearsay Your Honor.

14          THE COURT:  All right.  If you can work around the

15   hearsay, let's see you do it.  But if it gets to the hearsay,

16   I'm going to sustain the objection.

17   BY MS. DEAN:

18   Q    Did you review any of the defendant's calls from jail?

19   A    I did.

20   Q    And did the defendant speak of Milennium Custom Auto in

21   any of these telephone calls?

22   A    Yes, he did.

23   Q    And did the defendant speak of any dispute with Milennium

24   Custom Auto?

25   A    Yes, he did.

WILLIAM HESSLE-DIRECT-DEAN                          707

1   Q    And what did he say about Milennium Custom Auto?

2   A    That they had stolen his cars.

3   Q    Showing you Government Exhibit 81I, do you recognize this

4   document?

5   A    I do.

6   Q    What is it?

7   A    It's a check payable to Milennium Custom Auto, in the

8   amount of $1,500, drawn on the Regions account of Collectable

9   Coins.

10  Q    And 82C?

11  A    Also a check payable to Milennium Custom Auto, in the

12  amount of $660.87, drawn on the Bank of America account of

13  Collectible Coins.

14  Q    82D?

15  A    It's payable to -- check in the amount of $2,000, payable

16  to Milennium Custom Auto, drawn on the Bank of America account

17  of Collectible Coins.

18  Q    And 82E?

19  A    Check in the amount of $2,000, payable to Milennium

20  Custom Auto, drawn on the Bank of America account of

21  Collectible Coins.

22  Q    And finally, 82F?

23  A    A check in the amount of one thousand dollars, payable to

24  Milennium Custom Auto, drawn on the Bank of America account of

25  Collectible Coins.

SEAN McMULLEN-DIRECT-DEAN                    805

1   Q    Did Gerald Machacek agree to meet with the defendant and

2   record him?

3   A    Yes, he did.

4   Q    And what was the purpose of having Machacek meet with and

5   record the defendant?

6            MR. GOLTZER:  Objection; basis of knowledge.

7            THE COURT:  If he knows the purpose, he can tell us

8   the purpose.  Overruled.

9   A    I was told there was a threat against Judge Joseph Bianco

10  and AUSA --

11           THE COURT:  That's not the purpose, sir.  What was

12  the purpose?

13  A    The purpose was to record the meeting.

14           THE COURT:  The first part of the answer is

15  stricken.  Okay.  Go ahead.  The purpose was to record the

16  meeting.  Go ahead.

17  Q    Without testifying as to what anyone told you, what were

18  you having Gerry Machacek record the defendant for?

19           MR. GOLTZER:  Objection.

20           THE COURT:  Overruled.

21  A    He was going to record the defendant to see if there was

22  a threat against Judge Joseph Bianco and AUSA Lara Gatz.

23  Q    And you said that this meeting was to take place at the

24  Central Islip Courthouse?

25  A    Yes, inside the lockups in the marshals' area.  It's a

SEAN McMULLEN-DIRECT-DEAN                806

1    holding area where they keep the prisoners.

2    Q    The holding area where the prisoners stay before a court

3    appearance?

4    A    Yes.

5    Q    Did the defendant have a court appearance that day?

6    A    The defendant did, yes.

7    Q    With who?

8    A    Judge Joseph Bianco.

9    Q    Did Gerald Machacek have a court appearance that day?

10   A    He did not.

11   Q    And so was the intent to make it appear that Gerald

12   Machacek had a court appearance?

13   A    Yes.

14   Q    And what specifically did you do on August 10th of 2012?

15   A    I provided Gerry Machacek a recording device to record

16   the meeting.

17   Q    Can you describe what this recording device looked like?

18   A    It's a small silver box, about two inches by two inches.

19   Q    When you say you provided it to Gerald Machacek, can you

20   describe what you mean by that?

21   A    I told Gerry Machacek where we were going to place it on

22   him.  I told -- gave him instructions not to touch the

23   recording device.  And I turned the device on when he was --

24   went back to the cells.

25   Q    Now, where did this meeting between you and Gerald

SEAN McMULLEN-DIRECT-DEAN                807

1   Machacek take place?

2   A    It took place outside.  There's a little marshals'

3   office.  In that office.

4   Q    So Mr. Machacek was in a holding pen, and then you

5   removed him to meet with him?

6   A    Yes.  The marshals removed him and brought him to me to

7   put the device on him.

8   Q    Were there any other agents with you when you met with

9   Mr. Machacek?

10  A    Special Agent Tariche.  And I think, if I remember

11  correctly, Investigator Randy Cox was also there.

12  Q    Now, you said that you informed Mr. Machacek as to where

13  you were going to place the recording device.  Where did you

14  place the recording device?

15  A    We placed it in a pocket on his shirt.  Being that the

16  pocket was on the outside, I had him turn the shirt inside out

17  so the pocket was facing on the inside.  And then I placed the

18  recording device inside that pocket.

19  Q    What was the purpose of having him turn his shirt inside

20  out?

21  A    So the defendant wouldn't notice the recording device.

22  Q    Now, you also told Mr. Machacek not to touch the

23  recording device.  Why did you tell him not to touch the

24  recording device?

25  A    I did not want him starting and stopping the device.

SEAN McMULLEN-DIRECT-DEAN                    808

1    Only I could do that.

2    Q    And so when you put the recording device in Mr.

3    Machacek's pocket, it was already turned on?

4    A    Yes.  I turned it on when I put it in his pocket.

5    Q    When you gave him the recording device, did you give him

6    any particular instructions?

7    A    The only instructions I gave him was not to touch the

8    recording device, just act normal and nice and easy.  That's

9    really it.

10   Q    Were you aware of any prior meetings that Machacek had

11   had with the defendant prior to that day, August 10, 2012?

12   A    Yes, I knew there was a meeting.  I don't know how many

13   meetings.

14   Q    And did you give Mr. Machacek any particular instructions

15   with respect to the fact that he had prior meetings with the

16   defendant?

17   A    I did not.

18   Q    Now, did the meeting between Mr. Machacek and the

19   defendant, in fact, take place?

20   A    It did.

21   Q    And approximately how long was the meeting?

22   A    About an hour and a half, hour and 20 minutes.

23   Q    And how did the meeting come to a conclusion?  How did it

24   end?

25   A    We removed Machacek from the cell.  I retrieved the

SEAN McMULLEN–DIRECT–DEAN                    809

1    recording device and deactivated it.

2    Q     Where did that take place?

3    A     That took place outside the holding pens.  There's a

4    door, and they walked him to me.

5    Q     So Mr. Machacek was removed from the holding pen that he

6    was in with the defendant?

7    A     Yes.

8    Q     And brought to you?

9    A     Yes.

10   Q     After you retrieved the recording device from Mr.

11   Machacek, could you tell whether it had been, in fact, turned

12   off or back on by Mr. Machacek?

13   A     Yes, I can.

14   Q     And what did you find?

15   A     It was not turned on and off.  I was the only one that

16   turned it on and off.

17   Q     How did you know that?

18   A     Because when you go to download it, there would be more

19   than one entries.  You'd see the machine go off and then

20   restart on and then be off again.  So there's only two

21   entries, on and off.

22   Q     Now, did that recording device capture just sound or was

23   there video, too?

24   A     That recording device just captured sound.

25   Q     And after you downloaded the recording, did you listen to

Strecker - direct - Miller                    830

1   undercover capacity?

2   A    Approximately a thousand.

3   Q    And in the course of those thousand cases, have you

4   recorded meetings with subjects of investigations?

5   A    Yes, I have.

6   Q    And have you engaged in recorded telephone calls with

7   subjects of investigations?

8   A    Yes.

9   Q    About how many telephone calls and meetings have you

10  engaged in in an undercover capacity?

11  A    Well over a thousand.

12  Q    Now, did there come a time when you were assigned to work

13  on this case?

14  A    Yes.

15  Q    And approximately when was that?

16  A    It was approximately the middle of August 2012.

17  Q    Prior to that assignment, had you had any involvement in

18  the case?

19       Did you know anything about the case?

20  A    I didn't know anything about it.

21  Q    Had you any involvement in any investigation involving an

22  individual named Joseph Romano?

23  A    No.

24  Q    Did you meet with FBI agents and investigators to discuss

25  the case?

Strecker - direct - Miller                    831

1    A    Yes, I did.

2    Q    And what did you understand your role in the case to be?

3    A    I was to pose as an individual who could do investigative

4    work, but was also open to doing acts of violent behavior for

5    pay.

6    Q    And who were you supposed to meet with in your role as an

7    undercover of that kind?

8    A    I was to meet Joseph Romano.

9    Q    Where?

10   A    In the Nassau County Jail in East Meadow, New York.

11   Q    And what did you plan to tell Joseph Romano about why you

12   were there to visit?

13   A    I was there under, at the direction of an individual

14   named Harold.

15   Q    And who was Harold?

16   A    Harold was a man who Mr. Mirkovic and Jerry Machacek had

17   discussed in jail.  Harold was Machacek's person outside of

18   jail who can get people to do investigative work and perform

19   acts of violent behavior and murder for hire.

20   Q    I think you said it was an individual that Mr. Mirkovic

21   and Mr. Machacek had discussed.

22   A    I'm sorry.  Mr. Romano and Mr. Machacek.

23   Q    And what undercover name did you use or were you planning

24   to use?

25   A    Robert Russo.

CMH       OCR       RMR       CRR       FCRR

Strecker - direct - Miller                    832

1   Q    Is that an undercover name that you've used before?

2   A    Yes.

3   Q    And where did you get that name and identity?

4   A    The Suffolk County Police Department provided it to me.

5   Q    Okay.  And was that -- were you provided with any other

6   materials related to that name?

7   A    Yes, I was provided with two others.

8   Q    Can you explain?

9   A    Yes.  They gave me a New York State driver's license with

10  the name of Russo on it and I also have a Social Security

11  number assigned to Robert Russo.

12  Q    Who obtained those documents for you?

13  A    The Suffolk County Police Department.

14  Q    Did there come a time when you visited Joseph Romano at

15  the Nassau County Correctional Center or Nassau County Jail?

16  A    Yes, I did.

17  Q    What day was that?

18  A    That was August 21, 2012.

19  Q    Did you actually meet Joseph Romano that day?

20  A    Yes, I did.

21  Q    Can you take a look around the courtroom and let the jury

22  know whether you see Joseph Romano in court today?

23  A    Yes, I do.

24  Q    Can you please indicate where he's sitting and a piece of

25  clothing that he's wearing?

Strecker - direct - Miller                    856

1        MR. MILLER:  Can you start it again.

2        (Video played.)  (Video stopped.)

3   Q    I'm going to pause it there and ask you a couple of

4   questions, Detective.

5   A    Okay.

6   Q    Directing your attention back to page three of the

7   transcript, during the recording you just listened to,

8   Mr. Romano indicated, They sentenced me to 15 years.

9        Were you aware at that time what he was talking

10  about?

11  A    Yes, I was.

12  Q    What was he talking about?

13  A    That he had been sentenced for 15 years incarceration for

14  a federal fraud case.

15  Q    And directing your attention forward to page four,

16  earlier you said Harold sent you and then in the recording, as

17  reflected on the bottom of page four, you said, Harold said

18  you might have some work for me.

19        Can you explain to the jury what you were referring

20  to there?

21  A    Yes.  Harold is a person that came up in a conversation

22  between Mr. Romano and Mr. Jerry Machacek.

23        MR. GOLTZER:  Objection.

24        THE COURT:  No.  Overruled.

25  Q    You can proceed.

A-76

Strecker - direct - Miller                                    857

1    A    During that conversation, Mr. Machacek indicated that he

2    had a person outside of jail named Harold who could do

3    investigative work but also can do assaults for hire and

4    murder for hire.

5    Q    Is that what you were referring to?

6    A    Yes.

7    Q    Okay.  Then towards the top of page five, you indicated,

8    as reflected on the recording, I have guys who do

9    investigative stuff but I do other stuff, you know what I

10   mean.

11        What did you mean?

12   A    I meant that I had people who worked for me who could do

13   investigative work but I was there at that meeting to do other

14   stuff.  I left it open-ended.  I was speaking in a general

15   term to see where Mr. Romano went with it.

16   Q    Okay.  And then you said, Anybody can do that stuff.  I'm

17   not here for that.  I'm here for something else.

18        Can you explain to the jury what you were saying?

19   A    Again, I'm speaking in a general term to let Mr. Romano

20   direct the conversation but I was alluding to acts of violent

21   behavior for hire.

22   Q    How did Mr. Romano respond to that?

23   A    Yeah.

24   Q    And then what did he say?

25   A    Well, then he said, I have a couple of things that I need

Strecker - direct - Miller                    863

1   A    Yes, it's a good example.

2   Q    What do you mean?  What happened here when the

3   conversation changed?

4   A    A visitor is walking right behind us and we're discussing

5   the assault and he just, Mr. Romano changes the conversation

6   right to his brother being a Yankee fan, changes the subject.

7   Q    And how did you respond at that point?

8   A    I went with his lead.

9   Q    And what did you say?

10  A    I said, Is he a lawyer?

11  Q    And why did you say that?

12  A    I was just trying to develop an alternative subject until

13  we can get back to the meat of the, the heart of the matter.

14  Q    Okay.  We're going to pick up now.

15            (Video played.)  (Video stopped.)

16  Q    Detective Strecker, I want to direct your attention back

17  to where we picked up this portion.

18            You had just testified about Mr. Romano indicating

19  the one to start, the guy who stole two cars from him.  Is

20  that right?

21  A    Yes.

22  Q    And who did you understand was the one to start?  Who was

23  the guy who stole two cars from him?

24  A    Nick Pitas.

25  Q    And did -- what did you understand Mr. Romano to be

Strecker - direct - Miller                    864

1   asking you to do to Nick Pitas?

2   A    He wanted me to commit an act of violent behavior against

3   him.

4   Q    Directing your attention then to the bottom of page seven

5   to the conversation that's reflected there, you asked, Does

6   the guy live here or do I have to travel?

7           What did you mean by that?

8   A    I meant did he live in the New York area or would I have

9   to go somewhere else outside of New York.

10  Q    For what?

11  A    To go and perform an assault or murder on him.

12  Q    And directing your attention to the top on page eight,

13  what did Mr. Romano tell you?

14  A    He said he was, he was there, he was right there.

15  Q    And what did you understand that to mean when he said

16  here?

17  A    That he would be out on Long Island, in the close

18  vicinity.

19  Q    Okay.  Directing your attention then to page nine, after

20  you heard about Mr. Pitas, you asked, What do you, smack him

21  up, beat him up?

22          What were you asking there?

23  A    I was asking Mr. Romano what he wanted to do to

24  Mr. Pitas.

25  Q    And when you were there with Mr. Romano, were you able to

Strecker - direct - Miller                    865

1   hear a little better even than what we were able to here on

2   this video and audiotape?

3   A    Yes.

4   Q    And what did he say, smack him up or beat him up?

5   A    He said beat him.

6   Q    Then you asked, Bad.  What did you mean by that?

7   A    Severe beating, severe assault.

8   Q    And what was the point of asking that?

9   A    I wanted to know how much damage Mr. Romano wanted me to

10  inflict on Mr. Pitas.

11  Q    And what did he respond to you?

12  A    He said, Bad, bad.

13  Q    Okay.  Now, at the end, Mr. Romano said, I got 15.  And

14  then you said, So things are good in here.  Things are cool.

15  You asked that on the top of page ten.

16  A    Yes.

17  Q    Why did you change the subject?

18  A    There were some other people around, people within

19  earshot, so I changed the subject.

20  Q    Okay.  So we'll pick up there.

21       (Video played.)  (Video stopped.)

22  Q    Sir, again, I want to make sure we understand.

23       You switched the subject there to his wife, is that

24  right?

25  A    Yes.

CMH      OCR      RMR      CRR      FCRR

Strecker - direct - Miller                   866

1   Q    Why did you do that?

2   A    You can see on the video on the top of the screen, foot

3   traffic.  People are walking by.  They're pretty close, from

4   within earshot, so we're changing the subject trying to avoid

5   speaking about criminal activity.

6   Q    Were some of those individuals visitors?

7   A    Yes.

8   Q    Were some of those individuals correction officers?

9   A    Yes, law enforcement, yes.

10  Q    We'll pick up there.

11         (Video played.)  (Video stopped.)

12  Q    All right.  Detective Strecker, going back then to where

13  this portion began on page ten, in the middle of page there,

14  reflected there, you said, Who likes coming to these places?

15         What were you referring to there, sir?

16  A    Who likes going into jails.

17  Q    And when Mr. Romano responded, I'm all right here, these

18  guys are a bunch of pussies, who did you understand him to be

19  referring to there?

20  A    The other inmates.

21  Q    And when he says, I'm all right here, what did you

22  understand him to mean?

23  A    That he was all right in jail.

24  Q    And then directing your attention to the conversation

25  reflected on the next page, page 11, you said, I thought there

```
                  Strecker - direct - Miller                867
```

1   was a more serious thing.

2           What were you referring to in a general way there,

3   sir?

4   A    I was referring to more serious acts of violent behavior.

5   Q    Such as?

6   A    Such as murder for hire.

7   Q    And how did Mr. Romano respond?

8   A    He said there is one.

9   Q    And did he say that twice?

10  A    Yes, he did.

11  Q    And how did you respond?

12  A    So we're going to build a little relationship.

13  Q    What did you mean by that?

14  A    That we would start off with the Nick Pitas assault and

15  if that was successful, we would move on to more serious acts

16  of violent behavior.

