# 14-1588-cr

# United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

DEJVID MIRKOVIC, AKA Dave Mirkovic,
AKA David Mirkovic, AKA Dejuid Mirkovic,

*Defendant,*

JOSEPH ROMANO,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLANT

DANIEL S. NOOTER, ESQ.
*Attorney for Defendant-Appellant*
1380 Monroe Street, NW #427
Washington, DC 20010
(202) 215-0512

## TABLE OF CONTENTS

Table of Authorities ................................................. iii

Jurisdictional Statement .............................................1

Statement of the Issues...............................................1

Statement of the Case.................................................2

Statement of Facts...................................................11

Summary of the Argument.............................................21

Argument

POINT I

THE DISTRICT COURT ERRED IN DECLINING TO SUPPRESS MR.
ROMANO'S POST-ARREST STATEMENT, WHERE THE
GOVERNMENT OBTAINED SUCH EVIDENCE THROUGH ITS
PURPOSEFUL ATTEMPT TO UNDERMINE THE EFFECT OF THE
*MIRANDA* WARNINGS. ...............................................23

POINT II

THE DISTRICT COURT'S ENTRAPMENT INSTRUCTION RELIEVED
THE GOVERNMENT OF ITS BURDEN, UNDER *JACOBSON V.
UNITED STATES*, OF PROVING PREDISPOSITION BEYOND A
REASONABLE DOUBT, AND FURTHER CREATED A SUBSTANTIAL
RISK OF CONFUSING THE JURY CONCERNING THE PARTIES'
BURDENS OF PROOF..................................................32

    A. The district court's jury instruction was inherently confusing
concerning the parties' respective burdens of proof. ...................34

    B. The references in prior opinions of this Court to a "preponderance
of the evidence" standard for a defendant to prove inducement are
*dicta* and are not binding on this panel.............................41

i

Conclusion ......................................................................................47

Certificate of Compliance ...............................................................48

## TABLE OF AUTHORITIES

<u>Cases</u>

*Baraket v. Holder,*
    632 F.3d 56 (2d Cir. 2011) ...............................................................41–42, 44

*Dickerson v. United States*,
    530 U.S. 428 (2000) ............................................................................... 24

*Hudson v. New York City*,
    271 F.3d 62 (2d Cir. 2001) .......................................................................33

*Jacobson v. United States*,
    503 U.S. 540 (1992) ...............................................................2, 22, 32–39

*Jones v. Murphy,*
    694 F.3d 225 (2d Cir. 2012) ....................................................................26

*Mathews v. United States*,
    485 U.S. 58 (1988) ........................................................................36, 41–42

*Miranda v. Arizona*,
    384 U.S. 436 (1966) ............................................................................*infra*

*Missouri v. Seibert*,
    542 U.S. 600 (2004) ...........................................................................21–31

*Oregon v. Elstad,*
    470 U.S. 298 (1985) .................................................................................25

*People v. Dunbar*,
    Nos. 169 & 170, 2014 NY Slip Op 07293 (N.Y. October 28, 2014) ......26–30

*United States v. Awan*,
    384 Fed. Appx. 9 (2d Cir. 2010) (summary order) ......................................31

*United States v. Bala,*
    236 F.3d 87 (2d Cir. 2000) .........................................................33–35,43–45

*United States v. Brand,*
    467 F.3d 179 (2d Cir. 2006) ........................................................35, 37, 43–44

*United States v. Bye,*
    919 F.2d 6 (2d Cir. 1990) ...........................................................................31

*United States v. Collins,*
    957 F.2d 72 (2d Cir. 1992) .....................................................................41–42

*United States v. Cromitie,*
    727 F.3d 194 (2d Cir. 2013) ............................................................35–36, 38

*United States v. Davis,*
    799 F.2d 1490 (11th Cir. 1986) ..................................................................38

*United States v. Gagliardi,*
    506 F.3d 140 (2d Cir. 2007) ...................................................................44–45

*United States v. Guarno,*
    819 F.2d 28 (2d Cir. 1987) .........................................................................31

*United States v. Gurolla,*
    333 F.3d 944 (9th Cir. 2003) ......................................................................37

*United States v. Huff,*
    959 F.2d 731 (8th Cir. 1992) ......................................................................37

*United States v. Jackson,*
    345 F.3d 59 (2d Cir. 2003) .....................................................................44–45

*United States v. Jaswal,*
    47 F.3d 539 (2d Cir. 1995) .........................................................................31

*United States v. King,*
    73 F.3d 1564 (11th Cir. 1986) ....................................................................37

*United States v. Kopstein,*
    759 F.3d 168 (2d Cir. 2014) ...........................................................33, 35–36

*United States v. Lakhani*,
 480 F.3d 171 (3d Cir. 2007) ................................................................37–38

*United States v. Phan*,
 121 F.3d 149 (4th Cir. 1997) ........................................................37

*United States v. Pillado,*
 656 F.3d 754 (7th Cir. 2011) ................................................................37, 38

*United States v. Poulsen*,
 655 F.3d 492 (6th Cir. 2011) ........................................................37

*United States v. Scull*,
 321 F.3d 1270 (10th Cir. 2003) ........................................................37

*United States v. Taylor*,
 475 F.3d 65 (2d Cir. 2007) ................................................................44–45

*United States v. [Lloyd] Williams*,
 23 F.3d 629 (2d Cir. 1994) ................................................................41–43

*United States v. [Robert] Williams*,
 681 F.3d 35 (2d Cir. 2012) ................................................................24

*United States v. Wise*,
 221 F.3d 140 (5th Cir. 2000) ........................................................37

*United States v. Young,*
 78 F.3d 758 (1st Cir. 1996)........................................................37

*United States v. Yousef,*
 327 F.3d 56 (2d Cir. 2003) ........................................................5

Statutes

18 U.S.C. § 1117................................................................3

18 U.S.C. § 1341 ................................................................3

18 U.S.C. § 1343 ...................................................................3

18 U.S.C. § 1349 ...................................................................3

18 U.S.C. § 3231 ...................................................................1

28 U.S.C. § 1291 ...................................................................1

Other

Sand, *Modern Federal Jury Instructions*, Instruction 8-7 ....................................8, 37

## JURISDICTIONAL STATEMENT

Defendant-Appellant Joseph Romano appeals the judgment entered April 16, 2014 by the Honorable John F. Keenan, sitting as "Visiting Judge" in the United States District Court for the Eastern District of New York. Joint Appendix ("JA") at 189. The District Court had jurisdiction under 18 U.S.C. § 3231. Appellant filed a timely notice of appeal on April 25, 2014. (JA 193.) This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

POINT I

WHETHER the district court erred in denying Mr. Romano's motion to suppress his post-arrest statement, where the evidence demonstrated that law enforcement sought purposefully to mislead Mr. Romano into believing he was entering into a formal cooperation agreement with the government, both prior to and directly after reading Mr. Romano his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), thus intentionally vitiating the effect of those warnings.

Answer: Yes.

POINT II

WHETHER the district court's jury charge concerning Mr. Romano's entrapment defense, in which the court instructed the jury that Mr. Romano bore

the burden of proving, by a preponderance of the evidence, that the government

induced Mr. Romano to commit the charged offense, violated *Jacobson v. United*

*States*, 503 U.S. 540 (1992), and relieved the government of having to prove Mr.

Romano's disposition to commit the offense beyond a reasonable doubt.

    Answer: Yes.

## STATEMENT OF THE CASE[1]

---

[1] The procedural history of this case is exceptionally tortuous and includes, among other things: additional proceedings concerning a separate, albeit related fraud prosecution; the recusal in this case of the judges of the U.S. District Court for the Eastern District of New York, with the subsequent appointment of Judge Keenan of the Southern District of New York to preside over the matter as "Visiting Judge"; the recusal of most of the prosecutors from the U.S. Attorney's Office from the Eastern District, and the subsequent re-assignment of the prosecution of this case to the U.S. Attorney's Office for the *Western* District of New York; the appointment under the Criminal Justice Act and the subsequent replacement (for various reasons) of four previous attorneys for Mr. Romano in this case; litigation concerning Mr. Romano's mental competency to stand trial; litigation concerning the empanelling of an anonymous jury; litigation seeking the recusal of the two Eastern District prosecutors not already recused; litigation concerning the scope and timing of the news media's access to sensitive evidence in the case; a lengthy sentencing process, including challenges to many of the facts presented in the Presentence Investigation Report; and, finally, during the pendency of this matter on appeal, further litigation before the district court concerning Mr. Romano's alleged violation of an applicable protective order. Because none of these aforementioned matters is particularly germane to either of the two questions presented for review, and for purposes of economy and readability, this section instead focuses only on those procedural matters relevant to the two issues on appeal: (1) whether the government unlawfully obtained a post-arrest statement from Mr. Romano; and (2) whether the jury was improperly instructed concerning Mr. Romano's entrapment defense.