17  Q    And how did he respond?

18  A    Yeah.

19  Q    And did he give you a time frame on when you would move

20  on to more serious behavior such as a murder?

21  A    Yeah, immediately.

22  Q    And what did you understand by immediately?

23  A    That as soon I was done assaulting Nick Pitas, that he

24  would give me my next act of violent behavior to perform.

25  Q    Now, on line 30, as reflected there, you asked, Who can

Strecker - direct - Miller                871

1  A    Nick Pitas is a person who Mr. Romano felt stole two cars
2  from him.
3  Q    And did he, during this conversation we just listened to,
4  did he explain the circumstances of how those cars were taken?
5  A    Yes.
6  Q    And was Nick Pitas just a guy who stole cars or how did
7  he explain it to you?
8  A    Nick Pitas was a person who was doing work on the cars
9  and there was a dispute over payment and Nick Pitas felt he
10 wasn't paid in full and took the cars back.
11 Q    Okay.  So that's the Nick that you're referring to, that
12 Nick Pitas?
13 A    It's one and the same.
14 Q    And what did Mr. Romano ask you to do to Nick Pitas?
15 A    He wanted me to beat him.
16 Q    So when you said, Three grand, and I'll use the term,
17 mess him up, what did you mean by that?
18 A    I wanted $3,000 to assault Nick Pitas.
19 Q    And how did the defendant respond to that?
20 A    Easy.
21 Q    And did he elaborate when you would get the money towards
22 the bottom of page 15 at line 41?
23 A    Yes.  He says, You do this thing, I'll give you the
24 money.
25 Q    Now, directing your attention to what's still on the

Strecker - direct - Miller                    872

1   screen and at the top of page 16, Mr. Romano said, For three

2   grand, I might as well -- let's do the first one.

3           What did you understand that to mean?

4   A   For $3,000, he wanted me to assault Nick Pitas and he's

5   intimating that he has another assault or act of violent

6   behavior for me but then he pulls it back.

7   Q   And what does he say at the end there?

8   A   He says, remember, he didn't send me to jail.

9   Q   And what did you -- is that important to you in terms of

10  what your understanding is about your role here?

11  A   Yes, absolutely.

12  Q   And what did you understand that to mean?

13  A   That he had planned some more violent acts of people who

14  had sent him to jail.

15  Q   All right.  So let's pick up there.

16          MR. MILLER:  Your Honor, I was going to play another

17  portion.  I think it will be less than ten minutes but I just

18  wanted to let Your Honor know.

19          THE COURT:  Yes, the next portion, and then we'll

20  take our break.

21          MR. MILLER:  Yes.

22          (Continued on next page.)

23

24

25

CMH      OCR      RMR      CRR      FCRR

1091

Tariche/Direct/Miller

1   Q    Can you go ahead and explain that to the jury?

2   A    The protection of federal judges is the responsibility of

3   the United States Marshals Service, so we met with United

4   States Marshals Service and discussed that threat.

5   Q    Whose responsibility is it to protect the safety of a

6   federal prosecutor?

7   A    The United States Marshals Service as well.

8   Q    And what steps were taken at that time in connection with

9   the threat side of the investigation?

10  A    With regard to the threat side, the United States

11  Marshals Service enacted their security procedures for the

12  judge and for the prosecutor.

13  Q    Going forward in the investigation, what role if any did

14  the United States Marshals Service play on the threat side of

15  the investigation?

16  A    On the threat side of the investigation, they continued

17  to monitor the level of the threat and provide whatever

18  security procedures they have to protect the judge and the

19  prosecutor.

20  Q    And did you insure that they were kept up to date on the

21  status of the investigation?

22  A    Yes.

23  Q    After that meeting on August 8 of 2012, did you take any

24  investigative steps in connection with the investigation?

25  A    Yes.

ALLAN R. SHERMAN, CSR, RPR    Official Court Reporter

1092

Tariche/Direct/Miller

1   Q    What did you do?

2   A    We set up a meeting between Jerry Machacek and Joseph

3   Romano in which we would provide Jerry Machacek with a

4   recorder.

5   Q    And the purpose of the recorder was?

6   A    To tape record the conversation between Joseph Romano and

7   Jerry Machacek.

8   Q    Did that meeting take place?

9   A    Yes.

10  Q    On what day?

11  A    On August 10, 2012.

12  Q    Where that was meeting?

13  A    It was in the United States marshals lockup at the

14  Federal court house in Central Islip, Long Island.

15  Q    Has the jury reviewed and heard the video and audio

16  recording of that meeting at this trial?

17  A    Yes, they have.

18  Q    What happened during that videotaped meeting that was of

19  particular relevance to the next step of your investigation?

20  A    At that videotaped meeting, Joseph Romano said that he

21  want to kill the Federal Judge Bianco and Prosecutor Gatz.

22  Q    And was there any further discussion that affected the

23  next step in your investigation?

24  A    Yes, he also discussed mutilations that he would have a

25  desire to do to the judge and to the prosecutor.

ALLAN R. SHERMAN, CSR, RPR    Official Court Reporter

1093

Tariche/Direct/Miller

1  Q   Was there a further discussion of something that led to

2  the next step in terms of an undercover operation?

3  A   Yes, Mr. Romano expressed a desire to meet with an

4  investigator that would do both investigations or have access

5  to investigations and also to acts of violence on the outside.

6  Q   In connection with the threat side of the investigation,

7  after that August 10 meeting, what did you do?

8  A   We, briefed the United States Marshals Service so they

9  could take the appropriate security procedures.

10  Q   In connection with the criminal side of the

11  investigation, what did you do next?

12  A   We attempted to locate an undercover agent or detective

13  to play the role of this investigator who was willing to do

14  acts of violence.

15  Q   So essentially to pose as a hitman?

16  A   Yes.

17  Q   I want to direct your attention to August 16th of 2012,

18  about six days after the meeting you just described.

19  A   Yes.

20  Q   Where was the defendant at that time?

21  A   He was incarcerated at the Nassau County Correctional

22  Center.

23  Q   Just so it's clear, prior to your involvement in the

24  threat investigation that you described when you were assigned

25  on August 8, 2012, had you been involved in the investigation

ALLAN R. SHERMAN, CSR, RPR   Official Court Reporter

Tariche - Cross-Examination - Goltzer          1240

1   A    A threat, yes.

2   Q    And an Assistant United States Attorney?

3   A    Yes.

4   Q    As well as other civilian persons?

5   A    Yes.

6   Q    And the FBI has policies with respect to threats; is that

7   correct?

8   A    Yes.

9   Q    And one of the policies that the FBI has is to warn the

10  targets of threats?

11  A    Yes.

12  Q    Whether the threats are imminent or not imminent?

13  A    Depending upon the case, yes.

14  Q    Now, would you agree, sir, that as of

15  September the 30th, 2012, the investigation had yielded no

16  evidence of an imminent threat to Judge Bianco?

17  A    Yes.  "An imminent threat" is a very specific law

18  enforcement term and would require immediate action; that is

19  correct.

20  Q    And would you agree that as of September the 30th, 2012,

21  the investigation had yielded no evidence of an imminent

22  threat to Assistant United States Attorney Lara Gatz?

23  A    No, imminent threat.  No.

24  Q    And would you also agree that the investigation, as of

25  September the 30th, had yielded no imminent threat with

Tariche - Cross-Examination - Goltzer          1241

1   respect to others?

2   A    No imminent threat.

3   Q    And that's what I said, imminent threat, as you

4   understood it to be; is that correct?

5   A    Yes.

6   Q    And that meant no immediate threat?

7   A    That meant in law enforcement jargon that we would not

8   have to do something immediately to prevent an act of violence

9   from occurring.

10  Q    And you analyzed the August 10th tape-recording between

11  Jerry Machacek and Romano; is that correct?

12  A    Yes.

13  Q    And after evaluating the tape-recorded conversation,

14  which the jury heard early in the case between Mr. Romano and

15  Jerry Machacek, you also stated, reached a conclusion that

16  there was no imminent threat to anyone?

17  A    Yes, because an imminent threat would have required an

18  immediate action by tactical teams of the United States

19  Marshals Service, by FBI tactical teams, or by local police

20  responding lights and sirens to prevent an act of violence

21  against Judge Bianco, Lara Gatz, or others.  Yes, there was no

22  imminent threat at that time.

23  Q    So after you overheard the conversation with Romano, it

24  didn't need to have lights going off and sirens whaling in the

25  streets of the City of New York to protect Judge Bianco?

Tariche - Cross-Examination - Goltzer          1243

1   A    I know what they did in this case.

2   Q    What did they do?

3   A    In this case, they notified Judge Bianco and Lara Gatz.

4   The judges already have home monitoring alarm systems that

5   have panic alarms of the possibility of a threat.  A home

6   panic alarm was offered also to Lara Gatz.  That's my

7   understanding of the initial moves done by the Unites States

8   Marshals Service.

9   Q    In other cases, the Marshals Service provided 24-hour

10  guards?

11  A    Yes, as a matter of fact, in this case, after the

12  September 25th receipt of a large amounts of cash for the

13  killing for Judge Bianco and Lara Gatz, the United States

14  Marshals Service offered security details to both Judge Bianco

15  and Lara Gatz.  Lara Gatz accepted that security detail of

16  armed U.S. Marshals seven days a week, 24-hours a day, until

17  October 9th.  Judge Bianco had already moved to an undisclosed

18  location and did not accept security detail.

19  Q    As they were entitled to do?

20  A    Yes, for the U.S. Marshals security protocols.

21  Q    That's part of the normal protocols when there's such a

22  threat?

23  A    Yes.

24  Q    Now, the money that was transferred didn't involve a real

25  hit contract?

Tariche - Cross-Examination - Goltzer                1244

1    A    No, in this case, it was undercover detectives.

2    Q    So what happened was you received a communication from

3    the United States Attorney's Office to assist in the

4    investigation of a possible threat toward federal authorities?

5    A    Yes.

6    Q    And that was on August the 8th of 2012?

7    A    Yes, that's correct.

8    Q    And then you had a meeting --

9    A    Yes.

10   Q    -- with the source of that information?

11   A    Yes.

12   Q    Among other people?

13   A    Yes.

14   Q    The source of the information was a fellow by the name of

15   Jerry Machacek?

16   A    Yes.

17   Q    Up until that point, Machacek was an inmate in a jail?

18   A    Yes.

19   Q    Up until that point, he had not been asked to do anything

20   by you?

21   A    Correct.

22   Q    Following the meeting, you asked him or somebody in your

23   presence asked Machacek to act on behalf of the United States

24   Government; is that correct?

25   A    Yes.

Tariche - Cross-Examination - Goltzer          1245

1  Q    And what you asked him to do was go into a meeting with

2  Joe Romano at the Nassau County Jail?

3  A    Go into a meeting at the federal courthouse in Central

4  Islip.

5  Q    I stand corrected.  And that was set up by members of the

6  United States Government?

7  A    Yes.

8  Q    And what you did was you set up the meeting in a

9  particular cell?

10 A    Yes.

11 Q    And you set up an electronic device which could record

12 conversations?

13 A    Yes.

14 Q    In the nature of some kind of digital recording device?

15 A    Yes.

16 Q    And the audio was already set up in the room?

17 A    A video was set up.

18 Q    And did you give Mr. Machacek instructions on how to act

19 as United States representative for the day?

20 A    Yes.

21 Q    What instructions did you give him?

22 A    Told him to act natural and have a conversation with

23 Joseph Romano.

24 Q    Were those the only instructions you gave him?

25 A    Yes.

Tariche - Cross-Examination - Goltzer          1250

1   conversation that was recorded --

2           MR. GOLTZER:  I am.

3           THE COURT:  -- after he had reported to the FBI?

4           MR. GOLTZER:  That's correct.

5           THE COURT:  Let's be specific as to which

6   conversation.

7   Q    We're not talking about a conversation that wasn't

8   recorded or wasn't overheard.  We're talking about the one

9   that you recorded.  Okay?

10  A    Yes.

11  Q    You decided there was no imminent threat after

12  Mr. Machacek said to Mr. Romano, "Should we use a shark to

13  kill the judge?"  Is that correct?

14  A    There was no imminent threat after the meeting on

15  August 10th.

16  Q    Even after you heard him say, "I'd like him to be done by

17  a shark"?

18  A    There was no imminent threat after the August 10th

19  meeting between Jerry Machacek and Joseph Romano.

20  Q    Did you take the discussion about a shark seriously?

21  A    I don't think a shark was involved in this case, no.

22  Q    You didn't see any evidence of a shark?

23  A    I saw no evidence of a shark in this case.

24  Q    Did you see any evidence in this case --

25          THE COURT:  Wait.  Wait.  You've been asked a couple

Tariche - Cross-Examination - Goltzer            1251

1   of times, and other witnesses have been asked, what did you

2   understand the term "shark" to mean in the conversation that

3   was recorded?  What did you understand that to mean?

4         THE WITNESS:  In what particular context are you

5   talking about shark?

6   Q    Well, you remember that Jerry Machacek was saying to

7   Mr. Romano, "You hate these folks," right?  Do you remember

8   that kind of conversation, in sum and substance?

9   A    Yes, in sum and substance.

10  Q    Do you remember Mr. Machacek saying to Mr. Romano, in

11  words or substance, you really want these folks dead?  Do you

12  remember that?

13  A    Yes.

14  Q    Do you remember Mr. Machacek saying to Mr. Romano,

15  "Should we use a shark?"

16  A    Yes.

17  Q    He meant a fish?

18  A    Yes.

19  Q    Okay.  You didn't see a fish in this case?

20  A    No.

21  Q    Do you remember Mr. Romano suggesting to Mr. Machacek

22  that he would dig a deep hole and put the judge in there for

23  20 years?

24  A    Yes.

25  Q    You didn't see any evidence of a deep hole in this case

Tariche - Cross-Examination - Goltzer        1252

1    either, did you?

2    A    No.

3    Q    Did you hear Mr. Romano -- oh, did you hear Mr. Machacek

4    say to Mr. Romano, "Let's use a truck with a cement mixer"?

5    A    Yes.

6    Q    And that came from Mr. Machacek?

7    A    Yes.

8    Q    And then Mr. Romano responded, in words or substance,

9    "Great.  We'll put him in a cement mixer."  Did you think that

10   was real?

11   A    No.

12   Q    And that's part of the calculus, part of the reason that

13   you concluded that there was no imminent threat; is that

14   correct?

15   A    Yes, because, again, an imminent threat would have been

16   that there was a specific time, place, and somebody coming to

17   do harm to Judge Bianco, Lara Gatz, or somebody else.  There

18   was a threat because he had mentioned the judge by name, Lara

19   by name and discussions of wanting to murder the judge and

20   Lara, yes.

21   Q    Actually, that's what you were told by Mr. Machacek?

22   A    I believe that's what the defendant said in this tape,

23   that he wanted to kill -- what the defendant said, he wanted

24   to kill Lara and the judge.

25   Q    He said a lot of things on the tape, didn't he?

Tariche - Cross-Examination - Goltzer          1259

1    A    Yes.

2    Q    And the reason it's a fictional role is they're really

3    not going to hurt anybody?

4    A    Obviously not.

5    Q    So when Wighaus goes into a car and sits there with

6    somebody named Mirkovic, and he says I want to kill so and so,

7    he doesn't mean it?

8                MR. MILLER:  Objection.  Detective Wighaus was here

9    to answer these questions, your Honor.

10               THE COURT:  Precisely.

11               MR. GOLTZER:  He asked him about the whole

12   investigation.

13               THE COURT:  You could have asked Mirkovic -- excuse

14   me.  You could have asked -- I'm sorry.  You could have asked

15   Wighaus that question.

16               MR. GOLTZER:  Point being, sir, that --

17               THE COURT:  Wighaus was the one to cross-examine

18   about that.

19   Q    You were supervising Wighaus?

20   A    Yes.

21   Q    You were supervising Undercover Bob?

22   A    Yes.

23   Q    You were aware that everything that they were doing was

24   an act?

25   A    A role they were playing in furtherance of our

Tariche - Cross-Examination - Goltzer          1260

1   investigation, yes, I was aware of that fact.

2   Q    But every time they made a phone call to Mr. Mirkovic,

3   that phone call was set up by a Government agent?

4   A    Yes.

5   Q    And every time they had a meeting with someone, that was

6   set up by a Government agent?

7                MR. MILLER:  Objection.

8                THE COURT:  Well, to the degree that "set up"

9   sometimes implies more than arranging, I'm going to sustain

10  the objection.  So why don't you use the verb "arrange"

11  instead of "set up."

12  Q    It was arranged?

13  A    It was arranged, because some of the meetings were

14  requested by Dejvid Mirkovic, yes.

15  Q    And the times were known in advance; the places were

16  known in advance?

17  A    Yes.

18  Q    The surveillance was set up or arranged in advance?

19  A    Yes.

20  Q    And you were involved in surveillance over a period of

21  several weeks of Mr. Mirkovic?

22  A    Yes.

23  Q    And you oversaw the recordings with Mr. Mirkovic?

24  A    Yes.

25  Q    And the payments of money?

Tariche - Cross-Examination - Goltzer          1261

1   A    Yes.

2   Q    And all of that was done as part of this investigation?

3   A    Yes.

4   Q    And all of it was done in part of this investigation, it

5   was understood by you, did not involve real danger to Lara

6   Gatz?

7   A    Not with regard to our undercover detectives posing as

8   hit men on behalf of Joseph Romano and Dejvid Mirkovic.  No,

9   there was no danger with regard to that aspect.