Joseph Romano appeals the judgment imposed against him in case number 12-cr-691, over which the Honorable John F. Keenan presided.

On April 15, 2009, in a separate case — case number 09-cr-170 in the Eastern District of New York — Mr. Romano pled guilty to one count of conspiring to commit mail and wire fraud.[2]  The Honorable Joseph F. Bianco presided over Mr. Romano's fraud case, and one of the prosecutors in that matter was Assistant United States Attorney (AUSA) Lara Gatz.  At a sentencing hearing held February 9, 2012, Judge Bianco sentenced Mr. Romano to term of 180 months' incarceration in the fraud case.

On October 9, 2012, while serving that 15-year sentence, Mr. Romano was arrested and charged with two counts of conspiring to murder a United States employee, constituting the charges at issue in the instant appeal.[3]  (JA 20.) Specifically, the government charged Mr. Romano with conspiring to murder Judge Bianco and AUSA Gatz as retaliation for their roles in prosecuting and sentencing him in the fraud case.

The facts in this paragraph concerning Mr. Romano's October 9, 2012, arrest and his post-arrest statement will be are addressed in more detail in the "Statement of Facts" section, *infra*.  As relevant here, Mr. Romano was transported by Investigator James Randolph Cox of the U.S. Attorney's Office and FBI Special

---

[2] *See* 18 U.S.C. §§ 1341, 1343, & 1349.
[3] *See* 18 U.S.C. § 1117.

3

Agent Edward Heslin and FBI Task Force Officer George Davis from the Queens

detention facility where Mr. Romano was being housed to the FBI offices in

Melville, New York — a trip that took about an hour. During this trip, the agents

discussed with Mr. Romano the possibility of his cooperating with government,

and these discussions continued after Mr. Romano and the agents had arrived at

Melville. After executing an Advice of Rights form, to which Mr. Romano signed

his name and initials, the agents proceeded to interrogate Mr. Romano. At a

certain point, Agent Heslin left the interview room and returned with a confession

that Agent Heslin had written to resemble a cooperation agreement, which Agent

Heslin then presented for Mr. Romano's signature. Mr. Romano signed the

statement, as did FBI Agents Heslin and Davis.

On February 19, 2013, Mr. Romano filed an omnibus motion seeking —

among other relief — the suppression of Mr. Romano's post-arrest statement. Mr.

Romano attached an affidavit in support of this suppression motion, in which he

stated he was informed by the government during his arrest that he would face a

severe criminal sentence unless he agreed to cooperate with law enforcement. (JA

28–29.) Mr. Romano's motion identified two primary bases for suppressing the

post-arrest statement: first, because it was obtained after Mr. Romano had asked

for, and been denied, the assistance of counsel; and second, because —

notwithstanding a "Waiver of Rights" form Mr. Romano had signed — Mr.

4

Romano's waiver was not knowingly and voluntary since he had executed it only after having been led to believe he was entering into a formal cooperation agreement. Judge Keenan scheduled an evidentiary hearing for July 9, 2013, to address the allegations in Mr. Romano's motion. The sole witness to testify at the hearing was Investigator Cox.

In an order dated September 18, 2013, Judge Keenan denied Mr. Romano's suppression motion. In rejecting Mr. Romano's allegation that he had asked for and been denied the assistance of counsel prior to signing the statement, Judge Keenan determined he did not find Mr. Romano's allegation credible. As stated in the district court's order, "[Mr. Romano's] statements cannot be suppressed on the basis of a request that he did not make."[4] (JA 60–61.)

Judge Keenan also rejected Mr. Romano's claim that his statement was coerced by a promise of leniency, characterizing the argument as "unsupportable both by the facts of this case and the law of the Second Circuit." With respect to these "facts," Judge Keenan explained, "there is simply no evidence whatsoever of deceit by the agents." (JA 63.) With respect to the law, Judge Keenan cited three

---

[4] Although Mr. Romano disagrees with Judge Keenan's resolution of this issue, he is aware of the deferential standard with which this Court reviews challenges to a district court's credibility determinations. *See United States v. Yousef,* 327 F.3d 56, 124 (2d Cir. 2003) ("[c]redibility determinations are the province of the trial judges, and should not be overruled on appeal unless clearly erroneous."). Accordingly, Mr. Romano does not appeal this aspect of Judge Keenan's September 18 order.

5

cases of this Circuit for the principle that a mere promise of leniency to a defendant if he cooperates with law enforcement generally does not rise to the level of coercion. (JA 63.) Notably, in denying the motion to suppress on this theory, Judge Keenan did not address the language of the statement itself — which was written by Agent Heslin — and which asserts, among other things, "I have agreed to cooperate with the FBI and provide statements about crimes I know about and crimes in which I was personally involved." (JA 160.0

An anonymous jury was empanelled on January 9, 2014, and a two-week trial commenced on that date. At trial, Mr. Romano's post-arrest statement was admitted into evidence over his objection. (JA 99–100.) Investigator Cox was also permitted to testify at length about other self-incriminating admissions Mr. Romano allegedly made to law enforcement agents during his post-arrest interrogation at the Melville facility, which were not reduced to a writing or presented to Mr. Romano. (E.g., JA 98–113.)

Mr. Romano's defense at trial was that he had been entrapped into committing the offense by the actions of an inmate, Gerald Machacek, who was acting as a government agent, and who (while wearing a recording device provided by the FBI) directed Mr. Romano to contact a particular "hit-man" to arrange the murders of Judge Bianco and AUSA Gatz. The "hit-man" Machacek had been instructed to tell Mr. Romano about was actually an undercover police officer

6

named Robert Strecker, who staged a fake assault on a car mechanic with whom Mr. Romano had a dispute, in order to gain Mr. Romano's trust and to convince him to advance the murder plot. Officer Strecker testified as part of the government's case-in-chief, but the government declined to have Machacek testify. Instead, he was subpoenaed by the defense and testified as a hostile witness.

Entrapment was Mr. Romano's sole defense at trial. Accordingly, the district court's jury instruction concerning this defense was integral to the jury's resolution of the case. In particular, Mr. Romano objected to an instruction proposed by the government and adopted by the district court that imposed a burden on Mr. Romano of proving, by a preponderance of the evidence, that the government had initiated the murder conspiracy. (JA 164–65.) Mr. Romano had instead proposed an instruction that would have imposed merely a *production* burden on him, then shifting the burden of persuasion to the government if there was "any evidence" that the government had initiated the offense conduct:

> As such, your inquiry on this issue should first be to determine if there is any evidence that a government agent took the first step that led to a criminal act, in this case, the conspiracies to murder Judge Joseph F. Bianco and Assistant United States Attorney Lara Treinis Gatz. If you find there was no such evidence, there can be no entrapment and your inquiry on this defense should end there. If, on the other hand, you find some evidence that a government agent initiated the murder conspiracies charged in the indictment, then you must decide if the prosecution has satisfied its burden to prove, beyond a reasonable

7

doubt, that prior to first being approached by government agents the defendant was ready and willing to commit those specific crimes.[5]

The instruction Mr. Romano proposed directly tracks Instruction 8-7 of Judge

Sand's *Modern Federal Jury Instructions*, which states in relevant part:

> Your inquiry on this issue should first be to determine if there is any evidence that a government agent took the first step that led to a criminal act.  If you find there was no such evidence, there can be no entrapment and your inquiry on this defense should end there.
>
> If, on the other hand, you find some evidence that a government agent initiated the criminal acts charged in the indictment, then you must decide if the government has satisfied its burden to prove beyond a reasonable doubt that prior to first being approached by government agents, the defendant was ready and willing to commit the crime.

The district court rejected Mr. Romano's proposed instruction, however, and

instead charged the jury that Mr. Romano's entrapment defense failed unless he

proved by a preponderance of the evidence that the government had originated the

criminal design:

> Your inquiry on this issue should first be to determine whether the defendant has shown by a preponderance of the evidence that a government agent originated the criminal design of the particular criminal acts charged in the indictment.  To prove something by a preponderance of the evidence means to prove only that it is more likely true than not true.  If you find that the defendant has failed to meet this burden, then there cannot be any entrapment and your inquiry on this defense should end there.