10  Q    And that was my question.  And there was no danger with

11  regard to the same question with respect --

12  A    Obviously not, with regard to our undercover detectives.

13  There was no danger to the judge, to Prosecutor Gatz, and/or

14  anybody else in this case, with regard to our undercover

15  detectives, yes.

16  Q    And as far as those meetings, and payments, and the like,

17  those were very closely controlled and monitored by law

18  enforcement agents?

19  A    They were monitored by law enforcement, yes.

20  Q    Now, you overheard Mr. Romano on the August 10th tape

21  discuss the notion of escaping; is that correct?

22  A    Yes.

23  Q    And he, in fact, was, as the jury heard, very animated

24  about it.  Escape, escape, escape; is that right?

25  A    Yes.

NICOLE CANALES, CSR, RPR

Cox - direct - Dean                                    1305

1          Forget me, go ahead.

2          (The requested portion of the record was read back

3    by the Official Court Reporter.)

4          THE COURT:  The witness was then asked generally.

5          MS. DEAN:  Yes, Your Honor.

6          THE COURT:  Go ahead.

7    A    Again, it was explained to the defendant that there had

8    been an undercover operation; that we knew of his plan

9    basically to kill the Judge and the prosecutor.

10         Because of that, Mr. Romano asked us about Dejvid

11   Mirkovic.  We told him that Mirkovic was in the same situation

12   as he was down in Florida, essentially that he was arrested.

13         We also, Mr. Romano talked and complained about his

14   underlying coin fraud case and his general treatment in that

15   case.

16         The other topic was Agent Heslin talked about

17   cooperation with Mr. Romano; that when we get to the office he

18   should think about cooperating, if he had any information that

19   would be helpful because the case that we had on him based on

20   him meeting the undercover and the arrest for the conspiracy

21   to commit murder was very strong.

22   Q    Now did you, in fact, arrive at the FBI offices?

23   A    Yes.

24   Q    You may have said this earlier, but where exactly are

25   those offices located?

Cox - direct - Dean                                    1308

1   A    Yes.

2   Q    Did he waive those rights and agree to speak to you

3   without an attorney present?

4   A    Yes.

5   Q    Did he waive his rights orally or in writing?

6   A    In writing.

7        MS. DEAN:  Now, showing you for identification

8   purposes what's been marked Government's Exhibit 100.

9        (The above-referred to Exhibit was published to the

10  witness.)

11  Q    Do you recognize this document?

12  A    Yes.

13  Q    What is it?

14  A    It is the Miranda warnings, the Advice of Rights that was

15  read to Mr. Romano that day.

16  Q    And did you witness this form being reviewed with the

17  defendant?

18  A    Yes.  He reviewed it and it's signed by the defendant.

19  Q    And who else signed it towards the bottom?

20  A    Special Agent Edward Heslin and myself.

21       MS. DEAN:  Your Honor, at this time the Government

22  would offer Government's Exhibit 100.

23       MR. GOLTZER:  No foundational objection, subject to

24  ruling.

25       THE COURT:  It's been identified by him and he said

VB      OCR      CRR

                    Cox - direct - Dean                    1309

1   that it was signed by the defendant and that it was witnessed

2   by him and the other law enforcement officials, so that's a

3   sufficient foundation.

4           MR. GOLTZER:  No, I said I have no foundational

5   objection.

6           THE COURT:  Oh, you have no foundational.  I thought

7   you said there was no foundation.  I misheard you, I'm sorry.

8           MR. GOLTZER:  I have no foundational objection and

9   that's all.

10          THE COURT:  All right, thank you.  Sorry for the

11  misunderstanding; my fault, not yours.

12          The Exhibit is received.

13          (Government's Exhibit 100 was received in evidence.)

14          THE COURT:  Before you go into the substance of the

15  questioning, we are going to recess for the day because we are

16  not going to finish this for a while.

17          You can finish anything preliminary and then we'll

18  recess for the day.

19          (The above-referred to Exhibit was published to the

20  jury.)

21          MS. DEAN:  The document has been published, I'll

22  just note for the record.

23  Q   Investigator Cox, what does this document say on the top?

24  What is the title of this document?

25  A   Advice of Rights.

Cox - Direct Examination - Dean                        1327

1   Q    And when you say "prior testimony," what are you

2   referring to?

3   A    Testimony from a prior hearing in this case.

4            MS. DEAN:  Your Honor, may I approach?

5            THE COURT:  You may.

6   Q    Investigator Cox, I'm showing you what's been marked

7   Government Exhibit 3500-RC4, RC-8, RC-10 and RC-1.  Are those

8   some of the documents that you're referring to?

9   A    Yes, they are.

10  Q    Now, I'll leave those next to you.  If you do need to

11  refer to them, please let me know before you do so.  Now, can

12  you explain how the interview with the defendant began?

13  A    It began with the defendant talking for ten minutes, or

14  really venting about how he'd been treated in his prior case,

15  in the coin case.  He talked about how unjust it was.  He

16  described how he thought the government had "disassembled,"

17  was the word he used, his life, and let him go on for quite a

18  while.  He said that I read the Bible many times, and the

19  Bible said that vengeance belongs to God.  And then he said,

20  "But I think God has taken a long vacation."

21            After letting him vent for a few minutes or so,

22  Mr. Heslin said to him something of the effect of let's talk

23  about the matter at hand, and directed the conversation

24  towards the meeting with the undercover and discussion about

25  Nick Pittas.

Cox - Direct Examination - Dean                    1331

1  defendant was incarcerated, Mirkovic was -- he said Mirkovic

2  would pay his wife money.  Mirkovic agreed with him.  At Joe's

3  request and instruction to pay Karen Romano money, not a set

4  amount, but what she needed on an ongoing basis.

5  Q    Now, you testified yesterday that one of the things you

6  wanted to find out about in interviewing the defendant was

7  whether there was an ongoing threat to Judge Bianco and AUSA

8  Getz.  Did you try and ascertain in your interview whether

9  there was, in fact, still an ongoing fact?

10 A    Yes, we asked him directly if there were any other

11 individuals that through his -- while he was in jail he'd

12 asked to commit an act of violence on his behalf, whether it

13 be beatings or killings and, specifically, whether it was

14 anything else that any other action put forward.  We wanted to

15 find out if there was anybody else that had been contracted.

16 He said there was nobody else contracted, but that he had

17 spoken to a number of other people in jail, or he'd been

18 venting in jail about Judge Bianco, about the prosecutor.  And

19 there had been several people who'd approached him who offered

20 to do acts of violence on his behalf and said they could do

21 things on the outside for him.

22 Q    Did he name names?

23 A    Yes.

24 Q    Who did he mention that he had spoken to about possibly

25 committing acts of violence on his behalf?

Cox - Direct Examination - Dean                    1332

1   A    Ishmel Cohen.  That's, I-s-h-m-e-l, C-o-h-e-n.  Breon

2   Florestal, B-r-e-o-n, F-l-o-r-e-s-t-a-l.  And Bobby Brown.

3   Q    Now, taking the first of those individuals, Ishmel Cohen.

4   What did the defendant say about what he had discussed with

5   Ishmel Cohen?

6   A    He said, again, that Ishmel Cohen had heard him venting,

7   complaining.  They were housed together in the same unit at

8   the Nassau County Correctional Center.  He said that it

9   occurred, he estimated, around February 2012.  And he said

10  that Cohen told him, "Listen, I've got guys on the outside."

11  Cohen is a "Blood," a gang member, a "Blood."  He said, "I

12  have guys they call bloodhounds.  They track people down.

13  They can do hits."

14          Mr. Romano said he never asked him to do any hits,

15  but he did ask him to do a beating of Nick Pittas.  And he

16  said he actually negotiated a price for $2500 to accomplish

17  the beating.  I asked him what happened?  Mr. Romano said that

18  the beating -- the obligation was never fulfilled.  Cohen said

19  his guys on the outside would not do the beating while Cohen

20  was still in jail.

21  Q    Now, did the defendant tell you when he had these

22  discussions and negotiations with Cohen?

23  A    He estimated it was about in February of 2012.

24  Q    Now, was there anything of significance that happened in

25  the defendant's underlying coin fraud case in February of

Cox - Direct Examination - Dean                    1333

1    2012?

2    A    He was sentenced in February of 2012.

3    Q    What was his prison sentence?

4    A    Fifteen years.

5    Q    And so, according to the defendant, this took place --

6    these conversations with Ishmel Cohen took place how many

7    months before the Government received notification about a

8    threat from Gerald Machacek?

9    A    That was in August, so approximately six months before.

10   Q    Now, you also said that the defendant mentioned someone

11   with the last name Florestal.  What did the defendant say

12   about his conversations with inmate Florestal?

13   A    That Florestal was somebody he'd met, like, 18 months

14   before in jail, and that Florestal was somebody who said he

15   could do -- take care of things on the outside, beatings of

16   people.

17   Q    When you say 18 months, are you talking about 18 months

18   prior to October 9th, 2012?

19   A    Yes.

20   Q    Okay.

21   A    But that he never asked Florestal to do anything.  They

22   were supposed to be contacted after Florestal got released

23   from jail and nothing ever happened.

24   Q    Now, you also mentioned an inmate named Bobby Brown that

25   the defendant spoke about.  What did he tell you about his

Cox - Direct Examination - Dean                     1334

1   conversations with Bobby Brown?

2   A    He said that Bobby Brown was another inmate that he was

3   housed with at the Nassau County Correctional Center.  He said

4   that Brown also had heard him venting.  He talked to Brown.

5   Brown said he was somebody that could take care of things on

6   the outside for him, and one of the things he could do was

7   beatings, but that he never put any plan of action together

8   with Brown.

9   Q    Now, when did the defendant say that this conversation

10  took place with Bobby Brown?

11  A    He estimated it was about six months before our

12  conversation, which was October, so that would, I guess, put

13  it somewhere in April of 2012.

14  Q    And so how many months, according to the defendant, did

15  that conversation with Brown take place?  How many months

16  before the Government received notification about a threat to

17  Judge Bianco and AUSA Gatz from Gerald Machacek?

18  A    That would have been about four months before?

19  Q    Now, was Bobby Brown an inmate at the Nassau Jail?

20  A    Yes.

21  Q    When did Bobby Brown leave the Nassau Jail?

22  A    He left in June of 2012, and he was sent to an upstate

23  prison.

24  Q    Has he since been released from prison?

25  A    Yes.

NICOLE CANALES, CSR, RPR

Cox - Direct Examination - Dean                    1341

1  whether he had taken steps to murder Judge Bianco and AUSA
2  Gatz?
3  A    He said that the only people that he'd taken steps to
4  murder were -- well, he took steps for the beating of Nick
5  Pittas, and the only steps he took to murder anybody were
6  Judge Bianco and AUSA Gatz.
7  Q    In the course of the interview, did the defendant express
8  his feelings toward Judge Bianco and AUSA Getz?
9  A    Yes, on more than one occasion he said that he hated them
10 and he wanted them killed.
11 Q    Now, you earlier referenced a telephone call made by the
12 defendant from the Nassau Jail to Dejvid Mirkovic, in which
13 they discussed the murders of Judge Bianco and AUSA Gatz.  Was
14 that telephone call made using the defendant's own personal
15 identification number?
16 A    No.
17 Q    Did you ask the defendant about his usage of other
18 inmates' personal identification numbers to make telephone
19 calls?
20 A    Yes.  And he told us that he had used numerous other
21 inmates' pins to make calls, and he also put money in various
22 inmates' commissary accounts.
23 Q    Did the defendant say how?
24 A    He would direct Dejvid Mirkovic to do it, generally, or
25 somebody else on the outside.

Cox - Direct Examination - Dean                    1342

1  Q    Did the defendant explain why Dejvid Mirkovic was doing

2  this for him?

3  A    Well, as I explained earlier, he said that he felt

4  Mirkovic owed him, because he said Mirkovic got in the coin

5  business; bailed him out financially, and that Mirkovic was

6  making a lot of money from the business, and he owed that to

7  Mr. Romano.

8  Q    Now, you testified that the defendant acknowledged that

9  he had ordered the murders of Judge Bianco and AUSA Gatz.  Did

10 you ask the defendant any questions about the manner in which

11 he wanted them murdered?

12 A    Yes.  Specifically, I asked him whether he had -- or

13 whether he had wanted -- had said that he wanted their heads

14 preserved in formaldehyde, and he told me he had said that but

15 it was in jest.  I followed up and asked him if he had

16 directed Dejvid Mirkovic to tell that to Bob, the undercover,

17 and he acknowledged -- he said, yes, he told him to do that.

18 Q    He acknowledged that he gave the order to cut their heads

19 off?

20 A    Yes.

21            MR. GOLTZER:  Objection to leading.

22            THE COURT:  Sustained.  Don't lead him.

23            MS. DEAN:  Yes, your Honor.

24 Q    During the course of the interview, did the defendant

25 express any interest in cooperating with the Government?

Cox - Direct Examination - Dean                    1343

1    A    Yes.

2    Q    Can you explain what it means to cooperate in a

3    government investigation in the context of a criminal case?

4    A    Yes.  Generally means that somebody provides information

5    about any crimes, any and all crimes that they've committed,

6    and the acts that they've committed, and any and all

7    information they have about criminal acts that other people

8    committed.

9    Q    What is the possible benefit to a defendant in

10   cooperating in a Government investigation?

11   A    Cooperating in an investigation can lead to a formal

12   agreement with the Government, in which somebody -- the

13   Government can advise a sentencing judge of all the

14   cooperation they provided, and based on that letter to the

15   judge, a judge can, then, in his or her discretion, give a

16   lighter sentence to the defendant.

17   Q    Now, you -- as a law enforcement agent, do you make the

18   decision as to whether a defendant gets offered a cooperation

19   agreement?

20   A    No.

21   Q    Who makes that determination?

22   A    The prosecutors handling a particular case.

23   Q    And, now, when the defendant expressed an interest in

24   cooperating in the Government's investigation, was he told

25   anything about what he might receive in return?

NICOLE CANALES, CSR, RPR

Cox - Direct Examination - Dean                1344

1  A    He was told that we pass the information on to the

2  prosecutors.

3  Q    Now, did the defendant, in fact, during the course of the

4  interview, give you information about the criminal activity of

5  people other than himself?

6  A    Yes.

7  Q    Who did he speak about?

8  A    He spoke about a double homicide in Freeport, New York

9  that he said he learned about in jail, and also about somebody

10 else he had talked to in jail, and told them about push-in

11 robberies that were done in the late 2000s by a robbery crew.

12 Q    Now, you said push-in robberies?

13 A    Yes.

14 Q    Can you explain what push-in robberies are?

15 A    Yeah.  They're robberies where somebody is usually

16 present at a house or a business, and the robbers go in, push

17 their way in, or enter and commit the robbery.

18 Q    And you said that the defendant spoke to you about an

19 individual who he believed had committed a double homicide.

20 Did he give you a name?

21 A    Yes.

22 Q    What name did he give you?

23 A    Ishmel Cohen.

24 Q    And is this the same Ishmel Cohen that the defendant said

25 he had previously spoken to about committing acts of violence?

Cox - Direct Examination - Dean                    1345

1   A    Yes.

2   Q    With regard to the push-in robberies, did the defendant

3   give you a name?

4   A    Yes, Timothy Glass.  Said he had met him down in prison

5   in Florida when he was first arrested down there.

6   Q    Now, you testified that the interview of the defendant

7   took approximately an hour.  How many times did the defendant

8   bring up the name Gerald Machacek during that interview?

9   A    Towards the beginning of the interview, he said that he

10  had met the undercover because a Jerry from Nassau County

11  Correctional Center that he'd been talking to said he had

12  somebody on the outside that could help commit acts of

13  violence, and that Jerry had arranged for him to meet the

14  undercover.

15  Q    Now, when the name "Jerry" came up, did the defendant

16  ever suggest that the plot to murder Judge Bianco and AUSA

17  Gatz was the Jerry's idea?

18            MR. GOLTZER:  Objection.

19            THE COURT:  No.  Overruled.

20  A    No, he never said that.

21  Q    In fact, what did he say about the plot to murder

22  Judge Bianco and AUSA Gatz, whose idea it was?

23  A    He said it was his idea, and he had directed Dejvid

24  Mirkovic -- given instructions to David Mirkovic regarding

25  Mirkovic's dealings with the undercover.

Cox - Direct Examination - Dean                    1346

1   Q     Now, other than this one time, did the defendant ever

2   mention Jerry Machacek at all in connection with the plot to

3   murder Judge Bianco and AUSA Gatz during that interview?

4   A     No.

5   Q     Now, showing you for identification purposes what's been

6   marked Government Exhibit 101, do you see that on your screen?

7   A     Yes.

8   Q     What is that document?

9   A     This is a statement that was written by Agent Heslin and

10  later signed by Joseph Romano.

11  Q     Now, you said that Agent Heslin wrote this statement.

12  How many pages is this statement?

13  A     The statement's three pages, and attached to it are the

14  Advise of Rights, marked as page 4.

15  Q     Turning your attention to page 3, there's a signature

16  here.  Whose signature is that above the word "signature"?

17  A     Joseph Romano.

18  Q     Did you see the defendant, Joseph Romano, sign this

19  document?

20  A     Yes.

21        MS. DEAN:  Your Honor, the Government would offer

22  Government Exhibit 101.

23        MR. GOLTZER:  No objection.

24        THE COURT:  Received.

25           (Marked as - Government's Exhibit 101)

Cox - Direct Examination - Dean                    1347

1      MS. DEAN:  May we publish?

2      THE COURT:  Yes, it may be published.

3  Q    Investigator Cox, at what point during the interview did

4  Agent Heslin draft this one-page statement?

5  A    Approximately 30 to 40 minutes into the interview.

6  Q    Now, what topic had been discussed with the defendant

7  when Agent Heslin stepped out to draft this document?