---

[5] Undersigned counsel inadvertently omitted this document from the Joint Appendix; but the quoted text is from document number 130 in the docket (Mr. Romano's January 2, 2014, proposed jury instructions), at page 18.

8

If, on the other hand, you find that a government agent initiated the criminal acts charged in the indictment, then you must decide if the Government has satisfied its burden to prove beyond a reasonable doubt that prior to first being approached by government agents, the defendant was ready and willing to commit the crime.

(JA 157–58.)

At the charge conference, Mr. Romano, through trial counsel, renewed his objection to two aspects of the instruction.  First, he argued that requiring the defendant to bear the burden of proof on the first, so-called "inducement" prong of the entrapment inquiry was wrong as a matter of law.  (JA 150–51.)  Further, Mr. Romano objected that even if the defendant did bear such a burden, the way the jury instruction discussed the preponderance standard was misleading and raised a substantial likelihood of confusing the jury about the government's burden of proof.  (JA 151.)  Indeed, giving credence to the fears expressed by Mr. Romano's counsel concerning this latter point, the government stressed at three different times to the jury, during both its initial summation and rebuttal summation arguments, that Mr. Romano bore a burden of proving inducement:

- "When a defendant argues that he is innocent because he was entrapped he must prove, not the Government, but he must prove that he was induced to commit the crime";

- "when it comes to showing inducement, the defendant bears that burden of proof.  . . . [W]hen it comes to inducement that's the defendant's burden.  The defendant has to show that the Government originated this crime, the Government came up with the idea for the crime, and then the Government persuaded the

9

defendant to commit the crime.  That's what inducement is and that's the defendant's burden."

- "Remember this is an affirmative defense.  The Government bears the burden of proving the guilt of the defendant beyond a reasonable doubt about his murder conspiracy counts.  We embrace that burden and we submit it's been met and then some. But when it comes to inducement this is the defendant's burden."

(JA 152–55.)

The jury returned a verdict the same afternoon, finding Mr. Romano guilty of both charges.  (JA 159.)  Mr. Romano subsequently moved for a judgment of acquittal, pursuant to Fed. R. Crim. P. 29, asserting that conduct by the government and its agents in this case constituted entrapment as a matter of law.  In a written decision filed March 28, 2014, the district court denied Mr. Romano's Rule 29 motion.  (JA 176–88.)  In a judgment dated April 14, 2014, the district court sentenced Mr. Romano to incarceration for a term of life on both counts, to run concurrently with one another and consecutively to his 15 year sentence in the fraud case.  (JA 190.)

Mr. Romano raises two issues on appeal.   First, he contends the trial court erred in failing to suppress Mr. Romano's post-arrest statement, where the government's coordinated efforts to lead Mr. Romano to believe he was entering into a cooperation agreement had the effect of undermining the *Miranda* warnings and rendering Mr. Romano's waiver of his right to remain silent presumptively involuntary.  Second, he contends the jury was improperly instructed regarding the

law of entrapment — in particular, the instruction given by the district court misstated the parties' applicable burdens of proof and effectively shifted the burden away from the government and on to Mr. Romano to disprove a predisposition to commit the charged offense. For the foregoing reasons, Mr. Romano respectfully requests this Court reverse the judgment and remand the matter for a new trial.

### STATEMENT OF FACTS[6]

The first part of this section addresses facts relevant to Mr. Romano's October 9, 2012, arrest and the self-incriminating statements he made to law enforcement while in custody. The second part of this section provides additional context concerning the inducement prong of Mr. Romano's entrapment defense.

A.  The October 9, 2012 Arrest.

As Investigator Cox testified both on direct and cross-examination, the subject of Mr. Romano's cooperation with law enforcement came up repeatedly in

---

[6] As with the "Statement of the Case," the facts presented in this section are limited to those issues actually germane to the two questions presented on appeal. That being said, Mr. Romano concededly made a number of reprehensible and, indeed, ghoulish comments in connection with the events of this case, and undersigned counsel anticipates the government will seek to invoke these inflammatory comments as often as it can in its appellate brief, much as it did at trial. To the extent any such fact, not mentioned in this section, indeed proves relevant to one of the issues in this case, undersigned counsel shall endeavor to address it in Mr. Romano's reply brief.

the hours following his October 9, 2012, arrest, both before and after he was read the *Miranda* warnings.  At the suppression hearing, Investigator Cox testified on direct examination that he had advised Mr. Romano to cooperate with law enforcement.  (JA 30.)  Cox also recalled that Mr. Romano had participated in the conversation regarding cooperation, but Cox claimed only to recall Agent Heslin's response to Mr. Romano's statements, which was to cajole Mr. Romano to make his decision about cooperating quickly because Heslin was planning to attend a performance of "War Horse" at Lincoln Center that evening.  (JA 31.)  Investigator Cox initially testified that Mr. Romano was not promised anything if he agreed to cooperate.  (JA 32.)

On cross-examination, however, Investigator Cox recalled more details of his discussion with Mr. Romano concerning the subject of cooperation. Investigator Cox noted that the subject was brought up initially during the car trip to Melville, again at the Melville interview, and referenced yet again in the statement itself.  (JA 35–36.)  In particular, Investigator Cox recalled that Mr. Romano had asked how he could benefit himself by cooperating and that Mr. Romano had been informed his cooperation would be made known to the prosecutors and the judge.  (JA 33–34.)  Investigator Cox testified that, although it was not explicitly stated to Mr. Romano, it was nevertheless "understood" that the

purpose of their offering to tell the prosecutors and the judge about Mr. Romano's cooperation was so that Mr. Romano would receive lenient treatment. (JA 47–48.)

Investigator Cox confirmed that the subject of Mr. Romano's cooperation was brought up to him prior to his having been read his rights under *Miranda*. (JA 41.) These discussions also continued after the agents read Mr. Romano his rights. (JA 42.) Investigator Cox confirmed that the possibility of cooperation was offered to Mr. Romano during the car ride to Melville, before he was read his *Miranda* rights, as "an avenue he could take" and that "Mr. Heslin float[ed] it out there as an avenue he could take to hopefully help himself." (JA 42, 43.) Investigator Cox believed Mr. Romano had also addressed questions to the agents in the car in response to their offer of cooperation, but Cox testified he was unable to recollect the substance of Mr. Romano's questions. (JA 42.)

With respect to the handwritten statement, Cox confirmed that Mr. Romano had not written it himself and, in fact, was not even present when it was written. (JA 36.) Rather, Investigator Cox explained, "Agent Heslin left the room and wrote the statement and then brought it back and reviewed it with Mr. Romano." (JA 36.) Cox testified that the language in the statement was not Mr. Romano's, but Agent Heslin's. (JA 36–37.) He also confirmed that Agent Heslin did not discuss the composition of the written statement with Mr. Romano. (JA 39.)

13

The statement itself reads like a cooperation agreement — or at least, reads that way to a person not trained in the law. The statement, which the government presented to the jury as Government Exhibit 101 and which is included in the Joint Appendix, consists of seven handwritten paragraphs over two pages, with an additional pre-printed third page containing legal boilerplate nonspecific to Mr. Romano's case, as well as lines for Mr. Romano's signature, the date, and the signature of two witnesses. (JA 160–62.) The first paragraph of the handwritten statement identifies Mr. Romano's name, date of birth, and social security number; the second paragraph of the statement incorporates by reference Mr. Romano's signed Advice of Rights form, which was appended to the conclusion of the statement. (JA 160.)

The third paragraph, however, which begins the substantive portion of the statement, asserts, "*I have agreed to cooperate with the FBI* and provide statements about crimes I know about and crimes in which I was personally involved." (JA 160; emphasis added.) The fourth paragraph, as composed by Agent Heslin, is virtually legalese, and consists simply of a conclusory admission that Mr. Romano, "and at least one other, including but not limited to Dejvid Mirkovic, conspired to [commit the charged offenses]." (JA 160–61.) The final three paragraphs of the statement then return to the theme of Mr. Romano's cooperation, each paragraph beginning with the identical phrase, "I am willing to

14

provide information . . . " (JA 161.) These paragraphs proceed to identify additional offenses and individuals about which Mr. Romano indicated to the government that he could provide information. (JA 161.)