8  A    We were discussing the Nick Pittas beating, the plot to

9  murder Judge Bianco and Prosecutor Gatz.  And we talked about

10 the different individuals who he'd approached in jail, whether

11 to approach him regarding their ability to do work for him on

12 the outside.  I think there may have been other information

13 after that.

14 Q    You mentioned that the defendant spoke to you about an

15 individual he believed had committed a double homicide, as

16 well as an individual he believed was responsible for push-in

17 robberies.  Had those topics been discussed at that point?

18 A    Yes.

19 Q    And can you explain how this document, Government

20 Exhibit 101, was presented to the defendant?

21 A    Yes.  Agent Heslin had left the room, written this

22 document up based on information that we had already discussed

23 with Mr. Romano.  He returned to the room, and he sat down

24 next to Mr. Romano, and he reviewed each paragraph and

25 statement with Mr. Romano by reading it aloud, and Mr. Romano

Cox - Direct Examination - Dean                1348

1   agreed with it.  He then had him initial it.

2   Q    Now, there are a number of initials on the left-hand side

3   of this page.  Were these initials placed there separately

4   after each paragraph was reviewed with the defendant?

5   A    Yes.

6   Q    Did you see the defendant initial each paragraph?

7   A    Yes.

8   Q    Can you just read, starting with paragraph 1, on page 1

9   of this document?

10  A    "My name is Joseph Romano."  And it gives his date of

11  birth and social security number.

12  Q    And paragraph 2?

13  A    "I have signed the Advise of Rights form, which is

14  attached to this statement and incorporated by reference."

15        Paragraph 3:  "I have agreed to cooperate with the

16  FBI about statements, about crimes I know about, in crimes in

17  which I was personally involved."

18        Paragraph 4:  Which continues to the next page also.

19  "I and at least one other, including but not limited to, David

20  Mirkovic or Dejvid Mirkovic, conspired to murder Federal

21  District Court Judge Joseph Bianco and Assistant United States

22  Attorney Lara Gatz.

23        Paragraph 5:  "I am willing to provide information I

24  acquired while incarcerated regarding a double homicide in

25  Freeport, New York."

Cox - Cross - Goltzer                    1356

1           THE COURT:  Cross examination.

2           MR. GOLTZER:  Thank you, sir.

3   CROSS EXAMINATION BY MR. GOLTZER:

4   Q    Good morning, sir.

5   A    Good morning Mr. Goltzer.

6   Q    You really have not told the jury everything that Mr.

7   Romano said to you, during the course of the interview, have

8   you?

9   A    Mostly everything.  The important things.  Every word, no.

10  Q    Did Mr. Romano tell you during the course of the

11  interview that upon reflecting-- in substance, upon

12  reflection, he referred to the plot to kill Judge Bianco and

13  A.U.S.A. Gatz as a, "harebrained scheme", which he only

14  recently contemplated putting into action?

15  A    That's the exact quote as it is written in my notes, yes.

16  Q    He did say that?

17  A    Yes.

18  Q    And, did he also tell you, that Jerry, was the only

19  individual he discussed the plan of action with, the only one

20  he discussed the killing of Judge Bianco with?

21  A    Yes.

22  Q    You were concerned whether Mr. Romano had ever discussed

23  killing Judge Bianco with everybody-- with anybody else?

24  A    Say that again.

25  Q    You were concerned about anyone else being a threat to

Cox - Cross - Goltzer                              1357

1  Judge Bianco?

2  A    Judge Bianco or Prosecutor Gatz or anybody else,

3  absolutely.

4  Q    And he told you that Jerry was the only person he ever

5  discussed it with?

6  A    Yes.

7  Q    And he had not discussed a concrete plan of action with

8  anyone other than Jerry?

9  A    That's what he told us, yes.

10 Q    Now, the process of cooperation that you were asked about

11 by the government lawyer, involves as you put it, proffer

12 sessions?

13 A    Yes.

14 Q    Debriefings?

15 A    Yes.

16        THE COURT:  Why don't you have him explain what a

17 proffer session is.  I'm watching the jury.

18        MR. GOLTZER:  May I lead through that?

19        THE COURT:  Yes.

20 BY MR. GOLTZER:

21 Q    You have been an investigator with the United States

22 Attorney's office for how long?

23 A    Twelve years.

24 Q    In the twelve years, you have attended several proffer

25 sessions?

Cox - Cross - Goltzer                    1360

1   truthful with us.  If you lie, we are not interested.

2   A     Correct.

3   Q     And then the person either does or doesn't speak, right?

4   A     That's right.

5   Q     And very often, there are a series of meetings; is that

6   correct?

7   A     Yes.

8   Q     And it is not unusual for people to withhold information

9   in the beginning, and give it later?

10  A     Yes, there are different circumstances, some people are

11  completely forthright from the beginning, others take

12  sometimes two or three meetings.

13  Q     And the government and its agents recognize that and they

14  go through the process and then they make a judgement whether

15  to accept or reject cooperation from that particular individual?

16  A     Yes.

17  Q     And then if the government says, we will engage in a

18  cooperation process with you, then the person enters into a

19  cooperation agreement?

20  A     Right.  Which is formally offered by the prosecutors in

21  the case.

22  Q     Every agreement is different depending upon the facts and

23  circumstances of that particular cooperation?

24  A     Yes.

25  Q     And, in the car ride from the Queens private facility

Cox - Cross - Goltzer                          1361

1   over to the Melville F.B.I. office, you indicated yesterday

2   that the question of cooperation came up in the automobile?

3   A     Yes.

4   Q     And the issue of cooperation was raised by Agent Heslin?

5   A     Yes.

6   Q     And Agent Heslin told Mr. Romano, that they had him

7   pretty good, it would be in his best interest to cooperate and

8   basically, I'm going to the theater with my wife, about an

9   hour after we get over to Melville; is that right?

10  A     He said, he is going to the theater with his wife later

11  that day and all he cared about was being on time for that.

12  Q     Basically he didn't want to waste time with Mr. Romano

13  and miss the theater with his wife, that is what he was

14  referring to Mr. Romano?

15  A     Exactly.

16  Q     He was basically putting a little bit of appropriate

17  pressure on Mr. Romano to make up his mind about whether he

18  wanted to cooperate?

19            MS. DEAN:  Objection.

20            THE COURT:  Sustained.

21  Q     And Mr. Romano then asked a question; is that right?

22  A     No, I don't remember what question-- whether he asked a

23  question.

24  Q     Didn't he ask him what he was going to see in the theater?

25  A     That was five or ten minutes later.

Cox - Cross - Goltzer                    1362

1   Q    All right.

2   A    Because it was-- yes, he said, what are you going to see,

3   Mr. Heslin responded War Horse at Lincoln Center.

4   Q    And, Mr. Heslin was behind you?

5   A    Correct.

6   Q    Sitting next to Mr. Romano?

7   A    Correct.

8   Q    You were checking them both in the mirror.

9         You were looking in the rearview mirror?

10  A    Occasionally.

11  Q    Most of the time you were looking ahead?

12  A    Yes.

13  Q    Agent Heslin was describing the cooperation process to

14  Mr. Romano?

15  A    Yes.  He made numerous statements about the cooperation

16  process.

17  Q    Tell the jury the number of statements he made to Mr.

18  Romano in the car ride about the cooperation process as best

19  as you recall?

20  A    I will tell you what I recall him saying.

21        Mr. Heslin said, listen, when we get down to the

22  office in Melville, sit down and talk to you.  I think you

23  should think about cooperating, it is probably the best avenue

24  here.  We have in essence, you know, an amount of evidence, we

25  will be getting with an undercover.  You know, whatever you do

Cox - Cross - Goltzer                    1363

1    it is up to you, I don't really care, but he kind of shrugged

2    his shoulders nonchalantly.

3    Q    Did he tell Mr. Romano for example, that you could get a

4    much reduced sentence by cooperating?

5    A    I don't think that came up in the car.

6    Q    Did it come up at all during the entire period of time

7    that Mr. Romano was in your presence, be it Melville or the

8    other car ride.  Let's stick with Melville?

9    A    I think there was general talk about what a cooperation

10   could do.  We can give your information to the prosecution, it

11   could lead to a reduced sentence.

12   Q    You told him it could lead to a reduced sentence on

13   allegations that he conspired to kill a Judge?

14   A    We told him in general that cooperation could lead to a

15   reduced sentence.

16   Q    Even on his coin fraud case?

17   A    No.  That was done.

18   Q    Well, did you ever hear of Rule 35?

19   A    I have.

20   Q    And Rule 35 is a rule in the Federal Rules of Criminal

21   Procedure, by which even after someone is sentenced, they can

22   make a motion or the government can make a motion to a Judge

23   to reduce, substantially reduce a sentence because of

24   cooperation, right?

25   A    Yes.

Cox - Cross - Goltzer                                    1364

1   Q    And you told Mr. Romano or somebody during this meeting

2   told Mr. Romano that there was something known as a 5-K letter?

3   A    Well, we didn't talk about the Rule 35.  I don't recall

4   talking about a 5-K letter.

5   Q    But you don't know whether Mr. Romano prior to that

6   meeting knew or didn't know about it?

7   A    About what?

8   Q    5-K or Rule 35?

9   A    I'm sure he knew about 5-K because-- well, I would assume

10  he did.  He had a prior case and there were other cooperators

11  in his case and he talked about a cooperator in his case.  He

12  was aware of what cooperation was, in terms of that.

13  Q    In fact, you were aware that as part of the 3500 material

14  in the coin fraud case, he was given copies of cooperation

15  agreements?

16  A    Yes, exactly.

17  Q    So, you knew this, Mr. Romano knew what you were talking

18  about?

19  A    Yes.

20  Q    So you were providing Mr. Romano in the automobile and

21  later at Melville, with an opportunity to cooperate?

22  A    We told him what cooperation could possibly do.

23  Q    He apparently was in the process-- during your interview

24  with him, of accepting that possibility?

25  A    No, it was a variety of information that we asked him in

Cox - Cross - Goltzer                    1366

1   A    No.

2   Q    You were just having a conversation?

3   A    Yes.  We were interviewing him.

4   Q    It was part of your plan that you had undertaken with

5   fellow agents earlier that day, to try to get Mr. Romano to

6   make statements?

7   A    Yes, any time we arrest somebody, they are willing to

8   make a statement, we want to take statements from them.

9   Q    Number one, you want to get some evidence to use against

10  him in court?

11  A    Well, we had plenty of evidence in this case.  But, yes,

12  that is one of the general purposes of interviewing somebody.

13  Q    You wanted more, right?

14  A    We wanted to-- if he was willing to talk to us, we are

15  willing to take the information.

16  Q    You weren't wasting your time?

17  A    No, I don't think it was a waste of time at all.

18  Q    You also wanted to find out whether there were any other

19  threats or potential threats against anybody else?

20  A    Yes.

21  Q    And, you told Mr. Romano at that point, you really need

22  to tell us the truth; is that right?

23  A    Yes.

24  Q    And Mr. Romano told you, he wanted to cooperate, right?

25  A    He did.  He was cooperative during the interview.

Cox - Cross - Goltzer                    1367

1   Q    But he said several times on Government Exhibit 101, I

2   have agreed to cooperate, for example in paragraph three; is

3   that correct?

4   A    Yes.

5   Q    He said, I am quoting, I have agreed to cooperate with

6   the F.B.I. and provide statements about crimes I know about

7   and crimes in which I was previously involved.  He said that?

8   A    Yes.

9   Q    He signed it?

10  A    Yes, he agreed with those statements.

11  Q    He initialed it?

12  A    Yes, he did.

13  Q    Paragraph four, I and at least one other, including, but

14  not limited to Dejvid Mirkovic conspired to murder Federal

15  District Court Judge Joseph Bianco, Assistant United States

16  Attorney Lara Gatz.  He said that?

17  A    Yes.

18  Q    This interview took about an hour?

19  A    Yes.

20  Q    He didn't cut the interview short?

21  A    No.

22  Q    He didn't say, stop, I want to talk to a lawyer?

23  A    No he talked to us throughout.  Even in the car ride on

24  the way to the courthouse.

25  Q    In fact, you knew, that at this particular point, on

A-123

Cox - Cross - Goltzer                              1368

1   October the 9th, of 2012, that Mr. Romano did not even have a

2   lawyer?

3   A    Yes.

4   Q    He was representing himself in a proceeding in front of

5   Judge Bianco, right?

6   A    Yes, restitution proceeding on the underlining coin fraud

7   case.

8   Q    As required by law, you told Mr. Romano, listen, you

9   don't have to talk to us, right?

10  A    Correct.

11  Q    Anything you say can and will be used against you in a

12  court of law?

13  A    Yes.

14  Q    You have the right to an attorney?

15  A    Yes.

16  Q    You have a right to an attorney now?

17  A    Yes.

18  Q    During questioning, you told him that?

19  A    Yes.

20  Q    And you told him that if he could not afford an attorney,

21  you will get one for him?

22  A    Yes.

23  Q    And he still wanted to talk to you and he wanted to

24  cooperate?

25  A    Yes.

Cox - Cross - Goltzer                    1369

1   Q    And, he still told you, this was a harebrained scheme,

2   the murder of Romano and-- murder of Bianco and Gatz.  This

3   was a harebrained scheme?

4   A    Yes, he did say that.

5   Q    Which I very recently, recently contemplated?

6   A    He said, which I only recently contemplated putting into

7   action, something like that.

8        Do you want me to read the quote?

9   Q    That's all right.

10       The only person I spoke to about it was Jerry?

11  A    The only person he spoke to putting --

12  Q    The plan of action?

13  A    The plan of action was Jerry.

14  Q    So he told you that the only person he talked to about

15  really doing anything to Judge Romano or Lara Gatz was Jerry?

16  A    That's what he told us, yes.  Although, he did say he

17  talked to David Mirkovic about it and instructed him to carry

18  forward.

19  Q    That was after he met Jerry?

20  A    Yes.

21  Q    He never told you that he talked to Mirkovic about

22  killing anybody prior to the time that he met Jerry?

23  A    I don't think that was clear to me.  He did say he talked

24  to Mirkovic about a number of things.

25       Can I refer to my notes?

```
                    Cox - Cross - Goltzer                 1372
 1    A     Yes.
 2    Q     He gave you the names of people he told that to?
 3    A     Yes.  Ishmael Cohen and Breon Florestal and Bobby Brown.
 4    Q     And in an effort to cooperate with you, he told you,
 5    these bad guys came to me and said, listen, we will do this
 6    for you, right?
 7    A     Yes.
 8    Q     And he told you, he said, I didn't do it, right?
 9    A     He didn't do what?
10    Q     He didn't ask them to kill Judge Bianco?
11    A     No.  He asked Ishmael Cohen to beat up Nick Pittas.
12    Q     You see the difference between a beating and a murder?
13    A     I do.  I see this case that one preceded the other.
14    Q     You see in this case, that one is more serious than the
15    other?
16    A     Yes.
17    Q     You see in this case that the payment of $3,000 to
18    assault somebody for a personal grudge is not even a federal
19    crime?
20    A     I don't think it is, no.
21    Q     It is a misdemeanor assault across in the State Court,
22    right?
23          MS. DEAN:  Objection.
24          THE COURT:  Objection sustained.  I thought I was
25    going to tell people what the law was, I thought I made that
```

Cox - Cross - Goltzer                              1373

1   clear last week.

2              MR. GOLTZER:  You did, sir.

3              THE COURT:  I accept your apology, but don't be

4   telling people it is a misdemeanor.  Something-- some assaults

5   are felonies.  There are under New York State law, there are

6   two felonious degrees of assault.

7   BY MR. GOLTZER:

8   Q    There was no-- when the assault on Mr. Pittas was done,

9   the staged photographs didn't involve the use of a weapon?

10  A    No.

11  Q    Or the infliction of serious physical injury that could

12  readily cause death or protracted impairment?

13             MS. DEAN:  Objection.

14  Q    If you know?

15  A    There are pictures of him lying on the ground, looked

16  like he was crumpled up.  You really can't tell from them how

17  he was purportedly assaulted.

18  Q    Thank you.

19             So whether it was a serious or not serious one could

20  not tell from looking at the photographs?

21  A    All you can tell, the instruction was to give him a

22  serious beating.

23  Q    Now, this going back to the venting, he told you, that he

24  had been offered by other people to have the Judge hurt and

25  Lara Gatz hurt or killed?

Cox - Cross - Goltzer                1374

1   A    Yes.

2   Q    And he didn't avail himself of those offers.  Didn't

3   accept?

4   A    Well, the first stage with Ishmael Cohen was the beating

5   and that didn't go forward.  So there was no discussion

6   afterwards, no, from what he told us.

7   Q    But he told you that people came to him and offered to do

8   harm to the Judge?

9   A    Yes.

10  Q    And he didn't--

11  A    Offered to do harm on his behalf on the outside.

12  Q    And he didn't do it?

13  A    Not with Ishmael Cohen, not from what he told us.

14  Q    Or any of the others before Jerry, right?

15  A    From what he said, no.

16           THE COURT:  Let's take our recess now.  We will

17  complete cross afterwards.

18           MR. GOLTZER:  Yes.

19           I do apologize for that.

20           THE COURT:  The apology is accepted.

21           (Jurors left the courtroom and recess taken.)