Notwithstanding the way the government drafted this statement concerning Mr. Romano's agreement "to cooperate with the FBI" and "provide information," Investigator Cox admitted he was familiar with the process of how cooperation agreements work in reality, and was aware that no cooperation agreement could actually have been arranged for Mr. Romano during the Melville interrogation since such agreements require the participation of a U.S. Attorney. (JA 46–47.) Investigator Cox confirmed, however, that the impossibility of actually entering into a cooperation agreement with Mr. Romano was not explained to him either during the car ride or during the subsequent interrogation at Melville, at any of the times they were urging Mr. Romano to "agree[] to cooperate with the FBI." (JA 47.)

In addition to the suppression hearing, Investigator Cox also testified during Mr. Romano's trial, and this time his testimony was more extensive concerning the offers of cooperation that had been made to Mr. Romano on the morning of his arrest, both in the car and later at the Melville facility. Cox again noted that Agent Heslin had broached the topic of Mr. Romano's cooperation during the car ride, and that Heslin "made numerous statements about the cooperation process" to

15

Romano.  (JA 117–18.)  At the suppression hearing, Investigator Cox had testified that the agents had not explicitly informed Mr. Romano about any benefit he could receive from his cooperation, other than that they would let the prosecutors and judge know about it.  (JA 47–48.)  In contrast, Investigator Cox explained during his trial testimony that the carrot of a reduced sentence had in fact been explicitly dangled in front of Mr. Romano while the agents were urging him to cooperate: "there was general talk about what a cooperation could do.   We can give your information to the prosecution, it could lead to a reduced sentence."  (JA 119.)  In response to a later question, Investigator Cox again reiterated, "We told him in general that cooperation could lead to a reduced sentence."  (JA 119.)

Moreover, Investigator Cox revealed at trial that he was certain Mr. Romano knew at the time of the Melville interrogation about the benefits he could hope to receive from a cooperation agreement because, "He had a prior case and there were other cooperators in his case and he talked about a cooperator in his case."  (JA 120.)  Investigator Cox further testified that he knew Mr. Romano had been given copies of previous cooperation agreements in connection with his prior fraud case. (JA 120.)  Thus, Cox confirmed that he knew that Mr. Romano was aware of what the agents' offers of cooperation entailed.  (JA 120.)

Mr. Romano responded to Cox and Heslin by telling the agents he wanted to cooperate.  (JA 121.)  Although Investigator Cox initially tried to shade his

16

testimony into merely noting Mr. Romano "was cooperative during the interview," Cox conceded that Mr. Romano's signed statement (which Agent Heslin had actually composed) did not merely talk about Mr. Romano being "cooperative" in general, but rather, stated that Mr. Romano had "agreed to cooperate with the FBI and provide statements about crimes I know about and crimes in which I was personally involved." (JA 121–22.)

In addition to his testimony concerning the signed statement the government entered into evidence as GX-101, Investigator Cox testified at trial concerning numerous self-incriminating statements that he claimed Mr. Romano also made to law enforcement while in custody at Melville, These included Mr. Romano's alleged venting about how the government had "disassembled" his life and how unfairly he felt he had been treated by the government in the fraud case (JA 101); Mr. Romano's alleged statement that other inmates had approached him while in prison and that Mr. Romano had in fact negotiated a price to have one of them beat up a car mechanic with whom Mr. Romano had had a longstanding dispute (JA 102–03); Mr. Romano's alleged statement that he hated Judge Bianco and AUSA Gatz and wanted them killed (JA 106); and Mr. Romano's alleged admission that the murder plot was all his idea and that he directed the actions of his alleged co-conspirator, Mirkovic. (JA 110.) Agent Heslin apparently opted to omit these

topics from the statement he prepared for Mr. Romano's signature, however, and thus were not preserved in any writing signed by Mr. Romano.

## B.  Mr. Romano's Evidence Concerning the Inducement Prong of the Entrapment Defense.

In seeking to establish his burden under the first prong of his entrapment defense, Mr. Romano called Gerald Machacek, who testified as a hostile witness. Machacek testified that he met Romano on July 26, 2012, when they were fellow prison inmates.  (JA 140.)  Machacek happened to be carrying his legal papers at the time of their meeting and Romano thus noticed that the judge in Machacek's case was Judge Bianco, who had presided over Romano's own fraud case.  (JA 140)  According to Machacek, Romano got angry at seeing Judge Bianco's name on the paperwork and, as a result, went on and on for two or three hours to Machacek concerning how much he hated Judge Bianco and wanted him to be murdered in front of his own children.  (JA 140–41.)  Machacek further testified that Romano boasted he was a big shot at the jail, that he was an expert sniper, and that he also had expertise with weapons and bombs.  (JA 141–42.)

Machacek stated that he felt this was an emergency situation, one that made him shake — indeed, he testified that he was shaking again at trial just thinking about it.  (JA 147.)  In fact, Machacek testified he was so distraught from this conversation with Romano that he could not even sleep.  (JA 146.)  Nevertheless,

Machacek apparently did not feel this was such an emergency that he should actually inform any guards or wardens at the prison. (JA 148.) He claimed he did not do so because all the guards at the prison were corrupt. (JA 148.) He also testified that it never crossed his mind to inform a U.S. Attorney about an alleged threat to a federal judge. (JA 147.) In fact, it didn't cross Machacek's mind really to do anything at all for several days after his conversation with Romano, or even up to a week. (JA 147–48.) Eventually, however, it did cross Machacek's mind finally to contact someone: his lawyer. (JA 148.)

This was a smart move, for Machacek was facing up to life imprisonment on his pending charges — although Machacek testified a judge had informed him he was merely looking at "45 years" incarceration. (JA 131.) Machacek was also facing a 5-year mandatory minimum sentence on a gun charge. (JA 131.) And he also had three prior felony convictions, including for armed kidnapping. (JA 132–33.) Machacek had also participated in the armed robbery of a medical facility, so that he could steal people's medicine. (JA 134–35.) And he had fired a gun at an occupied taxi cab, although he could no longer remember why. (JA 137–38.) And, not unlike Romano while he was being interrogated at the Melville facility, Machacek wanted a cooperation agreement in order to avoid a lengthy prison term. (JA 139.) So in the end, Machacek wrote a letter to his attorney, and the attorney forwarded the letter to the government. (JA 144.)

19

The government met with Machacek and they agreed to set up a meeting between Romano and Machacek at which Machacek would wear recording equipment.  (JA 85.)  That meeting occurred on August 10, 2012, in the U.S. Marshals lockup at the federal courthouse in Central Islip, New York.  (JA 85.) According to one of the government's witnesses, the only instructions provided to Machacek were to "act natural and have a conversation" with Romano.  (JA 91.) At the August 10 meeting, Machacek indicated to Romano that he knew someone outside of the jail, "Harold," who could perform assaults for hire and murder for hire.  (JA 76.)  The FBI decided to locate an undercover law enforcement officer who could play the role of a hitman.  (JA 86.)  That person turned out to be Officer Robert Strecker, who used the alias "Robert Russo."  (JA 73.)

Strecker visited Romano at the jail and told him that "Harold" had instructed him to meet Romano.  (JA 73.)  Strecker arranged with Romano to beat up an auto mechanic with whom Romano had a feud, and Strecker later showed Romano staged photographs to make it appear as if the mechanic had been beaten up.  (JA 78.)  Together, Romano and Strecker, the latter acting particularly through with Romano's associate Dejvid Mirkovic, who was not incarcerated, plotted the "murder" of Judge Bianco and AUSA Gatz — although as FBI Special Agent Tariche testified, there was never a *real* hit contract in the case, as the money was

20

only paid to undercover detectives. (JA 89–90.) To the contrary, as Agent Tariche

testified, "There was no danger to the judge, to Prosecutor Gatz, and/or

anybody else in this case." (JA 97.)

## SUMMARY OF THE ARGUMENT

While the instant case has perhaps fascinated the news media for its sordid

details concerning murder plots against a federal judge and prosecutor, it should

hopefully prove just as fascinating to this Court for the two fundamental issues of

criminal procedure it addresses. The first issue lies at the forefront of evolving law

concerning the limits on deceptive police tactics in the already-fraught arena of

custodial interrogation. In particular, it draws upon a watershed case decided just

this past October by New York's highest court, which substantially limited law

enforcement's attempts to undermine the protections of *Miranda*.