22           THE COURT:  All right.  Everybody please be seated.

23           You may continue, Mr. Goltzer.

24           MR. GOLTZER:  Thank you, sir.  Just a couple of more

25  questions.

Cox - Cross - Goltzer                    1375

BY MR. GOLTZER:

Q    Officer, August 8, 2012, you attended a meeting with Mr.
Machacek, and several other representatives of the United
States government?

A    Yes.

Q    That included Assistant United States Attorneys?

A    Yes.

Q    Not these two?

A    No, two others.

Q    As well as other F.B.I. agents and investigators and the
like?

A    Yes.

Q    And, was Mr. Machacek asked during that meeting, to tape
record Mr. Romano?

A    Yes.  We told-- after interviewing him that day, he
provided information regarding at least the threats and he
said Mr. Romano wanted to kill the Judge and prosecutor.

Q    Did I ask you what he said?

A    I'm sorry, no.

Q    All right.  We will let Mr. Machacek talk about that, okay?

A    Yes.  We did give him instructions, yes, I apologize.

Q    No problem.

     Now, during that meeting, it became apparent that
you folks wanted Mr. Machacek to do something for the United
States which was wire up and record Mr. Romano?

Cox - Cross - Goltzer                    1376

1  A    Yes, we wanted him to follow up on what he told us.

2  Q    He was provided with instructions about how to conduct

3  the meeting?

4  A    Not until Friday, I believe.

5  Q    Was he told he was an undercover officer, that you wanted

6  him to arrange to have Mr. Romano meet with?

7  A    That was part two, yes, of what we told him.

8  Q    Where did part two take place?

9  A    At the Courthouse in Central Islip --

10 Q    So, prior--

11 A    -- on Friday, August 10th.

12 Q    On August 10th, there was another meeting with agents and

13 Jerry Machacek?

14 A    Yes.

15 Q    Who attended that particular meeting, if you recall?

16        MS. DEAN:  Objection as to scope.

17        THE COURT:  Overruled.

18 A    I was there with Agent Tariche from the F.B.I., Special

19 Agent McMullen and there were others.  I think Deputy Quinn

20 was there from the Marshal Service.

21 Q    What information, if any, was-- what instructions if any

22 were given to Mr. Machacek?

23 A    We told Mr. Machacek that we wanted him to engage in

24 conversation with Mr. Romano.  We provided him with a

25 recording device, which he wore in his shirt, inside out.  He

Cox - Redirect - Dean                                  1377

1    was told to try to bring up topics that they had previously

2    discussed and to talk about them further.

3              He told us, about what I was going to say before.

4    We told him that if the--

5              THE COURT:  You can tell us what you told him.

6    A    We told him that if the discussion comes up regarding

7    killing of the Judge and prosecutor, and you can offer and say

8    you have somebody on the outside that can help, maybe will

9    help with that.  You would be willing to introduce them.

10             We talked about him providing a name to Mr. Romano

11   if that happened.

12   Q    Did you give him the name Harold?

13   A    Yes.

14   Q    Did you give him any other names?

15   A    No.

16             MR. GOLTZER:  Nothing further, thank you.

17             THE COURT:  All right.  Redirect if any.

18             MS. DEAN:  A couple of questions, Your Honor.

19             More than a couple.

20   REDIRECT EXAMINATION BY MS. DEAN:

21   Q    Investigator Cox, you were asked questions about whether

22   the defendant referred to the murder plot as a harebrained

23   scheme.  Do you recall those questions?

24   A    Yes.

25   Q    And in fact the defendant did say that, that the murder

Machacek - direct - Goltzer                    1388

1  cooperation that you signed you acknowledge, that the maximum

2  penalty you were facing for the Hobbs Act robbery was 20

3  years; is that correct?

4  A    Yes.

5  Q    Additionally, you were facing a five-year mandatory

6  minimum term consecutive to the possibility of 20 years for

7  the gun count; is that correct?

8  A    Yes.

9  Q    And you also knew that while there was a five-year

10 minimum term on the gun count, there was a possible maximum

11 term of life in prison; isn't that true?

12 A    Yes.

13 Q    So, when you were arrested and indicted in January of

14 2012, you were facing potentially the rest of your life in a

15 Federal penitentiary without the possibility of parole?

16 A    No, the Judge told me 45 years.

17 Q    Forty-five years.  How old are you now?

18 A    Forty-four.

19 Q    How old were you then?

20 A    Forty-two.

21 Q    But you acknowledge that you could face a possible life

22 sentence for the gun?

23 A    Yes.

24 Q    And you didn't want to live in a Federal jail for the

25 rest of your life?

Machacek - direct - Goltzer                    1389

1   A      No.

2   Q      You didn't want to live in a Federal jail for 45 years?

3   A      No.

4   Q      You didn't want to live in a Federal jail for five

5   minutes.

6   A      No.

7   Q      And you knew that you had a prior criminal record;

8   correct?

9   A      Yes.

10  Q      And your prior criminal record was going to place you in

11  a position where you would have a very high advisory

12  guideline; is that correct?

13  A      Yes.

14  Q      That's because, in part, you have three prior felony

15  convictions?

16  A      Yes.

17  Q      One of the felony convictions is actually for a

18  kidnapping in the second degree?

19  A      Yes.

20  Q      That was in a State court case?

21  A      Yes.

22  Q      And you, in fact, did kidnap somebody?

23  A      Yes.

24  Q      Who did you kidnap?

25  A      I had somebody owed me some money and I kidnapped him to

Machacek - direct - Goltzer                    1390

1   try to collect the money.

2   Q    Okay.  You were going to hold him for ransom?

3   A    Yes.

4   Q    That's kidnapping in the first degree, isn't it?

5   A    I'm not sure, I believe so, I believe it was second

6   degree.

7   Q    And was there a gun involved in that particular case?

8   A    Yes.

9   Q    Were you going to kill anybody?

10  A    No.

11  Q    Okay.  Were you going to let him go?

12  A    Yes.

13  Q    Did they know who you were?

14  A    Yes.

15  Q    And did you think they were going to go to the police

16  after you let them go?

17          MS. DEAN:  Objection.

18          THE COURT:  Overruled.

19          Did you think that they were going to go to the

20  police?

21          MR. LA PINTA:  I hadn't thought about it, Judge.  I

22  never thought about it, Judge.

23          THE COURT:  He said he never thought about it.

24          Go ahead, next question.

25  Q    Did you do the kidnapping with anybody else?

VB        OCR        CRR

Machacek - direct - Goltzer                    1407

1   Q    In other words, you agreed with other people to steal
2   drugs?
3   A    Yes.
4   Q    Heroin?
5   A    No.
6   Q    Cocaine?
7   A    No.
8   Q    What drugs?
9   A    Doctor -- prescription drugs.
10  Q    From whom would you steal prescription drugs?
11  A    Stolen from a medical center when I was involved with
12  that robbery.
13  Q    What medical center?
14  A    In, I don't know the name of it, in Flushing.
15  Q    And who were you involved with?
16  A    With Timmy Glass and Terry Biddell.
17  Q    And you folks went to a medical center?
18  A    Yes.
19  Q    You drove the car?
20  A    No, I was a passenger.
21  Q    You knew there was going to be a robbery.
22  A    Yes.
23  Q    You agreed to take part in the robbery?
24  A    Yes.
25  Q    Tell the jury what you did.

Machacek - direct - Goltzer                    1408

1    A    I waited outside while they, while the other guy went in

2    and took the money and the drugs.

3    Q    He went inside with a gun?

4    A    Yeah, he went inside with a gun.

5    Q    You were a lookout?

6    A    Yes.

7    Q    You were helping him out?

8    A    Yes.

9    Q    You knew that there were people inside of that medical

10   center.

11   A    Yes.

12   Q    You knew that those people were going to be robbed of

13   their personal possessions?

14   A    Yes.

15   Q    He took jewelry?

16   A    I'm not sure.

17   Q    Well, what did he take?

18   A    He took a bag.

19   Q    What was in the bag?

20   A    Money and drugs.

21   Q    What was your take?

22   A    A few hundred dollars.

23   Q    You were part of a group that did this on a regular

24   basis, weren't you?

25   A    Yes.

Machacek - direct - Goltzer                    1410

1   Q    You pled guilty to money laundering right?

2   A    Yes.

3   Q    You were facing twenty years for the money laundering,

4   right?

5   A    Yes.

6   Q    What's that money laundering about, tell this jury?

7   A    Well, when you get money from a crime and then you spend

8   it, like for gas or whatever to go do another crime, then it's

9   money laundering.

10  Q    In fact, you were involved in the money laundering

11  conspiracy for a number of years.

12  A    Yes.

13  Q    How many years?

14  A    Two years.

15  Q    And during that money laundering conspiracy, you were the

16  bag man?

17  A    I don't understand.

18  Q    You were the guy who was supposed to pick up the money,

19  take it somewhere --

20       MR. GOLTZER:  I'm sorry, I withdraw that.

21  Q    You were the guy who was going to pick up the stolen

22  goods, right?

23  A    Yes.

24  Q    And other people's stuff that didn't belong to you?

25  A    Yes.

Machacek - direct - Goltzer                 1419

1   leg?

2           MR. LA PINTA:  Yeah, he shot me in the leg and I

3   shot him in the butt and that was it.

4           THE COURT:  All right.  He shot you by accident and

5   you shot him on purpose.

6           MR. LA PINTA:  I don't know, I don't think he shot

7   me by accident.

8           THE COURT:  You don't think he shot you by accident.

9           All right, go ahead.

10  Q   But it's okay because you're even now, right?

11  A   No, it was childish, I'm an adult now.

12  Q   Was it childish when you fired shots at a taxi cab?

13  A   No.

14  Q   Tell the jury what you did.

15  A   I shot -- I fired some shots at a taxi.  It was about a

16  quarter of a mile away.

17  Q   What did you did you use to shoot at the cab?

18  A   A .22.

19  Q   A .22 rifle?

20  A   Yes.

21  Q   Why?

22  A   I don't remember.  I think we had an argument, it's a

23  very long time ago.

24  Q   You can't remember why you shot at a taxi cab?

25  A   No.

VB     OCR     CRR

Machacek - direct - Goltzer                    1420

1   Q    Was there somebody in the cab when you shot at it?

2   A    The driver.  The guy was driving away.

3   Q    What about a passenger?

4   A    I don't remember.

5   Q    You don't remember what the argument was about?

6   A    No.  It was -- was it my job?  I wouldn't be accurate to

7   tell you.  I don't remember.

8   Q    By the way, you've been in what, fifty fights?

9   A    No, not that many.  But I been in a few fights.

10  Q    You know how to take care of yourself pretty well?

11  A    Well, no, I didn't do so good in some of them, you know.

12  Q    On July the 26th of 2012 you were at the Nassau County

13  Corrections Facility?

14  A    Yes.

15  Q    You were a prisoner in connection with the Federal

16  indictment involving Hobbs Act robbery, money laundering and

17  weapons use?

18  A    Yes.

19  Q    A robbery with which you were charged.  Part of the

20  charges involved the medical center that you've told this jury

21  about.

22  A    Yes.

23  Q    Part of the charges against you involved the perfume

24  store?

25  A    Yes.

Machacek - direct - Goltzer                    1421

1  Q    Part of the charges involved all of the money laundering

2  that you had done?

3  A    Yes.

4  Q    And part of the charges involved the gun that the robber

5  had used while you were the lookout?

6  A    Yes.

7  Q    And you were still trying to get your cooperation

8  agreement?

9  A    Yes.

10 Q    You were hoping, as a result of a cooperation agreement,

11 that you could avoid a significant term in prison?

12 A    Yes.

13 Q    You were hoping, as the result of your cooperation

14 agreement, that you could get time served?

15 A    Never thought about that, but.

16 Q    Did you ever inquire whether there was any mandatory

17 minimum if you got a cooperation agreement?

18 A    Yes.

19 Q    And what did you find out?

20 A    That the Judge can use his discretion.

21 Q    And the Judge could give you a big break?

22 A    Yes, possible.

23 Q    Did you ever try to find out what kind of breaks people

24 could get for getting cooperation agreements with the

25 Government?

VB        OCR        CRR

Machacek - direct - Goltzer                    1426

1   A     The first time I met him, yeah, he told me what he was

2   charged with.

3   Q     When was the first time you met him?

4   A     First time I spoke with Joe was January 26th.

5   Q     July?

6   A     July 26th.

7   Q     And you had some paperwork?

8   A     Yes.

9   Q     And on your paperwork were listed things about your case?

10  A     It was a copy of my indictment.

11  Q     And it was on the table?

12  A     Yes.

13  Q     And you and Joe and Desi were at the same table?

14  A     Yes.

15  Q     And Joe mentioned, oh, you have Bianco?

16  A     Yes.

17  Q     And at that point, did he start to rant?

18  A     No, he started to explain his case to me.  He started to

19  show me pictures of his house and he started to get into the

20  particulars of his case, how he was screwed, how he was

21  railroaded.

22  Q     He was angry?

23  A     Yeah, he got angry, yes.

24  Q     He went on for like two hours.  An hour, two hours?

25  A     We spoke for less than three hours, I would say.

Machacek - direct - Goltzer                    1427

1   Q   That whole time he was telling you how he got shafted?

2   A   I think he was telling me a lot more than that.

3   Q   He told you he hated the Judge, couldn't stand the Judge?

4   A   No, he told me he wanted to kill the Judge.

5   Q   I want the Judge dead, I want the prosecutor dead, I want

6   everybody dead?

7   A   No, no, no.  He wanted the Judge murdered.

8   Q   That's what he told you?

9   A   Yes, in that conversation.

10  Q   First time you met him?

11  A   Well, it was a few hours into the conversation.  He said

12  that he should die, he should be murdered, he should be

13  murdered in front of his children and let them be fatherless

14  like him.

15          And he explained to me that he was a bigshot caller

16  in the jail.  Explained to me that he had a lot of people

17  working for him in the jail, that they were peanut brains and

18  that these people in the jail, you know, he wants them to do

19  some work for him, he wants -- he has them doing things for

20  him in the jail and he's very frustrated, very mad about the

21  whole situation, and he feels like a political -- how is it?

22  Conspiracy against him.

23  Q   And he went on for an hour or two?

24  A   Not about that.  He went on about his military history.

25  Q   He told you he was a weapons expert?

VB        OCR        CRR

Machacek - direct - Goltzer                1428

1   A    Weapons, bombs.

2   Q    Told you he was a bombs expert?

3   A    Sniper.

4   Q    Sniper expert?

5   A    Yeah.

6   Q    Told you he had all kinds of guns, told you he had people

7   on the outside?

8   A    Yes.

9   Q    Told you he was a dangerous man?

10  A    From what I gathered he's a scary, tough -- he's a tough

11  guy.

12  Q    Now --

13  A    He's a veteran, you know.

14       THE COURT:  What was the last thing?

15       MR. LA PINTA:  He was a veteran, he was a tough guy,

16  he was trained in combat.

17  Q    You realized at that point that it would be good for you

18  if could you give information about Joe Romano to the United

19  States Government?

20  A    Not at all, no.

21  Q    Never occurred to you?

22  A    Never even thought about it.

23  Q    You never thought about cooperating against Joe Romano

24  after you heard him talking for an hour or two about killing

25  people?

Machacek - direct - Goltzer                    1429

1   A    No, I was really actually, really scared.

2   Q    He scared you?

3   A    Very much.

4   Q    Now, you weren't afraid earlier in your life to steal

5   things.

6   A    No, I was afraid sometimes.

7   Q    You weren't afraid to go with people to rob things.

8   A    Sometimes I was, sometimes I wasn't.

9   Q    But you overcame it?

10  A    Yeah, you could say so, yes.

11  Q    Well, I do say so.  You found the courage.  You found the

12  courage to steal?

13  A    Yes.

14  Q    You found the courage to lie to people?

15  A    Yes.

16  Q    You found the courage to help people use guns, to steal

17  from people?

18  A    Yes.

19  Q    You found the courage to know that the people you were

20  working with were going to stick the guns in people's faces;

21  right?

22  A    Yes.

23            MS. DEAN:  Objection, Your Honor.

24            THE COURT:  Sustained.

25  Q    And you were afraid of Joe Romano?

Machacek - direct - Goltzer                    1430

1  A    Talking about killing people.  Killing them in a house in
2  front of their children.  Yes, I'm afraid of it.  And yeah --
3  Q    Did you write a letter to your lawyer?
4  A    Yes, I did.
5  Q    And did you say to your lawyer in a letter that you know
6  was given the Government --
7  A    Yes.
8  Q    -- the guy's nuts?
9  A    Yes.
10 Q    Did you think the guy was nuts?
11 A    Oh, I think he's nuts, but I think he's serious nuts to
12 do this, yes.  Yes.
13 Q    You told your lawyer he was nuts.
14 A    Mm-hmm.
15 Q    You told your lawyer you were really concerned for the
16 welfare of the Federal Judge?
17 A    I was scared I was going to open the paper the next day
18 and see that a judge was killed because he told me he had
19 other people in the street working on things for him.
20 Q    Didn't you tell your lawyer in the same letter that you
21 didn't know whether -- you had no idea whether he had any
22 plans?
23 A    This is what I felt.
24 Q    Didn't you tell your lawyer in that letter I have no
25 idea --

VB        OCR        CRR

```
                 Machacek - direct - Goltzer              1431
```

1   A    No, I had no idea of his particular plans however, I know

2   he had people working in the streets and he said these things

3   were in the works already.