Since the Supreme Court's issued its 2004 opinion in *Missouri v. Seibert*, it

has no longer been permissible for law enforcement to devise ways technically to

comply with the *Miranda* warnings while effectively stripping those warnings of

their ability to ameliorate the inherently coercive environment of custodial

interrogation. In this case, as in the two-step interrogation process struck down in

*Seibert* and the interrogation process recently struck down by the New York Court

of Appeals, the actions of law enforcement in this case functioned intentionally to

negate the protections of *Miranda* for Mr. Romano. It is one thing merely to

21

suggest to a defendant that he may want to cooperate, but yet another thing to advise a defendant — as the FBI did with Mr. Romano in this case — about the benefits of cooperation, and then *actually to trick him* into waiving his rights and signing a confession in the form of a fake cooperation agreement. Such law enforcement conduct cannot be squared with *Miranda* and *Seibert*, and Mr. Romano's confession ought to have been suppressed.

The second issue in this case also cuts to the core of a criminal defendant's most cherished protection: the government's obligation to prove his guilt beyond a reasonable doubt. Further, this issue affords this Court the opportunity to reconsider a position on which this Circuit presently stands alone among the federal courts: the imposition of a burden of persuasion on a defendant asserting an entrapment defense. As explained below, however, imposing such a burden runs contrary to the text and spirit of the Supreme Court's opinion in *Jacobson v. United States*, and effectively permits the government to evade its heavy burden of proving a defendant's disposition to commit an offense by simply re-characterizing disposition evidence (considered under the entrapment defense's second prong, on which the government bears the burden) instead as evidence rebutting the prong of inducement (on which the defendant bears a persuasion burden in this Circuit).

As detailed below, however, and notwithstanding this Circuit's several opinions referencing the defendant's burden of persuasion on the inducement

22

prong of an entrapment defense, such language has only ever been *dicta*, and has never been a holding essential to the determination of a precedential case. Accordingly, this panel can and should take the opportunity to disavow such *dicta* and instead join the rest of the Circuit Courts of Appeals, none of which imposes such a burden of persuasion on a defendant raising the defense of entrapment.

## ARGUMENT

## POINT I

THE DISTRICT COURT ERRED IN DECLINING TO SUPPRESS MR. ROMANO'S POST-ARREST STATEMENT, WHERE THE GOVERNMENT OBTAINED SUCH EVIDENCE THROUGH ITS PURPOSEFUL ATTEMPT TO UNDERMINE THE EFFECT OF THE *MIRANDA* WARNINGS.

The government's purposeful efforts, before and after giving Mr. Romano the *Miranda* warnings, to make Mr. Romano believe he was entering into a cooperation agreement with the government undermined the effect of the *Miranda* warnings and rendered his statement presumptively involuntary. This Court reviews a district court's determination regarding the constitutionality of a *Miranda* waiver *de novo*, and reviews its factual findings for clear error, viewing the evidence in the light most favorable to the prevailing party. See *United States v. [Robert] Williams*, 681 F.3d 35, 40 (2d Cir. 2012).

As *Miranda* explained, "the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which

23

work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *See Miranda*, 384 U.S. at 467. Indeed, "the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be accorded his privilege under the Fifth Amendment not to be compelled to incriminate himself." *Dickerson v. United States*, 530 U.S. 428, 435 (2000) (internal punctuation omitted).

Accordingly, confessions obtained during custodial interrogation are generally inadmissible against a defendant at trial unless the defendant was adequately informed regarding his constitutional rights, including the right to remain silent. *See Miranda*, 384 U.S. at 479. In contrast, providing a defendant with the *Miranda* warnings and obtaining a valid waiver "has generally produced a virtual ticket of admissibility" for the confession. *See Missouri v. Seibert*, 542 U.S. 600, 608–09 (2004). Thus, where an arrestee has been provided with *Miranda* warnings and waives his right to remain silent, a court generally considers only whether the statement was voluntary under the totality of the circumstances. *See, e.g., Oregon v. Elstad,* 470 U.S. 298 (1985).

In *Seibert*, however, the Supreme Court recognized an exception to *Elstad*'s "totality of the circumstances" analysis where the government acts purposefully to undermine the effect of the *Miranda* warnings. Thus, five Justices found

24

unconstitutional Missouri's "two-step" interrogation technique, whereby law enforcement would wait until after an arrestee had already provided a self-incriminating statement before giving him the *Miranda* warnings, then re-obtaining a similar confession after the arrestee had executed the rights waiver. *See Seibert*, 542 U.S. at 604. While divining the precise contours of *Seibert*'s rule is perhaps complicated by the fragmented nature of the case's plurality and concurring opinions, it is nevertheless apparent under both the plurality's approach *and* the approach taken in Justice Kennedy's concurring opinion that governmental action violates the rule of *Miranda* where the government acts intentionally and effectively to undermine *Miranda*'s safeguards. *See Seibert*, 542 U.S. at 611–12 (plurality opinion) (focusing on whether, in light of the challenged law enforcement practice, "the warnings could function 'effectively' as *Miranda* requires."); 542 U.S. at 622 (opinion of Kennedy, J., concurring) (focusing on whether a challenged law enforcement practice "was used in a calculated way to undermine the *Miranda* warning.").[7]

---

[7] Undersigned counsel anticipates the government will assert Mr. Romano waived this argument by not explicitly citing *Seibert* in his district court brief. *See Jones v. Murphy,* 694 F.3d 225, 247 (2d Cir. 2012) (finding habeas petitioner waived *Seibert* argument). In *Jones*, however, the petitioner's failure to raise the *Seibert* in the district court prevented that court from developing any factual record from which to adjudicate the claim. *See id.* In this case, in contrast, Mr. Romano's argument simply "simply applie[s] a slightly different label to what is essentially the same claim," *see id.*, as demonstrated by the fully-developed record in the district court addressing Mr. Romano's suppression argument.

The rationale of *Seibert*, however, is hardly limited merely to the two-step interrogation technique actually employed in that case. To the contrary, New York's highest court recently relied on *Seibert* to suppress two defendants' post-arrest statements in a factual setting closely similar to that of Mr. Romano's case. *See People v. Dunbar*, Nos. 169 & 170, 2014 NY Slip Op 07293 (N.Y. October 28, 2014). While *Dunbar* is obviously not binding on this Court, its reasoning and application of *Seibert* should be considered persuasive.

*Dunbar* involved a practice instituted by the Queens District Attorney's Office of reading a scripted "preamble" to arrestees directly prior to giving them the *Miranda* warnings. *See id.* at 1–2. This "preamble" was intended to encourage arrestees to waive their right to remain silent and to instead provide a confession to law enforcement agents, induced by the implication afforded by the scripted "preamble" that they could assist their case if they agreed to waive their rights:

> If you have an alibi, give me as much information as you can, including the names of any people you were with.
>
> If your version of what happened is different from what we've been told, this is your opportunity to tell us your story.
>
> If there is something you need us to investigate about this case you have to tell us now so we can look into it.
>
> Even if you have already spoken to someone else you do not have to talk to us.
>
> This will be your only opportunity to speak with us before you go to court on these charges.

*See id.* at 2–3. Following the "preamble," the agent would then read the arrestee the *Miranda* warnings, execute a waiver of rights form, and (at least in the two cases considered in *Dunbar*) obtain a videotaped statement from the arrestee. *See id.* at 3–4.

The New York Court of Appeals acknowledged that the factual situation involved in *Dunbar* was not identical to the Missouri "two-step" interrogation technique addressed in *Seibert*. *See id.* at 7–8. Yet the issue in *Seibert*, the *Dunbar* court explained, "was whether, in light of the protocol employed by the police in that case, 'the warnings could effectively advise the suspect that he had a real choice about giving an admissible statement.'" *See id.* at 7 (quoting *Seibert*, 542 U.S. at 612; internal brackets omitted). Similarly, the issue in *Dunbar*, the court explained, "as in *Seibert*, is whether a standardized procedure — there, the question-first-and-warn-later protocol; here, the preamble — effectively vitiated or at least neutralized the effect of the subsequently-delivered *Miranda* warnings." *See id.* at 7–8. The court determined that the preamble had just such an effect, because informing an arrestee that he could improve his prospects by cooperating with law enforcement directly contradicted the substance of the *Miranda* warnings:

> The statements to "give me as much information as you can," that "this is your opportunity to tell us your story" and that you "have to tell us now" directly contradicted the later warning that they had the right to remain silent. By advising them that speaking would facilitate an investigation, the interrogators implied that these defendants'

words would be used to help them, thus undoing the heart of the
warning that anything they said could and would be used against
them.