4   Q    So, you believed that he was a weapons expert.

5   A    Yes.

6   Q    You believed that he could make a bomb?

7   A    Yes.

8   Q    You believed that he had guns?

9   A    Yes.

10  Q    You believed that he was dangerous?

11  A    Yes.

12  Q    He frightened you terribly?

13  A    Of course, I'm scared.  Somebody like that wants to kill

14  people, kill a judge.

15  Q    And it never occurred to you that he was just venting?

16  A    No, there's a difference between venting.  If you were

17  there, it's a difference between venting and...

18  Q    So, you never saw Joe Romano vent?

19  A    There's a difference, in my opinion, from venting.  When

20  you get into the details of planning and details of about the

21  people's lives.  He was speaking about intimate things about

22  them.  He was a serious guy, serious.  This was well thought

23  out.

24  Q    And did you see this as a get-out-of-of-jail-free card

25  where you could use this and send it over to the Government?

Machacek - direct - Goltzer                1432

1  Did that ever enter your mind?

2  A    Absolutely not.  I was scared that someone's going to be

3  killed over here.

4  Q    So, let me just make sure we're clear on this.

5             Your writing the letter to your lawyer was strictly

6  on your part a charitable act where you cared for the welfare

7  of other people?

8  A    I tried to forget about it at first, and a hundred

9  percent I couldn't, I couldn't sleep.  I had to write him a

10  letter.  Hey, I didn't know what to do.  I didn't want to open

11  the next day that I would have known and then think I could

12  have stopped this.  Come on.

13  Q    So, this was a matter -- I'm sorry, did I interrupt you,

14  sir?

15  A    I can't have somebody getting killed.

16  Q    So, this was a matter of your conscience?

17  A    It was just bothering me, I didn't think about

18  conscience.  It was bothering me horribly inside.

19  Q    It broke your heart because --

20  A    No, I was, it was just, I was scared.

21  Q    And you wrote a letter to your lawyer?

22  A    Mm-hmm.

23  Q    And then you had a meeting over at the United States

24  Attorney's Office?

25  A    Yes.

VB        OCR        CRR

Machacek - direct - Goltzer                1433

1    Q    Did it occur to you on the way to that meeting that you
2    could be helping yourself or were you still primarily
3    concerned about the welfare of other people?
4    A    I really didn't think about it.
5    Q    It never occurred to you that you could do yourself any
6    good by talking to the United States Attorney about an alleged
7    threat to a Federal Judge?
8    A    Yes, in hindsight now, yes.
9    Q    But at the time.  At the time it never occurred to you
10   that this is a good thing for me?
11   A    To tell you the truth, I don't remember thinking about it
12   in that, that fashion or anything like that.  After the fact,
13   I have thought about it, yes.  But at that time, it was an
14   emergency, I was -- I'm shaking, I'm thinking about it now.
15   Q    It was an emergency that made you shake, right?
16   A    Yes.
17   Q    It was an emergency that made you shake on July the 26th,
18   2012, when you met Joe Romano, yes?
19   A    I was floored by what he was speaking about.
20   Q    And then you waited until about August 2nd to write the
21   letter?
22   A    No, I was thinking about what should I do.
23   Q    You waited about a week to figure out what you should do.
24   A    No, I don't think it was a week.  I that I, I think it
25   was before that.

VB        OCR        CRR

Machacek - direct - Goltzer          1434

1   Q   Are you sure?

2   A   I'm not sure.  I'm not a hundred percent sure.

3   Q   But you didn't do it right away?

4   A   Within a day or two, I believe.

5   Q   You wrote a letter?

6   A   Yes.

7   Q   You didn't think to make a phone call?

8   A   Who am I going to call?

9   Q   Your lawyer?

10  A   Well, I could only get in touch with him through a

11  letter.  I didn't have money for a phone.  It's a reverse

12  phone.  You need to have money on the other side.

13  Q   Did you think of telling the guard I have an emergency

14  situation I need to speak to law enforcement?

15  A   I've been in jail a while.  This guy has about the whole

16  jail bought.  You're not going no guard.

17  Q   So, let me get this straight.  Joe Romano, in your view,

18  had so corrupted the entire Nassau County Corrections Center

19  that you couldn't go to a warden or a guard and report a

20  threat to a Federal Judge; is that right?

21  A   I didn't think about it at the time and I didn't feel

22  very comfortable speaking to any of the staff in there because

23  it's corrupt, the jail.

24  Q   So, they were so corrupted you couldn't warn them --

25  A   I don't know how corrupt they were, but I was scared I

1471

1  close parenthesis, on the bottom of page four.

2        MS. DEAN:  Yes, Your Honor.

3        THE COURT:  Does everybody agree to that?

4        MR. BACHRACH:  Yes, Your Honor.

5        THE COURT:  Does the government agree?

6        MS. DEAN:  Yes, Your Honor.  We'll prepare an

7  amended version.

8        THE COURT:  Prepare an amended version and then

9  right after that you put in a true bill, and since the

10  indictment was returned here in the Eastern District, even

11  though the Western District is technically the prosecutor, it

12  should read Eastern District.  Okay.  All right.  Those are

13  the changes.

14        Now, on the entrapment issue, you both cite this

15  Cromitie case and you both supply it to me.  The defense

16  leaves a little bit out and the government adds the part that

17  is at the end of the so-called Cromitie about conduct.  It

18  seems to me that if it is going to go in, the conduct part has

19  to go in with it.

20        MR. BACHRACH:  I think you mean the statements part.

21        THE COURT:  Here's what I intend to charge if I

22  charge:  To determine whether the defendant was ready and

23  willing to commit the offenses charged, you may rely upon any

24  relevant evidence of what the defendant said or did before

25  first being approached by a government agent.  You may also

1472

1   rely upon any relevant statements of the defendant after he
2   was first approached by the government agent but you may rely
3   upon the defendant's conduct after he was first approached by
4   the government agent only if that conduct is independently
5   motivated and not the product of attention that the government
6   might have directed at the defendant.
7        MR. BACHRACH:  I would have no objection to that,
8   Your Honor.
9        THE COURT:  All right, then I'll do that since both
10  sides want it, and I don't think there's anything else as to
11  the charge conference then.
12       So, we'll get an amended indictment by tomorrow.
13       MR. BACHRACH:  Your Honor, the only thing else is
14  that I just need to preserve the record on the other issue
15  related to entrapment that I said I would reserve until now.
16       THE COURT:  Go ahead, you make your argument.
17       MR. BACHRACH:  Thank you, Your Honor.  There are two
18  issues, I understand that the Second Circuit disagrees with me
19  on this, the Second Circuit obviously controls what you can
20  do; however, I believe, as does the Sand book and many other
21  circuits who have weighed in, that the Second Circuit is
22  incorrect, that there is no preponderance of evidence
23  requirement for the defense, that's too strong a standard and
24  we wish to preserve that objection, Your Honor, because it
25  does appear the Second Circuit is alone in their fight on that

A-151

1473

1   issue.  That's the first one --

2          THE COURT:  You, Mr. Bachrach, have the luxury of

3   disagreeing with the Second Circuit.  I, a mere trial judge,

4   can't disagree with the Second Circuit.  So, your application

5   is denied and I'm going to charge as submitted to counsel.

6          MR. BACHRACH:  Thank you, Your Honor.  And just

7   relatedly, and this is not actually controlled by the Second

8   Circuit, I don't believe the Second Circuit has ruled on this

9   and if they have, I am not familiar with which case, I don't

10  believe that it is appropriate even if preponderance is the

11  correct standard, we would object to including an instruction

12  on preponderance because it causes the danger of misleading

13  the jury into burden shifting and we're concerned about that.

14         I don't believe the Second Circuit has ever said

15  that you are required to include a preponderance charge.

16  Sand clearly doesn't and some circuits have at least said that

17  including one would be reversible error but, again, that's not

18  the Second Circuit, I don't believe they have ruled.  So, we

19  would object on the burden shifting ground as well, Your

20  Honor.

21         THE COURT:  All right.  Your objection is noted, you

22  have an exception.

23         MR. BACHRACH:  Thank you, Your Honor.

24         THE COURT:  Okay.  Now, I think this part should be

25  off the record and if it is necessary to put anything on the

Summation - Ms. Dean                1509

1     Ladies and gentlemen, your job as jurors is to

2 evaluate the evidence fairly and impartially and doing your

3 jobs means using your common sense when you're evaluating the

4 evidence.  Here, the defendant's argument that he was

5 entrapped makes no sense.  It's the argument of a disparate

6 man who was caught red handed.

7     As I expect, Judge Keenan will instruct you

8 the defense of entrapment has two components.  When a

9 defendant argues that he is innocent because he was entrapped

10 he must prove, not the Government, but he must prove that he

11 was induced to commit the crime.

12     If he can prove that he was induced, and the

13 Government must prove, that the defendant was predisposed, in

14 other words, ready and willing to commit the crime.  This is

15 because the law permits government agents to trap an unwary,

16 criminally minded person but it doesn't permit government

17 agents to entrap unwary, innocent person.

18     Ladies and gentlemen, you neither saw nor

19 heard any evidence of entrapment in this case.  The evidence

20 was overwhelming and clear.  The defendant harbored these

21 plans to murder Judge Bianco and AUSA Gatz long before Jerry

22 Machacek ever entered the picture on August 10, 2012.  You

23 heard about how, long before the defendant met Jerry

24 Machacek, he was a violent, angry man who hated Judge Bianco

25 and AUSA Gatz.  He blamed them for the fact that he was

Rebuttal Summation - Mr. Miller                    1558

1   he met Mr. Machacek was an unwary, innocent person or a

2   criminally minded person, the evidence here screams out the

3   answer.  The defendant was a deeply disturbingly, committed,

4   criminal minded person long before he ever met Jerry

5   Machacek.  And, as a result, the entrapment defense fails,

6   fails at the very outset.

7              But let's talk about specifics.  Let's talk

8   about each of the pieces of evidence that shows you that and

9   shows you that this is a last-ditch effort to avoid

10  responsibility.

11             Now, as you heard from, I think, both sides,

12  we also predict Judge Keenan is going to instruct you about

13  entrapment but there's really two parts -- inducement and

14  predisposition.  And when it comes to showing inducement, the

15  defendant bears that burden of proof.

16             What does that mean?  It means, as you heard a

17  lot of times, the Government bears the burden of proving the

18  defendant's guilt of the murder conspiracy beyond a

19  reasonable doubt.  We embrace that burden.  I submit, as

20  Ms. Dean talked about at length, we've gone above and beyond

21  that burden in proving his guilt of the murder conspiracy.

22             But when it comes to inducement that's the

23  defendant's burden.  The defendant has to show that the

24  Government originated this crime, the Government came up with

25  the idea for the crime, and then the Government persuaded the

Rebuttal Summation - Mr. Miller                1566

1    get the murders done well after there's no way he spoke to

2    Jerry Machacek.  But what about between August 21st and

3    September 28th?

4               Now, Mr. Goltzer just told you he said they

5    met 8 to 12 times.  You know they met 8 to 12 times.  You

6    know it from the testimony.  Let's look at the testimony.

7    Page 1424.  You know he were in different dorms.  You know

8    they had work jobs.  One was on, I think, on the rec deck,

9    one of them was pushing carts and Mr. Goltzer asked them:

10   Did you ever see each other?  And let's look at what he said.

11              Go up a little bit for a second.  He says, you

12   were working on the rec deck and Joe was working giving out

13   meals.  Yes.  Look at what he says on lines 15 and 16."

14              "QUESTION:  How often would you see Joe?"

15              "ANSWER:  I seen Joe about maybe eight times,

16        ten times."

17              That's it.  They saw each other 8 to 10 times.

18   Anything else other than they saw each other is pure

19   speculation.

20              You already know that Mr. Romano said:  I

21   ain't going to backtrack.  He's not asking me any questions

22   about my business and I ain't going to tell him anything.

23   And then all we know is that he saw him 8 to 10 times.

24   Remember this is an affirmative defense.  The Government

25   bears the burden of proving the guilt of the defendant beyond

Rebuttal Summation - Mr. Miller                    1567

1   a reasonable doubt about his murder conspiracy counts.  We

2   embrace that burden and we submit it's been met and then

3   some.

4               But when it comes to inducement this is the

5   defendant's burden.  And, members of the jury, Mr. Bachrach

6   told you at openings.  See what he says.  "We're going to

7   call Jerry.  We'll get him to tell you about all the times he

8   met with Romano and all of his efforts to induce and entrap

9   Joseph Romano."

10              Mr. Goltzer put him on the stand and he asked

11  him a very careful question if you notice.  "How often would

12  you see Joe?"  And the answer was:  "I seen him about eight,

13  ten times."  And then Mr. Goltzer went away to a completely

14  different subject.

15              "Now, you never met him before July 26th?

16              "No."

17              "Is that right?"

18              "No."

19              "Was your answer no?"

20              "No."

21              Moves away, right?  They promised they were

22  going to get him to tell you about all of his efforts to

23  induce and entrap Joseph Romano but then they want don't want

24  to ask him actually, "Did you ever talk to him?"  "Did you

25  ever talk to him about the plot."  "Did you ever induce him?"

*Charge of the Court*                                        1630

1   substitute for proof that the defendant committed the crimes

2   charged in this case.  Nor may you consider this evidence as

3   proof that the defendant has a criminal propensity or bad

4   character.  The evidence of other bad acts was admitted for a

5   limited purpose, and you may consider it only for that limited

6   purpose.

7           Evidence has been introduced that the defendant made

8   statements to law enforcement officials about the crimes

9   charged.  You should weigh that evidence with caution and

10  carefully consider all the circumstances surrounding the

11  making of the statement.  Do this in deciding what weight to

12  give it, along with all the other evidence, when deciding the

13  guilt or innocence of the defendant.  In examining the

14  circumstances surrounding the statement, you may consider

15  whether the defendant made it freely and voluntarily with an

16  understanding of what he was saying.  You may consider whether

17  he made it without fear, threats, coercion, or force, either

18  physical or psychological, and without promise of reward.  You

19  may consider the conversation between law enforcement and the

20  defendant.  Considering all the circumstances, you should give

21  his statement such weight as you think it deserves.

22          Now, I will discuss with you the defense of

23  entrapment.  The defendant asserts, as a defense, that he was

24  the victim of entrapment by an agent of the Government.  While

25  the law permits government agents to trap an unwary criminally

*Charge of the Court* 1631

1  minded person, the law does not permit the government agents

2  to entrap an unwary innocent.  Thus, a defendant may not be

3  convicted of a crime if it was the Government who gave the

4  defendant the idea to commit the crime, if it was the

5  Government who also persuaded him to commit the crime, and if

6  he was not ready and willing to commit the crime before the

7  government officials or agents first spoke with him.

8          On the other hand, if the defendant was ready and

9  willing to violate the law, and the Government merely

10  presented him with an opportunity to do so, that would not

11  constitute entrapment.

12          Your inquiry on this issue should first be to

13  determine whether the defendant has shown by a preponderance

14  of the evidence that a government agent originated the

15  criminal design of the particular criminal acts charged in the

16  indictment.  To prove something by a preponderance of the

17  evidence means to prove only that it is more likely true than

18  not true.  If you find that the defendant has failed to meet

19  this burden, then there cannot be any entrapment and your

20  inquiry on this defense should end there.

21          If, on the other hand, you find that a government

22  agent initiated the criminal acts charged in the indictment,

23  then you must decide if the Government has satisfied its

24  burden to prove beyond a reasonable doubt that prior to first

25  being approached by government agents, the defendant was ready

*Charge of the Court* 1632

1 and willing to commit the crime.

2          To determine whether the defendant was ready and

3 willing to commit the offenses charged, you may rely upon any

4 relevant evidence of what the defendant said or did before

5 first being approached by a government agent.  You may also

6 rely upon any of the relevant statements of the defendant

7 after he was first approached by the government agent.  But

8 you may rely upon the defendant's conduct after he was first

9 approached by the government agent only if that conduct is

10 independently motivated and not the product of attention that

11 the Government might have directed at the defendant.

12          If you find beyond a reasonable doubt the defendant

13 was predisposed - that is, ready and willing - to commit the

14 offenses charged, and merely was awaiting a favorable

15 opportunity to commit them, then you should find the defendant

16 was not the victim of entrapment.  On the other hand, if you

17 have a reasonable doubt that the defendant would have

18 committed the offenses charged without the Government's

19 inducements, you must acquit the defendant.

20          You have heard testimony from both Agents of the

21 Federal Government and the Nassau County and Suffolk County

22 Police Departments.  The fact that a witness acts in a law

23 enforcement capacity does not mean that his or her testimony

24 is deserving of more or less consideration or greater or

25 lesser weight than that of an ordinary witness.  It is for you

A-159

Proceedings                                            1650

1          (Time noted:  3:03 p.m.)

2          THE COURT:  You can show the note to both sides and

3     we'll wait for Mr. Romano.

4          (Pause in the proceedings.)

5          (Defendant enters courtroom.)

6          (Jury enters courtroom.)

7          THE COURT:  All right.  You may all be seated,

8     except Juror Number One, would you please rise.

9          THE CLERK:  Has the jury agreed upon a verdict?

10          THE FOREPERSON:  We have.

11          THE CLERK:  How do you find defendant Joseph Romano

12     with respect to Count One?

13          THE FOREPERSON:  Guilty.

14          THE CLERK:  How do you find defendant Joseph Romano

15     with respect to Count Two?

16          THE FOREPERSON:  Guilty.

17          THE CLERK:  Please be seated.

18          THE COURT:  Could I please see the --

19          MR. GOLTZER:  May the jury be polled, Your Honor?

20          THE COURT:  Oh, certainly.  I just want to look at

21     the verdict form.