*See id.* at 8. Accordingly, The New York Court of Appeals affirmed the two

opinions of the Appellate Division which had ordered the suppression of the

respective defendants' statements. *See id.*

In this case, the record in the district court makes it apparent that Agent

Heslin and Investigator Cox engaged in a deliberate tactic both directly before and

after giving Mr. Romano his *Miranda* warnings to convince him it was in his legal

interest to make self-incriminating statements to law enforcement — indeed,

fooling him into thinking he was actually entering into a cooperation agreement —

all with the purpose and effect of negating the benefit of the intervening *Miranda*

warnings. Investigator Cox's testimony both at the suppression hearing and again

at trial revealed that he and Agent Heslin "made numerous statements about the

cooperation process" to Mr. Romano during the drive to Melville, and that they

specifically informed him his "cooperation could lead to a reduced sentence." (JA

117–19.) Further, Cox knew that Romano was aware of how cooperation

agreements worked as a result of the cooperators against him in the previous fraud

case. (JA 120.) Mr. Romano informed the agents that he wanted to enter into a

cooperation agreement, and Agent Heslin thus drafted a confession, GX-101, to

lead him into thinking he was doing just that. (JA 121; 160–63.)

28

The written statement itself — which Agent Heslin actually composed, outside of Mr. Romano's presence — is the most compelling evidence that Heslin and Cox sought to trick Romano into thinking he was entering into a cooperation agreement. Indeed, the statement reads precisely the way a non-lawyer would expect a cooperation agreement to read, beginning with Mr. Romano's name and identifying information and then stating, "*I have agreed to cooperate with the FBI and provide statements about crimes I know about and crimes in which I was personally involved.*" (JA 160; emphasis added.) Following a conclusory admission to the charged offenses written in the language of an indictment, the statement then presents three additional paragraphs identifying other offenses and individuals about which Mr. Romano purports to be willing to provide information as a government cooperator. (JA 160–61.) Taken together with the testimony that the agents made "numerous statements about the cooperation process" to Mr. Romano, there is no reasonable way to interpret GX-101 but as a purposeful attempt to make Mr. Romano believe he was waiving his rights to enter into a cooperation agreement.[8]

_____

[8] Moreover, the facts Agent Heslin elected to *omit* from the written statement are arguably as significant as those he opted to include. For if Investigator Cox's trial testimony is to be believed, Mr. Romano made numerous additional admissions that the government relied heavily at trial and in its post-trial motions. Had Agent Heslin included the more inflammatory facts to which Investigator Cox testified at trial, however, it would likely have dispelled the illusion that the document Mr. Romano was signing was related to a formal cooperation agreement. Accordingly,

29

And, just as in *Dunbar*, the predictable effect of this strategem was to "directly contradict the later warning" that anything Mr. Romano said to law enforcement could and, indeed, *would* be used against him (which, of course, it was). Just as in *Dunbar*, the agents, in wrongfully informing Mr. Romano that he could ameliorate his case by cooperating, in fact "un[did] the heart of the warning." Accordingly, the district court should have granted Mr. Romano's motion to suppress the statement.

In denying Mr. Romano's motion, however, and asserting Mr. Romano's argument was "unsupportable . . . by . . . the law of the Second Circuit," the district court quoted three cases that generally stand for the principle that a statement is not involuntary merely because investigators inform a defendant about the benefits that can inhere to him by cooperating. (JA 63.) Each of these cases, however, is distinguishable, and none justifies the government's conduct in this case.

As a threshold matter, two of the three cases, *United States v. Jaswal*, 47 F.3d 539, 541–42 (2d Cir. 1995) and *United States v. Guarno*, 819 F.2d 28 (2d Cir. 1987), were both decided well before the Supreme Court's intervening *Seibert* opinion and thus do not bear on the situation where law enforcement purposefully

---

the lion's share of the admissions Mr. Romano was alleged to have made during the Melville interrogation were never reduced to a writing and instead were simply put before the jury through Investigator Cox's oral testimony at trial.

attempts to vitiate the effectiveness of the *Miranda* warning before obtaining a post-warnings confession. The *Guarno* case, moreover, does not implicate *Miranda* at all, as there was no custodial interrogation involved in that case. Rather, as the *Guarno* opinion takes care to note, "The agents informed Guarno . . . that he was not under arrest and that he was free to consult a lawyer or to leave the motel room at any time." *See Guarno*, 819 F.2d at 30. The third case cited by the district court, *United States v. Awan*, 384 Fed. Appx. 9, at *15 n.2 (2d Cir. 2010) (summary order), is an unpublished opinion where the actual statement upon which the district court relies is a quote from a 1990 opinion, *United States v. Bye*, 919 F.2d 6, 9 (2d Cir. 1990), to the effect that "law enforcement agents [are] free to discuss with [a defendant] the evidence against him and the reasons why he should cooperate." In addition to the fact that the *Bye* case was also decided well prior to *Seibert*, the statement in that case is not particularly responsive to (and certainly not dispositive of) the issue here. The gravamen of Mr. Romano's claim is not merely that Agent Heslin and Investigator Cox *discussed cooperation* with him, but that they engaged in a substantial coordinated effort to make him believe he actually *was* in the process of cooperating.

Accordingly, the district court was incorrect to assert Second Circuit law rendered Mr. Romano's suppression claim "unsupportable." Further, Mr. Romano was prejudiced by the district court's failure to suppress his post-arrest statements,

31

as the government relied on such evidence extensively both as direct evidence of

the charged offenses and to rebut Mr. Romano's entrapment defense, and the

district court itself relied on the statement in denying Mr. Romano's Rule 29

motion.  (JA 182.)  Accordingly, this Court should reverse the conviction the

government obtained through this tainted evidence and should remand the matter

for a new trial.


## POINT II

THE DISTRICT COURT'S ENTRAPMENT INSTRUCTION RELIEVED
THE GOVERNMENT OF ITS BURDEN, UNDER *JACOBSON V.*
*UNITED STATES*, OF PROVING PREDISPOSITION BEYOND A
REASONABLE DOUBT, AND FURTHER CREATED A SUBSTANTIAL
RISK OF CONFUSING THE JURY CONCERNING THE PARTIES'
BURDENS OF PROOF.

Notwithstandings Mr. Romano's repeated objections at trial, the district

court instructed the jury that Mr. Romano bore a burden of persuasion to prove, by

a preponderance of the evidence, that the government induced the offenses charged

in the indictment.  The district court's instruction was both inherently confusing

within the facts of this case and wrong as a matter of law.

This Court reviews challenges to a jury instruction *de novo*.  *See United*

*States v. Kopstein*, 759 F.3d 168, 172 (2d Cir. 2014).  "Instructions are erroneous if

they mislead the jury as to the correct legal standard or do not adequately inform

the jury of the law."  *See id.* (quoting *Hudson v. New York City*, 271 F.3d 62, 67

(2d Cir. 2001)). "Objectionable instructions are considered in the context of the entire jury charge, and reversal is required where, based on a review of the record as a whole, the error was prejudicial or the charge was highly confusing." *See id.* "[A] confusing jury instruction on the defendant's sole defense will constitute plain error." *See id.* at 180 n.6.

Entrapment constitutes a complete defense to a crime because, as the Supreme Court has explained, "Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute." *Jacobson v. United States*, 503 U.S. 540, 548 (1992). The defense of entrapment thus has two elements: (1) government inducement of the crime, and (2) lack of predisposition on the defendant's part. *See, e.g., United States v. Bala,* 236 F.3d 87, 94 (2d Cir. 2000). "Where the Government has induced an individual to break the law," the Supreme Court has explained, "and the defense of entrapment is at issue . . . *the prosecution must prove beyond reasonable doubt* that the defendant was disposed to commit the criminal act prior to first being approached by Government agents." *See Jacobson*, 503 U.S. at 548–49 (emphasis added).

The Supreme Court has not opined, however, regarding who bears the initial burden of proving whether "the Government has induced an individual to break the

law." or by what standard such inducement must be shown. The question posed in this case, therefore, is whether the government can essentially be relieved of the "beyond a reasonable doubt" burden for proving a defendant's predisposition, as established in *Jacobson*, by permitting it to use the same predisposition evidence to contest inducement under a lesser standard of proof. The answer is: it should not. Yet, because the jury instruction given in this case in this case defies the spirit of *Jacobson* and substantially undermines the defense of entrapment, this panel should clarify that a defendant bears only a *production burden* of introducing "credible evidence" of inducement in order to shift the burden to the government to prove predisposition beyond a reasonable doubt.

A.  The district court's jury instruction was inherently confusing concerning the parties' respective burdens of proof and misstated the law of entrapment.