22          (Pause.)

23          THE COURT:  The verdict form is appropriate and

24     that's marked Court's Exhibit Four.

25          Juror number one, is that your verdict?

A-160

Page: 1 of 4

Knowing and understanding these rights, I hereby make the following statement:

I. My name is Joseph Romano, DOB ████████, SSAN ████████

II. I have signed an Advice of Rights form, which is attached to this statement and incorporated by reference.

III. I have agreed to cooperate with the FBI and provide statements about crimes I know about and crimes in which I was personally involved.

IV. I and at least one other, including but not limited to Dejvid Mirkovic, conspired to murder Federal District



GOVERNMENT EXHIBIT

101

12-CR-691 (JFK)

Court Judge Joseph Bianco and Assistant United States Attorney Lara Gatz.

V. I am willing to provide information I acquired while incarcerated regarding a double homicide in Freeport, NY.

VI. I am willing to provide information about other prisoners who approached me and offered to perpetrate violent acts on my behalf.

VII. I am willing to provide information about individuals who may be connected to organized crime groups.

A-162

I have read the foregoing statement consisting of _4_ pages. I fully understand this statement and it is true and correct to the best of my knowledge. I have made the corrections shown.

I make this statement freely and voluntarily, without threats, rewards or promises of immunity in return for it.

Subscribed and sworn to on this day _10 / 9 / 2012_

Signature

Witness

Edward J. Heslin   FBI - NYO
Witness

A-163

4/4

FD-395 (Rev. 11-5-02)

## ADVICE OF RIGHTS

Place 10/9/12
Date
Time 9.14 a.m.

### YOUR RIGHTS

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present.

Signed _____

Witness: Edward J. Abelin FBI - NYO

Witness: _____

Time: 9:21 a.m.

LAW OFFICE OF

# MICHAEL K. BACHRACH

276 FIFTH AVENUE, SUITE 501
NEW YORK, N.Y. 10001
--------------
TEL. (212) 929-0592 • FAX. (866) 328-1630

MICHAEL K. BACHRACH *
* admitted in N.Y. and D.C.

http://www.mbachlaw.com
michael@mbachlaw.com

January 20, 2014

By ECF

The Hon. John F. Keenan
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

*Re: United States v. Joseph Romano,*
*12 Cr. 691 (JFK) (EDNY)*

Dear Judge Keenan:

We represent Defendant Joseph Romano in the above-referenced matter and write in advance of the charge conference to propose a brief addition to this Court's present proposed entrapment instruction.  Specifically, we write to request that the following language be inserted into this Court's jury charge:

> To determine whether the defendant was predisposed – that is, ready and willing – to commit the offenses charged, you may rely upon any relevant evidence of what the defendant said or did before first being approached by a government agent, but you may not rely upon the defendant's conduct after his first contact with the government agent unless that conduct is independently motivated and not the product of the attention that the government had directed at the defendant.

(See Exhibit A, attached hereto, a copy of this Court's proposed charge with the above language included and underlined to highlight Defendant's proposed addition.)

The present version of this Court's charge appears to be based upon the Sand model instruction with one significant modification, namely, the insertion of language related to the defendant's "preponderance" burden, which had been

A-165

The Hon. John F. Keenan
January 20, 2014
Page 2 of 3

requested by the Government and objected to by the defense.  Putting aside until the charge conference our continuing objection to a "preponderance" instruction, we note our belief that the Second Circuit's August 22, 2013, holding in United States v. Cromitie, 727 F.2d 194 (2d Cir. 2013), which was decided more recently than the most recent edition of Sand, requires this Court to include in its entrapment instruction the additional language proposed above by the defense.

In relevant part, Cromitie addressed, as a case of first impression in the Second Circuit, the type of evidence relevant to predisposition, specifically, how the timing and type of conduct effects what the jury may consider in determining whether or not the defendant was predisposed to commit the charged offense. Specifically, the Second Circuit held as follows:

> **(3) Type of Evidence Relevant to Predisposition**
> Obviously any relevant evidence of what a defendant says or does *before* "first being approached by Government agents," Jacobson [v. United States], 503 U.S. [540,] 549, 112 S.Ct. 1535 [(1992)], is admissible. Not as clearly admissible is evidence of what a defendant says or does *after* inducement. Although as a general matter "a defendant's state of mind ... can be inferred from his actions and statements," United States v. Spencer, 995 F.2d 10, 11 (2d Cir. 1993), a broad application of that principle would undermine the entrapment defense by permitting any induced conduct to prove predisposition. To guard against that risk, the Supreme Court has required that conduct of a defendant, after contact by Government agents, offered to prove predisposition, must be "independent and not the product of the attention that the Government had directed at [the defendant]." Jacobson, 503 U.S. at 550, 112 S.Ct. 1535; see United States v. Squillacote, 221 F.3d 542, 565-66 (4th Cir. 2000) (Predisposition may be proved by evidence of "independently motivated behavior that occurs after government solicitation begins.").[11]

Cromitie, 727 F.3d at 208-09 (emphasis in original) (also explaining in n.11, "The District Court charged the jury, 'Although you may consider evidence relating to a defendant's conduct after he was first approached, you may do so only to the extent that it shows something about the defendant's state of mind before that

A-166

The Hon. John F. Keenan
January 20, 2014
Page 3 of 3

point.' Tr. 3488. This statement was too broad in that it did not limit consideration of post-contact conduct to 'independently motivated behavior.' Squillacote, 221 F.3d at 565.").

    Accordingly, to be consistent with the Second Circuit's recent opinion in Cromitie, we respectfully request that this Court incorporate into its entrapment charge the language proposed herein by the defense.

                              Respectfully submitted,

                              Michael K. Bachrach
                              George R. Goltzer
                              *Attorneys for Defendant Joseph Romano*

cc:     All parties of record (by ECF)

**<u>Defendant's Exhibit A</u>**

**<u>Entrapment</u>**

Now, I will discuss with you the defense of entrapment. The defendant asserts, as a defense, that he was the victim of entrapment by an agent of the Government. While the law permits Government agents to trap an unwary criminally minded person, the law does not permit the Government agents to entrap an unwary innocent. Thus, a defendant may not be convicted of a crime if it was the Government who gave the defendant the idea to commit the crime, if it was the Government who also persuaded him to commit the crime, and if he was not ready and willing to commit the crime before the Government officials or agents first spoke with him.

On the other hand, if the defendant was ready and willing to violate the law, and the Government merely presented him with an opportunity to do so, that would not constitute entrapment.

Your inquiry on this issue should first be to determine whether the defendant has shown by a preponderance of the evidence that a Government agent originated the criminal design of the particular criminal acts charged in the Indictment. To prove something by a preponderance of the evidence means to prove only that it

A-168

is more likely true than not true. If you find that the defendant has failed to meet this burden, then there can be no entrapment and your inquiry on this defense should end there.

If, on the other hand, you find that a Government agent initiated the criminal acts charged in the Indictment, then you must decide if the Government has satisfied its burden to prove beyond a reasonable doubt that prior to first being approached by Government agents, the defendant was ready and willing to commit the crime.

To determine whether the defendant was predisposed – that is, ready and willing – to commit the offenses charged, you may rely upon any relevant evidence of what the defendant said or did before first being approached by a government agent, but you may not rely upon the defendant's conduct after his first contact with the government agent unless that conduct is independently motivated and not the product of the attention that the government had directed at the defendant.

If you find beyond a reasonable doubt that the defendant was predisposed — that is, ready and willing — to commit the offenses charged, and merely was awaiting a favorable opportunity to commit them, then you should find that the defendant was not the victim of entrapment. On the

A-169

other hand, if you have a reasonable doubt that the
defendant would have committed the offenses charged without
the Government's inducements, you must acquit the
defendant.



**U.S. Department of Justice**

*United States Attorney*
*Western District of New York*

_____

MLM:UAD

January 20, 2014

<u>VIA E-MAIL, HAND DELIVERY AND ECF</u>

The Honorable John F. Keenan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007-1312

       Re:  United States v. Joseph Romano
           <u>Criminal Docket No. 12-691 (JFK)</u>

Dear Judge Keenan:

      The government respectfully submits this letter in
response to the defendant's request for the addition of new language
to the Court's proposed jury instruction on entrapment.  As set forth
below, the government does not oppose additional language
instructing the jury regarding predisposition evidence, so long as
it is complete, balanced and addresses statements as well as conduct.

      Relying on <u>United States v. Cromitie</u>, 727 F.3d 194 (2d Cir.
2013), the defendant requests an instruction on the permissible use
of evidence of what the defendant said and did after the initial
approach of a government agent to prove predisposition.  However,
the requested instruction is not complete as it only addresses
<u>conduct</u> after that initial approach, rather than conduct <u>and</u>
<u>statements</u>.  The government does not oppose the additional
instruction, so long as the Court's instruction addresses both the
defendant's conduct and statements after the initial approach.[1]

_____

[1] While the government does not oppose a balanced and complete instruction,
addressing post-approach statements as well as conduct, it is not apparent that
the instruction is legally necessary.  The Court's draft charge on entrapment is
based on Judge Sand's model charge, which has been repeatedly used in Second Circuit
courts and upheld by the Court of Appeals.  <u>See</u> <u>United States v. Brand</u>, 467 F.3d
179, 205 (2d Cir. 2006) (upholding entrapment instruction that "mirrors the model
language from Sand's <u>Modern Federal Jury Instructions</u> – language we have previously
approved); <u>United States v. Han</u>, 230 F.3d 560, 565 (2d Cir. 2000).  Indeed, the

1

In Cromitie, 727 F.3d at 199, a prosecution resulting "from an elaborate sting operation conducted by the FBI using an undercover informant," where the informant met with the four defendants scores of times over the course of almost a year, the Circuit addressed the admissibility of evidence of what a defendant said and did after the alleged inducement, offered to prove predisposition.  Applying Jacobson v. United States, 503 U.S. 540, 548 (1992), the Second Circuit held it permissible for the government to offer "conduct of a defendant, after contact by Government agents, [] to prove predisposition" so long as that conduct is "'independent and not the product of the attention that the Government had directed at [the defendant].'"  Cromitie, 727 F.3d at 209 (quoting Jacobson, 503 U.S. at 550)).  Drawing a distinction between post-contact conduct and post-contact statements, the Cromitie Court went on to hold that "what a defendant says after contact[] by agents is generally admissible to prove predisposition . . ."[2]  Id.

The government does not oppose the Court delivering additional instruction on this issue, so long as the instruction is complete and addresses both post-contact conduct and statements.  In order to ensure that the jury does not misunderstand how to assess predisposition evidence, the government respectfully requests the following instruction, which augments the request submitted by the defense:

> To determine whether the defendant was ready and willing to commit the offenses charged, you may rely upon any relevant evidence of what the defendant said or did before first being approached by a government agent.  You may also rely upon any relevant statements of the defendant after he was first approached by the government agent.  But you may rely upon the defendant's conduct after he was first approached by the government agent only if that conduct is independently motivated and not the

---

model charge was upheld by the Circuit after the Supreme Court decided Jacobson v. United States, 503 U.S. 540, 548 (1992), on which opinion the portion of United States v. Cromitie,727 F.3d 194, 208-09 (2d Cir. 2013), relied upon by the defense is based.

[2] The Cromitie Court drew this distinction because "although some post-contact conduct might be the product of inducement, it will be a rare situation where a defendant can plausibly claim that the inducement caused him to say something that evidenced predisposition."  Id. at 209 (emphasis in original).

A-172

product of attention that the government might have
directed at the defendant.

A copy of the Court's entrapment instruction, with the additional
proposed language, is attached as Exhibit A.


                              Respectfully submitted,

                              ERIC H. HOLDER, JR.
                              Attorney General of the United States
                              WILLIAM J. HOCHUL, JR.
                              United States Attorney

                      By:    /s/ Marshall L. Miller
                              Marshall L. Miller
                              Una A. Dean
                              Assistant U.S. Attorneys
                              (718) 254-6421/6473



Attachment

cc:       Defense counsel (via email and ECF)


3

A-173

<u>EXHIBIT A</u>

Now, I will discuss with you the defense of entrapment. The defendant asserts, as a defense, that he was the victim of entrapment by an agent of the Government. While the law permits Government agents to trap an unwary criminally minded person, the law does not permit the Government agents to entrap an unwary innocent. Thus, a defendant may not be convicted of a crime if it was the Government who gave the defendant the idea to commit the crime, if it was the Government who also persuaded him to commit the crime, and if he was not ready and willing to commit the crime before the Government officials or agents first spoke with him.

On the other hand, if the defendant was ready and willing to violate the law, and the Government merely presented him with an opportunity to do so, that would not constitute entrapment.

Your inquiry on this issue should first be to determine whether the defendant has shown by a preponderance of the evidence that a Government agent originated the criminal design of the particular criminal acts charged in the Indictment. To prove something by a preponderance of the evidence means to prove only that it is more likely true than not true. If you find that the defendant has failed to meet

this burden, then there can be no entrapment and your inquiry on
this defense should end there.

If, on the other hand, you find that a Government
agent initiated the criminal acts charged in the Indictment,
then you must decide if the Government has satisfied its burden
to prove beyond a reasonable doubt that prior to first being
approached by Government agents, the defendant was ready and
willing to commit the crime.

**To determine whether the defendant was ready and
willing to commit the offenses charged, you may rely upon any
relevant evidence of what the defendant said or did before first
being approached by a government agent.  You may also rely upon
any relevant statements of the defendant after he was first
approached by the government agent.  But you may rely upon the
defendant's conduct after he was first approached by the
government agent only if that conduct is independently motivated
and not the product of attention that the government might have
directed at the defendant.**

If you find beyond a reasonable doubt that the
defendant was predisposed - that is, ready and willing - to
commit the offenses charged, and merely was awaiting a favorable
opportunity to commit them, then you should find that the
defendant was not the victim of entrapment.  On the other hand,
if you have a reasonable doubt that the defendant would have

A-175

committed the offenses charged without the Government's

inducements, you must acquit the defendant.

```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------X
UNITED STATES OF AMERICA        :
                                :
     -against-                  :        No. 12 Cr. 691 (JFK)
                                :           OPINION & ORDER
JOSEPH ROMANO,                  :
                                :
              Defendant.        :
------------------------------X
```

APPEARANCES

FOR UNITED STATES OF AMERICA
Eric H. Holder, Jr.
  Attorney General of the United States
William J. Hochul, Jr.
  United States Attorney, Western District of New York
By:  Marshall L. Miller
     Una A. Dean

FOR DEFENDANT JOSEPH ROMANO
George R. Goltzer
Michael K. Bachrach

**JOHN F. KEENAN, United States District Judge:**

Before the Court is Defendant Joseph Romano's motion for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure.  For the reasons that follow, the motion is denied.

## I.   Background

On January 23, 2014, a jury convicted Defendant of conspiring to kill a United States District Judge (the "Judge") and an Assistant United States Attorney (the "AUSA") in violation of Title 18, United States Code, Sections 1114 and

1117.  The Court presumes familiarity with this case, and
recounts the facts and trial testimony only as necessary to
decide the instant motion.

At trial, the Government offered evidence that Defendant
made statements about killing the Judge and the AUSA to Gerald
Machacek when they first met at the Nassau County Correctional
Center ("NCCC") in July 2012.  To support his entrapment
defense, Defendant called Machacek as a hostile witness.
Machacek testified that at their first meeting, Defendant stated
that he wanted the Judge killed because of the Judge's role in
his earlier coin fraud prosecution. (Trial Tr. at 1427.)
Machacek stated that he believed Defendant was serious and not
merely "venting":  "There's a difference . . . .  When you get
into the details of planning and details of people's lives.  He
was speaking about intimate things about them.  He was a serious
guy, serious.  This was well thought out." (Id. at 1431.)

Machacek wrote about the encounter to his attorney, and
later met with the U.S. Attorney's Office. (Id. at 1432.)  At
the Government's request, Machacek wore a wire to a second
meeting with Defendant on August 10, 2012.  A video of this
meeting was played for the jury at trial, and was replayed at
the jury's request during jury deliberations.  During this
conversation, Defendant stated that he swore to kill the Judge
after his sentencing. (Gov. Ex. A at 34.)  He also discussed his

2

A-178

plans for the AUSA. (Id. at 24-25, 34-35, 40.)  It was during this conversation that Machacek offered to introduce Defendant to an "investigator" who could perform acts of violence. (Id. at 33-34, 37-41, 44-51.)  Defendant agreed to meet Machacek's man, and asked him to set up the meeting the following week. (Id. at 51.)

The "investigator" was actually Robert Strecker, an undercover detective with the Suffolk County Police Department. At Defendant's first meeting with Strecker, he "hired" Strecker to assault a Nicholas Pittas, who Defendant believed had stolen two of his cars. (Gov. Ex. C at 5-9.)  Defendant also told Strecker that he had "plenty of work" if the Pittas assault went well. (Id. at 18.)  A staged assault of Pittas was later photographed and shown to Defendant's alleged co-conspirator, Dejvid Mirkovic.  After this, Defendant directed Mirkovic to arrange with Strecker murders of the Judge and AUSA. (Gov. Ex. F.)