Alone among the federal courts, the Second Circuit has opined that defendants bear the burden of proving government inducement of the crime. In particular, this Court has generally — although not uniformly — stated that a defendant must demonstrate government inducement of the offense "by a preponderance of the evidence." *See, e.g., Bala,* 236 F.3d at 94; *United States v. Brand,* 467 F.3d 179, 190 (2d Cir. 2006). Even so, the *Bala* case appears to qualify this standard, however, somewhat ambiguously explaining a defendant in fact need present merely "*credible evidence* of government inducement," at which

point the burden shifts to the prosecutor to prove the predisposition prong beyond a reasonable doubt. *See id.* (emphasis added). Similarly, the *Brand* opinion, while noting a defendant's burden to prove the first element of the defense by a preponderance of the evidence, proceeds to characterize this burden as "relatively slight" and "relatively easily satisfied." *See Brand*, 467 F.3d at 190. Further, the *Brand* case repeats the statement from the *Bala* opinion that a defendant need only present "credible evidence" of government inducement to shift the burden of proof to the government to prove predisposition beyond a reasonable doubt. *See id.* at 189.

   In several recent cases, however, this Court has declined to reference a "preponderance" standard at all. *See, e.g., United States v. Cromitie*, 727 F.3d 194, 204 (2d Cir. 2013); *Kopstein*, 759 F.3d at 173. In *Cromitie*, decided August 2013, this Court quoted the Supreme Court for the notion that predisposition, rather than inducement, is "the principle element in the defense of entrapment." *See Cromitie*, 727 F.3d at 204 (quoting *Mathews v. United States*, 485 U.S. 58, 63 (1988)). The *Cromitie* court proceeded to state that a defendant asserting entrapment "has the burden of showing inducement . . . and, if inducement is shown, the prosecution has the burden of proving predisposition beyond a reasonable doubt," yet declined to elaborate whether the defendant bore a burden of persuasion or merely of production. *See Cromitie*, 727 F.3d at 204 (internal citations omitted). In this

35

Court's July 2014 opinion in *Kopstein*, the court similarly omitted any reference to a preponderance standard and instead described a defendant's burden concerning the first prong of the entrapment defense as merely presenting "credible evidence" of inducement. *See, e.g., Kopstein*, 759 F.3d at 173.[9] Accordingly, it appears this Circuit may be moving toward a reconciliation with the rest of the federal judiciary, all of which has declined to adopt a version of the entrapment defense that shuttles back and forth between a defendant's and the government's distinct burdens and standards of proof.

Indeed, it is significant, in assessing the confusion inherent in challenged jury instruction, that no other Circuit imposes such a persuasion burden on the defendant to prove inducement. Rather, each of this Court's sister Circuits simply requires a defendant to satisfy an initial production burden. *See, e.g. United States v. Young,* 78 F.3d 758, 760 (1st Cir. 1996); *United States v. Lakhani*, 480 F.3d 171, 179 n.10 (3d Cir. 2007); *United States v. Phan,* 121 F.3d 149, 154 (4th Cir. 1997); *United States v. Wise*, 221 F.3d 140, 154 (5th Cir. 2000); *United States v. Poulsen*, 655 F.3d 492, 502 (6th Cir. 2011); *United States v. Pillado,* 656 F.3d 754, 763 (7th

---

[9] The district court in *Kopstein* similarly omitted any reference to a "preponderance" standard, instead charging the jury: "Your inquiry on this issue should first be to determine if there is any evidence that the undercover agent took the first step that led to a criminal act of the defendant transporting and shipping child pornography. If you find there was no such evidence, there can be no entrapment, and your inquiry on this defense should end there." *See Kopstein*, 759 F.3d at 173.

Cir. 2011); *United States v. Huff*, 959 F.2d 731, 737 (8th Cir. 1992); *United States v. Gurolla*, 333 F.3d 944, 951 (9th Cir. 2003); *United States v. Scull*, 321 F.3d 1270, 1275 (10th Cir. 2003); *United States v. King,* 73 F.3d 1564, 1569–70 (11th Cir. 1986). Moreover, as noted in the "Statement of the Case," *supra*, that is also the approach endorsed by Judge Sand. *See* Sand, *Modern Federal Jury Instructions*, Instr. 8-7.

Consistent with this Court's own acknowledgment in *Brand* that the defendant's burden of proof is "relatively slight" and "relatively easily satisfied," every other Circuit also requires only minimal evidence of entrapment to satisfy the defendant's production burden and shift the burden to the government to prove predisposition beyond a reasonable doubt. *See Gurolla*, 333 F.3d at 951 ("Only slight evidence will create the factual issue necessary to get the defense to the jury, even though the evidence is weak, insufficient, inconsistent, or of doubtful credibility"); *Lakhani*, 480 F.3d at 179 n.10 (defendant need only make a proffer of evidence supporting his entrapment defense); *Pillado,* 656 F.3d at 763 (same). The Eleventh Circuit has gone one step further, specifically addressing the extent to which instructions, such as the one in Mr. Romano's case, that require a jury to navigate the "intricacies" of burden-shifting "are of little merit" in actually instructing the jury about how to apply the law:

> This court previously has rejected the claim that an entrapment charge
> must detail the shifting burdens of production and proof inherent in

37

the defense. Although appellants' proposed charge perhaps is not without academic value for its analysis of the shifting burdens of the entrapment defense, *its intricacies are of little merit as a means of instructing a jury in the law to be applied*. Once the entrapment defense is properly before the jury, all the jury need decide is whether the government proved beyond a reasonable doubt that the defendant was predisposed to commit the crime.

*United States v. Davis*, 799 F.2d 1490, 1493 (11th Cir. 1986) (emphasis added).

The risk *Davis* hints at is the risk that was realized in this case, where the government argued both to the jury and to the district court (in response to Mr. Romano's Rule 29 motion) that Mr. Romano failed to meet his burden of proving inducement precisely *because* Mr. Romano's conduct showed he was already predisposed to commit the offense. The government's blurring of the distinction between the inducement and predisposition prongs has the effect of improperly transforming the initial, inducement inquiry into an examination of *the defendant's own mental state* instead of, properly, an inquiry into the *government's* conduct in taking steps to initial the actual *commission* of the offense. *See Cromitie*, 727 F.3d at 210 ("the conduct of government agents is the focus of the inducement component"). The Supreme Court's language in *Jacobson* makes the distinction clear: "Government agents may not originate a criminal design, *implant in an innocent person's mind the disposition* to commit a criminal act, and *then induce commission of the crime* so that the Government may prosecute." *See Jacobson*, 503 U.S. at 548 (emphasis added). The disposition prong concerns the defendant's

38

mental state ("an innocent person's mind"), whereas the inducement prong

concerns "commission of the crime." By permitting the government to rebut Mr.

Romano's evidence that the government actually set commission of the crime in

motion by presenting evidence of Mr. Romano's prior intent, the government

performs an end-run around the beyond-a-reasonable-doubt standard established in

*Jacobson* for the government to prove predisposition.

Indeed, reference to the district court's denial of Mr. Romano's Rule 29

motion demonstrates that this is precisely what occurred in the instant case. (JA

180–83.) Rather than consider what the first steps toward *commission* of the

offense was, and whether those steps were initiated by Mr. Machacek and Officer

Strecker or by Mr. Romano, the district court instead opined that the jury could

believe Machacek's testimony that he believed Mr. Romano was serious at their

initial July 2012 meeting about his desire to murder Judge Bianco and AUSA Gatz.

(JA 181.) The district court also stated the jury could rely on Mr. Romano's post-

arrest statements (which, as noted in the prior section, should have been

suppressed) to determine that the murder plot "was [Mr. Romano's] *idea*," a

determination that yet again goes to disposition and mental state rather than actual

commission of the crime.[10] (JA 182.)

---

[10] As for the district court's third theory, that the jury could have found from
watching the August 2012 recording that Mr. Romano, rather than Machacek,
"initiated the crime of conspiracy," Mr. Romano could *not*, in fact, have initiated a

In short, the district court's preponderance instruction, combined with the government's argument to the jury (and to the district court) conflating evidence of inducement and evidence of predisposition, had the effect of subverting the government's burden of proving predisposition beyond a reasonable doubt, as established in *Jacobson*. Moreover, the government's thrice-repeated admonishments to the jury during summation that Mr. Romano bore the burden of proof on the inducement prong could only have exacerbated jury confusion concerning the parties' distinct burdens of proof. It was thus error to impose upon Mr. Romano the burden of persuasion on the inducement prong of his defense.