## II.  Discussion

### A.  Rule 29 Legal Standard

Rule 29 of the Federal Rules of Criminal Procedure states that a district court "on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Such a motion may be made after the jury has returned a guilty

3

verdict, see Fed. R. Crim. P. 29(c)(2), but the defendant
"carries a heavy burden; he must show that when viewing the
evidence in its totality, in a light most favorable to the
government, and drawing all inferences in favor of the
prosecution, no rational trier of fact could have found him
guilty," United States v. Cromitie, No. 09 Cr. 558, 2011 WL
1842219, at *1 (S.D.N.Y. May 10, 2011), aff'd, 727 F.3d 194 (2d
Cir. 2013).  Under this standard, the court must credit every
inference that the jury might have drawn in favor of the
government, "recognizing that the government's evidence need not
exclude every other possible hypothesis." United States v.
Persico, 645 F.3d 85, 104 (2d Cir. 2011) (citations omitted).
And "while the defendant's conviction cannot rest on speculation
or conjecture, it may be based solely on reasonable inferences
drawn from circumstantial evidence." United States v. Duncan,
No. 02 Cr. 122, 2003 WL 21305469, at *2 (D. Conn. June 4, 2003)
(Droney, J.) (citing United States v. Pinckney, 85 F.3d 4, 7 (2d
Cir. 1996)).  Ultimately, the court must uphold the conviction
if "'any rational trier of fact could have found the essential
elements of the crime beyond a reasonable doubt.'" United States
v. Payne, 591 F.3d 46, 60 (2d Cir. 2010) (quoting Jackson v.
Virginia, 443 U.S. 307, 319 (1979)).

4

### B.   Analysis

Defendant argues that no reasonable jury could have rejected his entrapment defense.  This defense "'has two related elements:  government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in criminal conduct.'" Cromitie, 727 F.3d at 204 (quoting Mathews v. United States, 485 U.S. 58, 63 (1988)).  The Court discusses each element in turn.

### 1.   The Jury Was Entitled to Conclude that Defendant Failed to Meet His Burden of Proving Inducement

The first element of the entrapment defense is government inducement of the crime. See, e.g., United States v. Bala, 236 F.3d 87, 94 (2d Cir. 2000).  Inducement occurs where the government "sees fit to set the accused in motion," and includes "soliciting, proposing, initiating, broaching or suggesting the commission of the offence charged." United States v. Sherman, 200 F.2d 880, 883 (2d Cir. 1953) (Hand, J.).  The burden is on the defendant to establish government inducement by a preponderance of the evidence. See United States v. Brand, 467 F.3d 179, 189 (2d Cir. 2006) (citing United States v. Williams, 23 F.3d 629, 635 (2d Cir. 1994).  The Second Circuit has characterized this burden as "relatively slight," but not "hollow." Id. at 190.

**A-181**

In the instant case, the defense appears to take its burden to show inducement for granted. See Def. Br. at 2 (conclusory statement that "Romano was induced into the conspiracies by the Government's cooperating informant, Gerald Machacek"). The Second Circuit has cautioned, however, that a defendant does not meet his burden by "simply point[ing] to the government's use of an undercover agent or confidential informant." Brand, 467 F.3d at 190. Here, the evidence was more than sufficient for the jury to conclude that Defendant had failed to establish inducement by a preponderance of the evidence. As described earlier, the jury heard from Machacek that Defendant had talked about his plans for revenge at their first meeting in July 2012, before any Government involvement. Machacek testified that he believed Defendant was serious about these plans, and was not boasting or venting. (Trial Tr. at 1431.) The jury was entitled to credit this testimony, and it was not irrational for them to do so. See Duncan, 2003 WL 21305469, at *4 (the jury was "free to accept" cooperator's testimony that defendant initiated the criminal act prior to the cooperator "becoming an 'agent' of the government"); see also United States v. Eppolito, 543 F.3d 25, 45 (2d Cir. 2008) (noting that "the government's evidence need not exclude every other possible hypothesis").

Additionally, the jury twice watched the recording of the second meeting between Defendant and Machacek, which occurred on

6

August 10, 2012.  During that meeting, Defendant made several
statements about his plans for the Judge and the AUSA. (Gov. Ex.
A at 24-25, 34-35, 40.)  After reviewing this recording, the
jury could have reasonably concluded that it was Defendant, and
no one else, who "initiated the crime" of conspiracy. United
States v. Mayo, 705 F.2d 62, 67 (2d Cir. 1983); see Payne, 591
F.3d at 60 (the court "must defer to the jury's resolution of
the weight of the evidence and the credibility of the
witnesses").

        Finally, the jury heard testimony from James Randolph Cox,
an investigator with the U.S. Attorney's Office.  Cox
participated in Defendant's arrest on the instant charges, which
occurred on October 9, 2012, and in the interview of Defendant
that day.  Cox testified that Defendant had stated that the
conspiracy to kill the Judge and AUSA "was his idea". (Trial Tr.
at 1345-46.)  He also testified regarding Defendant's written
statement, which was admitted into evidence and published to the
jury.  That statement reads, in part:  "I and at least one
other, including but not limited to Dejvid Mirkovic, conspired
to murder Federal District Court Judge Joseph Bianco and
Assistant United States Attorney Lara Gatz." (ECF No. 38-3.)
Cox testified that Defendant agreed to and initialed each
paragraph of his statement, which does not mention Gerald
Machacek. (Trial Tr. at 1350-51.)  The jury was entitled to

7

credit this testimony as well. See Eppolito, 543 F.3d at 45-46
("The ultimate question is not whether we believe the evidence
adduced at trial established the pertinent fact, but whether any
rational trier of fact could so find." (alterations and emphases
omitted)).

In sum, Defendant has failed to show that no rational jury
could have rejected the first element of his entrapment defense,
inducement.  Crediting "every inference that the jury might have
drawn in favor of the government," Eppolito, 543 F.3d at 45, as
the Court must under Rule 29, the Court concludes that ample
evidence existed from which the jury could have reasonably
determined that Defendant initiated the charged conspiracy, see
Sherman, 200 F.2d at 883.  Defendant's motion is denied.

   **2.   The Jury Was Entitled to Conclude that Defendant Was
          Predisposed to Commit the Charged Conspiracies**

If a defendant meets his preponderance burden of presenting
credible evidence of inducement by a government agent, the
burden shifts to the government to prove, beyond a reasonable
doubt, that the defendant was predisposed to commit the charged
offense. Brand, 467 F.3d at 189; Duncan, 2003 WL 21305469, at
*3.  The predisposition inquiry "'focuses upon whether the
defendant was an unwary innocent or, instead, an unwary criminal
who readily availed himself of the opportunity to perpetrate the
crime.'" Cromitie, 727 F.3d at 204 (quoting Mathews, 485 U.S. at

8

63).  To prove disposition, the government may show evidence of
"(1) an existing course of criminal conduct [by the accused]
similar to the crime for which he is charged, (2) an already
formed design on the part of the accused to commit the crime for
which he is charged, or (3) a willingness to commit the crime
for which he is charged as evidenced by the accused's ready
response to the inducement." Brand, 467 F.3d at 191; see United
States v. Al-Moayad, 545 F.3d 139, 154 (2d Cir. 2008).
Ultimately, predisposition "does not require specific prior
contemplation of criminal conduct by the defendant." Cromitie,
2011 WL 1842219, at *3.  He need only be "of a frame of mind
such that once his attention is called to the criminal
opportunity, his decision to commit the crime is the product of
his own preference and not the product of government
persuasion." United States v. Williams, 705 F.2d 603, 618 (2d
Cir. 1983).

     As noted earlier, the jury would have been well within
bounds to reject the entrapment defense on the first element,
inducement.  But even if the jury proceeded to the second step,
it could have found disposition on several grounds in the
record.  Most obviously, when Machacek and Strecker indicated
that they could be of assistance in a plot to kill the Judge and
AUSA, Defendant's response was indisputably "ready" and
"prompt." See Cromitie, 727 F.3d at 206 ("'Ready compliance' is

9

usually indicated by the promptness of a defendant's agreement
to commit an offense."). This is not a case where government
agents repeatedly cajoled or pressured the defendant into
participating in a criminal act. See Jacobson v. United States,
503 U.S. 540, 550 (1992) (reversing conviction where Government
spent over two years exploring defendant's willingness to break
the law, but reaffirming that had the defendant "promptly
availed himself of this criminal opportunity, it is unlikely
that his entrapment defense would have warranted a jury
instruction"). Here, the jury was entitled to conclude that
Defendant's enthusiasm evinced predisposition. See Cromitie, 727
F.3d at 205 n.5 ("[W]e rely on the jury, as the conscience of
the community, to convict those it believes, based on all the
evidence, would (or at least are likely to) commit the crime if
solicited by someone other than a government agent and acquit
those it believes would not (or at least are not likely to)
commit the crime if so solicited."); Brand, 467 F.3d at 191-95.

   Alternatively, the jury could properly have decided that
Defendant was predisposed to commit the charged crimes because
of his prior conduct. Defendant correctly points out that
"predisposition to harm is not predisposition to kill," at least
not necessarily. (Def. Br. at 1; see id. at 3-4.) However, the
jury heard evidence that Defendant convinced his co-defendant in
the coin fraud case not to cooperate with the Government by

10

holding a knife to the co-defendant's throat and threatening to
cut his head "clean off." (Gov. Ex. A at 43; Trial Tr. at 689-
97.)  On the same recording, Defendant also stated:  "I was
going to kill him [Defendant's brother-in-law] too.  I told my
mother I was going to kill him and she was like "No, no — he
didn't, he didn't cooperate then." (Gov. Ex. A at 44.)  These
statements, although made to the Government's informant, were
ostensibly Defendant's recollections of his earlier actions and
ideations. See Cromitie, 727 F.3d at 208-09 & n.12 ("Of course,
what a defendant says after contacted by agents is generally
admissible to prove predisposition because, although some post-
contact conduct might be the product of inducement, it will be a
rare situation where a defendant can plausibly claim that the
inducement caused him to say something that evidenced
predisposition."). See generally Jacobson, 503 U.S. at 550
(conduct of a defendant after contact by Government agents may
be offered to prove predisposition if the conduct was
"independent and not the product of the attention that the
Government had directed at" the defendant).  Although various
inferences can be drawn from these statements, the jury would
have been within the bounds of reason to conclude that Defendant
was serious, and that his statements about harming and killing
certain people involved in his coin fraud case demonstrated his
predisposition to conspire to kill other people involved in that

11

A-187

case — namely, the Judge and AUSA. See Eppolito, 543 F.3d at 45 ("As it is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence, when there are such competing inferences, we must defer to the jury's choice." (citations and internal quotation marks omitted)).

Finally, the Government asserts that the remaining avenue of proving predisposition — "an already formed design on the part of the accused to commit the crime" — was satisfied at trial through testimony that Defendant had already planned to kill the Judge and AUSA before meeting Machacek. (Trial Tr. at 1345, 1427, 1430-31.)  The Second Circuit has recently considered precisely what constitutes "design" for the purpose of proving predisposition. See Cromitie, 727 F.3d at 206-08. The majority of that panel concluded that a defendant has the requisite design if he is

> "prepared" in the sense of being ready to commit the offense once the opportunity is presented.  If the accused has a "preexisting purpose" to commit offenses such as, or similar to, the charged offenses, then he has the requisite preparedness.  That is enough to have the requisite "design."

Id. at 207.  Under this standard, the Court agrees with the Government that the jury was entitled to determine that the evidence established Defendant's design.  If the jury credited the testimony of Machacek and Investigator Cox, as the Court assumes under Rule 29, then they properly concluded that

12

Defendant had a "preexisting" idea to kill the Judge and AUSA, and was "ready and willing" to do so. See, e.g., Al-Moayad, 545 F.3d at 154 ("A defendant is predisposed to commit a crime if he is ready and willing without persuasion to commit the crime charged and awaiting any propitious opportunity to do so." (citations and internal quotation marks omitted)).

In any of the above ways, or indeed in some other, the jury may rationally have decided that the Government met its burden of proving Defendant's predisposition to commit the charged conspiracies beyond a reasonable doubt. The Court may not disturb that judgment. Accordingly, Defendant's failure as to this element of the entrapment defense provides an alternative basis for denying the motion.

### III. Conclusion

For the reasons stated above, Defendant's Rule 29 motion is denied. Sentencing will proceed on April 2, 2014 at 10:30 A.M. as scheduled.

**SO ORDERED.**

Dated:   New York, New York
         March 27 , 2014                    s/John F. Keenan

                                            John F. Keenan
                                  United States District Judge

13

AO 245B      (Rev. 10/2011 EDNY) Judgment in a Criminal Case
             Sheet 1

# UNITED STATES DISTRICT COURT

Eastern _____ District of ___ New York ___

| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
|---|---|---|
| v. | ) | |
| JOSEPH ROMANO | ) | |
| | ) | Case Number:   0207 1:12 CR 00691-001 (JFK) |
| | ) | USM Number:   72247-053 |
| | ) | |
| | ) | George Goltzer, Esq. |
| | | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

X was found guilty on count(s)   one and two
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC 1117 | Conspiracy to murder an employee of the United States | 10/9/2012 | one and two |

The defendant is sentenced as provided in pages 2 through    4    of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____   ☐ is   ☐ are  dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

April 14, 2014
Date of Imposition of Judgment

s/John F. Keenan

Signature of Judge

HON. JOHN F. KEENAN, USDJ
Name and Title of Judge

April 14, 2014
Date

AO 245B    (Rev. 09/11) Judgment in Criminal Case
           Sheet 2 — Imprisonment

Judgment — Page   2   of   4  

DEFENDANT:          JOSEPH ROMANO
CASE NUMBER:        0207 1:12 CR 00691-001 (JFK )

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

Life on each count to run concurrently with each other.   Counts one and two  are to run consecutively  with the undischarged portion of the  sentence imposed under #09 Cr 170.

☐   The court makes the following recommendations to the Bureau of Prisons:

X   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

    ☐   at _____ ☐ a.m. ☐ p.m.   on _____ .

    ☐   as notified by the United States Marshal.

☐   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐   before 2 p.m. on _____ .

    ☐   as notified by the United States Marshal.

    ☐   as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ _____ to _____

a _____ _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B   (Rev. 09/11) Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page  3  of  4

DEFENDANT:           JOSEPH ROMANO
CASE NUMBER:         0207  1:12 CR 00691-001 (JFK)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|           | **Assessment** | **Fine** | **Restitution** |
|-----------|----------------|----------|-----------------|
| **TOTALS** | $ 200 | $ | $ |

☐ The determination of restitution is deferred until ____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|-------------------|-----------------|-------------------------|----------------------------|
| **TOTALS** | $ | $ | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

A-192

AO 245B    Case 1:12-cr-00691-JFK    Document 171    Filed 04/16/14    Page 4 of 4 PageID #: 1698
         (Rev. 09/11) Judgment in a Criminal Case
         Sheet 6 — Schedule of Payments

DEFENDANT:       JOSEPH ROMANO                                    Judgment — Page    4    of    4
CASE NUMBER:     0207 1:12 CR 00691-001 (JFK)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A   X   Lump sum payment of $ ___200___ ___ ___ due immediately, balance due

        ☐  not later than ___ ___ ___ ___ ___ , or
        ☐  in accordance       ☐ C,   ☐ D,   ☐   ☐ E, or   ☐ F below; or

B   ☐   Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

C   ☐   Payment in equal ___ ___ (e.g., weekly, monthly, quarterly) installments of $ ___ ___ over a period of
        ___ ___ (e.g., months or years), to commence ___ ___ (e.g., 30 or 60 days) after the date of this judgment; or

D   ☐   Payment in equal ___ ___ (e.g., weekly, monthly, quarterly) installments of $ ___ ___ over a period of
        ___ ___ (e.g., months or years), to commence ___ (e.g., 30 or 60 days) after release from imprisonment to a
        term of supervision; or

E   ☐   Payment during the term of supervised release will commence within ___ ___ (e.g., 30 or 60 days) after release from
        imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F   ☐   Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during
imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial
Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

    Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount,
    and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal,
(5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

A-193

Criminal Notice of Appeal - Form A

# NOTICE OF APPEAL

### United States District Court

Eastern _____ District of New York _____

Caption:

United States _____
           v.

Joseph Romano _____

Docket No.: 12 Cr. 691 _____
JFK, VJ
(District Court Judge)

Notice is hereby given that Joseph Romano _____ appeals to the United States Court of

Appeals for the Second Circuit from the judgment [✔], other [ ] _____

entered in this action on April 16, 2014 _____.
           (date)
                                                 (specify)

This appeal concerns: Conviction only [ ]   Sentence only [ ]   Conviction & Sentence [✔]   Other [ ]

Defendant found guilty by plea [ ]   | trial [✔] | N/A [ ]

Offense occurred after November 1, 1987? Yes [✔]   No [ ]   N/A [ ]

Date of sentence: April 14, 2014 _____   N/A [ ]

Bail/Jail Disposition: Committed [✔]   Not committed [ ]   | N/A [ ]

Appellant is represented by counsel? Yes [✔] | No [ ]   | If yes, provide the following information:

*Both defense counsel appointed pursuant to CJA (Criminal Justice Act) in District Court.*

| | |
|---|---|
| Defendant's Counsel: | Michael K. Bachrach, Esq.   / George R. Golzer, Esq. |
| Counsel's Address: | 276 Fifth Avenue, Suite 501   / 200 W. 57th St. |
| | New York, NY 10001   / New York, NY 100019 |
| Counsel's Phone: | (212) 929-0592   / (212) 608-1260 |
| Assistant U.S. Attorney: | AUSA Marshall L. Miller   / AUSA Una A. Dean |
| AUSA's Address: | United States Attorney's Office - EDNY |
| | 271 Cadman Plaza East, Brooklyn, NY 11201 |
| AUSA's Phone: | (718) 254-6421   / (718) 254-6473 |

_____
Signature