---

conspiracy with Machacek at this meeting, because Machacek was already working as an agent of the government by this point, and one cannot conspire with only government agents. At most, therefore, the jury could have found that Mr. Romano *wanted* to initiate a conspiracy at this point, which goes to disposition rather than inducement.

40

B.  The references in prior opinions of this Court to a "preponderance of the evidence" standard for a defendant to prove inducement are *dicta* and are not binding on this panel.

Notwithstanding the several prior cases in which panels in this Circuit have referenced a defendant's burden of proving inducement by a preponderance of the evidence, none of those statements were holdings, and thus this panel is not constrained to follow their *dicta*.  As this Court has explained, in addressing whether a prior panel's statements constitute precedential holdings or mere *dicta*, "it is not substantive discussion of a question or lack thereof that distinguishes holding from dictum, but rather *whether resolution of the question is necessary for the outcome of the case*."  *See Baraket v. Holder,* 632 F.3d 56, 59 (2d Cir. 2011) (emphasis added).  As explained below, no prior published opinion of this Court has necessitated resolution of whether the defendant was required to prove inducement by a preponderance of the evidence.

The earliest reference in this Circuit to a defendant's burden of persuasion by a preponderance of the evidence appears to occur in *United States v. [Lloyd] Williams*, 23 F.3d 629, 635 (2d Cir. 1994).  *Williams* purported to locate the source of the preponderance standard of proof in two prior cases, *Mathews*, 485 U.S. at 63 and *United States v. Collins*, 957 F.2d 72, 76 (2d Cir. 1992).  *See Williams*, 23 F.3d at 635   Yet careful review of these two cases reveals no discussion either of a preponderance of the evidence standard in particular or of any burden of

41

persuasion imposed on the defendant to prove inducement. Rather, *Collins* reiterates that "It is a bedrock, axiomatic and elementary constitutional principle, that a defendant's conviction may not stand if it is based on an evidentiary presumption that essentially relieves the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime." *See Collins*, 957 F.2d at 75 (internal punctuation omitted). Accordingly, it would have been rather incongruous for *Collins* to have imposed a burden of persuasion on a defendant that similarly relieves the government of having to prove the absence of the entrapment defense beyond a reasonable doubt. As for *Mathews*, not only does that case not impose any burden of persuasion on a criminal defendant, but significantly, none of the other Circuits has interpreted this Supreme Court case in the over 25 years since it was decided to assume it imposes such a burden.

Moreover, no such burden-shifting preponderance standard was "necessary for the outcome" of the *Williams* case, a case that did not even involve a jury trial. *See Baraket*, 632 F.3d at 59. In *Williams*, the defendant, having learning that one of his coconspirators had been a government informant for part of the pendency of the conspiracy, moved to withdraw his guilty plea on the theory that he had been entrapped. *See Williams*, 23 F.3d at 634–35. As the court noted, however, the evidence was undisputed that the defendant had already been an active member of the conspiracy well before the coconspirator had become a government agent.

Thus the court found it unnecessary to hold an evidentiary hearing on the defendant's motion to withdraw his plea. *See id.* at 635. The issue of burden-shifting — much less of jury instructions — was never present in *Williams* because his entrapment claim was frivolous from its inception: the defendant had failed to allege any evidence that he had been entrapped *prior* to already engaging in the conspiracy. *See id.* Thus, it was immaterial to the *Williams* court's resolution of the case whether the defendant or the government bore a burden of production or persuasion and, if so, by what standard. The reference in *Williams* to the defendant's preponderance standard was mere *dictum*.

The several published opinions of this Circuit that have followed *Williams* in assuming a defendant must prove inducement by a preponderance of the evidence have similarly done so merely as *dicta*. Thus, in *Bala*, the court upheld a defendant's conviction against a sufficiency-of-the-evidence challenge, determining a jury could rationally infer that *the government* had satisfied *its own* burden of proof under the second, *predisposition* prong. *See Bala*, 236 F.3d at 94. Whether the defendant *also* bore a burden of persuasion on the initial, inducement prong played no role in the *Bala* court's determination of the case.

In the *Brand* case, the court delved more deeply than in *Bala* into a discussion of the preponderance standard, including a reference to the evidence introduced by the defendant concerning whether or not he had been induced by the

43

government to commit the offense. *See Brand*, 467 F.3d at 189–90. Following this several paragraph discussion, however, the *Brand* court explicitly stated that we "We need not decide the issue," since the government had presented sufficient evidence of the defendant's predisposition. *See id.* at 190. To reiterate the point from *Baraket*, it is not whether an opinion substantively discusses an issue or not that distinguishes its holding from *dictum*, but rather, whether resolution of the matter in question is necessary for the outcome of the case. *See Baraket v. Holder,* 632 F.3d at 59. Notwithstanding the *Brand* panel's fairly extensive discussion of the defendant's burden of proof, the court made it explicit that it was *not* resolving the matter on those grounds. Accordingly, the *Brand* panel's opinions concerning this issue are not binding on the present panel.

Beyond the aforementioned cases, undersigned counsel has identified three additional published, precedential opinions of this Court that reference a defendant's burden to prove inducement by a preponderance of the evidence. *See United States v. Taylor*, 475 F.3d 65, 69 (2d Cir. 2007); *United States v. Gagliardi,* 506 F.3d 140, 149 (2d Cir. 2007); *United States v. Jackson,* 345 F.3d 59, 66 (2d Cir. 2003). In none of these cases either, however, is the discussion of the preponderance standard a holding that determines the outcome of the case or that binds this panel.

44

*Taylor* concerned the question of whether a defendant who raises an entrapment defense is thereby precluded as a matter of law from gaining an adjustment to his Sentencing Guidelines offense level for acceptance-of-responsibility. *See Taylor*, 475 F.3d at 69–70. The question of whether or not the defendant bore a burden of proving government inducement thus had no relevance whatsoever to the issue or outcome of that case. *See id. Gagliardi* and *Jackson*, as with the *Bala* case, involved a defendant's challenges to the sufficiency of the evidence. *See Gagliardi,* 506 F.3d at 149–50; *Jackson,* 345 F.3d at 66–67. And, as in *Bala*, each of those panels resolved the case — upholding the defendant's conviction — by holding that *the government* had produced sufficient evidence to satisfy *its* burden of proving predisposition to commit the offense. *See ids.* In neither case, in contrast, did the *defendant's* alleged burden of persuasion matter to the outcome of the case, even as an alternative holding.

In conclusion, despite several references in prior panel opinions suggesting that the defendant defense bears the burden of proving inducement by a preponderance of the evidence, that finding does not appear ever to have been part of a holding necessary to the resolution of an issue before this Court. Accordingly, this panel is not bound by *dicta* in previous panel opinions that have assumed the existence of such a persuasion burden on the defendant.

45

Thus, this Court should embrace the present opportunity to depart from those *dicta* and instead bring the Second Circuit into accordance with the other Circuits in holding a defendant bears only an initial *production* burden of offering "credible evidence" of inducement. Indeed, such a determination that can even be made by the trial court, as a matter of law, before determining whether or not to instruct the jury about entrapment in the first instance. Assuming there exists "credible evidence" suggesting inducement, as there unquestionably does in the instant case, the government then bears either of proving predisposition or of disproving inducement beyond a reasonable doubt.

The instruction given in the instant case, in contrast, is confusing, contrary to the law of every other Circuit, contrary to the rule of *Jacobson*, and improperly invites the jury to shift its burden of proof to the defendant. Furthermore, there is no way to determine whether the jury convicted Mr. Romano in this case because they believed the government had met its burden of proving predisposition beyond a reasonable doubt or, rather, because they believed the government was able to rebut Mr. Romano's evidence of inducement, preventing him from satisfying his burden. Because there is thus a substantial question about whether the government in fact disproved Mr. Romano's entrapment defense beyond a reasonable doubt, Mr. Romano's conviction should be reversed and the case remanded.

46

## CONCLUSION

For the foregoing reasons, the defendant respectfully requests this Court

vacate his conviction and remand the matter for a new trial.

Respectfully submitted,


/s/ Daniel S. Nooter
Daniel S. Nooter
*Attorney for Appellant*
1380 Monroe Street, N.W., #427
Washington, DC 20010
(202) 215-0512


Date: February 4, 2015

47

## CERTIFICATE OF COMPLIANCE

Undersigned counsel hereby certifies:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,478 words, excluding the parts of the brief excepted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

/s/ Daniel S. Nooter
Daniel S. Nooter