# 14-1588

*To Be Argued By*:
UNA A. DEAN

# United States Court of Appeals

**For the Second Circuit**

◆◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

DEJVID MIRKOVIC, also known as DAVE MIRKOVIC, also known as DAVID MIRKOVIC, also known as DEJUID MIRKOVIC,

*Defendant,*

JOSEPH ROMANO,

*Defendant-Appellant.*

**On Appeal From The United States District Court
For The Eastern District of New York**

## BRIEF AND APPENDIX FOR THE UNITED STATES

WILLIAM J. HOCHUL, JR.,
*United States Attorney,*
*Western District of New York.*

DAVID C. JAMES,
UNA A. DEAN,
*Assistant United States Attorneys,*
*Of Counsel.*

ii

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES...............................................iv

PRELIMINARY STATEMENT...............................................1

STATEMENT OF FACTS..................................................3

    I.   Coin Fraud......................................3

    II.  Murder Plot.....................................5

        A.   Confidential Informant......................5

        B.   Undercover Operation........................5

    III. Suppression Hearing...........................144

    IV.  Jury Charge....................................19

SUMMARY OF ARGUMENT................................................23

ARGUMENT...........................................................24

POINT ONE – THE DISTRICT COURT PROPERLY DENIED
        DEFENDANT'S MOTION TO SUPPRESS....................24

    I.   Applicable Law.................................24

    II.  Discussion.....................................25

        A.   *Seibert* Does not Apply.....................25

        B.   Romano's Miranda Waiver Was Valid...........30

            1.   Romano's History and Characteristics.......31

            2.   The Discussion about Cooperation..........31

            3.   Romano Did Not Believe He Was
               Cooperating With The Government...........33

POINT TWO – THE DISTRICT COURT CORRECTLY CHARGED
        THE JURY ON ENTRAPMENT............................36

    I.   Applicable Law.................................36

iii

II.   The District Court Correctly Instructed
      the Jury under the Law of this Circuit...............38

III.  Even under the Law of Other Circuits,
      Romano's Claim Would Fail...........................40

      A.    Romano Cannot Show Inducement..................43

      B.    Romano Cannot Show Lack of
            Predisposition................................46

IV.   Any Error Was Harmless..............................50

CONCLUSION................................................51

iv

TABLE OF AUTHORITIES

Page

CASES

Berghuis v. Thompkins,
  560 U.S. 370 (2010)........................................ 24

Jacobson v. United States,
  503 U.S. 540 (1992)........................................ 45

Johnson v. United States,
  520 U.S. 461 (1997)........................................ 26

Kotteakos v. United States,
  328 U.S. 750 (1946)........................................ 26

Mathews v. United States,
  485 U.S. 58 (1988)......................................... 42

Missouri v. Seibert,
  542 U.S. 600 (2004)............................... 23, 25, 27

Moran v. Burbine,
  475 U.S. 412 (1986)........................................ 25

Neder v. United States,
  527 U.S. 1 (1999)...................................... 36, 50

Oregon v. Elstad,
  470 U.S. 298 (1985)........................................ 27

People v. Dunbar,
  24 N.Y.3d 304 (2014)....................................... 29

United States v. Al-Moayad,
  545 F.3d 139 (2d Cir. 2008)................................ 37

United States v. Anderson,
  929 F.2d 96 (2d Cir. 1991)........................ 25, 28, 31

United States v. Awan,
  384 F. App'x 9 (2d Cir. 2010).............................. 28

United States v. Bastian,
  770 F.3d 212 (2d Cir. 2014)................................ 29

v

United States v. Brand,
  467 F.3d 179 (2d Cir. 2006)............................... passim

United States v. Braver,
  450 F.2d 799 (2d Cir. 1971)............................. 38, 39

United States v. Brunshtein,
  344 F.3d 91............................................. 37

United States v. Burkley,
  591 F.2d 903 (D.C. Cir. 1978)........................... 42

United States v. Carter,
  489 F.3d 528 (2d Cir. 2009)....................... 24, 27, 28

United States v. Corbett,
  750 F.3d 245 (2d Cir.),
  cert. denied, 135 S. Ct. 261 (2014)..................... 28

United States v. Corsey,
  512 F. App'x 6 (2d Cir. 2013)........................... 37

United States v. Dominguez Benitez,
  542 U.S. 74 (2004)...................................... 26

United States v. Dunn,
  779 F.2d 157 (2d Cir. 1985)........................... 37, 40

United States v. Frady,
  456 U.S. 152 (1982)..................................... 26

United States v. Gagliardi,
  506 F.3d 140 (2d Cir. 2007)............................. 37

United States v. Gaines,
  295 F.3d 293 (2d Cir. 2002)............................. 28

United States v. Gonzalez-Perez,
  778 F.3d 3 (1st Cir.),
  cert. denied, 2015 WL 1399328 (2015) ................. 41, 42

United States v. Isnadin,
  742 F.3d 1278 (11th Cir. 2014)........................ 42, 43

United States v. Jackson,
  345 F.3d 59 (2d Cir. 2003).............................. 37

vi

United States v. Jaswal,
    47 F.3d 539 (2d Cir. 1995)............................... 24, 28

United States v. Kozeny,
    667 F.3d 122 (2d Cir. 2011),........................... 36, 50

United States v. Male Juvenile,
    121 F.3d 34 (2d. Cir. 1997)................................ 25

United States v. Marcus,
    130 S. Ct. 2159 (2010).................................... 26

United States v. Martinez-Carcano,
    557 F.2d 966 (2d Cir. 1977)................................ 40

United States v. Mayfield,
    771 F.3d 417 (7th Cir. 2014).............................. 41

United States v. Mayo,
    705 F.2d 62 (2d Cir. 1983)................................ 45

United States v. Olano,
    507 U.S. 725 (1993)................................... 26, 29

United States v. Pillado,
    656 F.3d 754 (7th Cir. 2011).............................. 42

United States v. Poulsen,
    655 F.3d 492 (6th Cir. 2011).............................. 41

United States v. Scull,
    321 F.3d 1270 (10th Cir. 2003)............................ 42

United States v. Sherman,,
    200 F.3d 880 (2d Cir. 1952)............................... 39

United States v. Siraj,
    2008 WL 2675826 (2d Cir. 2008) (summary order).......... 37, 39

United States v. Steinberg,
    551 F.2d 510 (2d Cir. 1977)............................... 40

United States v. Thomas,
    274 F.3d 655(2d Cir. 2001) (en banc)...................... 26

United States v. Whab,
    355 F.3d 155 (2d Cir. 2004)............................... 29

United States v. Williams,
  23 F.3d 629 (2d Cir. 1994)............................. 36, 38

United States v. Wright,
  921 F.2d 42 (3d Cir. 1990)................................ 42

STATUTES AND RULES

28 U.S.C. § 2111......................................... 26

Fed. R. Crim. P. 52(b) .................................. 26

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 14-1588

UNITED STATES OF AMERICA,

<u>Appellee</u>,

-against-

DEJVID MIRKOVIC, also known as DAVE MIRKOVIC, also known as DAVID MIRKOVIC, also known as DEJUID MIRKOVIC,

<u>Defendant</u>,

JOSEPH ROMANO,

<u>Defendant-Appellant</u>.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

BRIEF FOR THE UNITED STATES

<u>PRELIMINARY STATEMENT</u>

Joseph Romano appeals from a judgment entered on April 16, 2014, in the United States District Court for the Eastern District of New York (Keenan, J., sitting by designation), convicting him, after a jury trial, of two counts of conspiracy to murder an employee of the United States, in violation of 18

2

U.S.C. § 1117. The district court sentenced Romano to two terms of life imprisonment, to run concurrently to each other and consecutively to the undischarged portion of a 180-month sentence Romano received in February 2012 following a separate conviction.

On appeal, Romano argues that (1) the district court erroneously denied his motion to suppress his post-arrest statements and (2) the jury instruction on entrapment was erroneous. As shown below, these arguments are without merit, and Romano's conviction should be affirmed.

3

STATEMENT OF FACTS

I.    Coin Fraud

At the time of his arrest in this case, Romano was serving a 180-month term of imprisonment for conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349. This conviction stemmed from his operation, from approximately August 2001 to November 2008, of companies based in Long Island, New York that engaged in the fraudulent telemarketing and sale of coins.  (GA 43-45; T 670).[1]  To induce unsuspecting customers to invest in coins, Romano and his coconspirators made a series of materially false promises regarding, among other things, the coins' grade, value and resale demand.  (GA 43-44).  For example, Romano and his coconspirators sold the coins at fraudulently inflated prices, misrepresenting their value to victim customers by falsely claiming that the coins were of particular high grades, when they were actually of a much poorer quality.  (Id.).  Romano and his coconspirators also falsely claimed that there were investors waiting to purchase complete sets of the coins at higher prices, once the victim customers made sufficient purchases from the coin business to assemble

---

[1]    "A," "GA" and "T" refer to Romano's appendix, the government's appendix and the trial transcript, respectively. "ST" refers to the transcript of the suppression hearing.  "GX" refers to government exhibits.  "DE" refers to entries on the district court's docket.

4

complete sets. (GA 44). In fact, however, there were no such investors. (GA 44-45). The fraud generated over $40 million in revenue. (GA 45).

In 2008, a grand jury in the Eastern District of New York returned an indictment charging Romano and others with conspiracy to commit mail and wire fraud in connection with this scheme. Romano was released on bail pending trial. (T 697). The prosecution was handled by Assistant United States Attorney ("AUSA") Lara Treinis Gatz and presided over by the Honorable Joseph F. Bianco. (T 660).

While the case was awaiting trial and while Romano was on pretrial supervision, investigators discovered that Romano had continued his coin fraud business. (T 679). He did so by opening a coin company in Florida and installing his friend Dejvid Mirkovic (who would later become his conspirator in the murder plot) as the nominal owner of the company. (T 679, 683-85). Money earned from this company was later used to finance the murder plot charged in this case. (T 1330). As a result of those activities, Romano's bail was revoked, and he was housed in the custody of the United States Marshals Service at the Nassau County Correctional Center (the "NCCC"). (T 698).

In September 2010, the coin fraud case proceeded to trial, and Romano pleaded guilty during jury selection.

5

(GA 49). In February 2012, Judge Bianco sentenced Romano to 180 months' imprisonment and ordered the forfeiture of approximately $7 million. (T 675-76). Romano remained at the NCCC pending post-sentencing hearings regarding restitution, which took place in July 2014.

## II. Murder Plot

### A. Confidential Informant

In August 2012, law enforcement agents received information from Gerald Machacek, an inmate at the NCCC, that Romano was seeking to murder Judge Bianco and AUSA Gatz. (T 1089-90). On August 10, 2012, agents arranged to have Machacek meet with Romano in the holding pens of the United States District Court in Central Islip, New York. (T 1092). In a conversation captured on audio recording, Romano discussed with Machacek his desire to torture and kill Judge Bianco and AUSA Gatz to retaliate against them. (GA 103, 108, 123). He told Machacek that he planned to mutilate their bodies. (GA 103, 108). During that conversation, Machacek purported to agree to assist Romano in locating a contract killer. (GA 120-24).

### B. Undercover Operation

On August 21, 2012, an undercover officer, Detective Robert Strecker, posed as a contract killer for hire and visited

6

Romano at the NCCC. (T 831-32). During the meeting, which was captured on audio and video recordings, Romano expressed his desire to have Strecker carry out acts of violence on Romano's behalf. (GA 142-76; T 847). Preliminarily, Romano provided the name of a car mechanic, Nick Pittas, with whom he was engaged in a financial dispute. (GA 148; T 870-71). Romano agreed to pay Strecker $3,000 to assault Pittas and indicated that he had contacts outside of jail who would make the payments. (GA 150, 152, 156; T 871). Romano further indicated that he had additional, more violent, assignments for Strecker once the assault was successfully completed. (GA 158-59; T 867, 871-872).

That same day, after Strecker's visit, Romano attempted to call Mirkovic eleven times and spoke to him four times. (T 1112-13; GX 298). In those calls, Romano asked Mirkovic to "reverse directory" the telephone number Strecker had provided during the meeting, although he did not tell Mirkovic about Strecker or the reason for the request. (T 1114-17; GX 304, 305). Mirkovic reported to Romano the next day that the telephone number appeared to be that of a prepaid telephone. (GX 307; T 1117-19).

In the days following Strecker's visit, on August 23, 2012 and August 24, 2012, Romano instructed Mirkovic in three

7

separate phone calls to call Strecker's number and relay the message that Romano needed a little more time and would be in touch in a couple of days. (GX 308, 309, 310; T 1119-21, 1133-1134). Mirkovic left a voicemail message for Strecker on August 24, 2012 with this information.

The Federal Bureau of Investigation ("FBI") instructed Strecker not to call back but to wait to see if Mirkovic called again. (T 1135). On August 28, 2012, Romano asked Mirkovic whether Mirkovic had called "Mr. Softee," referring to Strecker. (GX 312; T 1137-39). Mirkovic confirmed that he had tried but was unable to get through. (GX 312). Romano instructed Mirkovic not to leave voicemail messages but to speak to Strecker directly. (GX 312). Two days later, on August 30, 2012, Romano asked again whether Mirkovic had been able to reach Strecker. When Mirkovic informed him that he kept getting voicemail, Romano said, "Every day do it till he picks up." (GX 313; T 1139).

On September 5, 2012, when Strecker still had not returned Mirkovic's calls, Romano asked Mirkovic to call again and this time to leave a message. He instructed Mirkovic, who lived in Florida, to tell Strecker that he was calling on behalf of Romano and was "going to be in town on the 14th of September." (GX 315; T 1140). Later that day, Romano called

8

Mirkovic again and asked whether he had made the call. (GX 316; T 1140). When Mirkovic said he had not, Romano said, "Please, please, I beg of you." (GA 179). Mirkovic called Strecker later that day and relayed Romano's message. (GX 204; T 1141-42).

Because Strecker had a vacation planned and was therefore unable to meet Mirkovic on September 14, 2012, he visited Romano at the NCCC on September 10, 2012. During that meeting, which was captured on video,[2] Romano gave assurances that once the assault was completed, he would hire Strecker for "a lot of big work," "real serious work." (T 921-22). Following this meeting, on September 12, 2012, Mirkovic called Strecker at Romano's direction and left a voicemail message again seeking to meet on September 14, 2012. (GX 319, 207; T 929-31).

In response, the FBI arranged to have a second undercover officer, Detective John Wighaus, pose as an associate of Strecker and meet Mirkovic. (T 935-36). Accordingly, Strecker called Mirkovic to confirm the meeting and request a down payment for the assault. (GX 208; T 931-34). During the September 14, 2012 meeting between Mirkovic and Wighaus, which

---

[2] The audio recording device malfunctioned and did not record the meeting. (T 912).

9

was recorded, Mirkovic delivered a $1,500 down payment for the assault against Pittas. (GX 212).

In response to Romano's request to have Pittas beaten, the FBI met with Pittas and told him about Romano's request. (T 1080-81). Pittas agreed to pose on the ground as if he had been assaulted for the FBI to photograph as "proof" of the assault. (T 1080-81). He also agreed to give the FBI his identification card to use as further proof.

On September 25, 2012, Strecker met with Mirkovic, who had flown to New York from Florida. (GX 226; T 994). The meeting was recorded. Preceding this meeting, Strecker and Mirkovic exchanged a series of voicemails and phone calls to confirm that the assault had been carried out, to arrange another meeting and to discuss the final payment for the assault. (GX 215-225; T 950-63).

When Strecker and Mirkovic met on September 25, 2012, Strecker showed Mirkovic "proof" of the assault of Pittas, in the form of Pittas's identification card and a photograph of the staged assault. (GX 226; T 969). Mirkovic paid Strecker the $1,500 balance for the assault. (GX 226; T 969).

Mirkovic left this meeting and visited Romano at the NCCC for further instruction. (T 1185-86). Upon leaving the NCCC, Mirkovic requested another meeting with Strecker. During

10

this second meeting, which was recorded, Mirkovic told Strecker that Romano wanted Judge Bianco and AUSA Gatz murdered. (GX 229; T 984-87). Mirkovic agreed that he and Romano would pay $40,000 for the murders, beginning with a $20,000 down payment. (GX 229; T 989). Additionally, Mirkovic transmitted requests from Romano regarding how the murders should take place, asking for AUSA Gatz's breasts to be cut off and for the heads of the victims to be preserved in formaldehyde as souvenirs. (GX 229; T 985-87). Mirkovic then paid Strecker $12,000 in cash for the murders. (GX 229; T 989).

On September 28, 2012, Romano was transferred from the NCCC to the Queens Private Detention Facility, also known as "Queens Geo." (T 1206-07). Before being transferred, Romano gave Machacek, who was being transported to the courthouse, a handwritten note for Machacek to mail to Mirkovic. (T 1213-15). The note read, "Hey Dave  Thank God they moved me.  Come Visit me at the New Jail.  Make sure all our Projects continue Joe." (GX 41E; T 1215).

On October 2, 2012, Mirkovic flew from Florida to New York and met with Strecker a third time. (GX 35, 234). The meeting was recorded. During the meeting, Mirkovic delivered an additional $10,000 in cash for the murders. (GX 234; T 1024). Further, Mirkovic promised to pay the remaining $18,000 upon

11

confirmation of the murders' successful completion. (GX 234; T 1027).

On October 9, 2012, Romano and Mirkovic were arrested. Mirkovic was arrested first at his home in Florida. (T 1228-30). Romano was arrested later that morning at Queens Geo. (T 1297). During a search of Mirkovic's home, law enforcement agents seized a loaded handgun and $18,000 in cash, the balance of the contract for the murders. (T 1229).

Following his arrest, Romano was transported from Queens Geo to the FBI field office in Melville, New York. (ST 17-18). At the FBI offices, Romano was advised of his Miranda rights, which he waived orally and in writing. (GA 4; Supp. Hr'g. GX 1). During the interview that followed, Romano first "vented" for approximately ten minutes about his coin fraud case and how the government had "disassembled" his life. (GA 57). He then orally confessed that he had instructed Strecker to assault Pittas and that he had used Mirkovic to make payments to Strecker for the assault. He also acknowledged that he and Mirkovic had agreed to pay $40,000 for the murders of Judge Bianco and AUSA Gatz. (T 1329). Romano stated more than once that he hated Judge Bianco and AUSA Gatz and wanted them killed. (GA 65). Romano also admitted that the plan to murder Judge Bianco and AUSA Gatz was his idea. (GA 66).

12

Romano further informed the agents that he had previously approached three other inmates and sought to have them commit acts of violence on his behalf. (GA 58-59). According to Romano, he had been venting in jail about Judge Bianco and AUSA Gatz and had been approached by inmates offering their help. Specifically, Romano said he spoke to three inmates: Ishmel Cohen, Breon Forrestal,[3] and Bobby Brown. (GA 58-59).

Romano said he had asked Forrestal in or around April 2011 to assault certain people outside of jail on his behalf. (GA 60). He said that Forrestal agreed to contact Romano upon release from jail to follow up on the request but never did. (Id.). After that, according to Romano, he negotiated with Cohen in or around February 2012 a price of $2,500 to have Pittas assaulted. (GA 59). Romano knew Cohen to be a Bloods gang number. (Id.). Cohen later backed out of the transaction. (Id.).

Finally, Romano said that, in or around April 2012, an inmate named Bobby Brown offered to carry out beatings for Romano. (GA 61). Romano told agents that he and Brown never pursued the idea, but the agents later met with Brown and found

---

[3] The inmate's name is spelled incorrectly in the trial transcript as "Florestal."

13

this statement to be untrue. (Id.). In January 2013, Investigator James Cox of the United States Attorney's Office for the Eastern District of New York approached Brown one or two days after Brown's release from jail. They escorted Brown to his grandmother's home, where Brown retrieved from his prison belongings a piece of paper that bore Pittas's name, address and physical description, along with Romano's name, inmate number and email address. (GA 61-64, 78-79).

Toward the end of the interview, Romano also signed a written statement in which he acknowledged that he had conspired to murder Judge Bianco and AUSA Gatz. (GA 80-83; T 1346-50). In the statement, Romano also agreed to provide information concerning other crimes about which he had information. (GA 80-87; T 1347-50).

14

III. Suppression Hearing

On February 19, 2013, Romano filed a motion to suppress "any and all statements allegedly made by him to law enforcement" on the day of his arrest on October 9, 2012. (DE 31). In support of his motion, he submitted an affidavit in which he claimed that he had been interrogated by agents after he repeatedly requested an attorney, that he had not knowingly waived his Miranda rights, and accordingly, that his statements to law enforcement on the day of his arrest were not made voluntarily. (A 28-29).

On July 9, 2013, the district court held a hearing on Romano's motion. The government called to the stand Criminal Investigator Cox, one of the lead investigators of the murder conspiracy. (ST 12). Romano called no witnesses.

During the hearing, Cox testified in detail regarding the events surrounding Romano's arrest and post-arrest interview. FBI Special Agent Edward Heslin and FBI Task Force Officer George Davis were also present that day for Romano's arrest. (ST 15). After Romano was handcuffed at Queens Geo, the agents escorted him to a Ford Explorer waiting outside. (ST 15, 17). Investigator Cox testified that they did not engage in any conversation with Romano at Queens Geo, except perhaps with regard to the placement of Romano's handcuffs. (ST 48).

15

Once in the car, Heslin informed Romano that they were transporting him to the federal courthouse later that day, whereupon Romano asked, "What's going on?" (ST 19). In response, Heslin, who was seated next to Romano, stated that Romano had been meeting with an undercover officer rather than a hitman. (ST 19). Romano appeared "calm, nonplussed" in reaction to this news. (ST 20). After a period of silence, Romano inquired about Mirkovic and was told that Mirkovic had also been arrested. (ST 21-23).

Thereafter, without prompting, Romano began complaining angrily to the agents about his unfair treatment in the coin fraud case by Judge Bianco and AUSA Gatz, among others. (ST 21-22, 26). During the remainder of the car ride, there were periods of conversations and of silence. (ST 19). The conversation was primarily between Heslin and Romano. (ST 54). At one point, Heslin told Romano it was in his interest to cooperate once they arrived at the FBI offices, since they had "all the evidence." (ST 24). Heslin also told Romano that he did not care whether Romano cooperated and that his primary interest was in completing the arrest process in time to see a

16

Broadway show later that evening.[4] (ST 25). Romano responded by inquiring as to which show Heslin intended to see. (ST 25).

Cox described Heslin and Romano as calm during the entire car ride, except that Romano became angry when he spontaneously began speaking about the coin fraud case. (ST 26). Both Heslin and Romano spoke in a conversational manner. (ST 26). None of the agents asked any questions of Romano about either the coin fraud case or the murder plot. (GA 2). Romano did not request an attorney at any point and did not appear to be confused or fearful. (GA 2-3).

Once they arrived at the FBI offices, Romano was placed in an interview room and uncuffed. (GA 3). Heslin reviewed Romano's Miranda rights with him by sitting next to him with an FBI "Advice of Rights" form and reading each right listed on the form out loud. (GA 4; ST 33-35; Supp. Hr'g GX 1). After each right, Romano was asked whether he understood the right and, if so, to place his initials next to it. (ST 33-34). Romano did so with respect to each right without hesitation and without asking any questions. (ST 35). He appeared "attentive" while he and Heslin reviewed the form together. (ST 36).

---

[4]    Investigator Cox stated his belief that Heslin did not in fact have a show to see and that Heslin was engaging in "schtick." (ST 59).

17

After reviewing Romano's rights, Heslin read aloud the following from the Advice of Rights form: "I have read the statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." (Supp. Hr'g GX 1; ST 35). Romano then orally acknowledged that he understood his rights and signed the form without hesitation and without asking any questions. (ST 35-36). Romano never asked for an attorney at any point during this process. (ST 41).

The law enforcement agents then commenced interviewing Romano. The interview lasted approximately one hour. (ST 37). Romano confessed to hiring Strecker to kill Judge Bianco and AUSA Gatz. (T 1329-30, 1340-41). He also expressed interest in cooperation and, at one point during this interview, asked what information he might provide that could lead to a cooperation agreement. (A 33). The agents informed Romano that any cooperation would be made known to the prosecutor and the judge presiding over his case. (A 34). Romano then provided information he had regarding a double homicide and robberies. (T 1344-45).[5]

---

[5] It was not entirely clear during the suppression hearing at which point the law enforcement agents told Romano about the potential benefits of cooperation. However, Cox testified at trial that this conversation took place after Romano had waived his Miranda rights. (T 1363).

18

Cox explained that Heslin left the interview room after approximately 30 to 40 minutes to prepare a written statement, which was based on information that had been provided by Romano.[6] (ST 83). After Heslin returned to the interview with the statement, Romano signed it.[7] (ST 38).

In his post-hearing memorandum, Romano no longer argued that he repeatedly requested an attorney but that he requested an attorney once, while at Queens Geo. (GA 24). He also asserted for the first time that he was tricked into believing that he had entered into a formal cooperation agreement with the government on the day of his arrest. (GA 31-39).

On September 18, 2013, the district court issued an opinion and order denying Romano's motion. (A 49-64). The court rejected the assertion in Romano's affidavit that he had repeatedly requested an attorney the day of his arrest. (A 60). The court specifically noted that it found Cox's testimony on this issue "straightforward and credible." (A 58). It also

---

[6] The statement was not admitted into evidence during the hearing but was admitted at trial as GX 101.

[7] At trial, Cox testified that Heslin sat down next to Romano with the statement and read each paragraph out loud. (T 1347-48). Romano initialed each paragraph as well as the bottom of each of the three pages after acknowledging that he agreed with what Heslin had written. (Id.).

19

characterized Romano's version of the events "far-fetched" and "belied by the testimony at the hearing." (A 59-60).

With respect to the contention that Romano's post-arrest statements were coerced, the court held that defendant "understood his rights and freely chose to waive them." (A 61). In so ruling, the court noted that Romano was not questioned at all during the car ride from jail to the FBI offices and that the questioning began only after Romano was informed of his Miranda rights both orally and in writing. (A 61). The court found that Romano was calm when he waived his rights and that there was otherwise "absolutely nothing in the record to indicate that anything occurred that would undermine the waiver's validity." (A 61-62). Finally, the court found that the discussion of cooperation that took place in the car prior to the Miranda waiver and the suggestion by the law enforcement agents that cooperation was in Romano's best interest did not amount to coercion. (A 63).

## IV. Jury Charge

Prior to trial, Romano gave notice that he intended to raise the affirmative defense of entrapment. (DE 139 at 2). Romano and the government filed their proposed jury charges on January 2, 2014 and January 3, 2014, respectively. (DE 130, 132). The parties disagreed on the proper instruction regarding

20

Romano's initial burden, i.e., the "inducement" prong of the entrapment analysis. Romano sought an instruction that would require Romano to show "any evidence that a government agent took the first step that led to a criminal act." (DE 130 at 18 (emphasis added)). In its proposed jury charge, filed on January 3, 2014, the government sought an instruction that Romano must prove "by a preponderance of the evidence that a government agent originated the criminal design of the particular criminal act charged." (DE 132 at 35).

On January 17, 2014, the court sent the parties its draft jury charge, in which it adopted the government's proposed instruction on inducement. (See T 1458, 1472). Romano objected to this instruction but acknowledged that the standard proposed by the government and adopted by the court was correct under Second Circuit case law. (T 1472). At trial, the court instructed the jury as follows:

> Now, I will discuss with you the defense of entrapment. The defendant asserts, as a defense, that he was the victim of entrapment by an agent of the Government. While the law permits government agents to trap an unwary criminally minded person, the law does not permit the government agents to entrap an unwary innocent. Thus, a defendant may not be convicted of a crime if it was the Government who gave the defendant the idea to commit the crime, if it was the Government who also persuaded him to commit the crime, and if he was not ready and

21

willing to commit the crime before the government officials or agents first spoke with him. On the other hand, if the defendant was ready and willing to violate the law, and the Government merely presented him with an opportunity to do so, that would not constitute entrapment.

Your inquiry on this issue should first be to determine whether the defendant has shown by a preponderance of the evidence that a government agent originated the criminal design of the particular criminal acts charged in the indictment. To prove something by a preponderance of the evidence means to prove only that it is more likely true than not true. If you find that the defendant has failed to meet this burden, then there cannot be any entrapment and your inquiry on this defense should end there.

If, on the other hand, you find that a government agent initiated the criminal acts charged in the indictment, then you must decide if the Government has satisfied its burden to prove beyond a reasonable doubt that prior to first being approached by government agents, the defendant was ready and willing to commit the crime.

To determine whether the defendant was ready and willing to commit the offenses charged, you may rely upon any relevant evidence of what the defendant said or did before first being approached by a government agent. You may also rely upon any of the relevant statements of the defendant after he was first approached by the government agent. But you may rely upon the defendant's conduct after he was first approached by the government agent only if that conduct is independently motivated and not the product of attention that the Government might have directed at the defendant.

22

> If you find beyond a reasonable doubt the defendant was predisposed - that is, ready and willing - to commit the offenses charged, and merely was awaiting a favorable opportunity to commit them, then you should find the defendant was not the victim of entrapment. On the other hand, if you have a reasonable doubt that the defendant would have committed the offenses charged without the Government's inducements, you must acquit the defendant.

(A 156-58).

On January 23, 2014, the jury returned a verdict of guilty on both counts of conspiracy to murder an employee of the United States. (A 159). On April 14, 2014, the district court sentenced Romano to two concurrent terms of life imprisonment, to run concurrently with the undischarged portion of his sentence for the coin fraud. (A 189-92).

23

SUMMARY OF ARGUMENT

The district court properly denied Romano's motion to suppress. Romano's argument that the conduct of the agents violated the principles of Missouri v. Seibert, 542 U.S. 600 (2004), was not raised in district court and Romano fails to show plain error on appeal. Moreover, the district court properly found that Romano validly waived his Miranda rights under the totality of the circumstances.

Romano's challenge to the jury charge on entrapment is without merit. The district court charged the jury in accordance with the established law of this Circuit that the defendant has the burden of showing inducement by a preponderance of the evidence. Moreover, even if the court had applied the law of other circuits, Romano would have fared no better. Indeed, under the law of other circuits, Romano would not have been entitled to a charge on entrapment at all.

24

ARGUMENT

POINT ONE

THE DISTRICT COURT PROPERLY DENIED
DEFENDANT'S MOTION TO SUPPRESS

Romano contends that the district court erred in denying his motion to suppress his post-arrest statements. Romano's argument is without merit.

I. Applicable Law

The Miranda warnings were designed to "ensure that the person in custody has sufficient knowledge of his or her constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent and voluntary." United States v. Carter, 489 F.3d 528, 534 (2d Cir. 2009). This Court reviews district court determinations regarding the constitutionality of a Miranda waiver de novo and underlying factual findings for clear error. Id.

The government bears the burden of proving by a preponderance of evidence that the defendant validly waived his rights. See Berghuis v. Thompkins, 560 U.S. 370, 382 (2010); "To prove a valid waiver, the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right." United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995). "Only if the

25

totality of the circumstances 'reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.'" United States v. Male Juvenile, 121 F.3d 34, 40 (2d Cir. 1997) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). To determine whether a confession is coerced, courts must consider, among other factors, "the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials." United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991).

II. Discussion

A. *Seibert* Does Not Apply

Romano argues that agents in this case "act[ed] purposefully to undermine the effect of the Miranda warnings" and that this Court should find that he did not validly waive his Miranda rights pursuant to the Supreme Court's decision in Missouri v. Seibert, 542 U.S. 600 (2004). (Br. 24-25). He describes Seibert as creating "an exception" to the "totality of the circumstances" test that normally applies to Miranda claims. (Br. 24). As he concedes, however, he failed to raise this argument in district court. (Br. 25 n.7). Accordingly, Romano is required to show that the district court committed plain error in applying the traditional "totality of the

26

circumstances" analysis in denying Romano's claim. <u>See</u> Fed. R. Crim. P. 52(b).

Plain error is (1) error, that (2) is plain, (3) affects substantial rights, and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings. <u>See</u> <u>Johnson v. United States</u>, 520 U.S. 461, 467 (1997); <u>United States v. Thomas</u>, 274 F.3d 655, 667 (2d Cir. 2001) (en banc). An error is "plain" only if it is "clear under current law." <u>United States v. Olano</u>, 507 U.S. 725, 734 (1993) An error satisfies the third criterion of affecting the defendant's substantial rights where there is a "reasonable probability that the error affected the outcome of the trial." <u>United States v. Marcus</u>, 130 S. Ct. 2159, 2164 (2010). "To affect 'substantial rights,' <u>see</u> 28 U.S.C. § 2111, an error must have 'substantial and injurious effect or influence in determining the . . . verdict.'" <u>United States v. Dominguez Benitez</u>, 542 U.S. 74, 81 (2004) (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)). Finally, if the first three elements of the test are satisfied, the fourth part of the test gives this Court discretion to correct the error "in those circumstances in which a miscarriage of justice would otherwise result." <u>United States v. Frady</u>, 456 U.S. 152, 163 n.14 (1982).

27

Romano's newly-raised Seibert claim fails to satisfy the demanding plain error test.

In Seibert, the defendant had been interrogated before receiving her Miranda warnings and confessed to committing murder. See Seibert, 542 U.S. at 604-05. Following the confession, a police officer advised the defendant of her Miranda rights, which the defendant waived, and proceeded to obtain a second confession, which mirrored the first. See id. at 605. The police officer testified at a suppression hearing that he had been trained to follow this particular interrogation technique. See id. at 605-06. A plurality of the Supreme Court found improper the officer's tactics, which amounted to a deliberate attempt to "drain[] the substance" out of Miranda and suppressed the defendant's post-arrest statements. Id. at 617. Both the plurality opinion and Justice Kennedy's concurring opinion made clear that their rationales applied to the specific "two-step" interrogation technique presented in that case. See id. at 610-11 (plurality opinion); id. at 620-22 (Kennedy, J. concurring). As this Court subsequently ruled, "Seibert lays out an exception to [Oregon v.] Elstad[, 470 U.S. 298 (1985)] for cases in which a deliberate, two-step strategy was used by law enforcement to obtain the postwarning confession." Carter, 489 F.3d at 536.

28

Seibert has no relevance to this case because, unlike Seibert, this case does not involve a two-part interrogation, much less an intentional two-part interrogation. Nor does it involve any pre-warning confession. Law enforcement agents did not ask any questions of Romano before issuing his Miranda warnings. (GA 2-4; A 58). Moreover, Romano did not make any admissions regarding the charged conspiracies until after he waived his rights. See id. Romano presented no evidence at the hearing to refute any of these facts.

The mere fact that Agent Heslin suggested during the ride to the FBI offices that Romano could help himself by cooperating does not make Seibert applicable to this case. This Court has held repeatedly, both before and after Seibert was decided, that "vague promises of leniency for cooperation" do not vitiate the validity of a Miranda waiver so long as agents do not make "material misrepresentations or unfulfillable promises." United States v. Gaines, 295 F.3d 293, 299 (2d Cir. 2002); see also, e.g., United States v. Corbett, 750 F.3d 245, 253 (2d Cir.), cert. denied, 135 S. Ct. 261 (2014); United States v. Awan, 384 F. App'x 9, 14 n.2 (2d Cir. 2010); Jaswal, 47 F.3d at 542; cf. Anderson, 929 F.2d at 100-02 (confession involuntary where suspect told that if he asked for a lawyer, he would be precluded from cooperating with the government). The

argument that Seibert overrules this authority is simply a non-sequitur since, as noted, Seibert addressed only the specific practice of intentional two-part interrogations.

At a minimum, Romano's argument that Seibert should apply to the very different circumstances of this case is not "clear under current law," as the plain error test requires. Olano, 507 U.S. at 734. The only case he musters in support of his interpretation of Seibert is the New York Court of Appeals' decision in People v. Dunbar, 24 N.Y.3d 304 (2014). (Br. 26-28). However, generally there can be no plain error "where the operative legal question is unsettled, including where there is no binding precedent from the Supreme Court or this Court." United States v. Bastian, 770 F.3d 212, 220 (2d Cir. 2014) (quoting United States v. Whab, 355 F.3d 155, 158 (2d Cir. 2004)) (internal quotation marks omitted). Here, the only "binding precedent" is the authority from this Court cited above holding that discussions of cooperation generally do not invalidate a Miranda waiver absent material misrepresentations or unfulfillable promises. Dunbar is obviously not binding and thus is insufficient to show that any purported error was plain.[8]

---

[8]    In addition, Dunbar is distinguishable. The court there drew an analogy to Seibert because it was addressing "a standardized procedure" that it found "effectively vitiated or at least neutralized the effect of the subsequently-delivered Miranda warnings." 24 N.Y.3d at 316. This case does not

30

Finally, Romano cannot bring this case under the rationale of Seibert (or Dunbar) by characterizing the agents' conduct as "a deliberate tactic" to "fool[] him into thinking he was actually entering into a cooperation agreement" for "the purpose and effect of negating the benefit of the intervening Miranda warnings." (Br. 28). The premise of this argument is that agents intentionally sought to deceive him. However, based on the suppression hearing testimony, the district court found "no evidence whatsoever of deceit by the agents." (A 63). That finding is not clearly erroneous. The agents did nothing more than this Court's precedent allows them to do in referring generally to the potential benefits of cooperation.

B.  Romano's *Miranda* Waiver Was Valid

Putting aside Romano's spurious Seibert claim, the remaining question is simply whether Romano validly waived his Miranda rights under the traditional "totality of the circumstances" test. The record amply supports the district court's finding (A 61) that Romano's waiver was valid.

---

involve any "standardized procedure" but simply general statements that it would be in Romano's best interests to cooperate, which, as already noted, this Court has held does not vitiate the Miranda warnings absent other circumstances not present here.

31

### 1. Romano's History and Characteristics

Romano's arrest on October 9, 2012 was his third federal arrest in the span of four years. He was first arrested in the coin fraud case in November 2008. (GA 42). He was arrested again in March 2010 for violating the terms of his pretrial release in the coin fraud case. (GA 54-55). At the time of his October 2012 arrest in the instant case, Romano was not a newcomer to law enforcement encounters, and it is fair to assume that Romano had familiarity with the criminal justice system. See Anderson, 929 F.2d at 99.

Further, as evidenced by his elaborate coin fraud scheme, Romano is intelligent, sophisticated and shrewd. He ran numerous coin telemarketing companies over a seven-year span and conned over 1,500 people out of millions of dollars using sophisticated sales tactics and marketing ploys. (GA 42-46). Romano earned gross proceeds of over $40 million and personally profited by over $7 million through his schemes. (GA 45, 47-48). It strains credulity to suppose that a person of his level of acumen could be easily duped or coerced into waiving his Miranda rights.

### 2. The Discussion about Cooperation

The evidence at the suppression hearing established that Romano was not subjected to any pressure or coercion prior

32

to the <u>Miranda</u> waiver. Cox's testimony at the suppression hearing established that the topic of cooperation was discussed only briefly with Romano on the way from jail to the FBI offices. Specifically, Heslin told Romano that it was in Romano's interest to be cooperative once they arrived at the FBI offices, because the agents had all the evidence needed to prove Romano's guilt. The conversation during the car ride was "calm" and "conversational," except when Romano complained, unprompted, about his coin fraud case.

Romano also appeared "calm" and "attentive" during his review of the Advice of Rights form, which was reviewed with him in painstaking detail. Heslin read each right out loud while Romano followed along beside him and asked after each right whether Romano understood. Only after Romano acknowledged his understanding did Heslin ask him to place his initials next to each right. After the entire form was reviewed with him, Romano orally agreed that he understood his rights and wished to speak to the agents without an attorney present. He then signed the Advice of Rights form.

Romano presented no evidence to contradict Cox's testimony regarding these events. The district court properly found Cox credible. Based on the facts elicited during the hearing, the court found that Romano "appeared to be calm and to

33

understand what was happening" when he was read his Miranda rights and correctly ruled that "there is absolutely nothing in the record to indicate that anything occurred that would undermine the waiver's validity." (A 61-62).

### 3. Romano Did Not Believe He Was Cooperating With The Government

Romano's contention that he believed he was somehow formally cooperating with the government when he waived his rights or confessed is untenable. To begin with, Romano made no such allegation in his affidavit in support of his suppression motion. While he claimed in the affidavit that agents told him that he "should cooperate" and that "now was [his] chance to cooperate" against Mirkovic (A 29), he never asserted that he believed that he actually had entered into a cooperation agreement with the government. That allegation appeared for the first time in defense counsel's post-hearing memorandum. (GA 31-39). But counsel's theory was unsupported by any sworn allegation from Romano himself, even though what Romano actually believed was a matter peculiarly within his own knowledge.

Even apart from the deficiencies of Romano's affidavit, the record fatally undermines any suggestion that he confessed to the charged crimes only because he believed he was entering into a cooperation agreement. First, as set forth above, the agents did nothing more than inform Romano that it

34

was in his interest to cooperate. Second, Romano could not have believed that he was entering into a cooperation agreement prior to signing the Advice of Rights form because he inquired during his post-arrest interview, which occurred <u>after</u> Romano had waived his rights, as to what information he might provide that could lead to cooperation. (A 33, 55-56).

Nor could Romano have believed he was entering into a cooperation agreement by signing the written confession. First, by the time Romano signed the written statement, he had already confessed orally to the charged crimes. Second, there is no evidence that any of the law enforcement agents told Romano that he was entering into a cooperation agreement with the government by signing the written statement. Third, the words "cooperation agreement" are nowhere to be found on the form containing the handwritten statement; rather, it reads, "Knowing and understanding these rights, I hereby make the following statement." The defense acknowledged at trial that Romano was familiar with cooperation agreements from his review of them during the coin fraud case, an admission that wholly undermines Romano's contention now that he believed he was signing a formal cooperation agreement. (<u>See</u> GA 68, 76-77). Further, the end of the written statement contains the language, "I make this statement freely and voluntarily, without threats, rewards or

35

promises of immunity in return for it." (GA 82; A 56). In signing this form, Romano acknowledged that he did not expect to receive any benefit from signing the written statement, whereas he knew that a cooperation agreement brings with it the benefit of possible leniency at sentencing. (A 34; GA 68, 76-77).

Based on these facts, there is no reason to believe that Romano believed he was in fact entering into a formal cooperation agreement with the government and, there is no merit to any suggestion that Romano's post-arrest statements were coerced by the promise of cooperation.

36

POINT TWO

THE DISTRICT COURT CORRECTLY CHARGED THE JURY ON ENTRAPMENT

Romano argues that the district court erred in its jury instruction on entrapment. Specifically, he argues that the court should not have instructed that Romano had the burden of proving by a preponderance of evidence that he was induced into committing the crime. For the reasons below, the argument is meritless.

I.   Applicable Law

This Court review claims of error regarding jury instructions de novo. See United States v. Kozeny, 667 F.3d 122, 130 (2d Cir. 2011), cert. denied, 133 S. Ct. 1794 (2013). Even if an instruction is erroneous, the conviction will be affirmed "if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." Id. (quoting Neder v. United States, 527 U.S. 1, 18 (1999)).

As Romano acknowledges and as the district court held (A 180), this Court has said repeatedly that "'[e]ntrapment is an affirmative defense that requires a defendant to prove by a preponderance of the evidence the government's inducement to commit the crime.'" United States v. Brand, 467 F.3d 179, 189 (2d Cir. 2006) (quoting United States v. Williams, 23 F.3d 629,

37

635 (2d Cir. 1994)); see also United States v. Corsey, 512 F. App'x 6, 9 (2d Cir. 2013); United States v. Al-Moayad, 545 F.3d 139, 153 (2d Cir. 2008); United States v. Siraj, 2008 WL 2675826 at *1 (2d Cir. 2008) (summary order); United States v. Gagliardi, 506 F.3d 140, 149 (2d Cir. 2007); United States v. Jackson, 345 F.3d 59, 66 (2d Cir. 2003). If the defendant carries his burden of proving inducement, "[t]he burden then shifts to the government to show that the defendant was predisposed to commit the crime beyond a reasonable doubt." Gagliardi, 506 F.3d at 149.

To show inducement, a defendant need only demonstrate that the government "initiated the crime." Brand, 467 F.3d at 190 (citation omitted). The defendant's burden is "relatively slight," and mere solicitation by a government agent suffices. Id.; United States v. Dunn, 779 F.2d 157, 158 (2d Cir. 1985). The government may prove predisposition by putting forth evidence of: "(1) an existing course of criminal conduct similar to the crime for which the defendant is charged, (2) an already formed design on the part of the accused to commit the crime for which he is charged, or (3) a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement." United States v. Brunshtein, 344 F.3d 91, 101–02 (2d Cir. 2003) (citation and brackets omitted).

38

II. The District Court Correctly Instructed
   the Jury under the Law of this Circuit

   The district court correctly instructed the jury that Romano bore the burden, by a preponderance of the evidence, of establishing inducement. The district court also correctly instructed the jury that, if Romano met his burden, the government then had the burden of proving, beyond a reasonable doubt, that Romano was predisposed to commit the crime. (A 157-58).

   Romano maintains that the law in this Circuit with regard to the defendant's burden is not settled and asks the Court to hold that a defendant need only produce "credible evidence" of inducement. (Br. 34). However, there is no merit to Romano's laborious effort to demonstrate that none of the numerous decisions of this Court that have recognized that the defendant has the burden of proving inducement by a preponderance of the evidence necessarily decided that issue. (Br. 41-46).

   To begin with, Romano's assertion that <u>Williams</u>, 23 F.3d at 635, "appears" to be "[t]he earliest reference in this Circuit to a defendant's burden of persuasion by a preponderance of the evidence" (Br. 41) is mistaken. In <u>United States v. Braver</u>, 450 F.2d 799, 802 (2d Cir. 1971), this Court rejected a challenge to a jury instruction on entrapment that placed upon

39

the defendant the burden of proving inducement "by a fair preponderance of the evidence." Id. at 801 n.4 (quoting jury charge). The Court relied upon Second Circuit authority dating back to United States v. Sherman, 200 F.3d 880, 882 (2d Cir. 1952), and commented that it was "late in the day" (as of 1971) for the defendant to argue that this Court had not already approved a jury charge placing the burden of proving inducement on the defendant. 450 F.2d at 802.

As noted above, this Court has continued to recognize that the defendant bears the burden of proving inducement by a preponderance of the evidence in the decades that have followed Braver. Indeed, in 2008, the Court ruled that an instruction identical to the one requested by Romano was erroneously favorable to the defendant. See Siraj, 2008 WL 2675826 at *1 ("The jury charge on entrapment erroneously instructed that the burden shifts to the government to show predisposition upon a showing of 'any credible evidence' of inducement.") (citing Brand, 467 F.3d at 189, for the proposition that "the defendant's burden is to show inducement by a preponderance of the evidence.").

It is true that Braver also "suggest[ed] that it would be preferable for the district courts of this circuit to use an entrapment charge that does not give to the jury two ultimate

40

factual issues to decide on two different burdens of persuasion imposed upon two different parties." Id. at 805. Further, the Court "suggest[ed] that there be no reference to 'burden' or 'burden of proof' or 'preponderance of the evidence' in describing a defendant's obligation." Id.; see also Dunn, 779 F.2d at 160; United States v. Martinez-Carcano, 557 F.2d 966, 970 (2d Cir. 1977). However, notwithstanding that suggestion, the holding of Braver is that it is not error to instruct the jury that the defendant has the burden of proving inducement by a preponderance of the evidence. See United States v. Steinberg, 551 F.2d 510, 513-14 (2d Cir. 1977) (citing Braver for the proposition that "the defendant must prove by a preponderance of the evidence that the crime charged was initiated or induced by a government agent."). In light of this authority, the district court did not err in rejecting Romano's proposed instruction and charged the jury consistently with the law of this Circuit.

## III. Even under the Law of Other Circuits, Romano's Claim Would Fail

In asking this Court to find error in the district court's instruction on entrapment, Romano seeks to have this Court abrogate its precedent on entrapment and follow the law of other circuits. (Br. 46). Putting aside the principle that this Court is bound by its prior decisions absent action by the

41

en banc Court or the Supreme Court, Romano would not be able to show prejudicial error in the district court's instruction even if the Court accepted his invitation to overrule its precedent.

What Romano's argument ignores is that the difference between the entrapment defense in the Second Circuit and other circuits lies not simply in the burden of proof by which the jury must find inducement. While many jurisdictions do not require a "preponderance" showing on inducement, those jurisdictions that allow for a lesser standard of proof, such as "any credible evidence," have concomitantly adopted a stricter definition of inducement.

In these circuits, unlike in the Second Circuit, mere government solicitation does not suffice to show inducement. Instead, defendants must show "an opportunity to commit the crime [and] also a 'plus' factor of government overreaching." United States v. Gonzalez-Perez, 778 F.3d 3, 11 (1st Cir.), cert. denied, 2015 WL 1399328 (2015); see also United States v. Mayfield, 771 F.3d 417, 433 (7th Cir. 2014) (requiring "something more" than "government solicitation of the crime," "either in terms of character and degree of the government's persistence or persuasion, or the nature of the enticement or reward"); United States v. Poulsen, 655 F.3d 492 (6th Cir. 2011) ("government inducement[] must be something more than 'merely

42

affording an opportunity or facilities for the commission of the crime'") (quoting Mathews v. United States, 485 U.S. 58, 66 (1988)); United States v. Wright, 921 F.2d 42, 45 (3d Cir. 1990) (finding mere solicitation not enough to show inducement); United States v. Burkley, 591 F.2d 903, 913 (D.C. Cir. 1978) (same). Under the law of these circuits, the defendant has to satisfy a higher threshold showing of inducement than in the Second Circuit, which requires only a showing that the government initiated the crime. See Brand, 467 F.3d at 190.

Moreover, in the majority of these other circuits, the defendant is not entitled to present a defense of entrapment to a jury unless he has made a threshold showing of both inducement and lack of predisposition. See Gonzalez-Perez, 778 F.3d at 11; United States v. Pillado, 656 F.3d 754, 763 (7th Cir. 2011); United States v. Scull, 321 F.3d 1270, 1275 (10th Cir. 2003); Wright, 921 F.2d at 45; Burkley, 591 F.2d at 913. But see United States v. Isnadin, 742 F.3d 1278, 1297 (11th Cir. 2014) (stating that a defendant need only produce evidence of inducement).

Here, if Romano had been held to the standards adopted by other circuits, he not would have been allowed to present his entrapment defense at all.

43

A.   Romano Cannot Show Inducement

As an initial matter, Romano failed to present any "credible evidence" of inducement. At trial, cooperating witness Machacek testified that the murder plot originated with Romano and that, when he met Romano for the first time at the NCCC in July 2012, Romano told Machacek about an already-formed plan to murder the judge and prosecutor assigned to his coin fraud prosecution. (GA 70-74). In particular, Machacek testified that, at that first meeting, Romano indicated that his murder plot was "in the works already." (GA 74). Machacek further testified that Romano spoke about the "details of planning" that had already taken place and the "intimate" information he had already gathered regarding the murder targets. (Id.). According to Machacek's testimony, before their very first meeting, Romano's murder plan was "well thought out." (Id.).

Even apart from Machacek's testimony, additional evidence refutes any claim of government inducement. First, the recording of the August 10, 2012 meeting between Romano and Machacek in the holding cell at the federal courthouse belies Romano's contentions that Machacek, acting as a government agent, induced Romano to commit murder. In that recording, Romano repeatedly indicates to Machacek that he had already been

44

planning to murder Judge Bianco and AUSA Gatz. (See, e.g., GX 201 ("[Judge Bianco], I'm gonna kill slowly . . . . I'm going to fucking cut him to pieces" (GA 103); stating that he had decided to kill Judge Bianco "after he sentenced me" (GA 117) in February 2012)). That Romano planned to commit these murders before the August 10, 2012 meeting with Machacek is readily apparent from the recording.

Second, evidence of Romano's motive and his investment of time and money also demonstrated that he was not induced to commit the charged crimes, but that he was independently motivated and committed. As Romano himself indicated during the August 10, 2012 meeting with Machacek and in his post-arrest statements, he wanted to kill Judge Bianco and AUSA Gatz to get revenge for their involvement in his fraud prosecution, which culminated with his conviction and sentencing in February 2012. (GA 57, 65, 84-141). In other words, Romano developed his motive to murder independent of any government involvement in the case and long before Romano met Machacek for the first time in July 2012. (GA 64).

After his arrest, Romano confessed that the plan to murder Judge Bianco and AUSA Gatz was his own idea and that he had directed Mirkovic regarding how to move the plot forward. (GA 66). At no point during that post-arrest interview did

45

Romano suggest that the murder conspiracy was the product of inducement by Machacek or anyone else. (GA 66-67).

Contrary to Romano's argument (Br. 38-39), reliance on this evidence, which the district court cited in denying his Rule 29 motion (A 181-82), does not improperly conflate proof of lack of inducement with proof of predisposition by diverting attention from the government's conduct to the defendant's mental state. The evidence cited above does not merely show that Romano was generally predisposed to commit acts of violence but rather that he had already formed the plan to commit the specific crimes charged in this case and taken action pursuant to that plan before the alleged inducement ever occurred. Such proof tends to show, in language Romano repeatedly quotes, that government agents did not "originate a criminal design, implant an innocent person's mind the disposition to commit the criminal act, and then induce commission of the crime[.]" Jacobson v. United States, 503 U.S. 540, 548 (1992). Rather, as the district court observed, it tends to show that "it was the Defendant, and no one else, who 'initiated the crime' of conspiracy." (A 182) (quoting United States v. Mayo, 705 F.2d 62, 67 (2d Cir. 1983)).

46

B.    Romano Cannot Show Lack of Predisposition

Even if Romano could show inducement, he would fail to make the threshold showing of lack of predisposition required by other circuits.  First, as of August 2012, when Romano alleges that the inducement occurred, Romano had already attempted, solicited and performed similar acts of violence aimed at obstructing justice and retaliating against individuals whom he blamed for his coin fraud prosecution.  Evidence introduced at trial, through Romano's statements to Machacek and the testimony of Investigator Hessle, demonstrated that Romano had previously engaged in a violent attack on his former friend and employee Rusty Barnes after Barnes began cooperating against him in the coin fraud investigation.  According to the evidence, Romano held a knife to Barnes's throat, cut Barnes's neck, and threatened to murder Barnes if Barnes did not cease his cooperation.  (GA 126-27).  Shortly after this attack, Barnes's cooperation did, in fact, cease.  (GA 49-52).  This evidence is thus compelling proof of Romano's predisposition.

Moreover, in his post-arrest statements, Romano indicated that, prior to meeting Machacek, he had approached three other inmates at the NCCC about committing violent acts on his behalf.  (GA 58-59).  In particular, Romano admitted that, in February 2012, he had attempted to hire Ishmel Cohen, a

47

Bloods gang member, to commit the Pittas assault and had negotiated a price of $2,500 for that assault. (GA 59-60). Romano also admitted to approaching Bobby Brown regarding committing violent acts for him, and when investigators visited Brown's residence after Brown's release from prison, they seized a document containing Romano's name, inmate number and email address along with the name, address and description of Pittas. (GA 61-64, 78). Romano's multiple prior attempts to hire inmates to commit the Pittas assault are particularly significant because the evidence demonstrated that the charged murder-for-hire plot consisted of two steps: commissioning a hit man to commit the test assault of Pittas, followed immediately by the murder of the judge and prosecutor.

Second, as of August 10, 2012, the alleged date of inducement, the evidence proved that Romano had already formed a design to commit the charged crimes. As set forth in detail above, prior to meeting Machacek, Romano had already hatched the murder plot – a plot that Romano admitted was his own. (GA 66, 70, 74). Indeed, as the recording of the August 10, 2012 meeting demonstrated, Romano had already formed his plan not only to murder Judge Bianco and AUSA Gatz, but also to mutilate their bodies in the very manner that he and Mirkovic later directed the undercover detective to employ. (GA 84-141).

48

Further, prior to the alleged inducement, Romano had begun implementing that design by commissioning inmates to take the first step in the plot: the test assault of Pittas. In sum, the same evidence that undermined Romano's claim of inducement demonstrated that he had already formed a design to commit the charged crimes, prior to the date of the alleged inducement.

Third, the evidence introduced at trial proved that Romano responded readily when presented with the opportunity to commit the murders he had been planning. Indeed, the trial evidence demonstrated that Romano responded with great enthusiasm, even glee. For example, when Machacek responded to Romano's description of his murder plot by indicating that he knew an investigator willing to serve as a hit man, Romano requested an immediate meeting with the hit man, asking that the hit man visit him at the first possible opportunity. (GA 134 (asking to see the hit man on Monday, the next visiting day at the NCCC)). At his first meeting with Strecker, who posed as the hit man, Romano commissioned the test assault of Pittas within minutes of Strecker's introducing himself. (GA 148-56). Romano further indicated that "more serious work" would follow the assault and assured Strecker that he had a list of other individuals targeted for violence. (GA 158-60 (indicating there was more serious work to follow the assault; describing a "whole

49

bunch more" violent acts, "plenty of work" to come, and "enemies everywhere")); see also (GA 123 (describing "list a mile long" of people Romano was targeting for violence)). At the end of that first meeting, in a visual display of his enthusiasm, Romano physically embraced Strecker. (GA 177). In call after call after that meeting, Romano repeatedly beseeched Mirkovic to follow up with the hit man, at one point, after not hearing from Strecker for two weeks, even "begging" Mirkovic to call Strecker to advance the murder plot. (GA 179).

Moreover, as soon as Strecker provided proof of his bona fides by presenting to Mirkovic the staged assault photo of Pittas, Romano immediately directed Mirkovic to hire Strecker to commit the murders. In a telephone call with Mirkovic later that day, Romano described himself as ecstatic that his murder plan was moving forward: "I'm in my cell . . . dancing around and singing and stuff . . . laughing my balls off thinking about that." (GA 184).

In short, based on these facts, the lack of inducement and Romano's predisposition to commit the charged crimes was clear, and Romano would not have been entitled to present his entrapment defense under the law of any other circuit.

50

IV.  Any Error Was Harmless

Even assuming that Romano was entitled to an entrapment charge and that the court improperly instructed the jury on inducement, any error would be harmless because the proof of Romano's predisposition, as outlined above, was overwhelming.  See Kozeny, 667 F.3d at 130 (error in jury charge is harmless "if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.") (citation omitted).  In this regard, it is irrelevant that, as Romano argues (Br. 46), there is no way to determine whether the jury convicted Romano based upon proof of predisposition or a failure of proof of inducement.  Even where a court fails to instruct the jury entirely on an element of the crime, thereby precluding the jury from making any finding concerning that element, the instructional error may be harmless if the proof of the additional element is overwhelming.  See Neder, 527 U.S. at 17.  Thus, the relevant inquiry is not what the jury in fact found, but rather what "a rational jury would have found" absent the alleged error.  Kozeny, 667 F.3d at 130. Here, for the reasons previously noted, any rational jury would have found predisposition and rejected Romano's entrapment defense regardless of what it was instructed on inducement.

51

CONCLUSION

For the reasons stated, the judgment of the district court should be affirmed.

Dated:    Brooklyn, New York
          May 6, 2015

                                   Respectfully submitted,

                                   WILLIAM J. HOCHUL, JR.,
                                   United States Attorney,
                                   Western District of New York.

                    By:    _____/s/_____
                                   Una A. Dean
                                   Assistant U.S. Attorney

DAVID C. JAMES,
UNA A. DEAN,
Assistant United States Attorneys,
     (Of Counsel).

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION,
TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.    This   brief   complies   with   the   type-volume limitation  of  Fed.  R.  App.  P.  32(a)(7)(B)  because  the  brief contains 10,199 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This   brief   complies   with   the   typeface requirements  of  Fed.  R.  App.  P.  32(a)(5)  and  the  type  style requirements  of  Fed.  R.  App.  P.  32(a)(6)  because  it  has  been prepared  in  a  monospaced  typeface  using  Microsoft  Word  in  12-point Courier New font.

Dated:    Brooklyn, New York
          May 6, 2015

                                        /s/
                          David C. James
                          Assistant U.S. Attorney

A P P E N D I X

TABLE OF CONTENTS

                                                           Page

Excerpt from Transcript of Suppression Hearing,
 United States v. Romano, 12-CR-691 (JFK),
 July 9, 2013.........................................GA 1

Defense Memorandum of Law in Support of Motion to Suppress,
 United States v. Romano, 12-CR-691 (JFK),
 Dated August 5, 2013.................................GA 5

Excerpts from Trial Transcripts,
 United States v. Romano, 12-CR-691 (JFK)

        Jan. 9, 2014.................................GA 41

        Jan. 10, 2014................................GA 53

        Jan. 16, 2014................................GA 56

        Jan. 21, 2014............................... GA 75


Gov't Exhibits,
 United States v. Romano, 12-CR-691 (JFK)

        GX 14........................................GA 78

        GX 101.......................................GA 80

        GX 201T......................................GA 84

        GX 202T......................................GA 142

        GX 202B-5....................................GA 177

        GX 316.......................................GA 178

        GX 325.......................................GA 180

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,  :  12-CR-691(JFK)
                         :

      -against-         :  United States Courthouse
                        :  Brooklyn, New York
                        :

JOSEPH ROMANO,        :  Tuesday, July 9, 2013
                        :  10:30 a.m.
      Defendant.     :
- - - - - - - - - - - - - - - -X

TRANSCRIPT OF CRIMINAL CAUSE FOR SUPPRESSION HEARING
BEFORE THE HONORABLE JOHN F. KEENAN
UNITED STATES DISTRICT JUDGE
SITTING BY DESIGNATION

A P P E A R A N C E S:

For the Government:    WILLIAM J. HOCHUL, JR., ESQ.
                    United States Attorney
                    Western District of New York
                    BY: MARSHALL MILLER, ESQ.
                        UNA DEAN, ESQ.
                        Assistant United States Attorneys
                        Eastern District of New York
                          271 Cadman Plaza East
                        Brooklyn, New York 11201

For the Defendant:     GEORGE R. GOLTZER, ESQ.
                    Attorney for the Defendant -
                    Joseph Romano
                        200 West 57th Street
                        Suite 900
                        New York, New York 10019
                    BY: GEORGE R. GOLTZER, ESQ.

*Anthony D. Frisolone, FAPR, RDR, CRR, CRI, CSR*
*Official Court Reporter*

J.R. Cox - Direct/Ms. Dean                    27

Q    And when you say, "Animated," can you describe what you mean by that?

A    Just his voice raised a bit, seemed angry.

Q    Now, you previously said that the defendant wasn't asked any specific questions before he started talking about his coin fraud case?

In the course of his talking about his coin fraud case, did he make any admissions?

A    No.

Q    At any point during that car ride, did the defendant make any admissions with regard to the murder plot?

A    No.

Q    Now, did you, Special Agent Heslin, or Officer Davis ask the defendant during that car ride any questions relating to the charged conduct, meaning, the murder plot?

A    No.

Q    The underlying coin fraud case?

A    No.

Q    At any point, did anyone raise his voice at the defendant?

A    No.

Q    Threaten him?

A    No.

Q    And, at any point during that car ride, did the defendant appear to you to be scared?

J.R. Cox - Direct/Ms. Dean                    28

A    No.

        MR. GOLTZER:  Objection.

Q    Emotionally unstable?

        THE COURT:  Objection sustained as to whether he appeared scared.

Q    Did he appear to understand what was happening --

        MR. GOLTZER:  Objection.

Q    -- based on his questions?

        THE COURT:  Overruled.

A    Yes.

Q    At any point during this car ride, did the defendant ask to speak to an attorney?

A    No.

Q    Now, what happened once you arrived at the FBI field offices in Melville?

A    Parked the car in the outside lot, Mr. Romano was escorted upstairs to the FBI's third floor offices.  He was brought to the processing area which is outside the interview room.

Q    Now, when the defendant -- the defendant was placed in the interview room?

A    Yes.

Q    And when he was placed in the interview room, did he remain handcuffed and shackled?

A    No, he was uncuffed.

J.R. Cox - Direct/Ms. Dean                29

Q     What happened once he was placed in the interview room?

A     After Agent Heslin and I and George Davis secured our weapons outside the room, we then interviewed him.  He was first Mirandized and then we spoke to him.

Q     Was he shown a copy of his arrest warrant?

A     Yes, he actually asked to see a copy of the warrant and I showed it to him.

Q     And who else was in that interview room with you?

A     Special Agent Heslin and Task Force Officer George Davis.

Q     Okay.

          MS. DEAN:  Your Honor, may I approach the witness.

          THE COURT:  You may.

          (Approaching the witness.)

Q     Showing you what's been marked as Government Exhibit 1. Do you recognize that document?

A     Yes.

Q     Now, what is that document?

A     It's the FBI Advice of Rights Form.

Q     And was this document presented to the defendant in that interview room?

A     Yes.

Q     And you were there when it was presented to the defendant?

A     Yes.

GA005

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X

UNITED STATES OF AMERICA,

       - against -                       12 Cr. 691 (JFK)

JOSEPH ROMANO,

               Defendant.

-----------------------------------------------------X

**POST-HEARING MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANT'S MOTION
TO SUPPRESS POST-ARREST STATEMENTS**

GEORGE R. GOLTZER, ESQ.     MICHAEL K. BACHRACH, ESQ.
200 West 57th Street, Suite 900   276 Fifth Avenue, Suite 501
New York, New York 10019     New York, New York 10001
(212) 608-1260               (212) 929-0592

*Attorneys for Defendant Joseph Romano*

## Table of Contents

Table of Authorities ............................................................................................. ii

Preliminary Statement.......................................................................................... 1

Background .......................................................................................................... 1

Argument.............................................................................................................. 6

THE GOVERNMENT HAS FAILED TO MEET ITS BURDEN IN
ESTABLISHING: (1) THAT THE DEFENDANT DID NOT REQUEST
AN ATTORNEY PRIOR TO BEING QUESTIONED BY LAW
ENFORCEMENT; AND (2) THAT THE DEFENDANT'S STATEMENTS
WERE VOLUNTARY REGARDLESS OF WHETHER AN ATTORNEY
WAS REQUESTED ............................................................................................. 6

    A.    Introduction ............................................................................... 6

    B.    The Law...................................................................................... 8

    C.    The Government failed to establish, by a preponderance of the
evidence, that the defendant did not request an attorney ................... 11

    D.    Even if an attorney had not been requested, the Government
failed to carry its burden to establish that the defendant's post-
arrest statements were voluntary ......................................................... 16

        1.    Absent speculation, the Government cannot explain what
occurred during more than 70% of the time it took to
execute Romano's written Miranda waiver ............................. 17

        2.    The evidence suggests that Romano was coerced into
making incriminating statements by the belief that he was
cooperating with the Government's investigation and that
he was doing so pursuant to a written and signed
cooperation agreement ........................................................... 22

Conclusion ........................................................................................................... 31

i

## Table of Authorities

CASES

Bram v. United States,
168 U.S. 532 (1897)..................................................................................................6

Brown v. Mississippi,
297 U.S. 278 (1936)..................................................................................................6

California v. Beheler,
463 U.S. 1121 (1983) .............................................................................................28

Campaneria v. Reid,
891 F.2d 1014 (2d Cir. 1989) ..................................................................................9

Colorado v. Connelly,
479 U.S. 157 (1986)..............................................................................................6, 7

Fare v. Michael C.,
442 U.S. 707 (1979)................................................................................................11

Green v. Scully,
850 F.2d 894 (2d Cir. 1988) ..........................................................................8, 9, 29

Lego v. Twomey,
404 U.S. 477 (1972)..................................................................................................6

Mathis v. United States,
391 U.S. 1 (1968)....................................................................................................28

McNeil v. Wisconsin,
501 U.S. 171 (1991)..................................................................................................9

Michigan v. Tucker,
417 U.S. 433 (1974)..................................................................................................8

Miller v. Fenton,
474 U.S. 104 (1985)..................................................................................................6

Miranda v. Arizona,
384 U.S. 436 (1966)....................................................................................6, 7, 11

North Carolina v. Butler,
441 U.S. 369 (1979)........................................................................................7, 11

Rhode Island v. Innis,
446 U.S. 291 (1980).......................................................................9, 17, 27, 29,
                                                                                                          30

Rogers v. Richmond,
365 U.S. 534 (1961)..............................................................................................11

Smith v. Illinois,
469 U.S. 91 (1984)................................................................................................10

Tankleff v. Senkowski,
135 F.3d 235 (2d Cir. 1998) ................................................................................27

Tolliver v. Sheets,
594 F.3d 900 (6th Cir. 2010) ..............................................................................26

United States v. Anderson,
929 F.2d 96 (2d Cir. 1991) ....................................................................................9

United States v. Bye,
919 F.2d 6 (2d Cir. 1990) .................................................................................8, 29

United States v. Ferrara,
377 F.2d 16 (2d Cir. 1967) ..................................................................................11

United States v. Jaswal,
47 F.3d 539 (2d Cir. 1995) ..................................................................................10

United States v. Mitchell,
966 F.2d 92 (2d Cir. 1992) ..................................................................................28

United States v. Quiroz,
13 F.3d 505 (2d Cir. 1993) .........................................................................10, 12, 15

United States v. Rivalta,
892 F.2d 223 (2d Cir. 1989) ............................................................21

United States v. Rodriguez-Preciado,
399 F.3d 1118 (9th Cir. 2005) ........................................................26

United States v. Ruggles,
70 F.3d 262 (2d Cir. 1995) ..............................................................9

United States v. Scarpa,
897 F.2d 63 (2d Cir. 1990) ............................................................11

United States v. Shonubi,
998 F.2d 84 (2d Cir. 1993) .......................................................21, 23

Wood v. Ercole,
644 F.3d 83 (2d Cir. 2011) ............................................................10

## STATUTES AND OTHER AUTHORITIES

18 U.S.C. § 1117....................................................................................5

18 U.S.C. § 1349.............................................................................1, 2, 3

18 U.S.C. § 1956....................................................................................1

Fifth Amend., U.S. Const. ...............................................................6, 17, 27

Wayne R. LaFave et al., 2 Criminal Procedure § 6.7(a) (2d ed. 1999).........27

## Preliminary Statement

Defendant Joseph Romano (hereinafter, "Romano"), by and through his attorneys, submits the instant memorandum of law in further support of Romano's motion to suppress his own post-arrest statements. For the reasons that follow we respectfully submit that the Government has failed to carry its burden to establish that Romano's statements were made voluntarily and as such the defendant's post-arrest statements must be suppressed.[1]

## Background

On March 24, 2009, Romano was charged under Indictment No. 09 Cr. 170 (hereinafter, the "coin fraud case") with one count of Conspiracy to Commit Mail and Wire Fraud in violation of 18 U.S.C. § 1349, and one count of Conspiracy to Commit Money Laundering in violation of 18 U.S.C. § 1956(h).

The Indictment was superseded twice and on September 28, 2010, after one day of jury selection, Romano pleaded guilty to the first count of the Second Superseding Indictment (i.e., Conspiracy to Commit Mail and Wire Fraud in violation of 18 U.S.C. § 1349).

On February 9, 2012, Romano was sentenced by the Honorable Joseph F. Bianco to 180 months imprisonment to be followed by 3 years of supervised

---

[1]     We note that as addressed in our letter, dated, August 2, 2013, the instant memorandum of law totals more than 25 pages in 14-point proportional font, however, it would total less than 25 pages if reduced to 12-point proportional font. Since we are unaware of which font size is intended by Your Honor's Individual Rules of Practice, we respectfully request leave to file the instant brief in its present oversized form.

release.   A determination of the defendant's restitution order remains pending before the Honorable Sterling Johnson, Jr., however the defendant has remained in continuous custody since being sentenced in the coin fraud case.

On October 5, 2012, an arrest warrant was issued against Romano for his involvement in a conspiracy to murder the Federal judge and lead prosecutor associated with Romano's coin fraud case (see ecf #1; see also ecf #5).

On October 9, 2012, Romano and his co-defendant, Dejvid Mirkovic, were arrested (see Transcript, dated, July 9, 2013, at 10, 13).[2]   Romano was arrested at the Queens Private Detention Facility (Tr. 14), also known as the Queens County Detention Center and/or Geo Group, where he was already being detained on the coin fraud case (id.), and Mirkovic was arrested in Florida (Tr. 13), where he had been at liberty.

Romano's arrest was executed by Investigator James Randolph Cox of the United States Attorney's Office in the Eastern District of New York (Tr. 10, 15), Special Agent Edward Heslin of the Federal Bureau of Investigation ("FBI") (Tr. 15), and FBI Task Force Officer George Davis (id.).  Romano was not represented by counsel at the time of his arrest and had been proceeding pro se in relation to the remaining restitution claims still to be resolved in the coin fraud case (Tr. 14-15).

---

[2]   References to the transcript, dated, July 9, 2013, hereinafter preceded by, "Tr."

According to Investigator Cox's testimony during the July 9, 2013, pre-trial hearing, Romano was taken into custody by Investigator Cox and his FBI counterparts "Shortly after 8:00 a.m." (Tr. 15).  According to Investigator Cox, "After arriving at the Queens jail … [Romano] was handcuffed by Task Force Officer Davis using a belly chain and handcuffs in the front" (id.).

Cox, Heslin, and Davis then put Romano into a Ford Explorer and transferred him from Geo Group to the FBI Field Offices in Melville, New York (Tr. 18).  According to Cox, they left Geo Group at approximately 8:10 a.m. and arrived at the FBI Field Office in Melville "[s]hortly after 9:00 o'clock" (id.). During the drive Romano continued to be restrained with "the belly chain and cuffs … and the seatbelt" (id.).  Cox, Heslin, and Davis were all also armed with "revolvers or semiautomatics" during the drive (Tr. 52-53).

Though later called into question on cross-examination, during direct examination Investigator Cox claimed that Romano never requested to speak to an attorney (see Tr. 17, 38-39, 41; but see Tr. 47-48 [Cox testifying on cross that he could not overhear what was stated between Romano and Task Force Officer Davis during the time when Davis was placing a belly chain and handcuffs on the defendant while placing him under arrest at Geo Group]).

While Investigator Cox claimed that there was no discussion with Romano regarding the basis for the new arrest while Romano was still at Geo Group (Tr.

3

16-17), Cox did not dispute that a conversation regarding the charges and Romano's potential cooperation did take place during the car ride to Melville (Tr. 19-27, 57, 61, 83-85), mostly between Romano and Special Agent Heslin (Tr. 54), and continued after Romano arrived at Melville (Tr. 84).

There was also no dispute that during the drive Romano "was still in shackles," "was under arrest for an attempt or a conspiracy to kill personnel including a federal judge and an Assistant United States Attorney," "was not free to leave," "was definitely in custody," and that "custody continued entirely through the ride of one hour from G.E.O. to Melville … [a]nd thereafter" (Tr. 54-55). It was also undisputed that Romano was not provided his written Miranda warnings during the car ride or at any time prior to arriving in Melville (Tr. 55-56).

Once in Melville, Romano was "Mirandized", and shown a copy of his arrest warrant, and further "interviewed" (Tr. 29). Romano signed an advice-of-rights form (Tr. 29-36) as well as a three-page written statement that had been drafted by Special Agent Heslin (Tr. 38, 65-66, 79-83) and that specifically stated that Romano had "agreed to cooperate with the FBI and provide statements about crimes [he knew] about and crimes in which [he] was personally involved," as well as "information [he] acquired while incarcerated" (Tr. 81-82).

4

During Romano's interrogation at Melville, "he admitted to his role in the murder plot" and provided "information with regard to … criminal activity that he knew of or participated in" (Tr. 38).

Romano was then taken from the FBI Field Office in Melville to the Federal Courthouse in Central Islip, New York, at "about 11:40" (Tr. 40), and was arraigned later that day (see Minute Entry, dated, October 9, 2012 [*ecf* #8]).

On November 7, 2013, the instant Indictment was issued charging Romano with two counts of Conspiracy to Murder An Employee of the United States in violation of 18 U.S.C. § 1117 (see *ecf* #11).

On February 19, 2013, then-defense counsel filed Romano's pretrial omnibus motions, moving, inter alia, to suppress Romano's October 9, 2012 statements to law enforcement (see *ecf* #31). In support of said argument, Romano submitted a signed affidavit wherein Romano swore under penalty of perjury that he had informed his arresting officers that he wanted a lawyer, that his request for a lawyer was ignored, and that during his interrogation it was suggested to him that he should cooperate against Mirkovic or would "otherwise … face a severe criminal sentence" (Defendant's Affidavit, dated, February 19, 2013, at 1-2 [*ecf* #31, Attachment 3]).

On July 9, 2013, a hearing was held on Romano's motion to suppress. The sole witness called to testify by the Government was Investigator Cox. The

5

defense called no witnesses.  The hearing was then continued to permit written post-hearing briefing.

### Argument

**THE GOVERNMENT HAS FAILED TO MEET ITS BURDEN IN ESTABLISHING: (1) THAT THE DEFENDANT DID NOT REQUEST AN ATTORNEY PRIOR TO BEING QUESTIONED BY LAW ENFORCEMENT; AND (2) THAT THE DEFENDANT'S STATEMENTS WERE VOLUNTARY REGARDLESS OF WHETHER AN ATTORNEY WAS REQUESTED.**

### A.   Introduction

As has long best established, Due Process forbids the use at trial of a confession that has been obtained from a defendant by coercion.  See Brown v. Mississippi, 297 U.S. 278, 286 (1936).  Coerced confessions also implicate the Fifth Amendment because a confession necessarily entails the defendant's relinquishment of the privilege against self-incrimination, see Miranda v. Arizona, 384 U.S. 436, 460-63 (1966); Bram v. United States, 168 U.S. 532, 549 (1897), however, Due Process remains the focus in examining the voluntariness of confessions, see Colorado v. Connelly, 479 U.S. 157, 163 (1986); Miller v. Fenton, 474 U.S. 104, 109-10 (1985).

While the Government need only establish voluntariness by a preponderance of the evidence, see Connelly, 479 U.S. at 168-69; Lego v. Twomey, 404 U.S. 477, 489 (1972), it is still the Government who bears the heavy burden of proving

6

voluntariness.  See Connelly, 479 U.S. at 168-69; North Carolina v. Butler, 441 U.S. 369, 372-73 (1979).  As explained in Miranda, "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel."  Miranda, 384 U.S. at 475 (citation omitted).  Indeed, "Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders."  Id.

Here, it is alleged that the defendant made numerous post-arrest inculpatory statements.  The Government does not dispute that all of the defendant's statements occurred after he was placed under arrest and while he remained in custody (Tr. 54-55).  It remains in dispute whether the defendant requested to speak to an attorney prior to answering questions, compare Defendant's Affidavit, dated, February 19, 2013 (*ecf* #31, Attachment 3), at ¶¶ 6, 7, 14 and Tr. 47-48 with Tr. 17, 38-39, 41, but it is not in dispute that statements were ultimately made and that the defendant signed a written advice-of-rights form (Tr. 29-36).  It is also not in dispute that the defendant signed a three-page written statement after signing his

7

advice-of-rights form (Tr. 38, 82-83), however we respectfully submit that such statement reads more like a cooperation agreement than a confession.

Therefore, two questions are presented for this Court: First, has the Government established by a preponderance of the evidence that Romano never requested an attorney prior to waiving his rights under <u>Miranda</u>?   Second, regardless of whether an attorney was requested, were Romano's statements "the product of an essentially free and unconstrained choice by its maker?"   <u>Green v. Scully</u>, 850 F.2d 894, 900 (2d Cir. 1988).

With respect to both questions, we respectfully submit the Government has failed to carry its burden and as a result Romano's statements must be suppressed.

### B.   <u>The Law</u>

In <u>Miranda v. Arizona</u>, the Supreme Court established procedural safe-guards that apply in situations where the defendant is subjected to custodial interrogation by the police.  The Court has since said that these safeguards are "not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected." <u>See</u> <u>Michigan v. Tucker</u>, 417 U.S. 433, 444 (1974).

In determining whether statements are voluntary, no one factor is dispositive; instead, the assessment must be based upon the totality of the circumstances.  <u>See</u> <u>United States v. Bye</u>, 919 F.2d 6, 9 (2d Cir. 1990).  The

8

inquiry centers around "(1) the characteristics of the accused[;] (2) the conditions of interrogation[;]and (3) the conduct of law enforcement officials." Green, 850 F.2d at 901-02. More specifically, relevant factors include the "the length" and the "nature of interrogation". Campaneria v. Reid, 891 F.2d 1014, 1020 (2d Cir. 1989). Coercion has been found to render confessions involuntarily in a number of circumstances including where the suspect is told that if he asked for a lawyer he would be precluded from cooperating with the Government, see United States v. Anderson, 929 F.2d 96, 100-02 (2d Cir. 1991), and where "[m]aterial misrepresentations based on unfulfillable or other improper promises might perhaps overbear a defendant's will." United States v. Ruggles, 70 F.3d 262, 265 (2d Cir. 1995).

Similarly, the term "interrogation" includes express questioning of the suspect and its "functional equivalent," meaning "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). As such, "psychological ploys" designed to induce a suspect to confess may be viewed as interrogation. Id. at 299.

To invoke the Miranda right to an attorney, the suspect must make "some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." McNeil v. Wisconsin, 501 U.S. 171, 178 (1991). The

9

Second Circuit has also said, however, that courts must "[r]esolve any doubts in favor of the conclusion that the suspect did not intend any waiver of his right to consult counsel." United States v. Quiroz, 13 F.3d 505, 511 (2d Cir. 1993); see also Wood v. Ercole, 644 F.3d 83, 91-92 (2d Cir. 2011) ("I think I should get a lawyer" was unambiguous request for counsel).

Once a suspect clearly invokes the right to counsel, post-request responses to further interrogation may not be used "to cause doubt on the adequacy of the initial request itself." Smith v. Illinois, 469 U.S. 91, 98-99 (1984) (suspect clearly requested counsel even though he indicated only moments later that he would answer questions); see also Quiroz, 13 F.3d at 512 (suspect's statement that he wanted to speak with attorney before signing waiver form was unambiguous request for counsel even though suspect subsequently stated he would answer questions).

To establish that a defendant validly waived his or her Miranda rights, the Government must prove by a preponderance of the evidence: "(1) that the relinquishment of the defendant's rights was voluntary[;] and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving the right." United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995). Under the Miranda decision, "a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was

10

in fact eventually obtained."  Miranda, 384 U.S. at 475; see also United States v. Scarpa, 897 F.2d 63, 68 (2d Cir. 1990) ("When considering whether a defendant waived his constitutional rights, we consider all relevant circumstances, employing a presumption that the defendant did not waive his rights."), citing, Butler, 441 U.S. at 373 ("courts must presume that a defendant did not waive his rights").

To put it another way, the test of voluntariness of a confession is whether all the relevant circumstances show that the conduct of law enforcement officials "was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined."  United States v. Ferrara, 377 F.2d 16, 17 (2d Cir. 1967), quoting, Rogers v. Richmond, 365 U.S. 534, 544 (1961).  Thus, as with the related question of whether a confession is itself voluntary, the determination of whether suspects have knowingly and voluntarily waived their Miranda rights depends upon the totality of the circumstances.  See Fare v. Michael C., 442 U.S. 707, 724-25 (1979).

Here, for the reasons that follow, we respectfully submit that the Government has not come close to satisfying its burden.

**C.    The Government failed to establish, by a preponderance of the evidence, that the defendant did not request an attorney.**

Romano submitted an affidavit in support of his omnibus motions wherein he swore, in relevant part and under penalty of perjury, that:

11

> On October 9, 2012, I was visited by members of Federal and State Law Enforcement at the GEO detention facility in Queens, New York.
>
> I was placed in handcuffs and told that I was being arrested for a plot to kill a judge and a prosecutor and that I would be facing a lengthy prison term unless I cooperated.
>
> I was very scared and confused as to what was going on and told my interrogators that I wanted a lawyer.
>
> I was taken from GEO facility in handcuffs and placed in a police car. During this time even though I had requested an attorney, I was still subjected to many questions.
>
> I was told that I should cooperate and that now was my chance to cooperate against who would ultimately be my co-defendant, Dejvid Mirkovic, otherwise, I would face a severe criminal sentence.

(Affidavit, dated, February 19, 2013, at ¶¶ 4-8 [*ecf* #31, Attachment 3]).

Since the Government may not continue to interrogate a suspect once he unequivocally asks for a lawyer, see Quiroz, 13 F.3d at 512 ("[i]n the absence of ambiguity, further questions by the authorities were prohibited"), the Government bears the burden of establishing that the defendant did not unequivocally request an attorney prior to making inculpatory statements. Here, however, the Government has failed to do so.

Without question, the Government's witness, Investigator Cox, repeatedly testified that the defendant never requested an attorney (Tr. 17, 38-39, 41).

However, Investigator Cox could only testify to statements made in his presence <u>that he overheard</u>, and he admitted during cross-examination that he could not hear all statements that were made to the defendant by the other arresting officers (Tr. 47-48).

Of particular importance, Investigator Cox specifically testified during cross-examination that during the defendant's arrest, while still at Geo Group while Task Force Officer Davis was shackling the defendant, Investigator Cox could not hear the conversation that was had between Davis and the defendant, and did not know what was said (Tr. 48):

> [Investigator Cox:]  When George Davis was putting the shackles on [Romano] they were talking about, I think, it was about arranging the shackles.  I was filling out the paperwork to take him out.
>
> Q.     Did you overhear the conversation between Mr. Romano and Mr. Davis?
>
> A.     I did not.
>
> Q.     And you don't know what they were taking about?
>
> A.     No.
>
> Q.     You don't know whether Mr. Davis was asking him any questions?
>
> A.     Mr. Davis wasn't going to ask him any questions.
>
> Q.     How do you know that?

13

A.    Because we planned to question him when we got back to the FBI office.

Q.    So it was part of the plan not to question Mr. Romano when he was inside the G.E.O.?

A.    Yes.

Q.    And it was part of the plan not to interrogate Mr. Romano until after you got back to Melville?

A.    That's right.

(Tr. 48.)

From this colloquy a few things can be ascertained: (1) statements were made between Task Force Officer Davis and Romano during the period when Romano was being arrested and shackled at Geo Group; (2) Investigator Cox could not hear what was being stated between Davis and Romano; (3) Investigator Cox did not know what Davis and Romano were talking about; and (4) Investigator Cox did not *believe* interrogation was taking place during that conversation because the "plan" was not to question Romano substantively until he arrived in Melville.

What cannot be ascertained from Investigator Cox's testimony is what was *actually* discussed between Davis and Romano during this stage of Romano's arrest, including whether Task Force Officer Davis informed Romano of his Miranda rights while shackling and handcuffing Romano or whether Romano requested an attorney while speaking to Davis.

14

According to Romano he requested an attorney <u>prior to</u> being questioned during the car ride from Geo Group to Melville (<u>see</u> Romano affidavit at ¶¶ 6, 7). Romano's affidavit does not state the precise moment he requested an attorney, but it is not the defendant's burden to establish when such occurred; rather it is the Government's burden to establish that it never occurred because it if did then all questioning was required to cease and no further interrogation could take place – not even interrogation initiated after a subsequent and valid <u>Miranda</u> waiver.  <u>See</u> <u>Quiroz</u>, 13 F.3d at 511-12.

Since Investigator Cox did not know what was said between Davis and Romano during Romano's arrest, it was incumbent upon the Government to call Officer Davis to explain what had occurred.  Absent Davis's testimony, however, the Government is unable to carry its burden to establish that counsel had not been unequivocally requested by the defendant prior to the execution of the defendant's <u>Miranda</u> waiver, particularly in light of the defendant's affidavit swearing to the contrary.

As such, all of Romano's post-arrest statements must be suppressed, not simply those that occurred prior to the execution of his written advice-of-rights form.

15

**D.    Even if an attorney had not been requested, the Government failed to carry its burden to establish that the defendant's post-arrest statements were voluntary.**

Even assuming *arguendo* that Romano never requested an attorney, we respectfully submit that the Government is still unable to carry its burden to establish by a preponderance of the evidence that Romano's statements were voluntary.  Much like Investigator Cox's inability to testify to the statements made between Romano and FBI Task Force Office Davis during the time Romano was being handcuffed and placed under arrest, Investigator Cox was also completely unable to explain why Romano's advice-of-rights card indicates that it took 7 minutes to complete notwithstanding the fact the reading of the rights and the signing and initialing of the card took no more than 1-2 minutes.

Additionally, Investigator Cox's testimony revealed that the arresting officers used a two-step interrogation process in which they began speaking to Romano about his case during the car ride prior to being Mirandized and then continued the discussions after Romano had been thereafter Mirandized at the FBI Field Office in Melville.  While the Government does not intend to use any of the pre-Melville statements at trial, it cannot be disputed that the arresting officers repeatedly peppered Romano with the concept of cooperation – in the car, in Melville prior to signing the advice-of-rights card, and in Melville after signing the

16

advice-of-rights card – and eventually had him sign a three-page statement that made clear Romano's desire to cooperate.

While the Government will surely characterize that written statement as a confession, looking at the entirely of the circumstances the statement appears more likely to have been a cooperation agreement, or at a minimum a written statement designed to make Romano believe it was a cooperation agreement.  Such trickery and psychological ploys is specifically what the Due Process Clause is intended to protect against during interrogations.  See Innis, 446 U.S. at 299.

> **1.      Absent speculation, the Government cannot explain what occurred during more than 70% of the time it took to execute Romano's written Miranda waiver.**

At the top right of the advice-of-rights form signed by Romano on the day of his arrest, the time "9:14 a.m." is indicated (Tr. 32 [emphasis added]); such indicates "[t]he time just before [Romano] was read his rights" (id.).  "So, essentially, [that is] the time that … [Investigator Cox] began reviewing this form with [Romano]" (id.).  At the bottom of the advice-of-rights form, under Investigator Cox's signature, the time "9:21 a.m." is indicated (Tr. 32-33 [emphasis added]); such indicates "[t]he time when [the form] was completed and after we had witnessed it" (Tr. 33).  Special Agent Heslin wrote in the times, but Investigator Cox observed him doing so (id.).

17

Describing how the advice-of-rights form was presented and reviewed with the defendant, Investigator Cox testified that "Agent Heslin was next to Mr. Romano" and that Heslin "read the rights to [Romano] as Mr. Romano appeared to be following along as they sat next to each other" (Tr. 33; see also Tr. 73).  "After each line, [Heslin] asked Mr. Romano if he understood and asked him to initial it if he did" (Tr. 33).

"[E]ach right[] was read to the defendant out loud," "each right was read to the defendant before he was asked if he understood each one," and the defendant initialed each one after each one was read to him" (Tr. 34).  Before initialing next to each right, Romano was asked if he understood the right and Romano indicated that he did (Tr. 35).  Investigator Cox agreed with the Government that Romano did not "hesitate at all in initialing each line" and testified that he did not recall Romano asking "any questions about his rights as they were being reviewed with him" (Tr. 35-36, 72).

While it might appear that much was taking place during that 7 minute time period, during the July 9, 2013 pretrial hearing Investigator Cox demonstrated the manner and pace in which Heslin had read Romano his rights (Tr. 34-35, 66), and conceded that the reading of the rights was "a smooth process" (Tr. 73) and Romano's execution of the form took no more than 1-2 minutes (Tr. 66).  That left

a 5-6 minute gap that Investigator Cox admitted was unaccounted for (Tr. 67, 71-73) and repeatedly could not explain (Tr. 73-75).[3]

Indeed, Investigator Cox does not dispute defense counsel's timeline, himself had the same questions about it, and other than speculation could not explain what took place during the unaccounted for 5-6 minutes of Romano's interrogation:

> Q.   So, by my reckoning, there is five or six minutes left where either there was either silence or conversation; is that correct?
>
> A.   Correct.
>
> Q.   So you're not disputing my timeline?
>
> A.   No. Actually, I had some of the same questions when I was going through it.
>
> Q.   So were there conversations between Joseph Romano and any of the agents in the room during the five or six minutes that I've asked you about, if you recall?
>
> A.   I don't recall any conversations between them. I did look at it and understand the time difference. I just don't recall the conversation. It would seem like there may have been some but I don't recall.
>
> Q.   Do you recall – you don't recall if there was a six- or seven-minute silence or a five- or six-minute silence that they just sat there?
>
> A.   No.

---

[3]   We note that 5 minutes equals approximately 71% of 7 minutes, and 6 minutes equals approximately 85% of 7 minutes.

19

GA029

X     X     X

Q.     There had to have been conversations between Mr. Romano and the agents or the agents among themselves?

A.     I could think of a number of things that happened. I don't recall the conversation…. Because I don't know the explanation.  I did see the times and I noted the seven-minute difference, it didn't take that long to read the form, and I don't know why.  Possibly Agent Heslin didn't put the time until after I signed it, gave it back to him, and we began talking.  I don't say.

X     X     X

Q.     Will you concede that there is a five-minute time period about which you have no recollection?

A.     I don't have any recollection of any conversations during that period.

Q.     Can  we  agree  during  the  five-minute, approximately, five- or six-minute time period you have no explanation for its presence there?

A.     Other than what I just offered.

Q.     And what you just offered was speculation…, isn't it?

A.     Correct.

Q.     So other than speculation, you have no explanation for this five- or six-minute gap?

A.     Correct.

(Tr. 73-75.)

20

In light of Investigator Cox's inability to account for what occurred during a significant portion of Romano's purported waiver, including specifically 5-6 minutes of the 7-minute period in which Romano was being <u>Mirandized</u>, and after which Romano purportedly gave a complete confession, we respectfully submit that the Government has failed to carry its burden.   <u>See</u> Government's Memorandum of Law, dated, March 5, 2013, in Opposition to Defendant Romano's In Limine Motions (hereinafter, "Gov't Memo"), at 6 (summarizing Romano's purported confession).

To the contrary, since Investigator Cox could only offer speculation as to what occurred during the unaccounted for 5-6 minutes, for the Government to establish by a preponderance of the evidence that Romano was not coerced and that his post-<u>Miranda</u> statements were voluntary, the Government was required to call Special Agent Heslin (or some other witness who was present and could remember what occurred) in order for the Government's burden to have been established.   <u>See</u> <u>United States v. Rivalta</u>, 892 F.2d 223, 230 (2d Cir. 1989) (holding that "the government cannot meet its burden, even under only a preponderance standard, with evidence that is 'speculative, unsupported, and unreliable' "); <u>United States v. Shonubi</u>, 998 F.2d 84, 90 (2d Cir. 1993) (holding that the Government could not rely upon speculation to prove facts, even when required to be established only by a preponderance of the evidence, and further

21

holding, "The district court's factual findings … when it imposed sentence were therefore necessarily predicated on surmise and conjecture.  As such, they were clearly erroneous.").

Having failed to call a witness with a recollection of what occurred during the entirely, or even majority, of Romano's <u>Miranda</u> waiver, we respectfully submit that the Government cannot establish by a preponderance of the evidence that Romano's statements were free of coercion and were voluntary, and as such Romano's post-arrest statements must be suppressed.

> **2.      The evidence suggests that Romano was coerced into making incriminating statements by the belief that he was cooperating with the Government's investigation and that he was doing so pursuant to a written and signed <u>cooperation agreement.</u>**

Even if this Court is not convinced that the Government failed to satisfy its burden as a result of its failure to elicit the testimony of FBI Task Force Officer Davis and/or Special Agent Heslin during the July 9, 2013 pretrial hearing, we respectfully submit there is one final basis in which the Government has failed to satisfy its burden of proof – we respectfully submit that the evidence suggests that Romano was coerced into making incriminating statements by the repeated talk of cooperation coupled with the three-page written statement that, to an individual who has never participated in a proffer session before, reads like a cooperation agreement.

22

There is no dispute that the topic of cooperation came up repeatedly during Romano's conversations with Special Agent Heslin, both before Romano signed the advice-of-rights form and afterwards (Tr. 24, 83-84). The only dispute, we assume, is to what extent such conversations affected the voluntariness of Romano's statements.

According to Investigator Cox, the issue of cooperation first came up during the car ride from the Queens County Detention Center (i.e., Geo Group) to the FBI Field Office in Melville (Tr. 24). "When Mr. Roman was talking, Agent Heslin said, 'You know, we're going to go back to our office, I think the best thing to do would be to cooperate in this case. We really have all the evidence.' As I said, we were meeting with an undercover, that you had been meeting with an undercover so we already know all the facts and circumstances of the case" (Tr. 24-25).

Although Investigator Cox could not "remember anything specifically" asked by Romano about cooperation (Tr. 25), when asked on direct examination whether "the defendant participate[d] in that part of the conversation regarding cooperation," Investigator Cox responded that "[h]e did" (id.).

According to Investigator Cox the conversations about cooperation were done in a "very calm" manner (Tr. 26). On direct examination Investigator Cox claimed that the defendant was not promised anything if he agreed to cooperate (Tr. 26). However, on both cross-examination and re-cross-examination

23

Investigator Cox testified that Romano had been told that the benefit of cooperation was "[t]hat it would be made known to the prosecutors and the judge" (Tr. 58; see also Tr. 93).  Indeed, on re-cross Investigator Cox conceded that while *the purpose* for informing the prosecutors and judge about Romano's cooperation went unstated, the purpose nonetheless "was understood" (Tr. 94).

Although Investigator Cox could not remember whether or not Special Agent Heslin told Romano that Mirkovic was going to be used to cooperate against Romano, Cox did not deny that Heslin might have told that to Romano (Tr. 61), which would clearly have been a ploy to convince Romano to speak first.  Indeed, Investigator Cox did not deny that at a minimum Romano was told that cooperation was "the best thing [for Romano] to do" (Tr. 24; see also Tr. 93-94) and that "we thought that that would be the best avenue for Mr. Romano to take" (Tr. 57).

At the same time, however, Romano was not informed that one cannot enter into a cooperation agreement with law enforcement, only with the prosecutors (Tr. 93).  There is also no testimony that Cox, Heslin, or Davis, explained how the cooperation process worked.  To the contrary, we respectfully submit that it benefited the Government to keep Romano in the dark with respect to how the cooperation process worked because by doing so Romano could be tricked into believing that he was entering into a cooperation agreement with the Government,

24

which would help him to avoid prosecution and possibly reduce his existing 180-month sentence, rather than merely providing the Government with the final nail into the coffin of his present prosecution.

Further, the efforts to convince Romano to cooperate were not confined to the "hour-long" drive from Geo Group to Melville (Tr. 83, 84-86). Cooperation began in the car, but continued at Melville both before and after the Miranda warnings and advice-of-rights form were given to Romano (Tr. 83-84). At Melville Romano was questioned for an additional hour (Tr. 37, 80), towards the end of which Romano was asked to sign a three-page statement that was drafted by Special Agent Heslin during a period of time when Heslin had left the interview room (Tr. 80-81), that did not contain a recitation of all of the statements made by Romano to the arresting officers but instead included only a brief summary that reads more like a cooperation agreement (see Tr. 80-82).

> Q.   [I]n the statement, would you agree that there are some references to the term "cooperation"?
>
> A.   Yes.
>
> Q.   For example, in the third numbered paragraph, do you recall whether it states, "I have agreed to cooperate with the FBI and provide statements about crimes I know about and crimes in which I was personally involved[]"[?]
>
> A.   Yes.

25

Q.    Would you agree that on the second page it says, under Roman numeral five, "I am willing to provide information acquired while incarcerated regarding," something?

A.    Yes.

Q.    Would you agree that under Roman numeral six it says in writing, if you recall, "I am willing to provide information about other," and there's more --

A.    Mm-hmm.

Q.    -- substantive information; right?

A.    Correct.

Q.    And under Roman numeral seven, "I am willing to provide information about," and there is more substantive information; is that correct?

A.    Yes.

(Tr. 81-82; see also Gov't Memo, at Exhibit C [the three-page written statement].)

Investigator Cox described the Melville conversations between Romano and Special Agent Heslin as an "interview"; one which was "calm, conversational" (Tr. 37), not filed with the more confrontational burdens associated with an interrogation. See Tolliver v. Sheets, 594 F.3d 900, 920-21 (6th Cir. 2010) (discussing the "fine line" between permissible follow up questions and impermissible interrogation under Miranda); United States v. Rodriguez-Preciado, 399 F.3d 1118, 1134 (9th Cir. 2005) (distinguishing between a "non-custodial interview" and a "custodial interrogation").

26

In Rhode Island v. Innis, supra, 446 U.S. 291, 300-01 (1980), the Supreme Court "conclude[d] that the Miranda safeguards come into play whenever a person in custody is subject to either express questioning or its functional equivalent." Because the underlying purpose of the Miranda rule is to prohibit compulsion, the relevant inquiry in deciding whether the defendant's statements are voluntary "focuses primarily upon the perceptions of the suspect, rather than the intent of the police." Innis, 446 U.S. at 301.

"This focus reflects the fact that the Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police." Id.; see also Wayne R. LaFave et al., 2 Criminal Procedure § 6.7(a), at 543 (2d ed. 1999) (contrasting Miranda's focus on perception of suspect in determining whether in criminal statements are product of interrogation with Sixth Amendment's focus on intent of police in deciding whether statements were deliberately elicited in violation of right to counsel).

Indeed, "The prophylactic rule of Miranda sweeps more broadly than the Fifth Amendment itself … and requires the suppression of some confessions that, while perhaps not actually involuntary, were obtained in the presumptively coercive environment of police custody." Tankleff v. Senkowski, 135 F.3d 235, 242 (2d Cir. 1998).

27

Here, there is no dispute that Romano was in custody for the entire period relevant to the present proceedings (Tr. 14-17, 55). See also California v. Beheler, 463 U.S. 1121, 1125 (1983) (in determining whether a defendant is in custody for Miranda purposes "the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest"); United States v. Mitchell, 966 F.2d 92, 98 (2d Cir. 1992) ("This inquiry focuses upon the presence or absence of affirmative indications that the defendant was not free to leave."); cf. Mathis v. United States, 391 U.S. 1, 4-5 (1968) (finding that defendant was in custody while incarcerated on unrelated charges). The only question is whether Romano voluntarily confessed his crimes or whether he was coerced into making inculpatory statements by the belief that he was cooperating with the Government in its investigation of the case and its prosecution of Romano's co-defendant, Dejvid Mirkovic.

While a mere isolated suggestion of cooperation by itself might not be sufficient to establish coercion, we respectfully submit that the totality of the circumstances present here suggest that more than a mere suggestion was made, but rather repeated discussions on and off over an approximate two-hour time period, possibly longer (i.e., on and off throughout the car-ride and up through the completion of the Melville interrogation), followed by the creation of a three-page statement that repeatedly mentions cooperation so much so that it is reasonable to

28

conclude that it was intended to trick Romano into believing it was in fact a cooperation agreement.  Such, we submit, is indeed sufficient to establish that Romano had been coerced, even more so when also coupled with Special Agent Heslin's suggestion that the Government already had all the proof it needed to convict Romano (Tr. 24-25) so cooperation was "the best avenue for Mr. Romano to take" (Tr. 57).

As previously mentioned, in determining whether a defendant's statements were voluntary or the product of coercion, no one factor is dispositive; instead, the assessment must be based upon the "totality of all the surrounding circumstances". United States v. Bye, supra, 919 F.2d 6, 9 (2d Cir. 1990), quoting, Schnechloth v. Bustamonte, 412 U.S. 218, 226 (1973).  The inquiry centers around "(1) the characteristics of the accused[;] (2) the conditions of interrogation[;]and (3) the conduct of law enforcement officials."  Green v. Scully, supra, 850 F.2d 894, 900, 901-02 (2d Cir. 1988).  The Supreme Court has made clear, however, that "[t]o limit the ambit of Miranda to express questioning would 'place a premium on the ingenuity of the police to devise methods of indirect interrogation, rather than to implement the plain mandate of Miranda.' "  Innis, 446 U.S. at 299 n.3 (internal citation omitted).

Here, Special Agent Heslin repeatedly suggested that cooperation was "the best thing [for Romano] to do" (Tr. 24; see also Tr. 57, 93-94).  Heslin also drafted

29

the three-page statement that Romano thereafter signed (Tr. 38, 65-66), which made multiple references to cooperation (see Tr. 81-82; see also Gov't Memo, at Exhibit C [the three-page written statement]), and presented it to Romano after repeated "calm, conversational" discussions of the offense and his "best avenue" being cooperation (Tr. 37, 57).

Based upon Special Agent Heslin's psychological ploys, coupled with all of the surrounding circumstances, we respectfully submit that it was reasonable for Romano to conclude that the three-page statement was intended as a cooperation agreement. Whether it really was a cooperation agreement is irrelevant, since the pertinent question is whether Romano was tricked or coerced into believing that it was. See Innis, 446 U.S. at 301. We respectfully submit that such was clearly the case, and, at a minimum, the Government has failed in its burden to establish otherwise.

**Conclusion**

Wherefore, based upon all of the reasons discussed above, Defendant Joseph Romano, by and through his attorneys, respectfully submits that the Government has failed to establish its heavy burden to prove by a preponderance of the evidence that Romano's post-arrest statements were voluntary and free of coercion. As such, Defendant further submits that his post-arrest statements must be suppressed and the Government must be precluded from introducing those statements in its case-in-chief at trial.

Dated:  New York, New York
         August 5, 2013


                                        Respectfully submitted,

                                        Michael K. Bachrach
                                        George R. Goltzer

                                        *Attorneys for Defendant*
                                        *Joseph Romano*

577

                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK

   - - - - - - - - - - - - - X

    UNITED STATES OF AMERICA,      : 12 CR 691
                                   :
                                   :
                                   :
         -against-                 : UNITED STATES COURTHOUSE
                                   : BROOKLYN, NEW YORK
                                   :
                                   :
                                   : JANUARY 9, 2014
    JOSEPH ROMANO,                 : 10:00 O'CLOCK A.M.
                                   :
            Defendant.             :

   - - - - - - - - - - - - - X

                      TRANSCRIPT OF TRIAL
            BEFORE THE HONORABLE JOHN F. KEENAN
                  SITTING BY DESIGNATION
         UNITED STATES SENIOR JUDGE, and a jury.


                    A P P E A R A N C E S:

For the Government: WILLIAM J. HOCHUL, JR.
                    United States Attorney
                    Western District of New York
                    138 Delaware Avenue
                    Buffalo, New York 14202
                    BY:  MARSHALL MILLER
                         UNA DEAN
                         Assistant United States Attorneys


For the Defendant:  GEORGE GOLTZER, ESQ.
                    200 West 57th Street, Suite 900
                    New York, New York 10019

                    MICHAEL BACHRACH, ESQ.
                    276 Fifth Avenue, Suite 501
                    New York, New York 10001

Court Reporter:     SHERRY J. BRYANT, RMR, CRR
                    225 Cadman Plaza East
                    Brooklyn, New York 11201
                    sbryant102@verizon.net
Proceedings recorded by mechanical stenography, transcript
produced by Computer-Assisted Transcript.


                    SB     OCR   RMR   CRR

WILLIAM HESSLE-DIRECT-DEAN                    656

A    For violations of mail fraud and money laundering.

Q    Where were these companies located?

A    On Long Island.

Q    What were the names of the companies you were investigating?

A    The first company was Last Quarter Coin, the second was American Coin, and the third was All American Coin.

Q    And just to be clear, did these companies all exist at the same time or at different points in time?

A    No.  One folded into the other and they -- two may have been in existence collectively, but only for a very short period of time.

Q    And what was the defendant's position with these companies?

A    He was the owner.

Q    Were charges brought as a result of your investigation?

A    Yes, they were.

Q    When were charges brought?

A    In November of 2008.

Q    Were charges brought against the defendant?

A    They were.

Q    Anybody else?

A    Yes.  There were nine co-defendants that were also charged.

Q    And were these nine others employed at the defendant's

WILLIAM HESSLE-DIRECT-DEAN                    663

plea agreement, what count of the indictment did the defendant plea guilty to?

A    He pled guilty to Count 1.

Q    So then turning back to what's been admitted as Government Exhibit 50, what did that count charge the defendant with?

A    Conspiracy to commit mail and wire fraud.

Q    Now, it says here in the indictment at paragraph 24, "The allegations contained in paragraphs one through 23 are alleged and incorporated as fully set forth in this paragraph."

So if you could turn to some of those paragraphs. Starting with paragraph 18, can you read starting from photograph 18?

A    Yes. "As part of this scheme and artifice to defraud, the defendants either personally telephoned potential coin purchasers or instructed employees under their supervision to telephone potential customers and offer coins for sale during sales pitches. During those sales pitches, the defendants and those acting at their direction offered for sale and sold rolls of Benjamin Franklin half dollars, typically starting at $390, while each subsequent roll was sold at an increased price. For instance, the second roll was typically sold for $780, and the third roll was typically sold for $1180. In each case, the defendants or those acting at their direction,

WILLIAM HESSLE-DIRECT-DEAN                    664

falsely informed the customers that substantial profits would be realized by investing in those coins."

Q    Can you keep reading?

A    "The defendants induced the customers to continue to purchase coins by falsely promising the customers that the subject companies had investors waiting to purchase the coins from the customers once the customers had purchased the complete roll sets.  The defendants or those acting at their direction also falsely told the customers that the Benjamin Franklin half dollars being offered for sale were MS-64 plus or better, and that the proof Benjamin Franklin half dollars being offered for sale were MS-68."

Q    If you could keep reading?

A    Paragraph 20:  "The defendants regularly instructed the customers to pay for the coins by sending the subject companies a check via Federal Express, DHL or U. S. Mail.  The coins were then sent to the customers via Federal Express, DHL or U. S. Mail.  After the customers purchased the complete roll set and contacted the defendants to arrange to sell their coins to the promised investors, the defendants falsely told the customers that the investors required that the customers purchase additional coins before they would purchase the collections from the customers.  After the customers purchased the additional coins at inflated prices, the customers realized that the investors had backed out the deal."

WILLIAM HESSLE-DIRECT-DEAN                    665

Paragraph 21:  "The defendants further induced customers to purchase additional coins by falsely informing them that new investors were interested in purchasing their coin collections, but that the new investors wanted the customers to purchase additional coins before they would purchase the collections from the customers.  None of the complete roll sets purchased by the customers of the subject companies were subsequently purchased by investors arranged via the subject companies, as promised by the defendants."

Paragraph 22:  "The defendants also falsely misrepresented the grade of the coins sold to the customers. The defendants falsely informed the customers that the Benjamin Franklin half dollars they purchased were graded MS 64 -- were graded MS-64 plus or higher, when in fact, they were not.  Similarly, the defendants falsely informed the customers that the proof Benjamin Franklin half dollars they purchased were graded MS-68 or higher, when in fact they were not.  As a result, the customers purchased coins worth approximately ten to 20 percent of the purchase price."

Q    If you could just read through 23A.

A    Paragraph 23:  "Between August 11th, 2002 and November 30, 2008, the defendants or those acting at their direction deposited more than $40 million into the bank accounts of the subject companies.  Between December 6th, 2002 and November 30th, 2008 payments from the bank accounts of the

WILLIAM HESSLE-DIRECT-DEAN                    666

subject companies were made as follows:  Letter A, $3,818,000 to the defendant, Joseph Romano, between December 6, 2002 and November 30, 2008."

Q    Thank you.

Now, just to be clear, Count 1 incorporated those allegations?

A    Yes.

Q    And the defendant pleaded guilty to Count 1?

A    He did.

Q    Now, turning back to the plea agreement, Government Exhibit 51, what was the maximum term of imprisonment allowed by statute for the defendant's crime?

A    Twenty years.

Q    And was there any required minimum?

A    No.

Q    Can you explain -- do you know what a sentencing Guidelines range is?

A    Yes, I do.

Q    Can you explain what a sentencing Guidelines range is?

A    It's a recommendation to a judge as to what a sentence should be.

Q    And that's calculated using a formula?

A    That's correct.

Q    What's the purpose of calculating a range for a sentencing Guidelines range?

LISA SCHMID, CCR, RMR

WILLIAM HESSLE-DIRECT-DEAN                667

A     To serve the Court with what a reasonable sentence should be for the defendant.

Q     Did the government come up with its own calculation for the sentencing Guidelines range for the defendant's crime?

A     It did.

Q     And is that reflected in paragraph two of this plea agreement?

A     Yes, it is.

Q     Now, turning to the end of paragraph two of Government Exhibit 51, what was the government's estimate for the sentencing Guidelines range for the defendant?

A     151 months to 188 months.

Q     How many -- can you tell us what that is in terms of years?

A     That's about 12 and-a-half to 15 and-a-half years.

Q     Now, turning to paragraph five of this document, can you just read that first sentence?

A     Yes.  "The defendant agrees to forfeit to the United States all of his right, title and interest in $7 million (seven million dollars) the forfeiture money judgment.  The defendant shall partially satisfy the forfeiture money judgment through the immediate forfeiture of the following assets."

Q     I'll just stop you there.  And there are a number of bank accounts and property listed there, is that right?

WILLIAM HESSLE-DIRECT-DEAN                    668

A    That's correct.

Q    Now, can you explain to the jury what forfeiture is in the context of criminal cases?

A    Forfeiture is a penalty for having done the crime.  It's also part of the sentence.

Q    And what is the $7 million represent with respect to monies earned by the defendant?

A    That represents a portion of the proceeds that were realized by the defendant as a result of the operations.

Q    Now, where is it says here, "That the defendant shall partially satisfy the forfeiture money judgment for the immediate forfeiture of the following assets," and then it goes on to list a number of bank accounts and assets.  Had the government seized those bank accounts --

A    Yes.

Q    -- and those other assets?

A    Yes, the assets, as well.

Q    There these were derived from the defendant's fraud?

A    Yes.

Q    Now, there are six pieces of property listed here in paragraph five, going onto the next page --

A    Yes.

Q    -- end of paragraph five.  Do you see that?

A    I do.

Q    Did these six pieces of property reflect all the property

WILLIAM HESSLE-DIRECT-DEAN                    689

A      Yes.

Q      Did the government contemplate bringing charges against Dejvid Mirkovic for his operation of CCI?

A      Yes.

Q      What was the outcome of the government' investigation of Dejvid Mirkovic?

A      Dejvid Mirkovic was offered a non-prosecution agreement, essentially, in exchange for his cooperation and testimony against the defendant.

Q      Can you explain what a non-prosecution agreement is?

A      Yes.  In exchange for cooperation with the government, the individual who is signing the nonpros agreement will not be prosecuted.

Q      Did Dejvid Mirkovic, in fact, testify against the defendant?

A      No, he did not.

Q      Why not?

A      The defendant pled guilty at jury selection.

Q      Are you familiar with an individual named Russell Barnes?

A      I am.

Q      Did Russell Barnes have a nickname?

A      Yes, he was also known as Rusty.

Q      And what was Russell or Rusty Barnes' relationship with the defendant?

A      They had been in the navy together in the late 1980s, and

WILLIAM HESSLE-DIRECT-DEAN                    690

Rusty worked for the defendant at the coin companies, as a salesman.

MS. DEAN:  Your Honor, at this time, the government would offer Government Exhibit 5, which is a photograph.

MR. GOLTZER:  No objection.

THE COURT:  No objection?

MS. DEAN:  May we display it to the jury?

THE COURT:  You may.  Received.

(Exhibit published to the jury.)

BY MS. DEAN:

Q    Was Rusty Barnes also indicted for his roll in the telemarketing companies?

A    Yes, he was.

Q    Did he also agree to cooperate?

A    He did.

Q    Did he agree to testify against the defendant?

A    He did.

THE COURT:  I don't want to try your case, but let me have him identify him.

MS. DEAN:  I'm sorry, Your Honor?

THE COURT:  Shouldn't you have the witness identify Barnes?  He didn't do it yet.

MS. DEAN:  Oh, I'm sorry.

THE COURT:  As I say, I don't want to try your case. You've got his name up there.

LISA SCHMID, CCR, RMR

WILLIAM HESSLE-DIRECT-DEAN                    691

MS. DEAN:  I apologize, Your Honor.

BY MS. DEAN:

Q    In Government Exhibit 5, do you recognize this individual?

A    That's Rusty, also known as Russell Barnes.

MS. DEAN:  Thank you, Your Honor.

THE COURT:  Okay.

MS. DEAN:  I jumped ahead.

BY MS. DEAN:

Q    Now, when was Rusty Barnes arrested?

A    In November of 2008.

Q    And when did he agree initially to cooperate with the government's investigation?

A    In December of 2008, he was proffered.

Q    Can you explain what a proffer is?

A    Yes.  Essentially, the individual comes in and tells us what he knows about the subjects that the government is interested in.

Q    Now, did his cooperation continue throughout the prosecution of the defendant?

A    No, it did not.

Q    Can you explain what you mean by that?

MR. GOLTZER:  Objection to relevance.  May we approach?

THE COURT:  What is the relevance of this?

LISA SCHMID, CCR, RMR

WILLIAM HESSLE-DIRECT-DEAN                    695

(In open court.)

THE COURT:  Could you read the pendant question to the witness?

(Record read.)

THE COURT:  The objection is withdrawn.

Go ahead.

A    In early 2009, the -- at the time, AUSA Treinis-Gatz was advised that Mr. Barnes was no longer cooperating with the government.

BY MS. DEAN:

Q    Now, you began investigating CCI early 2009?

A    Yes, I did.

Q    Did Rusty Barnes play any roll in CCI?

A    Yes, he became an employee of CCI, as a salesman.

THE COURT:  He was the guy that was in Navy with the defendant?

THE WITNESS:  Yes, Your Honor?

THE COURT:  Okay.  Go ahead.

BY MS. DEAN:

Q    And when did you first discover that Rusty Barnes was working at CCI?

A    In early 2009.

Q    Now, was that when charges were still pending against Mr. Barnes?

A    Yes, they were.

732

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,   : 12 CR 691
   :
   :
   :
     -against-    : UNITED STATES COURTHOUSE
   : BROOKLYN, NEW YORK
   :
   :
   : JANUARY 10, 2014
JOSEPH ROMANO,   : 10:00 O'CLOCK A.M.
   :
     Defendant.   :

- - - - - - - - - - - - - - X

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE JOHN F. KEENAN
SITTING BY DESIGNATION
UNITED STATES SENIOR JUDGE, and a jury.


A P P E A R A N C E S:

For the Government: WILLIAM J. HOCHUL, JR.
   United States Attorney
   Western District of New York
   138 Delaware Avenue
   Buffalo, New York 14202
   BY:  MARSHALL MILLER
      UNA DEAN
      Assistant United States Attorneys


For the Defendant:  GEORGE GOLTZER, ESQ.
   200 West 57th Street, Suite 900
   New York, New York 10019

   MICHAEL BACHRACH, ESQ.
   276 Fifth Avenue, Suite 501
   New York, New York 10001

Court Reporter:   SHERRY J. BRYANT, RMR, CRR
   225 Cadman Plaza East
   Brooklyn, New York 11201
   sbryant102@verizon.net
Proceedings recorded by mechanical stenography, transcript
produced by Computer-Assisted Transcript.


SB    OCR   RMR   CRR

WILLIAM HESSLE-CROSS-GOLTZER                782

his commissary for food and other conveniences of life?

A    Yes.

Q    And if you put money in somebody else's commissary account, you can buy him something, you can buy yourself something?

A    You could.

Q    You mentioned Rusty Barnes yesterday.  Do you know what he passed away from?  Did you find out?

A    Rusty Barnes had a heart condition.

Q    Did he have a heart condition, if you know, before he went to jail?

A    He had health problems, I know that.  I don't know specifically if it was a health -- if it was a heart condition, but he had issues.

Q    Did he apparently die from natural causes?

A    It appeared that way.

Q    No charges were filed in connection with the death of Rusty Barnes?

A    Not that I'm aware of.

Q    Was Mr. Romano's house searched when he was arrested in Florida?  Did you get a search warrant to search his house?

A    The arrest warrant for the defendant was issued --

            THE COURT:  Wait a minute.  Are we talking at the point when his bail was revoked in the coin case; is that what we're talking about?

SB    OCR   RMR   CRR

WILLIAM HESSLE-CROSS-GOLTZER                    783

MR. GOLTZER:  Yes.

THE COURT:  Okay.  So that you're clear on what we're talking about.

A    Mr. Romano was arrested in March of 2010, on an arrest warrant that was executed by the U.S. Marshal Service.

Q    That's because he violated, apparently violated his --

A    Yes.  There was no search of his residence.  There was no search warrant of his residence at that time.

Q    Was there subsequently a search warrant of his residence, if you know?

A    Not that I'm aware of.

Q    Was there a search warrant conducted in connection with the initial prosecution of the coin fraud in 2008, I think?

A    There was a search done of the business, not the residence.

Q    How many search warrants were procured, if you know?

A    I'm sorry?

Q    There was no search of his house?

A    No.

Q    Now, you mentioned yesterday that there was a self surrender; is that correct?

A    Yes.

Q    What does that mean?

A    The attorney is notified that his client has been indicted or an arrest warrant has been issued for him.  And in

1318

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,　　　: 12-CR-691
　　　　　Petitioner,　　　　:
　　　　　　　　　　　　　　:
V.　　　　　　　　　　　　:
　　　　　　　　　　　　: United States Courthouse
　　　　　　　　　　　　: Brooklyn, New York
　　　　　　　　　　　　:
JOSEPH ROMANO,　　　　　: January 16, 2014
　　　　　　　　　　　　: 10:00 a.m.
　　　　　Defendant.　　　:
------------------------- X

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE JOHN F. KEENAN
SITTING BY DESIGNATION
UNITED STATES SENIOR JUDGE

APPEARANCES:

For the Government:　WILLIAM J. HOCHUL, JR.
　　　　　　　　　United States Attorney
　　　　　　　　　Western District of New York
　　　　　　　　　BY:　MARSHALL MILLER
　　　　　　　　　BY:　UNA DEAN
　　　　　　　　　Assistant United States Attorneys
　　　　　　　　　271 Cadman Plaza East
　　　　　　　　　Brooklyn, New York 11201


For the Defendant:　GEORGE GOLTZER, ESQ.
　　　　　　　　　200 West 57th Street
　　　　　　　　　New York, New York 10019

　　　　　　　　　MICHAEL BACHRACH, ESQ.
　　　　　　　　　276 Fifth Avenue
　　　　　　　　　New York, New York 10001


Court Reporter:　　NICOLE CANALES, RPR, CSR
　　　　　　　　　225 Cadman Plaza East
　　　　　　　　　Brooklyn, New York 11201
　　　　　　　　　718-613-2509

Proceedings recorded by mechanical stenography, transcript produced by Computer-Assisted Transcript.

NICOLE CANALES, CSR, RPR

Cox - Direct Examination - Dean                    1327

Q    And when you say "prior testimony," what are you referring to?

A    Testimony from a prior hearing in this case.

         MS. DEAN:  Your Honor, may I approach?

         THE COURT:  You may.

Q    Investigator Cox, I'm showing you what's been marked Government Exhibit 3500-RC4, RC-8, RC-10 and RC-1.  Are those some of the documents that you're referring to?

A    Yes, they are.

Q    Now, I'll leave those next to you.  If you do need to refer to them, please let me know before you do so.  Now, can you explain how the interview with the defendant began?

A    It began with the defendant talking for ten minutes, or really venting about how he'd been treated in his prior case, in the coin case.  He talked about how unjust it was.  He described how he thought the government had "disassembled," was the word he used, his life, and let him go on for quite a while.  He said that I read the Bible many times, and the Bible said that vengeance belongs to God.  And then he said, "But I think God has taken a long vacation."

         After letting him vent for a few minutes or so, Mr. Heslin said to him something of the effect of let's talk about the matter at hand, and directed the conversation towards the meeting with the undercover and discussion about Nick Pittas.

GA058

Cox - Direct Examination - Dean                    1331

defendant was incarcerated, Mirkovic was -- he said Mirkovic would pay his wife money.  Mirkovic agreed with him.  At Joe's request and instruction to pay Karen Romano money, not a set amount, but what she needed on an ongoing basis.

Q    Now, you testified yesterday that one of the things you wanted to find out about in interviewing the defendant was whether there was an ongoing threat to Judge Bianco and AUSA Getz.  Did you try and ascertain in your interview whether there was, in fact, still an ongoing fact?

A    Yes, we asked him directly if there were any other individuals that through his -- while he was in jail he'd asked to commit an act of violence on his behalf, whether it be beatings or killings and, specifically, whether it was anything else that any other action put forward.  We wanted to find out if there was anybody else that had been contracted. He said there was nobody else contracted, but that he had spoken to a number of other people in jail, or he'd been venting in jail about Judge Bianco, about the prosecutor.  And there had been several people who'd approached him who offered to do acts of violence on his behalf and said they could do things on the outside for him.

Q    Did he name names?

A    Yes.

Q    Who did he mention that he had spoken to about possibly committing acts of violence on his behalf?

NICOLE CANALES, CSR, RPR

Cox - Direct Examination - Dean                    1332

A    Ishmel Cohen.  That's, I-s-h-m-e-l, C-o-h-e-n.  Breon Florestal, B-r-e-o-n, F-l-o-r-e-s-t-a-l.  And Bobby Brown.

Q    Now, taking the first of those individuals, Ishmel Cohen. What did the defendant say about what he had discussed with Ishmel Cohen?

A    He said, again, that Ishmel Cohen had heard him venting, complaining.  They were housed together in the same unit at the Nassau County Correctional Center.  He said that it occurred, he estimated, around February 2012.  And he said that Cohen told him, "Listen, I've got guys on the outside." Cohen is a "Blood," a gang member, a "Blood."  He said, "I have guys they call bloodhounds.  They track people down. They can do hits."

Mr. Romano said he never asked him to do any hits, but he did ask him to do a beating of Nick Pittas.  And he said he actually negotiated a price for $2500 to accomplish the beating.  I asked him what happened?  Mr. Romano said that the beating -- the obligation was never fulfilled.  Cohen said his guys on the outside would not do the beating while Cohen was still in jail.

Q    Now, did the defendant tell you when he had these discussions and negotiations with Cohen?

A    He estimated it was about in February of 2012.

Q    Now, was there anything of significance that happened in the defendant's underlying coin fraud case in February of

NICOLE CANALES, CSR, RPR

Cox - Direct Examination - Dean                    1333

2012?

A    He was sentenced in February of 2012.

Q    What was his prison sentence?

A    Fifteen years.

Q    And so, according to the defendant, this took place -- these conversations with Ishmel Cohen took place how many months before the Government received notification about a threat from Gerald Machacek?

A    That was in August, so approximately six months before.

Q    Now, you also said that the defendant mentioned someone with the last name Florestal.  What did the defendant say about his conversations with inmate Florestal?

A    That Florestal was somebody he'd met, like, 18 months before in jail, and that Florestal was somebody who said he could do -- take care of things on the outside, beatings of people.

Q    When you say 18 months, are you talking about 18 months prior to October 9th, 2012?

A    Yes.

Q    Okay.

A    But that he never asked Florestal to do anything.  They were supposed to be contacted after Florestal got released from jail and nothing ever happened.

Q    Now, you also mentioned an inmate named Bobby Brown that the defendant spoke about.  What did he tell you about his

NICOLE CANALES, CSR, RPR

Cox - Direct Examination - Dean                    1334

conversations with Bobby Brown?

A    He said that Bobby Brown was another inmate that he was housed with at the Nassau County Correctional Center.  He said that Brown also had heard him venting.  He talked to Brown.  Brown said he was somebody that could take care of things on the outside for him, and one of the things he could do was beatings, but that he never put any plan of action together with Brown.

Q    Now, when did the defendant say that this conversation took place with Bobby Brown?

A    He estimated it was about six months before our conversation, which was October, so that would, I guess, put it somewhere in April of 2012.

Q    And so how many months, according to the defendant, did that conversation with Brown take place?  How many months before the Government received notification about a threat to Judge Bianco and AUSA Gatz from Gerald Machacek?

A    That would have been about four months before?

Q    Now, was Bobby Brown an inmate at the Nassau Jail?

A    Yes.

Q    When did Bobby Brown leave the Nassau Jail?

A    He left in June of 2012, and he was sent to an upstate prison.

Q    Has he since been released from prison?

A    Yes.

GA062

Cox - Direct Examination - Dean                    1337

minutes.  Do you make the representation that that's relevant to this case?

MS. DEAN:  I do, your Honor.

THE COURT:  All right.  I'll accept it.  If it's not, it's all going to be stricken; you understand that?

MS. DEAN:  Understood, yes, your Honor.

THE COURT:  Go ahead.

A    Among the papers were numerous envelopes that had -- there were letters inside them, and on the envelopes they were addressed from or to inmate Bobby Brown with his correctional number, as they have to put on the envelope when they mail things to or from prison.

Q    On documents that Bobby Brown brought home with him from prison?

A    Yes.

MS. DEAN:  Now, may we have this marked for identification -- may we have the projector for identification?

THE COURT:  Government Exhibit 14.

MR. GOLTZER:  I have no objection to the introduction of the exhibit.

THE COURT:  You heard him say there's no objection to the introduction of the exhibit.

MS. DEAN:  The Government would offer Government Exhibit 14.  May we publish to the jury?

NICOLE CANALES, CSR, RPR

GA063

Cox - Direct Examination - Dean                1338

THE COURT:  (Inaudible response.)

Q    Investigator Cox, what is this document?

A    This is the document that we seized from Bobby Brown on February 1st, 2013, at his grandmother's house, apartment.

Q    Now, is this document in substantially the same condition as when you seized it from Bobby Brown on that day?

A    Yes.

Q    Are there any differences to this document from when you took it from Bobby Brown that day?

A    Yes, I had -- before we seized it, we had Bobby Brown sign and date the document.  There's a circle around his name with the date, 2/1/13.  I initialled it below, and Bill Hessle also initialed it below.  B.H. is Bill Hessle.  And the scribble there is mine, J.R.C.

Q    And above that, that circle, is that the Bobby Brown signature you were referring to?

A    Yes.

Q    Now, turning your attention to the upper left-hand corner of this document, can you read what that says?

A    Nick Pittas, 30 Brooke Avenue, Dear Park.  And then underneath that it says "profiles," with a dash, bald with a beard, exclamation point.

Q    Go ahead.

A    I'm not sure what it says below that.

Q    Now, with regard to the rest of this document, on the

NICOLE CANALES, CSR, RPR

Cox - Direct Examination - Dean                    1339

upper right-hand section of this paper, what does that say?

A    "Bible study," and it has some names from the Bible and verse numbers.

Q    And I'll note that there's a date written here next to the Bible verses.  What is that date?

A    July 14th, '11.

Q    And approximately how long before the Government received information about a threat from Gerald Machacek, July 14th, 2011?

A    A little over a year.

Q    Now, turning your attention to the bottom right of this document, can you read what it says there?

A    There's a phone number, which is not relevant to the case.  Below that it says "Joseph Romano."  It's got a dash and then the number 10003469.

Q    Are you aware of what that number is?

A    That's an inmate number assigned to Joseph Romano, the Nassau County jail.

Q    What does it say below that?

A    NotoriousJoe@hotmail.

Q    And, finally, below that?

A    "Andrea Davis," and then a dash, and then there's another inmate number.

Q    Do you have any understanding of that name and that inmate number?

NICOLE CANALES, CSR, RPR

Cox - Direct Examination - Dean                    1341

whether he had taken steps to murder Judge Bianco and AUSA Gatz?

A    He said that the only people that he'd taken steps to murder were -- well, he took steps for the beating of Nick Pittas, and the only steps he took to murder anybody were Judge Bianco and AUSA Gatz.

Q    In the course of the interview, did the defendant express his feelings toward Judge Bianco and AUSA Getz?

A    Yes, on more than one occasion he said that he hated them and he wanted them killed.

Q    Now, you earlier referenced a telephone call made by the defendant from the Nassau Jail to Dejvid Mirkovic, in which they discussed the murders of Judge Bianco and AUSA Gatz.  Was that telephone call made using the defendant's own personal identification number?

A    No.

Q    Did you ask the defendant about his usage of other inmates' personal identification numbers to make telephone calls?

A    Yes.  And he told us that he had used numerous other inmates' pins to make calls, and he also put money in various inmates' commissary accounts.

Q    Did the defendant say how?

A    He would direct Dejvid Mirkovic to do it, generally, or somebody else on the outside.

GA066

Cox - Direct Examination - Dean                    1345

A     Yes.

Q     With regard to the push-in robberies, did the defendant give you a name?

A     Yes, Timothy Glass.  Said he had met him down in prison in Florida when he was first arrested down there.

Q     Now, you testified that the interview of the defendant took approximately an hour.  How many times did the defendant bring up the name Gerald Machacek during that interview?

A     Towards the beginning of the interview, he said that he had met the undercover because a Jerry from Nassau County Correctional Center that he'd been talking to said he had somebody on the outside that could help commit acts of violence, and that Jerry had arranged for him to meet the undercover.

Q     Now, when the name "Jerry" came up, did the defendant ever suggest that the plot to murder Judge Bianco and AUSA Gatz was the Jerry's idea?

          MR. GOLTZER:  Objection.

          THE COURT:  No.  Overruled.

A     No, he never said that.

Q     In fact, what did he say about the plot to murder Judge Bianco and AUSA Gatz, whose idea it was?

A     He said it was his idea, and he had directed Dejvid Mirkovic -- given instructions to David Mirkovic regarding Mirkovic's dealings with the undercover.

NICOLE CANALES, CSR, RPR

Cox - Direct Examination - Dean                    1346

Q    Now, other than this one time, did the defendant ever mention Jerry Machacek at all in connection with the plot to murder Judge Bianco and AUSA Gatz during that interview?

A    No.

Q    Now, showing you for identification purposes what's been marked Government Exhibit 101, do you see that on your screen?

A    Yes.

Q    What is that document?

A    This is a statement that was written by Agent Heslin and later signed by Joseph Romano.

Q    Now, you said that Agent Heslin wrote this statement. How many pages is this statement?

A    The statement's three pages, and attached to it are the Advise of Rights, marked as page 4.

Q    Turning your attention to page 3, there's a signature here.  Whose signature is that above the word "signature"?

A    Joseph Romano.

Q    Did you see the defendant, Joseph Romano, sign this document?

A    Yes.

        MS. DEAN:  Your Honor, the Government would offer Government Exhibit 101.

        MR. GOLTZER:  No objection.

        THE COURT:  Received.

            (Marked as - Government's Exhibit 101)

GA068

Cox - Cross - Goltzer                                  1364

Q    And you told Mr. Romano or somebody during this meeting told Mr. Romano that there was something known as a 5-K letter?

A    Well, we didn't talk about the Rule 35. I don't recall talking about a 5-K letter.

Q    But you don't know whether Mr. Romano prior to that meeting knew or didn't know about it?

A    About what?

Q    5-K or Rule 35?

A    I'm sure he knew about 5-K because-- well, I would assume he did. He had a prior case and there were other cooperators in his case and he talked about a cooperator in his case. He was aware of what cooperation was, in terms of that.

Q    In fact, you were aware that as part of the 3500 material in the coin fraud case, he was given copies of cooperation agreements?

A    Yes, exactly.

Q    So, you knew this, Mr. Romano knew what you were talking about?

A    Yes.

Q    So you were providing Mr. Romano in the automobile and later at Melville, with an opportunity to cooperate?

A    We told him what cooperation could possibly do.

Q    He apparently was in the process-- during your interview with him, of accepting that possibility?

A    No, it was a variety of information that we asked him in

RB        OCR

Machacek - direct - Goltzer                    1423

this life behind and be sentenced.

Q    You've been ready to leave this life behind before, haven't you?

A    Yes.

Q    Weren't able to do it.

A    No.

Q    On January 26th of 2012, you were in the prison library at the Nassau County Corrections Center?

A    January 26th?  No, I wasn't.

Q    July, I'm sorry.  July 26th?

A    Yes.

Q    And you were in the library with a guy named Desi Fuqua?

A    Yes.

Q    And also in the library was Joseph Romano?

A    Yes.

Q    That's the gentleman sitting other there in the blue shirt?

A    Yes.

Q    And Joseph Romano was somebody you had met earlier?

A    Yes.

Q    A couple of times?

A    No.  I met Joe that day.

Q    For the first time?

A    Yes.

Q    You worked in the yard; is that correct?

VB     OCR     CRR

Machacek - direct - Goltzer                     1427

Q    That whole time he was telling you how he got shafted?

A    I think he was telling me a lot more than that.

Q    He told you he hated the Judge, couldn't stand the Judge?

A    No, he told me he wanted to kill the Judge.

Q    I want the Judge dead, I want the prosecutor dead, I want everybody dead?

A    No, no, no.  He wanted the Judge murdered.

Q    That's what he told you?

A    Yes, in that conversation.

Q    First time you met him?

A    Well, it was a few hours into the conversation.  He said that he should die, he should be murdered, he should be murdered in front of his children and let them be fatherless like him.

     And he explained to me that he was a bigshot caller in the jail.  Explained to me that he had a lot of people working for him in the jail, that they were peanut brains and that these people in the jail, you know, he wants them to do some work for him, he wants -- he has them doing things for him in the jail and he's very frustrated, very mad about the whole situation, and he feels like a political -- how is it? Conspiracy against him.

Q    And he went on for an hour or two?

A    Not about that.  He went on about his military history.

Q    He told you he was a weapons expert?

VB     OCR     CRR

Machacek - direct - Goltzer                    1428

A     Weapons, bombs.

Q     Told you he was a bombs expert?

A     Sniper.

Q     Sniper expert?

A     Yeah.

Q     Told you he had all kinds of guns, told you he had people on the outside?

A     Yes.

Q     Told you he was a dangerous man?

A     From what I gathered he's a scary, tough -- he's a tough guy.

Q     Now --

A     He's a veteran, you know.

        THE COURT:  What was the last thing?

        MR. LA PINTA:  He was a veteran, he was a tough guy, he was trained in combat.

Q     You realized at that point that it would be good for you if could you give information about Joe Romano to the United States Government?

A     Not at all, no.

Q     Never occurred to you?

A     Never even thought about it.

Q     You never thought about cooperating against Joe Romano after you heard him talking for an hour or two about killing people?

Machacek - direct - Goltzer                    1429

A    No, I was really actually, really scared.

Q    He scared you?

A    Very much.

Q    Now, you weren't afraid earlier in your life to steal things.

A    No, I was afraid sometimes.

Q    You weren't afraid to go with people to rob things.

A    Sometimes I was, sometimes I wasn't.

Q    But you overcame it?

A    Yeah, you could say so, yes.

Q    Well, I do say so.  You found the courage.  You found the courage to steal?

A    Yes.

Q    You found the courage to lie to people?

A    Yes.

Q    You found the courage to help people use guns, to steal from people?

A    Yes.

Q    You found the courage to know that the people you were working with were going to stick the guns in people's faces; right?

A    Yes.

        MS. DEAN:  Objection, Your Honor.

        THE COURT:  Sustained.

Q    And you were afraid of Joe Romano?

                    VB     OCR     CRR

GA073

Machacek - direct - Goltzer                    1430

A      Talking about killing people.  Killing them in a house in front of their children.  Yes, I'm afraid of it.  And yeah --

Q      Did you write a letter to your lawyer?

A      Yes, I did.

Q      And did you say to your lawyer in a letter that you know was given the Government --

A      Yes.

Q      -- the guy's nuts?

A      Yes.

Q      Did you think the guy was nuts?

A      Oh, I think he's nuts, but I think he's serious nuts to do this, yes.  Yes.

Q      You told your lawyer he was nuts.

A      Mm-hmm.

Q      You told your lawyer you were really concerned for the welfare of the Federal Judge?

A      I was scared I was going to open the paper the next day and see that a judge was killed because he told me he had other people in the street working on things for him.

Q      Didn't you tell your lawyer in the same letter that you didn't know whether -- you had no idea whether he had any plans?

A      This is what I felt.

Q      Didn't you tell your lawyer in that letter I have no idea --

VB      OCR      CRR

GA074

Machacek - direct - Goltzer          1431

A    No, I had no idea of his particular plans however, I know he had people working in the streets and he said these things were in the works already.

Q    So, you believed that he was a weapons expert.

A    Yes.

Q    You believed that he could make a bomb?

A    Yes.

Q    You believed that he had guns?

A    Yes.

Q    You believed that he was dangerous?

A    Yes.

Q    He frightened you terribly?

A    Of course, I'm scared.  Somebody like that wants to kill people, kill a judge.

Q    And it never occurred to you that he was just venting?

A    No, there's a difference between venting.  If you were there, it's a difference between venting and...

Q    So, you never saw Joe Romano vent?

A    There's a difference, in my opinion, from venting.  When you get into the details of planning and details of about the people's lives.  He was speaking about intimate things about them.  He was a serious guy, serious.  This was well thought out.

Q    And did you see this as a get-out-of-of-jail-free card where you could use this and send it over to the Government?

VB     OCR     CRR

1457

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,  :  12-CR-691(JFK)
                      :
                      :  U.S. Courthouse
                      :  Brooklyn, New York
    -against-         :
                      :  TRANSCRIPT OF
                      :  JURY TRIAL
                      :
                      :
JOSEPH ROMANO,        :  January 21, 2014
                      :  10:00 a.m.
    Defendant.     :
                      :

- - - - - - - - - - - - - - X

BEFORE:
          HONORABLE JOHN F. KEENAN, U.S.D.J.

APPEARANCES:

For the Government:      WILLIAM J. HOCHUL, JR., ESQ.
                      United States Attorney
                      Western District of New York
                      BY:  MARSHALL, MILLER, ESQ.
                            UNA DEAN, ESQ.
                            Assistant U.S. Attorneys

For the Defendant:       GEORGE GOLTZER, ESQ.
                      200 West 57th Street
                      New York, New York  10019

                      MICHAEL BACHRACH, ESQ.
                      276 Fifth Avenue
                      New York, New York  10001

Court Reporter:      Holly Driscoll, CSR
                      Official Court Reporter
                      225 Cadman Plaza East
                      Brooklyn, New York 11201
                      (718) 613-2274

Proceedings recorded by mechanical stenography, transcript
produced by Computer-Assisted Transcript.

*HOLLY DRISCOLL, CSR*
*OFFICIAL COURT REPORTER*

*Summation - Goltzer*                                    1522

theater, we are going see War Horse at Lincoln Center but when we get back to the office, come on, give it up.

Now, they're back at the office and they say to Joe Romano, as they're supposed to say, Joe, you don't have to talk to us, you have a right to a lawyer, you have a right to a lawyer before we question you, anything you say we're going to use against you in a court of law, and Joe says, I'll cooperate, I'll talk to you, I'll give it up.

Yes, Government Exhibit 101, take it in the back with you, absolutely, I and at least one other person, meaning Dejvid Mirkovic, we agreed to kill. The one thing though that they never bothered to tell you is what he told them and I brought out on cross-examination, it was a hair brained scheme that I just considered putting into place after I spoke to Jerry. When Joe Romano said that to them he had no lawyer, he had no guidance, he probably didn't know what the defense of entrapment was, he probably hadn't considered the issues of predisposition but he told them, I didn't decide to put it into play until I met Jerry.

Now, you know who Jerry is, Jerry is Jerry Machacek, their agent who set him up, who induced him, who played with his head. We'll get to that in a little bit.

Was Romano lying, was he lying when he said, I did it, was he lying when he said, I'll tell you about everything I ever heard in jail; he knew the benefits of cooperating, he

*HOLLY DRISCOLL, CSR*
*OFFICIAL COURT REPORTER*

*Summation - Goltzer*                                    1523

had been given copies of cooperation agreements before the coin fraud case, he viewed that as his only way out and they told him in no uncertain terms and he knew don't lie, tell the truth or else it won't work.

He admitted that he committed a crime, a terrible, terrible crime but, without even realizing it, he was implying that he had been set up and entrapped. He didn't even know it but it's true and it's a defense. Not one shred of evidence from the government, not one phone call to Mirkovic, let's get the judge, let's hurt the prosecutor, not one. And he had been sentenced in February of 2012, months went by, not one phone call, not one indication that he was ready and willing to kill.

Ms. Dean is very good, I enjoy watching her work. It's really a privilege to try cases against her and Mr. Miller, they are able, dedicated public servants, they do it very, very well but don't fall for what they did to you in that summation. Don't be tricked. Don't combine or conflate the notion that wanting to have somebody punched in the nose means you're predisposed to kill. It is far, far different. And when Cox and the other agents said to Joe Romano, we want to know if the judge is in danger from anybody else, Joe Romano told them, when he knew he had to tell the truth, when he thought he had no hope, Joe Romano said, I spoke to a lot of people, I told them I wanted the judge dead, I was angry,

BIBLE Study

Nick Pitas
30 BROOK AVENUE
DEER PARK
Pro files - Bald with A Beard!
WhiN. COT MORPENS

John - 1:6 plus :12) 3:3 !          7/14/11
Matthew 6. 22, 23, 24) 7:21 !   Thursday
Timothy - 6:6
EZEK'IEL - 36:26
LEVITICUS - 26: 1-6
PROVERBS . 13

Spat

HAiley

Cooper

GOVERNMENT EXHIBIT

14

12 CR 691 (JFK)

(341) 518 - 4209 . for A Room in QUeeNs

JOSEph ROMANO - 10003469
Notorious - JoE @ HotmAil
ANdrea Davies - 11002828 - D3 - A4

$b 2/1/13

Bolly B

B.H
2/1/13          2/1/13

Case 14-1588, Document 70, 05/06/2015, 1503393, Page139 of 246

" I might Not
feel like living
all the time, But
I damn sure dont
feel like Dying.
I might want
to press pause,
Fast-Forward or
Rewind. But
I damn sure
Dont want to Die,,

Case 14-1588, Document 70, 05/06/2015, 1503393, Page140 of 246

Page: 1 of 4

Knowing and understanding these rights, I hereby make the following statement:

I. My name is Joseph Romano, DOB ████████, SSAN ████████.

II. I have signed an Advice of Rights form, which is attached to this statement and incorporated by reference.

III. I have agreed to cooperate with the FBI and provide statements about crimes I know about and crimes in which I was personally involved.

IV. I and at least one other, including but not limited to Dejvid Mirkovic, conspired to murder Federal District



GOVERNMENT
EXHIBIT
101
12-CR-691 (JFK)

Page 2 of 4

Court Judge Joseph Bianco and Assistant United States Attorney Lara Gatz.

V. I am willing to provide information I acquired while incarcerated regarding a double homicide in Freeport, NY.

VI. I am willing to provide information about other prisoners who approached me and offered to perpetrate violent acts on my behalf.

VII. I am willing to provide information about individuals who may be connected to organized crime groups.

Page 3 of 4

I have read the foregoing statement consisting of 4 pages. I fully understand this statement and it is true and correct to the best of my knowledge. I have made the corrections shown.

I make this statement freely and voluntarily, without threats, rewards or promises of immunity in return for it.

Subscribed and sworn to on this day  10/9/2012

Signature

Witness

Witness  Edward J. Heslin  FBI-NYO

FD-395 (Rev. 11-5-02)

4/4

# ADVICE OF RIGHTS

Place 10/9/12
Date
Time 9-14 ᴇ. ₥.

## YOUR RIGHTS

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present.

Signed

Witness: Edward J. Aherin FBI - NYO

Witness:

Time: 9-21 ᴇ. ₥.

GA084

UNITED STATES v. JOSEPH ROMANO
12 CR 691 (JFK)

DATE:            August 10, 2012

TIME:            11:00 AM

PARTICIPANTS:    Gerald Machacek:        GM

                 Joseph Romano:          JR

                 Unknown Persons:        UP

                 Special Agent:          SA

ABBREVIATIONS:

                 [IA]       INAUDIBLE

                 [PH]       PHONETIC

                 [UI]       UNINTELLIGIBLE

*Scm 1/9/2014*
*FBI/NYO*

**GOVERNMENT
EXHIBIT
201T**
12 CR 691 (JFK)

1

GA085

SA:     I am giving this recording device to a CHS. Today's date is August 10th, 2012. Time now is 11:00 am. [Coughs]. Test, test, test, test. Testing. I'll be deactivating the device at the end of the meeting. Nice and easy. Nice and easy. [IA].

UP:     Yeah yeah. [IA]

JR:     You know there's a lot of other things I could have said in there, I just didn't want to give them the heads up.

UP:     Yeah

JR:     I don't want to give them the heads up - that's what I thought. I thought this hearing today was about whether these expert witnesses are in fact expert witnesses.

UP:     Looks like we were off the wall so much?

JR:     They could be astronauts for all I know. There's no space ship here to fly - what's the mission?

GM:     [Laughs]. You look red again, what happened? You look red again.

JR:     No, I'm good.

GM:     What happened?

JR:     Just me fighting with the judge.

GM:     You hate that mothafucka'.

JR:     Huh?

GM:     You hate that mothafucka'. You must have fucking dreams about that mothafucka.

JR:     Huh?

GM:     You must have dreams about him. I'm cold in here now. When you left uh...

JR:     When they brought me upstairs I had to wait a minute because they were doing some other civil matters and I says, I says "listen, do I have time - I need to use the facilities." They said "yeah, you got paper there?" I says "yeah," so I sat down and I'm telling you - it sounded like if you took a 55 gallon drum of, of dried kidney beans and poured them into your swimming pool. That's what it sounded like.

2

GM: [laughs] Way too much information bro. What the fuck you been eating? [Pause]. Yo I was lookin' in the book - come here - look.

JR: August 24th now is the date.

GM: You're not going to be out of here by September.

JR: Mm-hmm.

GM: We have treaties with these countries.

JR: These are the ones they have treaties with?

GM: Yeah. There's no one else out here, right?

JR: Nah.

GM: Don't want no one to know our businesss. Remember the one person rule. Ok, now look at the ones that are not in there. There's no treaty there.

JR: Not there?

GM: That's a treaty to transfer prisoners there. I know for a fact you're good here. You're good in ... uh... so I think you're good in ... umm.. Costa Rica too. That's where you'd go? To Costa Rica?

JR: Yeah

GM: Why?

JR: You know

GM: You know why? Cause of the women you mothafucka'.

JR: Wait, what?

GM: [laughs] The fuckin' women. Where's your girlfriend? She took you up?

JR: Huh?

GM: Your girlfriend took you up?

JR: No - I went there myself. Start a vacation. Oh yeah, she didn't take me. The one who grabbed my balls?

3

GA087

GM: [Laughs]. Yeah. You sick bastard, you. What the fuck, man. I was gonna sit –

JR: This guy - this attorney, my brother's attorney was up there.

GM: Mm hmm.

JR: And then they have a cooperating witness with his attorney, and I says "Your Honor, isn't this, isn't this ridiculous? You got a cooperating witness over here – it's Tom Arnold and his attorney - the cooperating witness is" – I says – "and, and then you have them sitting over here with us as if we're on the same team." I says "Isn't that, isn't that a problem?" I says "I, I see a, I see a problem with this. I don't want this man knowing what I plan on doing or what I plan on saying."

GM: Well. You should get some sort of lawyer, Joe. Really.

JR: Huh?

GM: You should really get some sort of lawyer because you really, just, even if he doesn't do anything for you. Just – if you get an advisor - like you're pro se now, right?

JR: Mhmm

GM: Let's say - I dunno - you know better than me. An advisor - like a legal advisor, like a paralegal or – it doesn't have to be a member of the bar, right? Could you get just someone? Because you can't possibly know all this law so you might say the wrong thing in there.

JR: I don't care.

GM: And this guy's going to screw you.

JR: Who cares? He already did.

GM: You can't get screwed more? What's the point of this whole hearing you have here then if you don't care? You know?

JR: To get the restitution down.

GM: I'm trying to figure out what's going to go on with me, now. With that in the future. How do I ...

4

JR: And then I told him, I says, "When I gave you, when I sent you my submission letter - that was a, a, that, at the very least, that was the very least methodology that I come up with."

GM: Right, but I don't understand – like today, you were sup . . . where's your expert witnesses now?

JR: Nobody was here and I says, I said, uh, I said, "Where is the uh –" I said, where, I says, I said, uh, "So we're coming here and going to have the hearing - the exact hearing on this." And he says, he says "Yeah, in two weeks we're going to have that." And I says "Oh, okay," because I was under the understanding –

GM: Here.

JR: I told him I was under the under – that's all. That's it. That's it.

GM: Take some more. C'mon. We went through 10 dollars worth of candy already. So what's a few more?

JR: I'm not too crazy about these fucking things. They give me agita.

GM: You eat them too fast.

JR: Um. You know what I'm saying? The proposed methodology – the one that I proposed – is at the very least there are some instances where there was no loss. I'm entitled to make a profit.

GM: I just don't understand the whole thing.

JR: Huh?

GM: They took you out of business for what? What's the reason though? Which one's it? What'd you get, money laundering? Try to make me understand it. [IA] I don't understand this drudge. You don't have this book?

JR: No.

GM: Why not?

JR: When they tried to buy it, they didn't get it. I gave him the name of it and he sent me a book that had the same title that was about some lawyer sleeping with another lawyer.

GM: Right up your alley.

5

JR: You should have seen me fucking going off on that. I went off in there again.

GM: You hate that mothafucka' man

JR: I went off like a maniac.

GM: [laughs] I could picture you in there.

JR: Hmm?

GM: You know I love you. I could picture you, I could picture you, right, when the agents come down. "Come on now mothafucka" [laughs]

JR: My sister was there, my brother Sal was there.

GM: It's nice to see them, but they don't come to visit you?

JR: Huh?

GM: They don't come to visit you?

JR: Yeah they do.

GM: But you have your wife come every week. I don't know what the fuck to do. Now what do we do in here? I was kind of cozier in the other cell.

JR: Huh?

GM: The other one, cell was cozy. Four hours went by. We didn't even, I didn't even know. Usually it's like fucking forever.

JR: I think we're leaving early today.

GM: I tried, I tried to ask the Marshal for more food.

JR: You get any? What you we got here?

GM: Nahh, I wanted to. You hungry? Here.

JR: What time is it?

GM: Lunch time. Have another sandwich.

JR: Nah go ahead - that's your sandwich.

6

GA090

GM:   No. You have it.

JR:   Eat. Mangia.

GM:   Mangia. Here take one, I'll leave you one.

JR:   Um.

GM:   They've been feeding me all day. I'll eat some – I'll eat a cereal. I feel fuckin' so bad for you man.

JR:   Huh?

GM:   I feel bad for you. [IA].

JR:   I says "what are we talking about here?" I says, "What are we talking about here?" I says, "You got people," I says, "You got people here are making accusations. You got people with affidavits." I says, "Let them come here. Let them face me in the courtroom." I says "Under testimony, not the affidavit." I said, "Their credibility is zero. The credibility is zero." He said "well, they say they bought $100,000 in coins and you have invoices that say you only bought 500....500.... $5,000 in coins the government has the burden to blah blah blah blah blah blah blah".

GM:   What are they saying they have? I don't understand?

JR:   Hm? They're saying what I sold people were worth 16 cents on the dollar. Yeah. Let me give you a simple lesson. Ready?

GM:   I'm ready.

JR:   A silver roll of Ben Franklins for 325 dollars.

GM:   What's a Ben Franklin?

JR:   Half dollar, solid silver. 20 in a roll. Ok?

GM:   How much is it worth?

JR:   325 dollars I sell it for. I pay 110.

GM:   Uh huh.

7

GA091

JR: I pay 110 - well prices have changed. I pay 185 dollars for it, I pay 190 dollars for it. Right?

GM: Plus your overhead.

JR: The price of gold, the price of silver. What it's worth in the price of silver is 170 dollars.

GM: Right.

JR: Okay? They're trying to say it's worth 48 dollars.

GM: But the price of silver is 170 dollars, plus shipping it, manufacturing it, the overhead.

JR: Just the intrinsic value alone.

GM: I know why I hate these fucking people. Just no fucking good, Joe. Anyway. I don't trust that other fucker–

JR: Huh?

GM: I didn't like the other guy with us, Gary. So, I mean, you didn't finish with the, uh, when the agents came. I was dying.

JR: When the what?

GM: When the agents came to get you.

JR: Oh. [IA]

GM: That's why I love you, you don't give a fuck. You'll kill anyone, I don't give a, you don't give a fuck. You're like me. You don't give a fuck about that shit. You were in the house . . .

JR: Look out the window out back, right. I just loaded up my car. I put two, two, um, chlorine jugs in there, and I put two propane tanks in there.

GM: Fucking blow something up?

JR: No. I mean it looks like I was making a bomb but I'm getting ready to fill those up for the barbeque and for the pool. Right?

GM: In the morning they came?

JR: Hmm?

8

GA092

GM: Was it the morning? In the morning.

JR: Yeah. Early morning. So I come outside on the driveway, I do that. I don't see nothing. I got a big property, right? I come back in the house. I always come in, I lock the door. I go upstairs in the kitchen. I'm trying to get a pair of pants dry because I gained weight. And I only fit in the one pair of pants. I washed them and I dried them, right?

GM: You've got everything in your house, and you only have one pair of pants.

JR: Yeah.

GM: Go figure.

JR: I go upstairs. I see men walking, like police. I'm like "Oh shit." I go downstairs, I take my keys. I open my closet door. Pull out my rifle.

GM: You don't give a fuck they're cops. You don't give a fuck –

JR: Yeah.

GM: – who they are.

JR: I pull out my rifle. I popped, I popped the clip in, right? I go upstairs I say "Karen, I think the police are here." I go upstairs - back upstairs. [IA] thing, a knock on the door. He's like, "Open the door, uh, we saw Mr. Romano, we know he's here. Open the door, we have a warrant for his arrest."

GM: You sick bastard - you knew the cops, the agents were there and you had your fucking....

JR: I go upstairs and I says, I says, uh, "Don't open the fucking door." My wife's there. And she's like, "But baby," and I said "Don't open the fucking door." Right? I go upstairs. And there was my fucking rifle. I open the thing, I said "Where is your paperwork?" And he said "You need to come down. Are you Mr. Romano?" I says "Yeah." "You need to fucking get down," and he started cursing. I said "Don't you fucking curse me at my house. This is my house, my friend. Don't you fucking curse me." He says, he says, "We need you to come down, right now." I said "I need to see the paperwork." He says, "We need you to come down right now, or we're going to kick the door in." But no, so he says, I said "I need to put some pants on," and he says "No, you need to come down right now. He says "Did you hear what I said?" I said "I need to go get dressed." He says "We're going to kick the door in," and I says "Okay, do it." Meanwhile, I got my rifle, and my wife's like "What are you gonna do? Are you gonna?" I said "I'm gonna fucking kill two of them – I'm gonna kill the two at the door." She's like, she's like "C'mon, c'mon, c'mon, c'mon." So I says "All right, go kick the door in." And I waited.

9

GA093

They said "We need you to come down," and I says "I need to see paperwork." I said "I'm going to get dressed." He said "We'll show you the paperwork in the car. We need to - uh." He says, uh, "Get dressed." I says "Okay." I get dressed. I put the rifle away. I says "Okay." My watch. Take all my shit off. You know the routine, right? I go out the front door. I go out the front door. I says "Do not touch me in front of my home." I give my kids a kiss goodbye.

GM: That was nice.

JR: Right? It was my daughter's birthday. I had already kissed her and wished her a happy birthday. I go out, I go out front. I says "Do not touch me on my property." They said "Let's go," and there was a whole bunch of them standing there. [IA]. They said "Let's go," and he says, he says – he puts the cuffs on and I get in the car. He says "You know the thing is –" I said "Hey, fuck you. Don't you fucking start trying to talk nice to me now." He's like "All right, fine," and I says "That's right, fine." I said "You want to start talking nice now, after your bullshit?"

GM: He doesn't know he came, he came within an inch of getting his fucking face blown off.

JR: Within an inch. An inch.

GM: His fucking face blown off. This mothafucka'. That's why I love ya. That's why I fell in love with ya. This mothafucka' don't care. I'm always worried about the fucking PSI, too. Tell me how that works.

JR: Umm, they're going to give you, ah, probably Gibbling. He's a little nerdy fucking guy that never got no pussy in his whole life. He's going to come here with his ripped socks and everything. He's going to meet up with you, make like he's your buddy. You're going to tell him the story. Meanwhile, he's going to make like he doesn't know anything about you and he's got the whole thing there. And when you're done he's going to say "What about the time you got a blowjob on the beach?" And what about this? And what about that? You understand?

GM: [laughs] You're sick, man. Are you serious?

JR: Uh huh.

GM: That's another motherfucker [IA] on your fucking hate list, huh?

JR: He was, he, he did that with me. He says "Um, what happened in Florida with this um, with this um, ludicrous – lascivious and ludicrous act?" And I says – so he thought he like stumped me – and I says "There is a woman present here." I says "That's an inappropriate thing." I says, "I – I was, I was having sex with a young lady." I says "Obviously you and your government word things to make it sound a lot worse than it

10

what it was," I says, "but I'm not going to get descriptive. It's probably none of your concern and like I said, there's a woman present."

GM: Well he probably didn't like that answer.

JR: Fuck him. Who are you? Who are you to me?

GM: It's – you're fucking mellow today. It's good – after that fucking judge. You got probably good news over there.

JR: I went in there and shit on him again.

GM: Did you? You love, you live for this shit. This motherfucker. Who do I have to worry about the most – the prosecutor, the judge or the PSI? What do you think?

JR: Huh?

GM: Who do I have to worry about the most? That's what I'm worried about.

JR: You gotta open your mouth to this judge. You gotta tell him to disqualify himself – because he tries to talk and talk and talk and talk without looking my way like he don't want me to have a word to say.

GM: Yeah, but, but he doesn't like the idea that you don't have a lawyer, or?

JR: He gave me the okay. You wanna hear what he said?

GM: Yeah

JR: He says, this is, this is, he says "Mr. Romano. You understand that you do not have – by not having a lawyer – you're, there are things you could say the wrong way that could hurt you. And I need to ask you have you ever had any psychiatric help?" No. He says "Have you ever done this or this, this this . . . ?" I said "No." He says, um, he says "Have you ever gone to law school?" I said "No." He says "Do you have any legal training?" I says, "Mm mm." He said "Well, you know there are capable attorneys." I says "Every time I try to get an attorney, as soon as they hear about what's going on here, in the, in the –"

GM: The court.

JR: "— that I'm here in the Eastern District and under, in this court room - they shy away from it." He says "Mr. Romano, I know many capable attorneys." I said "Then maybe His Honor would like to suggest them to me."

11

GM: [Laughs]. What'd he say?

JR: He was like, psh, pissed. He don't say nothing. And he says, uh, he says "So you have no training in, in, in law?" I says "No." He says "Well, you seem like a very intelligent guy," he says, "but I would still recommend that you, you interview attorneys." I says "Your Honor, I have, um, I had four attorneys..." And he said . . .

GM: How much money they take from you?

JR: And they . . . a million dollars. I says, "And they have gone – I says, and these attorneys have gone to law school. I am sure they've gone to prestigious schools." I says, "They had the training you are talking about in law school. I said, "However, I've been in business for twenty years. The only difference is, is that they, they are not, um," I says, "They're not, they may be capable. But they're not willing - and that's the difference. I'm willing, yet I didn't have the training. You see? So here I am." He says "Well, you seem like a very intelligent man and I'm sure you can handle this yourself, if that's what you want to do." He says "Understand, I am not trying to sway your position either way." I says "Absolutely - I know you're not".

GM: He thinks you're that stupid that, that he just wants to pay you lip service to everything, meanwhile he just took your life away? He just gave you 16 fucking years, Joe. And now he's trying to do something to help you?

JR: No - I don't think that.

GM: No.

JR: Does he think I think that? No.

GM: It's like – well, you know, I feel bad for you, but I'm also trying to read the future on me. How do I know I'm going to get every day of whatever I fuck I gotta get?

JR: It's like he rushed us again. It's like "Just a minute Your Honor, why are we in such a rush? Because you got a bunch of other things to do." Um –

GM: This is your life playing out and he doesn't give a fuck.

JR: No - just trying to rush everything.

GM: It's fucking - he might as well take a bat and hit you in the head. Do less damage, right - than this? Think about it. No fucking good, man. No fucking good. Was the prosecutor there again still?

12

JR: My brother Sal was, told me - he's like, tells his lawyer "Is there any way you could visit my brother and go there" because they know. And then he says "Joe, understand they're gonna bring these wholesalers in to say how much you paid for those things." They can't prove loss - I'm entitled to make money.

GM: So you gotta get all your bills from like – how much you pay rent, [IA] maintenance on the building, taxes on the building, how much you pay your employees, your payroll, your cleaning lady, to keep the parking lot clean – doesn't that count toward, don't they pro-rate that from the, you know, aggregated amount of all the moneys the same- whatever the fuck it is. Why don't . . .

JR: No - they just they, they just, they want to say, I said - that's why I told them tonight. I made a very good point. I says "I'm only suggesting what I paid for the coins to the retail price." I says, there are some instances in which there are - people pay – people, there is no loss whatsoever. As a matter of fact, I, I said "Where are the coins? Where are the coins we're talking about?"

GM: Well, why can't they just bring them back and get a refund?

JR: Well, this is where we are going to tear apart, we're gonna tear these guys apart. What 'coins did you look at? Where are the coins?

GM: I don't think they've seen the coins, I think. I'm a guy on the outside - I know nothing about this. I think they just have people telling them "Well, what did you buy from, uh, Joe Romano's company?" "I bought, uh, five Ben Franklin coins. Ten gold coins." Okay. They could say whatever [UI] – maybe they bought off the Franklin Mint. They don't know. Maybe they don't remember – do you understand? Do you remember 5 years ago these people? Most of them are older, correct?

JR: I don't know what they do.

GM: Is that a point you can bring up? No. Your, your, your client base is usually people who, who are maybe a little older than us, right? Who have money. Who have retired.

JR: 40-50-60-70. Yeah.

GM: Yeah. So this is what I'm thinking.

JR: You're thinking what?

GM: I'm thinking that, that maybe they just told them to sign these depositions.

JR: They did.

13

GM: They sent them a letter – so doesn't there have to be some sort of burden that they have to say, well, "I actually had these coins." "Are you sure how many? The accuracy of it?" Why don't they send a bill back or an invoice? And then you say "Well, how much?" I don't understand the charge they are trying to give you. You bought something low and you sell high? You have to justify your pro– for profit margin now? If they did it then every company would be out of business in this country. It's a capitalistic country. Gas, oil companies, they'd –

JR: Yeah I know, they're saying that my company is a fraud, so all of that don't come in to play is what they're saying.

GM: So - you committed a fraud your whole life. So you raised your family, your kids, bought property - your house, whatever, because you're a fraud. And you gotta plead guilty to that? That's disgusting. Now I know why you fucking want to kill all these motherfuckers. It's disgusting.

JR: You go up yet?

GM: No – I'm so – I'm so happy when fucking in the other pen. I come here, I'm just like, I'm disgusted.

JR: Why?

GM: I dunno. I was happy like 5 seconds ago.

JR: I go up there's a status conference.

GM: I'm fuckin . . .

JR: They said, uh, they said oh so we and the attorneys agreed to a status conference and I'm thinking I didn't agree to that.

GM: Still hungry? Eat. Make me laugh again, c'mon Joe. Get me spirit, get . . .

JR: I farted over here.

GM: Get my spirits going up here - get my spirits going up. Tell me about chilly ass or something.

JR: Chili Hiney. I love this girl grabbing my [UI].

GM: You know more important than that - I know - we gotta figure out a way that I [IA]. We gotta figure out a way that I can hook you up on the thing. The phone.

14

GA098

JR: I know.

GM: Ok.

JR: I know.

GM: Should I ask [IA]

JR: Can't you get it all hooked up and me, me send you the money on your account, and, and you bring it to the law library and [IA]

GM: I'm not going to be checked going up there, right?

JR: If a guy needs to dump money. If a guy needs to drop money somewhere then . . . Now this hearing I got is in two weeks, the 24th.

GM: August 24th

JR: So that means if I have this hearing on the 24th, they are getting rid of me like the next day. So what I'm going to do . . .

GM: I don't know if I am going to be cycled up with you or not.

JR: Yeah, I'm gonna, I'm gonna, uh try and make them put this off.

GM: All right, do it because I can definitely do that. I can help you Joe? I don't mind doing this fucking thing. When you want to do this fucking, this fucking guy in the street? Fucking . . . I should reach out to the investigator, right? This cocksucker is no fucking good. I feel bad for you for that. You gotta start livin' [IA] the fucking things. I gotta get this fucking, I gotta get this judge switched.

JR: You gotta tell this guy to fucking...uh...to disqualify himself, at the l . . . at the very least.

GM: Shit - I don't know what to fucking do. Because I'm going to get fucking humped over here. It's like I was, I was happy this morning and then, when you talked, I was thinking about what you said, "You're gonna get fucking humped, Jerry." It's the truth, don't I know it.

JR: I don't want to say it in such a bad way but...

GM: I know but you have to . . .

JR: But this guy is not a good guy. This is a very bad guy - he's not an experienced judge.

15

GM:     And, and, and the fucking that PSI guy. It's like, and the prosecutor, it's like oh my god. Do I have anyone on my fucking side? You know what I mean? Which are the better ones? How do we maneuver to get them? Now I know why you hate them all. Now I know why you want them all dead. I know you hate these mothafuckas. I know you are, you fucking hate them. I don't know what to do, Joe.

JR:     I had the cooperating witness fucking sitting there.

GM:     Do I take, do I take, the um cooperating...I don't know how you handled that without wanting to kill him. How the fuck do I - do I take the cop out like these other guys? What the fuck do I do, Joe? Do I wait them out? How long do you wait? What'd they offer you before they, the the 16.

JR:     They never offered me anything. Always wanted to take me to trial. They know you're not cooperating, they know you got, they, they, they're not, they don't ... they want you. I don't know why, who, who are you in this whole scheme of things?

GM:     I showed you the indictment.

JR:     I know but are you the, are you the top guy?

GM:     Nah.

JR:     A low level guy? Middle guy?

GM:     Middle maybe.

JR:     Yeah, so that's what they wanna do. They want all you middle guy up.

GM:     They have nothing, they can't prove it, they know because we don't put work in. We have the guns and everything. You know what I'm saying? So. You see how many gun charges I have? That's what's killing me. Put it this way - we're the workhorses.

JR:     All these guns on you?

GM:     They know how. We're the workhorses. We do the shooting. We do accidents. [IA] I'm talking to you. No one else knows and I'll deny it. You know what I mean? So I figure you're a good guy, if we're going to do something we'll take care of it, you know what I'm saying? That's why I get mad at your partner, Danny? [IA] fucking [IA] Going to rock his world. Yes master. We be up here every fucking memory. Yes judge. Take him wring his fucking neck, man.

JR:     That's like this scumbag cooperator. That was in the court, I saw him. I looked at him.

16

GA100

GM: That's why we were talking to you that day. Is I don't mind fucking helping you. He asked Jus about you. You call him Jus right, Des?

JR: Yeah.

GM: ..., about you. I understand that...

JR: He' ll tell you I'm a solid guy.

GM: I know, so that's why I'm gonna, I'll fucking help you out. I'll go talk to Harold too. No one is going to see I'll help you out with that. Just remember when I get where I'm going, I want you - you know what I want you to help me with? I want you to help me with, maybe when we get to where we're going, make some fucking money.

JR: I got umm.... let me tell you man.... I could a fucking told you how to make legitimate ....

GM: Legitimate, on the other side, I don't give a fuck.

JR: I'm talking big fucking money.

GM: It doesn't matter, you know what I mean, because what the fuck am I going to do for the rest of my life? Get out of jail, after ten, twelve fucking years, what the fuck am I going to do?

JR: How old are you now?

GM: 43, all right, so it's like –

JR: Oops - you'll be a umm... excuse me.

GM: I see you do your homework too. Like... this fucking asshole upstairs. How the fuck did you find out he's got five kids?

JR: He said that in court.

GM: Oh, he did?

JR: Five kids and then he'll destroy your manhood. How can they do that?

GM: And the other fucking day I was trying to tell you to calm down. I just didn't want anyone to talk about it. I hate them more than you do, you know what I mean? I don't want these other fucking clerks, only talk one on one. Remember that, you know? Who do you hate fucking worse? Who's the most damage, do you know what I mean, does the most damage?

17

JR: To me?

GM: No, in general. Like, the fucking prosecutor, the PSI or the judge?

JR: I think, uh, I think the, uh, judge has the final say. And uh, you got a bad judge.

GM: Ah that's why you fucking....uhh... I don't want to be hell bent like you when - after I get sentenced. I know I'll have this anger - take away the best part of our life, you know what I mean?

JR: I told this fucking guy - I said "I think you should separate this cooperating witness from us. Why is he sitting here on our side?" I said "They obviously cooperate with the government."

GM: Yeah why - why is he there?

JR: And he's like "No, we're not going to have a separate hearing and this, they're co-defendants in this, in this particular part of the, of the procedure, it's your, your co-defendants on this." I says, "I don't want to share any information. I don't want any of my information, I don't want any of my information known to the government."

GM: This fucking guy. So I don't want to be hell bent like you. Like, remember how mad you were that day? You know, "I want to get revenge. I want to fucking, you know murder everyone who's in charge of this." Ah, what the fuck? I don't want to live my next 10 years like that and drop dead. That's what I'm saying. How do you find peace, that's what I'm telling you.

JR: I don't know. My spiritual advisor came here. Listen to this one.

GM: Your spiritual advisor?

JR: Came here on Monday.

GM: Your yogi-gogi guy?

JR: No, he's a pastor. Okay? He comes here...

GM: You're a funny fuck, you know that?

JR: All right, listen –

GM: No, before you say that you wanna put fucking two in this fucking judge's head, and now you want – I want to see my spiritual advisor! [Laughs].

18

GA102

JR:     [Laughs]. No, you want to hear what I told him. This is the best part. This is the best part. You want to really fucking laugh.

GM:     [laughs] I love you, Joe.

JR:     He says to me, he says that the spiritual advisor [IA]. He sits there [IA] and I told him, I says, "Listen," I says, "I'm leaving here," I says. And he says "Well, I have, I have faith in you, Joe, and I have faith for you." I says, "Faith in what? Why do you have faith in me? About what?" He says, "That, that, that God will deliver you, and you'll come through this." I says, "Listen to me." I said "Anthony, and let's make sure that we're praying to the same god." I said, and meanwhile most people would call him Pastor Anthony or something like that.

GM:     You just call him Tony.

JR:     I said listen "Anthony, let's just make sure we are praying to the same god." I said "My god, that I pray to, the one that I hear the voice –" [Laughs].

GM:     [Laughs].

JR:     [Laughs]. Don't you fuckin' laugh. I says "The one that I hear the voice," I said, "He tells me that if another human being locks you down, traps you, puts you in a cage, tries to prevent you from doing something, he says, that I'm to do everything in my power to break that hold. And if I have to hurt someone in the process, that's what has to be done. And he understands that." And he says "Well, no. You do not return violence with violence." I said "I'm talking about defending." I says "Now what happens?" I says, "I served in the military, they teach you to escape. Escape, escape, escape."

GM:     And murder.

JR:     Never submit to this.

GM:     And kill.

JR:     I said . . .

GM:     Kill your captor.

JR:     You, you, you . . . right. He says "You get trapped and put in a pit in South Vietnam, all right?" I said, "You're supposed to try every method to escape and get away." He says "Well, the difference is, is if you escape that and you make it home, you're a hero. Here if you escape, you're a fugitive." I says "Wait a minute. Wait a minute. If I escape from those people who cah, who catch me – if I escape from them, and they catch me again,

19

they're going to kill me too." I says "All's it is is the person who's catching you." He says "Yeah, but that's sanctioned because of war." I says "You mean to tell me that God recognizes a uniform?" I says "My God recognizes only the person and not the uniform." I said, "So whether I'm being held captive by a guy wearing grey, or a guy wearing blue, or a guy wearing cammies, I'm being held captive against my will. I must do everything to escape." And he says, "I understand your logic."

GM: But what about the logic with revenge, though?

JR: And he told me. He says "Well, these things intertwine." So I told him that "Be glad that I am going to try the path of the least resistance. I'm gonna escape and I'm gonna run." I said "I'm not going to double back and go looking for these people." I said, "But if I feel trapped, I might as well at the last minute."

GM: The other day you were so mad though, you were like "Fuck it, I'll kill this motherfucker, I'll kill that one, I'll kill fucking Bianco. I'm going to kill fucking Lara Gatz."

JR: This is what I'm telling my spiritual advisor. And I told him, I'm killing –

GM: And he's trying to talk you out of killing them.

JR: Yeah and I told him, I says "That's the peace I made," I said, "but if I have to, I'm going to kill the guy who's sitting at home, who's, who's probably got kids and everything, right now he's sitting at home and he doesn't know he's going to die from me." I said "He thinks his life is going on forever."

GM: But he just sentenced you to 15 years. He doesn't even think about you at home. You're wasting 16 years, and he isn't even thinking about you.

JR: Right.

GM: He'll be on his couch, and you're just going to come by and bink [PH], pop [PH]. So what'd he say about that kind of charges?

JR: Him, I'm gonna fucking, him I'm gonna kill slowly, he ain't done.

GM: Sick bastard. [Laughs].

JR: I'm not even kidding you. I'm going to fucking cut him to pieces.

GM: He's the head of the whole thing, right?

20

GA104

JR:    My father was in the court. I told my father, I said "You're 80 years old, your life is over, why don't you kill them?" I said "I would do that for my kids." He said "Are you fucking crazy?" I said "If that's crazy, then yeah."

GM:    Yeah but how are we going to kill a fuck like that?

JR:    Find out where Bianco is. Find out where he's a preacher. Go there, boom - right in the fucking head.

GM:    That's fucking. . .

JR:    Tell him "Peace be with you." Boom!

GM:    You want to meet Jesus, you're going to meet him. [Laughs]. [IA].

JR:    Me and him will go to hell together.

GM:    But I don't know, sometimes I think the prosecutor is more

JR:    The prosecutor is a piece of shit. The one that's up there is an idiot.

GM:    She doesn't deserve to die, huh? That was the one Lana you were telling me about?

JR:    Huh?

GM:    That was the one Lana that you were telling me about?

JR:    Lara Gatz.

GM:    Lara? Lara? What kind of name is that?

JR:    I don't know.

GM:    Or the PSI guy, which is worse?

JR:    Gibling. Greg Gibling.

GM:    Well, you know it makes you feel better. Anyway, but . . . but, they're all, they're all culp– culpable for putting you here for . . . you're a good business man. You're a good fucking man. [IA] You're still helping people from in here and that PSI guy doesn't say that? Like, I don't know, Joe's a nice guy, this and that? He wants to fuck around. So it's like a conspiracy, right? That's what you were telling me, told me it was a conspiracy? I – I'm still believing like the state way. Like, well, probation does this job, the prosecutor does the job and the judge is gonna be fair. Fair? What do you - you

21

GA105

shoulda got nothing. Fair? You should have got maybe a civil sanction for not watching your employees. Correct?

JR: Yeah.

GM: Fuck.

JR: I'm gonna make a fucking pass at this girl. She fucking . . .

GM: [Laughs]. That's all you think about is pussy.

JR: [IA] I'm going to tell her I'm gonna tell her in Spanish, I'm gonna say, I say "Señorita, pussy tonight por favor? Pussy tonight, por favor? Give me a little kiss. Please."

GM: You think – you think she likes you?

JR: Yeah. And if she saw I took the box. She said, "You took the box off of my" [IA]? And she's like. It doesn't take much. It's like [IA] some strange look.

[Laughing].

GM: It's like the wind blowing. You make me feel better already. [Laughs].

JR: Yeah, don't, don't go up there and not open your mouth. Don't go up there and not open your mouth.

GM: I gotta wait for one of the marshals come to see what.

JR: This is what I'll do. This is what I'll do. I'll make you feel better. [Airplane noises] Going down the runway, ready? And I'm on a tail dragger, right? I pull the tail up a little. I'm going straight down the runway. [Airplane noises]. And I'm up. And I start pulling back and I go up [IA], and I got all the power [IA], and I turn the landing light off and everything, I go, I start going up high, and I'm get, I'm getting towards the practice area, ready? [Airplane noises]. Flipping around. How about this? [Airplane noises]. All the way up like this?

GM: What kind of plane?

JR: [Airplane noises] An Extra 200.

GM: Extra 200 is a jet?

JR: No.

22

GA106

GM: No, a prop, prop plane?

JR: It's a prop plane with a 200 horsepower motor in it that's fucking can handle six, six G's positive and negative.

GM: Wow, so you can flip?

JR: Like this - one second. That's it. One second. One second make a compl . . .

GM: Now do you have to be looking off to the horizon to make sure you're in the right spot?

JR: [Airplane noises]. All over. Oh man, talk about jamming. Take a girl up in that, put the parachute on her, suck her in there, tie it, take this little girl that comes here, right. This little Marshal fuck. She'll be fucking coming her ass off, fucking her adrenaline will be fucking, like, so out of control, she'll be like [breathes deep].

GM: [laughs] Joe, you're nuts. You need to get laid man. [IA]

JR: These mothafuckas man, what they did to me.

GM: I know man.

JR: What they did to me.

GM: I know you're going to get your revenge, though. I know. I know, I can tell what type of guy you are. Good luck with it. Let me know [IA]. . . something special.

JR: Ok, let me tell you how, I, uh, let me tell you what I've learned over the years.

[IA]

GM: [IA] . . , kill him slow.

JR: Did you ever read the book "The Ice Man?"

GM: No.

JR: Oh my god. The mafia hit man?

GM: No, I didn't read that shit.

JR: Holy shit, you kidding me? He fucking takes a guy, takes a guy and he ties him against the fucking palm tree in Florida. [overlapping] And he takes out a knife and he says listen . . .

23

GA107

GM: Where'd you tell me that he lives in Flushing, right?

JR: Huh?

GM: Flushing, right? You told me the judge, yeah.

JR: He lives in Flushing?

GM: Yeah, you told me.

JR: No, I didn't say that.

GM: Who was telling me that?

JR: I dunno. Really? Anyway. He takes a fucking knife and he says "Listen, unfortunately for you I have to make this hurt really bad." And he goes - he takes his arm and he cuts off filets, and puts them in a bag, right? The guy's like "Ahhhhh."

GM: This is what you're going to adopt as your way?

JR: Yeah.

GM: So you're plagiarizing. You're plagiarizing right now.

JR: He cuts off - he cuts meat off his legs, puts them in the bag, and he's, like, takes out another bag. He has his rubber gloves on. He pulls the guy's pants down. Cuts his cock and his balls off and puts them in there, he says "The boss wants to see these," because the guy fucked his daughter – raped his daughter. A mafia guy's daughter. He says "The boss wants to see these." And the guy is like [screaming noise]. Takes them, takes them, ties them in a, in a rubber inner tube, right? Ties them up and they are all bleeding and everything. Puts them in the beach water in Florida at night and sails them out to get eaten by sharks in shark-infested waters. They took, they took the meat and everything and he brought that back and he says I wanted to uh – because he was going to get a tip if he made it really bad – and he says "Yeah, this is him."

GM: So you're going to plagiarize him?

JR: Nah, there's other ones too. He took guys, he took guys and he let rats eat them.

GM: If you had to do it, who would you take an order for?

JR: What I want to do, what I would do to Bianco, okay, is – I'm a fair guy, okay?

24

GM: Unlike other people?

JR: Yeah, so I would take him. And I would build a prison . And I would build a place –

GM: You gotta be realistic, you can't build it.

JR: Well I'm just saying, you know, I would, I would dig, it would be a dug hole or something.

GM: Oh.

JR: And I would put him in there and because it's more horrific than living in the Nassau County Jail, I would keep him in there. He would get 2 for 1. I'd say keep him in there as many days as he kept me. Right? And then he'd get credit for not seeing his kids or visits and everything, no commissary, so, but I would torture him like that. I would like, all I want to do is give people back what they gave me. Lara Gatz – I want to cut her tits off.

GM: Would you want to cut his balls off first, then her tits?

JR: Huh?

GM: Him first, then her and then Greg last?

JR: The, ah, the postal inspector - I want to fucking cut his nuts off. [IA].

GM: Fuckin'A. Oh man. I don't want to have that rage in me that you have.

JR: Huh?

GM: I don't want to have that rage in me that you have, but, whatever you need help with.

JR: And then I'm gonna, um, ready to get motivated where I'm gonna start working out again and I get fucking huge. Right? I get huge. If you even see me do a fucking sit – push-ups yet, you see me – all of a sudden I start filling up like this. I get huge. And I'm gonna start doing that. And I'm going to start saying "Revenge. Revenge. Revenge. Revenge."

GM: Do you notice that fucking my memory is starting to fucking go.

JR: You're not reading, that's why.

GM: Ah I don't remember shit. I'll fucking talk to you and I won't fucking remember

JR: Why aren't you reading?

GM: I don't know man. Sometime –

JR: You need to read! I know you, I know you say for a certain reason but you want to lose your memory? Are you kidding me? It'll come back to you if you just start reading.

GM: I don't know.

JR: I can't believe they brought me up that quick, and this guy rushed me out of there.

GM: And they could have left you here all day. Wait and wait and wait. We have to wait until 3 o'clock to go back, you know, they're never going to take us back before 2 or 3, right?

JR: Huh?

GM: They're never going to take us back before 2 or 3 o'clock. Because I'm late today, I know that. They would have got us later from there but you had an early one, right? What's the difference - sitting there, sitting here – what the fuck does it matter? We gotta fucking get in line about this thing. You're in law library every fucking day.

JR: Yeah.

GM: From what time to what time?

JR: I mix it up, but usually about, uh . . . .

GM: 12:30, right?

JR: Usually about 5:15.

GM: At night?

JR: 5:15, yeah, until about 7:30?

GM: How come I keep seeing you on Thursdays at 12:30?

JR: That was just by chance, you know, that on Thursdays it was that time.

GM: Yeah, I kept seeing you on Thursday.

JR: Ah, don't get nervous, they're coming for ya.

GM: Ahh, I hate this shit. Well I'll help you with that.

26

JR: The girl's name is Nora.

GM: [IA] I can help you with, this fucking guy Danny, he comes to see you – he's in New York?

JR: Who?

GM: Danny.

JR: David.

GM: David, right. Fucking . . .

JR: No, Florida.

GM: How come he's not reporting up every two weeks?

JR: I don't want, I don't want to see him. I'm going to have him come – I told him this week, next week. If he don't come next week, the following week.

GM: What happened to fucking Manhattan offices?

JR: I didn't have Manhattan offices. I have a Manhattan apartment – just hangouts.

GM: Oh just hangouts.

JR: Beautiful fucking apartment, I designed the furniture and everything. [IA] like, "Where did you buy this?" I'm like "I fucking built it. It came out of my hands."

GM: Wow, man.

JR: Yeah. I showed you pictures of my house, didn't I?

GM: You showed me a couple of pictures.

JR: That was – that's my house. That's one of my houses. I have twelve houses.

GM: Twelve houses? On Long Island. You have your wife and kids –

JR: I got four on Long Island. I had four. Four, four in Florida. Three in the city, like that. Two buildings.

GM: Good, so you're all right.

GA111

JR:     Nah, they took half of that. They took all four. They left me with four houses.

GM:     What you got to do is –

JR:     I could still [IA]. I'll be good in a year. [IA] I'm gonna be good from day one.

GM:     I'll tell you what. I got – I gotta reach out on a visit. What day is today, Friday?

JR:     Yeah.

GM:     Probably Monday, I'm gonna reach out.

JR:     Give the A man another.

GM:     Nah, nah. Anything we talk about is me.

JR:     No, no, no, no, nothing. Don't write nothing in it. Say "Hey Joe, I'm looking for you."

GM:     Well, I, let me know your schedule, and I'm gonna ask for extra time now today.

JR:     Yeah you have to go in there and do – are you taking notes? Did you write this down because you're going to forget when you're in the courtroom.

GM:     No. I want to get our thing straight first. I'm not even worried about [IA] that shit. This is going to be bullshit. I gotta –

JR:     You got to write it down, what you're going to tell Bianco when you're in the courtroom. [Pause]. I write down all – I write down all this fucking bullshit. And I save the exculpatory, you know? Submission letter to the government. Disqualify yourself. Senior Judge. I write my questions down. Here – you gotta ask the judge: First ask him for law library time. Six hours a week. Okay?

GM:     And what times do you usually go there?

JR:     They'll call you. You'll be up there with me if they, if they call you. What is, what is the other thing you gotta ask him – to disqualify himself?

GM:     Do you really want me to do that? [IA] We're going to have a big fight up there.

JR:     Huh?

GM:     We're gonna have a big fight up there.

28

GA112

JR:    Why?

GM:    Because.

JR:    Your lawyer is not going to work for you.

GM:    I'll ask him for law library time this time – see how he is. Because I want him to rule on my discovery – I want to see what he rules on that. I need some discovery. The 3500 shit. My discs –

JR:    They only give you 3500 if you're going to trial.

GM:    He ordered some discovery.

JR:    Yeah.

GM:    I want to get us straight in there because I don't know what time we're going back. This is the first rule. Don't tell anything. No one.

JR:    Nobody.

GM:    Nobody. Like I said, always remember the one to one rule. It's always me and you. So I'm not talking if someone else is around or whatever.

JR:    Right.

GM:    So I don't talk about that. I loved you since the day I met you. I agree, I agree with you right. I agree with you, right? About how you feel about this prosecutor.

JR:    You have to read some books up in here. I'm going to bring you some books, that –

GM:    Okay. Now you want this fucking phone, right?

JR:    Yeah

GM:    Okay. All right. You want this fucking phone. Gonna reach out – I'm gonna reach out. You want an [IA] smart phone?

JR:    Huh?

GM:    [IA] Smart phone?

29

GA113

JR:     Nah I don't need something so great but something that could take a picture. I'd like someone to fucking send me a picture of their pussy. You know, one of my girls. They could fucking go suck a black dick.

GM:     Ok what about your [IA]. Okay, I'm planning to do business with you [IA] make fucking any money on it, let me know – whatever – I don't give a fuck alright.

JR:     I, I –

GM:     You can pay for the phone and the bill. I'll give it to you, and you're going to pay for it, right?

JR:     Yeah.

GM:     All right.

JR:     And they'll let me – it doesn't matter. I'll be gone before they let me know that it's fucking done. You know?

GM:     It doesn't work so easy here. You're not gonna – you think you're gonna leave less than the 24th of – having the hearing. Then if the next –

JR:     No, I think I'm going to push that off.

GM:     Aren't you going to be here through the holidays?

JR:     Until November.

GM:     I'm definitely moving then.

JR:     I don't think it's going to happen as quick as they think. They like to say that they, they got a hearing going on and everything, but I don't think it's going to happen on that day. Don't forget they gotta bring in all these witnesses and everything, and . . .

GM:     Are you putting the investigator out? Do you want, I'm going to reach out to him, see what's going on. Tell him one of my guys out there. I don't want to tell you too much, you know what I mean, to, to burden you, but . . . This guy fucking Dave, I'll take care of it, if you need me to. [IA] I'll take care of that for you.

JR:     Any connections in, ah, in Brooklyn?

GM:     Of course. [IA] in Brooklyn? [IA]

JR:     Really?

30

GA114

GM: Eastern District of Long Island. Wait, what part? Bensonhurst? Coney Island? Brooklyn?

JR: Yeah, because they're sending me to Brooklyn.

GM: Oh you mean in the jail?

JR: MDC.

GM: You mean in the jail. Uh we'll see – we got some connections over there. We'll get you whatever you fucking need to get. That's all.

JR: This judge is the worst fucking judge.

GM: Monday I'm going to ask him, listen. The stainless steel one, right?

JR: No get, you're better off with the fucking – because they make you sit on that fucking bench.

GM: It's a magnometer. If it's not metal [IA] it does not ring.

JR: Oh, so stainless steel [IA].

GM: High quality, a composite . . .

JR: High quality stainless steel won't be magnetized.

GM: Check it with a magnet, just to let you know it's honest.

JR: Yeah.

GM: Ease your fucking load off.

JR: Yeah, yeah, yeah, yeah, it's weird with stainless steel, ain't it?

GM: Well because it's got zinc in it. It's got zinc and nickel to harden the steel. What do you gotta make a fucking snot rag and a fucking hanger there? Why do you gotta get new underwear? What do you have on?

JR: I got no drawers that I could put stuff in.

GM: A pouch. Always wrapped.

31

JR: Yeah.

GM: You take it everywhere with you.

JR: Can't what?

GM: You take it everywhere with you. Do you know what you want to? Probably a diamond dust cutter. Cable.

JR: A cable?

GM: Diamond dust on it.

JR: Really? Can you get me that? I'd rather have that shit. Nah, I'd rather have it all. I'll take the stainless steel key. I'll take the fucking diamond dust cutter and the cell phone. I'll boost the whole fucking thing.

GM: Where's the cash, mothafucka?

JR: I'll put it all in the fucking thing. Listen, I took a fucking shit that was this big. Looked like it was sticking out of the bowl like the Loch Ness Monster.

[Laughs].

JR: Right? I almost had to break it with a shovel. Right? And so you think sticking a cell phone like that and the other thing ain't going to go.

GM: [IA] like that, that way you can relax, and uh use a cell phone or whatever. Make some fucking money and check on this fucking guy.

JR: You know what, in Papillon, you know what they call it when you're making a plan to escape? They call it "cavale." "Cavale." You're making your "cavale." That's plan. You're going to fucking do 16, 15 years?

GM: Hell no. I might be right behind you, I don't know.

JR: Listen to me. I will tell you the place where I am going to be. How to get in touch with me. Because if you get through all your shit and you get sentenced hard and you go to a place, I'll give you a way to contact me.

GM: I got faith that, that I'm gonna – quiet as a cat, listen – I have a lot of people on the street now still, part of a big thing on the street. Okay? So it's like your problems are really small – you know what I mean, my problems are a little big, but I think that maybe with a little luck I'll do a little less than 10 years.

32

JR: And you're going to do it?

GM: I'm going to have to do it. What am I going to do? I got too many deep ties and everything like that – I'm going to have to. You have to remember – I'm, I'm six, seven years younger than you too. It's a big deal – six, seven years at this point in life.

JR: You're going to do 10 years?

GM: Nah, if it's 10 you do like 7 – whatever, whatever it is, 8. I'm gonna have to – what the fuck am I gonna do?

JR: I'm going to be –

GM: Yeah, I know but you're a different guy than me.

JR: [IA] -- in Costa Rica, banging cocktail waitresses two at a time. While you're fucking chiseling big rocks. Like this and making 'em into little ones. You're going to be taking big, giant –

GM: It's fucking funny isn't it?

JR: Giant rocks and making fucking fish tank gravel out of it.

[Laughs].

GM: Salt water or fresh.

JR: Salt. Look, like this! Like you gotta make them that big.

GM: Do you want – um – do you want me to tell Harold you want to meet with one of his consultants or whatever? One of his consultant firm?

JR: Yes.

GM: You want it investigated for a couple hundred dollars an hour every time he comes.

JR: Yeah.

GM: It'll count as a visit – a professional visit.

JR: Yeah, and he'll do investigative work for me?

33

GM: He'll do anything you want. These guys were D-O-D, these guys will do anything. Listen, don't fuck me on this alright? These guys will do anything you want. These guys are – they are consultants, investigative, but whatever you say to them is privileged. They can do whatever the fuck they want to do out there. This is what you hear about, you know what I mean?

JR: Yeah.

GM: This is why the feds grab us [IA].

JR: Yeah, give me this guy's number. I want to reach out to him – have my people reach out to him.

GM: I gotta, I gotta, I gotta, I gotta ask his permission, you know what I mean? You can't have my guy because it's a conflict of interest.

JR: Yeah I understand.

GM: But, uh, because he's a quasi-investigator for the lawyers in the court so whatever I say to him is privileged. I could tell him I want to go kill Gandhi and he can't say a fucking word. So whatever investigators, it doesn't matter who you want to investigate, you need my help? You got it. I got them and I get covered legally.

JR: Bianco says "I gotta, have a couple of other things to do this morning. I have a couple of other things to do today." And I'm thinking "Yeah, you got one downstairs in the bullpen that you got to do."

GM: Ah, don't remind me. Did you like him at first?

JR: Don't be scared.

GM: I'm not scared of fucking anyone. Anyone. [IA]. Did you like him at first, or –?

JR: At first, I thought he was a gentleman. And I, by the second time I was like "Nah, I don't like this guy. I don't get the good vibe." I have a good feel – [IA].

GM: And when did you decide that you wanted to blow his brains out? What point was that – the sixth visit? The tenth?

JR: After he sentenced me to, uh, 16 years.

GM: That's when you sweared, right?

JR: Yeah. Yup.

34

GA118

GM: Yeah. Uh, I [IA] . . .

JR: I remember that he said that I also accused, I threatened to kill a prosecutor. This guy that was in the court room was the one that said that.

GM: They don't know you got a real guy to fucking – if they only knew.

JR: They don't even know that that night – you think you can fuck people like you did me. A good guy. I could have been, I could have been babysitting his fucking kids the day before I came here. Would have been babysitting your kids, and you did that to me?

GM: Nah, he's gotta pay, huh? The fuck.

JR: Yeah. Bad guy. Bad guy. I even told – I even told my attorneys at one point. I says "This guy needs to –" I told the magistrate judge. We had a private hearing and I told the magistrate judge, I says "This fucking -- this prosecutor needs to be stopped." And she says, she's like "Well, why don't you be the guy to do it? Why don't you put your best foot forward, and there's no reason why this court shouldn't show you favor." Really? Is that the favor I got shown? The judge had the nerve to tell me, "I think I've been fair with you." I says "I don't think you know the meaning of the word fair. You've been anything but fair."

GM: [Sigh]. These fucking people, man. She got big tits, Lara? Is that why you wanna cut them off?

JR: Huh?

GM: You wanna cut 'em off. She got big tits?

JR: Nah, I just want to cut them off. I want to make a fucking, a gunny sack out of one of them.

GM: You're sick.

JR: You know.

GM: You need psychological help.

JR: I wanna shoot black powder guns –

GM: You're crazy, motherfucker.

JR: -- and have a nice little titty to put the fucking gun powder.

35

GM:    No, in all seriousness.

JR:    Keep the gunpowder dry.

GM:    You gotta – I know, I can imagine the way you feel now.

JR:    Huh?

GM:    I can just imagine, how . . .

JR:    Listen – make no mistakes about it. This guy is going to hammer you and you're gonna see when you go up there and plead guilty and all that bullshit. When you go up there to do that shit, he's going to tell you, "You understand no matter how much time I give you, there's gonna, there's going to be nothing you can do about it." He's going to tell you that. Because he's planning on giving you a lot of time.

GM:    Not if, fucking – Joe Romano is going to do something about it. [Laughs]. So when you, are you gonna stop him.

JR:    This guy killed me and my kids. Not my kids. My kids will live on. But uh…

GM:    Why would you just fucking – why would you torture him? Why wouldn't you just end it?

JR:    This guy – I'd like to torture him. I'd love to torture him. Every time I think of something like, you know, I missed my daughter's communion. "Did you go to your kid's communion? I cut one of your fingers off."

GM:    Yeah but what are you going to hold the guy for fucking twenty years, you know what I mean?

JR:    No, I'm going to do this all in one day. I'm going to rush it like he does the hearing.

GM:    You rush him? Quick, quick, quick I gotta kill ya!

JR:    Hold on one second, I got a couple other things to do today. I see you got your friend over here. I'd love to have all three of them. Imagine all three of them, trapped in a fucking cage, like this. Oh my god. Oh my god. I'm so sucky. I'm so tired.

GM:    So that's your first order of business, huh? I'll get you your, I'll get you your key. And you can hang out in the law library for a couple months at least.

36

GA120

JR: Yeah? Well, that's why I got to push this off, I gotta push this hearing off, two weeks from today.

GM: Just do it. Harold's guy. Always do what you say with him. Always pay the money they need to be paid, please – you know what I mean, that's . . .

JR: Yeah.

GM: Joe – you're a good guy. I asked about you a lot. I wanna help you because you always help someone else - just always do what you're going to say with them, you know what I mean?

JR: Yeah.

GM: You know what I mean? I don't want to know your business. And don't even give any sort of connection unless we talk about it . . .

JR: Yeah.

GM: . . . unless it's one of us, you know what I mean?

JR: Yeah. I don't want any one of these fucking guys to know because everybody is a fucking stool pigeon.

GM: Yeah it's just – remember always talk one on one. Even with that, one on one. One on one with everyone. Lawyer one on one. Personal conversation one on one. Because if anything ever went wrong with it could say "I didn't say it." Walk, walk away. You know what I mean?

JR: Yeah, that's a good rule of thumb.

GM: Always keep that in mind. That's why I – when I, that day you said "I hate that kid." I thought you said, "Lana, I wanna fucking kill that bitch." [IA] I love this guy but I couldn't say that in front of them, you know what I mean?

JR: Every one of them.

GM: Whatever, whatever help you need – just let me know. I can only do so much from here. I wish I was out there. If I was out there, I'd help you.

JR: Huh?

GM: If I was out there, that's all I gotta tell you.

37

JR:     Yeah, but there's no, you know that's the thing – there's no, there's, there's very few stand up guys.

GM:     There's guys out there. You don't know them, that's why.

JR:     Yeah – you're darn right I don't.

GM:     There's guys out there.

JR:     This fuck that was standing there – sitting there in the courtroom. This piece of shit has the nerve to sit there.

GM:     So what do you want to do?   Just let me know. What do you want to do? That's the easy thing.  Just let me know what you want me to do.

JR:     And I told him fuck this mothafucka works and everything.

GM:     So what do you want to do – this, that – what do you want?

JR:     Oh yeah.

GM:     [IA]

JR:     I got – I'm not kidding – I got [IA] that I want done.

GM:     You want 'em done?

JR:     You don't even have to kill 'em, just fucking hurt them bad.

GM:     Can we tell them so they know it's coming from you?  Let me see, me see what it's gonna cost.  You want 'em broke?

JR:     Yeah.

GM:     Broken bad?

JR:     Yeah.  I got one guy, one guy, but he's in Delaware. Want his fucking hands broken in a million pieces. He's a guitar player, that's what he does. I want his hands broken, and then never work again.

GM:     All right. I'll get someone.

JR:     [Whispers] [IA].

38

GA122

GM: That fucking kid buddy – I got a good fucking kid.

JR: These guys are easy. They'll lay down.

GM: Lay down, yeah.

JR: They'll lay down like they're not going to fight.

GM: You gonna go after fucking Bianco? I'll help you. I'll get this guy to do it. Fucking, [IA] somebody hurt.

JR: I got guys that have screwed me while I was here.

GM: Right.

JR: I got a guy that stole two cars from me. [IA] but they weren't real reliable.

GM: They were unreliable?

JR: They couldn't do it. I swear to god.

GM: What was their pay schedule?

JR: They wanted like 2500, um, you know, 2500 to 5000 depending on what's going to go on.

GM: [IA] bullet [IA]

JR: I like that better.

GM: Yeah, we'll just get rid of it. You know this shit gets messy unless you like the guy or something.

JR: I don't like any of them.

GM: All right. Glad to hear it. This is what we do. [IA] Doesn't matter who it is. Fucking Gatz, probation. [IA]. They can help with that, you know what I mean? [IA]

JR: I got uh, the attorney I had he was, ah, Gotti's attorney.

GM: Umm, Shargel?

JR: No, Charlie Carnesi?

39

GM: Ah that must have been a later one, yeah.

JR: Motherfucker robbed me of 300,000 dollars and set me up.

GM: Are you kidding me?

JR: I got the other fucking attorneys – these fucking greaseball bastards – the Ansanelli firm took 350,000 dollars and fucking, and fucking did nothing but hung me over here with these –

GM: But you got, you got arrested – you can't go around killing the whole world. You got to pick your round two – you're going to waste all your money on this, you know what I mean?

JR: One or two guys is good for now.

GM: All right. These guys, they're sick. They love doing this shit.

JR: They deserve to die. They deserve to die. I have a whole list a mile long of these motherfuckers.

GM: Let me know what you want to do with fucking Lara – Laura?

JR: Lara Gatz – she's the prosecutor.

GM: Let me know what you want to do with her and the judge – Judge Bianco.

JR: God I'd love to do both of them. Kill both of them mothafuckers.

GM: Because it's helping me too.

[Laughs].

GM: What do you think – a shark tank? Think about it – you're a smart guy and you read.

JR: I'll think, I read. I'll plagiarize something from a book.

GM: Plagiarize? How about a big dump truck? You just said plagiarize. A big dump . . .

JR: A fucking, in a cement mixer – them spinning around.

GM: You're being too dramatic. Listen, I know, I'm a joker, but this guy's a serious guy. [IA] hit a car. [IA] hit a crash car. [IA] I'll hit her on, [IA] you know?

40

GA124

JR:  Yeah, that's a great way to kill someone. I had a guy who – I was outside

GM:  Yeah but is that enough torture for you?

JR:  Yeah! What to die in a car wreck? Good. I mean I'd be happy – there's a good chance like he got crippled or something like that. You'll be in a wheelchair the rest of your life.

GM:  He'll be on the stand still, crippled. Yeah two hundred years from the stand in his chair.

JR:  Yeah. That'd be great.

GM:  Unless you're telling me you just want him crippled?

JR:  Huh?

GM:  You just want him crippled?

JR:  Who? No, I want, I got other people that I want done first. There are some other people I want done first. About five really –

GM:  That's a lot.

JR:  If the guy does one or two, he's gonna want to do more.

GM:  These guys, these guys are professionals. They'd love to do a fucking prosecutor or a judge.

JR:  Love it.

GM:  Probably get that one for free. [Laughs]. So just let me know. When you get a phone, let me just know what you need or what you want, all right?

JR:  Yeah.

GM:  Listen – is it worth your life? Don't talk to anyone – don't get these elaborate fucking schemes. Let them take care of what they want to take care of.

JR:  I won't say nothing.

GM:  [IA]. Put the money in my account. I'll put the money somewhere. Don't worry, your credit's good. I'll get you a phone and you pay me after.

41

GA125

JR: It's like what I tell everybody. If they fucking take me, and they run me out of here today – your money will just come, showing up. You don't have to worry, your money will come showing up.

GM: I fucking wish I had bail. I could make your problems go away in a week.

JR: They wouldn't give you bail?

GM: I'm going to try a bail hearing – they might give me bail. I really do. You know why?

JR: Why didn't they give you bail in the first place?

GM: Ah, because we're a menace – a threat to everyone.

JR: Yeah, so that's why.

GM: You know, let me explain how bail works. For us, not for you, for the regular. It works for us. Once they know you have a plea and everything, and you're taking it – then they give you bail because they know that if you're a fugitive, they'll catch you. Guys like me – I've been arrested a few times. They fucking know, Joe – they fucking know. So why don't you take your time because a lot of times they can't prove nothing. They have one guy saying another guy, but guys, guys that have been in and out – we know, we have to take a bid, you know what I mean? Or they are going to make your life miserable and they'll give you a hundred years. So once they cop out, they usually let you go. Twice I was on bail. Twice I came in for state sentences. You come in – you're ready to go to prison. It's just the way it is. It's kind of an unwritten truce like that, but in the beginning they hold everyone on my case. There is probably one guy on bail. One guy, Pete.

JR: Why is he on bail?

GM: Because he had such a minor role. He told one guy "Oh, this guy got a lot of money." You know, it's like a regular guy whose never been in trouble before. "Oh that guy got a lot of money." So now you're in a conspiracy because they want to fuck the guy's card game up. Stick the guy's card game [IA] – [boom] [IA] "Put the money in the bag," and that's all he's getting. God damn. Do you think they give a fuck about these people? They'll kick their front fucking door in [boom boom boom boom] they don't fucking give a fuck. This is what – you know something? They'll meet their end one day like this. Bless you pastor. They're just sick fucks. Everyone gets in this world's got a, got a spot, you understand what I mean?

JR: Yeah.

GM: Listen – you had your knack making money, you know what I mean, but . . . yeah, it can be fucking arranged. I like the cement, cement mixer. Get hit by a cement truck.

42

JR: No, put them inside the cement mixer. The way they drive us in that van, right?

GM: You're making a joke out of it. This is serious.

JR: That bitch drove so fast, and we had no way – we were shackled – we had no way of, of stopping ourselves from, brace ourselves from falling. It was like we were in a cement mixer.

GM: I thought you were telling me you had a cement truck to fucking hit his car.

JR: I was at first, but then I was making a joke about spinning around in a cement mixer. "Help! Can we get out?"

GM: You're making a joke. I love you like that. You sadistic fuck, you. I can picture you fucking jumping like that – what is that, Reservoir Dogs?

JR: Yeah! Yeah umm – [sings] "Just when I thought that I was feeling all right, clowns to the right, left of me."

GM: People think you're fucking you're joking, you're fucking not, you know what I mean?

JR: [IA] I had a guy that died – my navy buddy. I, I uh, he came over my, uh, I told him to come over my house after this whole thing, and they told me he was cooperating. I told him "You're a piece of shit." He called me, called me, called me – I wouldn't answer the phone for weeks, I answer the phone. "What do you want?" He's like, bro, "I want to talk to you. What's going on?" I says "Come to my house." He comes over to my house, right? I have this Rambo knife, Rambo knife, and it's in a glass case. I said "Come here I want to show you something." Boom, I break the fucking thing. I pull the knife out, and I put it to his fucking throat, and I said "I'll cut your head off right now, asshole." He said, "What? What?" I said, "I'll cut your fucking head clean off." He says "This is going to fucking hurt, right?" I says "What's going – what are you doing?" He's like "I'm not going to say a word. I'm calling my attorney. I'm telling him I'm not cooperating." I'm like "Okay, [IA]." He had a cut on his neck. He called him up and said he ain't cooperating, so Lara Gatz called that attorney and said "Um, the only reason why your client's not cooperating is because Joe Romano is a bully." I'm not a bully –

GM: You didn't do nothing. I know what you're talking about.

JR: -- I'm gonna cut his head off. So I don't know how much of this stuff they know about me.

GM: They don't know . . . if they knew something they would do . . .

43

GA127

JR: My man Rusty, that's the guy Rusty, my man Rusty knew me in the Navy when I was young. And I was like this, and I beat the fuck out of mothafuckas. I mean, look at me. You see me all fucking cut up.

GM: No, no you're a serious guy. [IA].

JR: I got fucking stitches all over my face. Look at my fucking hands.

GM: In nine months you're gonna get out. [IA]

JR: Sixteen years. I said not one fucking word.

GM: Who – your brother-in-law that you said you wanted to get? We could get him about that [IA]. We want to get this guy in Buttner.

JR: I feel bad for my sister, that's why I was going to kill him too. I told my mother I was going to kill him and she was like "No, no – he didn't, he didn't cooperate then." But he's in Buttner.

GM: He cooperated?

JR: You know what he said? They approached him and they says "Did Joe Romano know what was going on?" And he's like "Yeah, he knew." You know I paid him, this is what I paid my brother in law, 5000 a week, right? He sat at a desk. I watched him on the cameras. He sat at a desk, read three newspapers a day. That was his work. Read three newspapers a day – let these, let these mothafuckas do what they want, right? Then when the shit goes down you blame me? You blame me? I'm in Florida!

GM: Why'd you change your mind to kill him?

JR: I haven't really seen him. I haven't – I've seen him one time in court…in, in two, in now.

GM: That's easy – I told you that's a lot cheaper to do down there.

JR: Yeah?

GM: Yeah, reach out – I'll even get the report sent back.

JR: Another, uh, another, uh, watchamacall – I want to get these guys. These, these fucking cooperators. That's why, that's why we have to try and stay in touch or something like that.

44

GA128

GM: If that's the guy I know, I'm gonna tell him what to do. Don't fuck me Joe, I swear. Don't fuck me. When Harold gives me a number, his partner, just gimme your word – just don't fuck me.

JR: I'm not going to fuck you. How am I going to fuck you? What are you talking about?

GM: Be straight with these guys all the time.

JR: Yeah.

GM: [IA] I'm going to tell them to talk to you like the way that they talk to me.

JR: Yeah.

GM: And that's it. Just be straight with these guys, you know what I mean? What you're going to fucking do.

JR: I got, I got a couple of weeks and one if this guy…

GM: You're going to be out a lot more than a couple of weeks and if you get the investigator you can keep postponing. "Oh, no I've got an investigator now, I want to investigate" because, listen, these people will also investigate this paperwork for you too. Yeah – you're paying them to do a legitimate investigation.

JR: I want them to investigate.

GM: And they'll do all the dirty work. They worked for the Department of Defense. What do you think they do with these guys from Iraq? Who come home – these guys are shit bags, they're fucking shish kebobs who will do anything. Plus we have our own street kids. Got someone everywhere, construction. We got people everywhere [IA]. The books you read is true. Ah, everything is alive and kicking today.

JR: Imagine. I think about, I think about –

GM: But you can't go around killing the whole world. You gotta think, you gotta think about how many people you want broke up.

JR: "Tom . . ."

GM: No, no, no, hold on.

JR: "Tom, I don't think about killing everybody – just my enemies." Like The Godfather.

GM: [IA]

45

JR:     "Tom, Tom – I don't think about killing everyone.  Just my enemies."

GM:     What the fuck I'm trying to tell you is [IA] fucking worst people.  Who's in jail?  The jail ones are easy to get.

JR:     The worst ones . . .

GM:     [IA]  This guy in Buttner.  Do you just want him broken up?  Or do you want him killed?  That's it.  Whatever you want – I'll help you.

JR:     Nah, I'm going to let him go.

GM:     You're gonna let, you're crazy – you change your mind from this week to next.

JR:     No not him, like. I'm going to let him go. He, he, he's, he's he's broken up. He's old.

GM:     All right.

JR:     He's old. He's fucking, he's in the fucking health unit over there.

GM:     The worst damage is I would say the prosecutor and the judge.  The worst damage.

JR:     The worst fucking damage dude.

GM:     Look at what the Judge did to you.

JR:     Not only them – these cooperating witnesses – there's four of them. There's four of 'em. This fuck that was in the – you fucking sitting there, sitting there like you're some sort of - I looked him dead in the eyes . . .

GM:     Do I know them?

JR:     . . . and then I told him –

GM:     It's not that kid, uh.

JR:     No. Not Jason Masca.

GM:     Yeah.

JR:     My brother Mike told me. I checked, I checked this Jason Masca. My brother Mike told me, he says, "Nah, Joe – Jay pretending he was crazy, that he wouldn't testify. They wouldn't use him." He pretended he was crazy.  He said Jay's a stand-up guy.

46

GA130

GM: I want to make sure I don't run into any of 'em. [IA]

JR: They're not. They're not in the jail. No one's in the jail. That's the only one that I got uh…uh…

GM: So the four guys cooperating your case – those are the four –

JR: Huh?

GM: Those are the four that did the most damage.

JR: Uh, guy named Tom Arnold. The guy that was here today.

GM: Tom Arnold, like the actor?

JR: Yeah!

GM: Without the bank account.

JR: And uh, and he used to have a bank account. A Mike DeBarry.

GM: Mike DeBarry

JR: Mike DeBarry was a fucking bubblegum gangster. He always pretended, always pretended, always pretended and he's got, he's got his – he brought his father and his uncle around. They were telling, they were telling me a long time ago "Oh yeah, we got a piece of Adventure Land" and this and that. Like, like – trying to move in on my business and stuff like that.

GM: To gobble you up.

JR: Yeah.

GM: It's called gobbling. That's what it's called.

JR: In the meanwhile, and then meanwhile, I chased them and, ah, and then –

GM: What's his last name?

JR: Huh?

GM: Wait, what's his last name? Ba-rah?

47

JR: Uh, DeBarry.

GM: DeBarry. Right, I can't forget that name.

JR: Yeah.

GM: [IA] ever dealing with these people [IA].

JR: He's a piece of shit.

GM: Cause some of our friends, dude, they come out here [IA] shit and all that type of shit. They're from Brooklyn – you know what I mean? So you don't want this guy coming here and going around guys like this, you know, these guys – see that's the only business he knows.

JR: Mike Debarry, Tom, Mike DeBarry. Tom Arnold. Anthony Lanza. Steve Candimirez. They're all gonna come to this system. They're all gonna come to this system. They're all gonna go to the rack place, wherever the rack is –

GM: 'Til we have their throats cut.

JR: Huh?

GM: [IA] Do you want, do you want their throat cut? You can't have them shot in jail.

JR: Huh?

GM: You can't have them shot in jail.

JR: No but we can have them busted up bad.

GM: You want them busted? All right. None of them are in now?

JR: You can have them stand up.

GM: Yeah I'll stand them up – if they fucking kill them they kill them.

JR: [IA] You can't see it when there's a little ….. I know I put them in fucking… [IA]

GM: You can't, once you….. you can't do that.

JR: I would like to fucking get these cooperating witnesses. I'd love to get them, right?

GM: If it's in the street, all right?

48

JR: These mothafuckers, man, destroyed my life.

GM: What we do is we get the investigator –

JR: You know [IA]. Will this investigator get me information on this judge?

GM: Of course.

JR: And what about Lara Gatz?

GM: Of course. That's what they're there for. We get their information from them and use it with what you want. You want them to be hit with a cement mixer? They'll be hit with a cement mixer. That's a perfect idea. It depends for anyone. If you want that done, that's it. We'll get information. Your left hand doesn't know what the right hand is doing.

JR: I want to get, I wanna get this investigator guy and get him to investigate a couple of people. I want to know everything about them and I want him to do some work on this case. He's got to come immediately.

GM: I'm going to tell Harold – alright, so pick the first thing you should. So you want him to investigate fucking Bianco and Gatz. And Arnold and, uh…

JR: No. I want to investigate, I want to investigate these coin people – these, uh, these coin people that are going to testify in the courtroom. The two thought they got wholesalers.

GM: [IA] he's gonna give that to one of his other guys, but the other type of work. . .

JR: Yeah I understand.

GM: But that's where his money's at. So you're gonna throw him a little bit of both. You understand what I mean?

JR: Yeah.

GM: So tell him to make a few dollars, he's got to put a few hours in on this judge. He's gonna put a few hours in on these coin people. He'll give it to one of …

JR: Yeah.

GM: Retired detective to do it . . . the coin people.

JR: Yeah.

49

GA133

GM: They don't know what they're investigating for anyway - they never tell them.

JR: Did you know when I had a private investigator investigating this guy Tom Arnold, do you know the dirt he came up with? When we were going to go to trial? All these people were dirty.

GM: They'll know everyone's habits, their addresses, what cars they drive, everything. Their family life. Their houses. Some houses. Their financial. [IA] That way you want them fucking done and that's it. You have everything you have a dossier. It's not a lot of money. You waste a lot of money, you can waste a few dollars on this. Always be straight, always be "how much is this going to cost me?" You understand what I mean?

JR: [IA].

GM: I don't care, you're a man - you do anything and you have to walk away. What do you think, I'm a Chili, Chili Ass?

JR: I'm afraid, I'm afraid something's going to come out of it, too.

GM: Let me give you something.

JR: I'm afraid something's gonna come out. Listen.

GM: Some of this? [Laughs].

JR: [IA] I'm telling you - I'm telling you for real. If I would have known you in the street ... oh my god. You could have made fucking millions with me. 'Cause, just, just my motherfuckers that, that fuck around with me ... just my motherfuckers that fuck around with me ... Oh!

GM: Good?

JR: Mmm.

GM: Don't worry about it. I'm going to see if I can get some candy from the lawyer. See what he gives me.

JR: Why? Does he bring shit?

GM: That's why I don't understand what kind of lawyers you had. I wonder if you can pay for sandwiches, this and that.

JR: [IA] you fat.

50

GM: Yeah he'll take a quarter of a million dollars from you but he won't bring you a ham sandwich, huh? That's a customary all wise guys and everything, old guys, all gangsters always eat when I come in here. 'Cause their lawyers bring them shit. I give them a fucking million dollars, can't get a candy bar? What am I, a jerk off?

JR: Can't get a fucking – can't bring me a cup of coffee. My lawyer brought me in this. He woulda brought me in what I wanted. But, uh, that was back then. That was 2 1/2 years ago. I was a little green then. Now I would say could you bring some shit [IA].

GM: I'll get you the phone.

JR: I could eat. Do you know . . .

GM: Don't ever talk, don't talk much on the jail phone. When I get you the other phone - that's the phone. To talk to the investigator in your cell – you can make your plan. Whatever you want to do. I don't need to know. [IA]

JR: Can you get this guy to come in on Monday?

GM: Probably by the end of the week.

JR: By the end of next week.

GM: Be realistic about it.

JR: Alright.

GM: I'm not gonna talk on the phone, I never mention your name. You need to give me your name., your number, your location. Write that all down for me. Also, what the fuck. I just lost my train of thought. The phone. Set it up for international calls.

JR: Set it up to what?

GM: It'll probably be a few hundred dollars a month, the phone.

JR: Yeah.

GM: Plus I'm going to see what it is to bring it in – whatever it is, you can start to put the money in my account, whatever. Do you want it set up for international so you can call . . .

JR: Nah, just local.

GA135

GM:     Local.  Long distance like Florida?

JR:     Florida? Just Florida and New York. That's all I call.

GM:     All right. That's it. And I'll just tell him to ..

JR:     That'll be great.

GM:     You want to pay for three months? Just pay for three months and then we'll dump it and get another one?

JR:     Three – make it two months.

GM:     Two months ... ok.

JR:     Like that.  This way we'll ... you know.

GM:     All right. And I gotta get the skinniest plug possible. If you ever got caught, god forbid, just flush the thing, right? Even if it's right in front of them. Don't scream on the phone at night. Try to use the computer and the texts. If you're talking at night, try to text at night and talk during the day. Leave your curtain open. You understand what I mean?

JR:     I do a lot of texting so.

GM:     You can text all day. And you talk in the house [IA]. Try to make up little codes. They'll, they'll call, they'll call you by your initials "J.R."

JR:     Are you getting, are you getting one to come in?  For you?

GM:     I'm going to get one - but I have to give you mine, for now. This is what I'm asking you.

JR:     I was gonna say why don't you get two, that way I can call you and go "Hey mothafucka!"

GM:     That's a good idea!

JR:     Yeah.

GM:     I gotta get it for different reasons, you know, cause I have to talk to a few guys that I don't want to know who I'm talking to.

JR:     Yeah.

52

GA136

GM:     And plus, you know - I don't have money like you.

JR:     Yeah. I get money coming in – that's what my big money is now. And then when I sell these, if I sell these three fucking properties man, and these guys don't get it. [IA]

GM:     Oh you know - I wanted to ask you a question. You were telling me before why don't you mortgage them. Mortgage them!  You told me before.

JR:     [IA]  My credit's no good no more

GM:     Listen - it doesn't matter.  Against the property - can't you mortgage them?

JR:     I can't deal, my credit is bad.  They destroyed me.

GM:     That's why you hate this fucking Bianco – he did this to you.

JR:     He destroyed me.  These fucking pieces of shit.  And they know I'm residulent (sic) – this is what bothers them about me.  You know what I did?  They told me "Don't get involved in telemarketing."  I went out, right?  Right?

GM:     Mmmm.

JR:     I went out on bail – I built, I built another company. In one year I made $1,300,000.

GM:     A million three.

JR:     A million three, my end!  In a year! From nothing.

GM:     [IA]

JR:     From nothing, from nothing. What about the money my man made?

GM:     David?

JR:     Yeah.  Yeah.

GM:     And he's treating you like this?

JR:     Wait a minute.  I made 1.3.  He made a good – he made about 4000 a week, right? Second year, second year, I get locked up. The business is still inhabited. The government says that it's my company and he's a straw man [IA] say no he's not! And I, I don't ever talk on the phone or nothing. I won't talk on the phone. Today – they get him to cooperate against me that I did this same thing again because they had no case on me.  So

53

this mother fucker was burying me and I was like "What the fuck!" I got all this 3500 material –

GM: Who is this guy?

JR: Dave.

GM: The guy is still working with you?

JR: Yeah! So six months go by, right? Finally he reaches out to my wife, and my wife says "What the fuck do you want? You buried my fucking husband. What do you want?" He fucking, this guy, I nursed him. He broke his leg in half when I first met him. I used to live next to him [IA] house, he used to wheel over in the morning. I'd say "C'mon bro, let's go." I'd cook him breakfast, everything. I'd bring him home lunch when I come back from wherever I'm fucking around, because I didn't work. I was retired since I'm 39. So, he was my friend. He was my next door neighbor. I nursed him to health because his fucking wife wouldn't do shit for him. I bring him in, and then he turns on me. And then he says – he says, he cooperates, and he says to my girls "You know Joe's finished, forget about him." My girls reached out to me because they're loyal, right. Chili Hiney and fucking coat hangers? So I go – he comes, he says to my wife "I want to go see Joe and everything. I'm sorry. I want to make good on everything." So I'm thinking I'm going to knock this motherfucker's teeth out when he comes in. He comes in on a visit and he starts crying. "Oh, I'm sorry bro, I'm sorry bro." I'm like "This is jail bro, you don't cry here." I says, "What do you want?" And he tells me "I want to make good. I'm sorry about this, they pinned me against the wall. I saved the business so that they didn't take that. That's your money coming in. I'm saving your head." Blah, blah, blah, blah. So he paid, he pays me a lot of money from the place. Of course, he's skimming, but I get a lot of money. Now . . .

GM: So, right now he's scared because you're shaking him down for whatever you're gonna get.

JR: Yeah, I just keep on, just keep . . .

GM: Keep shaking him loose . . .

JR: But . . .

GM: [IA] You shoulda been in my business.

JR: [IA] So I told him "You come and visit me." Cause I'm gonna tell him. Listen, I told you what I was going to tell him before. To call him tomorrow night, tonight, tonight or tomorrow, and I'm going to tell him, "Listen, if you're making me fight over my wife for $6,500 and you got the money I'm going to be upset."

54

GA138

GM: Bro, just watch the phone. Wait until you get your other phone. [IA]

JR: Nah, I only talk to him – I only talk to him on the phone. I talk to him all the time, all's we talk about is nonsense.

GM: But what I'm trying to tell you is you have a phone that's untraceable.

JR: I know.

GM: No one can know you're calling from here. First thing I fucked up – "You motherfucker, get my fucking money. Bah dah dah dah"

JR: Yeah.

GM: I gotta get you this phone.

JR: So, so, so anyway, this uh, so this guy, uh – so now he's on point, you know? And the meanwhile, I have all kinds of dirt on him. I investigated him while I'm here with his money. And then, now he'll pay, he's sitting there like I got a guy in the, in the, in the fucking kitchen. He's sitting there with a money order for $250. He's like "When do you want me to send it?" I was like "Just wait – I'll tell you when." He was like "Okay, I got the guy's number and everything," because I send people money 'cause I like to be on point with the money.

GM: Fancy money guy.

JR: He says, that's why I got, I always got brand new drawers – I get drawers every other week. I get socks. These are the things that I feel good about. I get fucking, I get, I get thermals, I get everything!

GM: They're hard to find in big sizes.

JR: I got, I got out a stack of magazines like this. I get [IA] Buttman.

GM: Can you bring me a couple, please?

JR: I'll bring you, I'll bring you, you, umm – one of the guys didn't return one of my Buttmans, and they ripped the cover off, them fucks. I'm going to bring you in one of my Buttmans, it's really good.

GM: Alright, yeah.

JR: Um, also and I get a lot of - I like old ladies. So I get 40 plus, 50 plus, 60 plus!

55

GM:   Ah, you pervert motherfucker!

JR:   Yeah, yeah! And I like, I like hairy, hairy pussy.

GM:   Hairy pussy you like? The blue hair beauties, eh? [Laughs]. You jerk.

JR:   Yeah! I told uh, I tell my wife, I'm like, I'm like, "What's going on. How's your pussy"? And she's like "Joe, it's summer, I trimmed it." I'm like, "Why? Don't fucking trim that fucking thing again - that thing's a fucking jungle cunt!"

GM:   So this fucking guy Dave - you don't want him smacked up, huh?

JR:   No, but listen. Dave is my money tree.

GM:   And you can't beat him up, yeah.

JR:   So I get all the money coming in from him. Anyway I was telling you the story. One point, see, I got lit from that fucking nursery spot. $1,300,000 in one year. Hey - cash! Cash! How they do that, how do they do that legally? The government didn't even know they did that. [IA] They had all their records, they said "Mr. Romano, Mr. Romano took $200,000 from this business in one year."

GM:   Who was that, Mrs. Gatz?

JR:   Yeah.

GM:   What's she look like?

JR:   Which I mean - I took 1.3. Looks like Mick Jagger with blonde hair. Um, one point three fucking million dollars liquid.

GM:   Great.

JR:   Look. In a fucking, fucking bag. In the meantime, we pissed through that with these attorneys. 350 on one, three and a quarter on another one plus all the bullshit in between. It's almost like a million bucks, like I said –

GM:   Wow.

JR:   So - $1,300,000. [IA]

GM:   You're not seeing that money.

GA140

JR: [IA] You see the shit I got.

GM: I know, but you gotta save it too.

JR: Listen, listen. If I get out and I'm back in it, I'm a multi-fucking millionaire, like that.

GM: Listen, if I get you a handcuff key in the thing, you gotta get out. You know.

JR: I can operate . . .

GM: You can operate from the [IA] on the phone.

JR: I can operate. Listen to me. As soon as I figure out everything, I can operate. All's I need is outta here. And if I had a cell phone in here I could make my life a little bit better. You understand?

GM: You got these fucking rats everywhere.

JR: And you know what – I'll tell you another thing. That's why there's a fucking couple of people there's not many - maybe one person, maybe one person, since I'm in the jail that I gave information to. [IA]. You gotta be hard core.

GM: Yeah. [IA]

UP: [UI] Lawyer. [UI]

JR: How are you?

UP: Good. How are you, Mr. Romano?

JR: Good, good. There's [IA].

UP: Well, at least you got it done and over with. It's better than waiting a whole day.

JR: Mm. Yeah, I don't [UI] the one o'clock routine, you know? I . . . [crosstalk]

GM: What time is it now, Miss?

UP: It is a little after one.

JR: Alright, good luck.

GM: Alright [UI] lawyer, talk. [UI] I'll be back.

57

UP: [UI]

SA: Special Agent Sean McMullen. Today's date is August 10, 2012.  Time now is 1:04 PM, and I'll be deactivating the recording device.

UNITED STATES v. JOSEPH ROMANO
12 CR 691 (JFK)

DATE:              August 21, 2012

TIME:              8:27 A.M.

TRACK:             8.21.12 UC1-JR meet__001 – 004

PARTICIPANTS:      Undercover 1:          UC1

                   Joseph Romano:         JR

                   Unknown Persons:       UP

ABBREVIATIONS:

                   [IA]        INAUDIBLE

                   [PH]        PHONETIC

                   [UI]        UNINTELLIGIBLE

GOVERNMENT
EXHIBIT
202T
12 CR 691 (JFK)

1

UC1: This is Detective Robert Strecker [UI] uh, August 21st. Going into Nassau County Correctional Facility.

* * *

[15:05]

UC1: Joey?

JR: Yeah.

UC1: I'm Bobby Russo, how are you?

JR: Hey! How are ya?

UC1: What's going on?

JR: I was saying: "who's this guy, he looks like me."

UC1: [Laughs].

JR: You look like my – you look like my, my brother.

UC1: Get outta here.

JR: Yeah – how ya doing?

UC1: I'm better looking, right. [Laughs].

JR: Yeah – actually his hair is like really coming out.

UC1: Oh yeah? Hey, ah – Harold sent me here to speak to you.

JR: Okay.

UC1: Do you understand - do you know what I'm talking about?

JR: Yeah.

UC1: Okay. So, what's going on? How are you holding up in here anyway? This fucking sucks, huh?

JR: Huh?

UC1: It sucks in here, right?

JR: It's terrible. It's terrible.

2

GA144

UC1: You holding up okay?

JR: I'm all right. Two and a half years in here, you know?

UC1: Oh, you've been in here that long?

JR: Yeah.

UC1: Jesus Christ.

JR: Thirty months.

UC1: So what ya looking at now?

JR: They, uh, they sentenced me to fifteen years, and y'know –

UC1: Can you appeal that shit or what?

JR: I gotta try something. I gotta try something. I have a hearing. I'm representing myself. I fired –

UC1: No lawyer?

JR: No. I had to fire the attorneys.

UC1: What the fuck?

JR: They don't do anything. They don't do anything.

UC1: They fucking probably charge you an arm and a leg too. Fucking unbelievable, right?

JR: Yeah. It's horrible. I was uh –

UC1: So they fucking sold you down the river?

JR: Huh?

UC1: They sold you down the river?

JR: Destroyed me. Destroyed me.

UC1: Unbelievable. Unbelievable.

3

JR:     All's they did is come here to ask what assets I have, what I own and to hand them over to – to hand them over. And I keep getting this, these amended forfeitures.

UC1:    That's beyond – that shit's beyond me. But they're fucking just taking everything you got, huh?

JR:     They, they destroyed me. They destroyed me. I got three kids –

UC1:    Oh, man, no way.

JR:     -- I got three kids, a wife. And I got a judge that sits there with a fucking, with like a, he sits there with a smirk on his face. [16:45]

UC1:    So he's fucking you.

JR:     Yeah.

UC1:    Unbelievable.

JR:     I hope he has that casual indifference when, when he's put to the test, you know?

UC1:    Yeah, no, I understand what you're saying. How old are your -- you got kids, you said?

JR:     Yeah. They're not doing good, not doing well.

UC1:    How old?

JR:     Nine, twelve, thirteen.

UC1:    Oh man, do you bring them in here? I mean I know it's a tough choice.

JR:     They come in. Yeah, they come in.

UC1:    Yeah – that's tough.

JR:     But uh –

UC1:    It's gotta be tough. So, uh, so Harold said you might have some work for me. So this is my office.

JR:     Huh?

UC1:    This is my office. So Harold said you might have some work for me?

GA146

JR: Yeah he did, ah, I spoke to a guy in here and he said that you, uh, that you do uh, investigating work.

UC1: Well, I kinda do. I have guys who do investigative stuff, but I do other stuff. You know what I mean?

JR: Yeah.

UC1: Okay. So that's really why I'm here. I don't – anybody can do that shit, you know what I'm saying? I'm not here for that.

JR: Yeah.

UC1: I'm here for, uh, something else.

JR: I have, uh, I have a couple of things that I need done.

UC1: Okay.

JR: I have a couple –

UC1: That's what I'm here for. The other shit's nonsense. I'm here for that.

JR: Okay. Um, the problem is, is – how do I go about it.

UC1: The way we do it is you tell me who you want to take care of. I don't know if you want them taken out and killed, or if you want them fucking smacked around good.

JR: Yeah.

UC1: You gotta let me know what you want, and you gotta let me know who. You know? I gotta know who. And also we got to discuss a payment schedule, you know what I'm saying?

JR: Ah, what kind of money do you need?

UC1: I gotta know what's up and everything. I gotta know who it is. If it's some fucking loser, you know, it won't be a big deal. I mean – you gotta talk to me.

JR: Okay, here's what I got. I got a lot of people that are no good.

UC1: I hear ya, no I know.

JR: A lot.

5

GA147

UC1: Believe me, I know – this is what I do, I mean I know what you're talking about.

JR: Losers, losers. And, and they're lay-down guys.

UC1: Right.

JR: Guys that will just lay down – they're not going to fight back.

UC1: Right. I got you.

JR: [IA].

UC1: Right.

JR: I have one, to start –

UC1: Okay.

JR: – stole two cars from me.

UC1: Stole from you personally?

JR: Yes.

UC1: Okay. I don't think that – I did some homework because this is what I do. Do you know what I'm saying?

JR: Yeah.

UC1: Like – I'm a professional guy.

JR: I just get worried.

UC1: I understand and I mean, I'm at risk too so, okay. You got two guys who stole cars from you –

JR: Did 'what's his name', did, did my man –

UC1: I gotta be honest with you. Harold vouched for you. I work with Harold.

JR: Right.

UC1: But we don't – he just said: "Meet this guy. Talk to him. Get kind of an idea what he might want done." And that's it. So I don't know anything else and I really don't want to know too much. I mean I want to know who you want, and what you want, and how much money we're going to decide to do. And that's all

6

GA148

I want to know. You know what I'm saying?

JR: How do I –

UC1: The less people who know about this shit, the better.

JR: Yeah, I know.

UC1: Because you don't want these motherfuckers, these fuckers in here knowing that. You don't know the guy. Your best friend in here ain't your best friend, you know what I'm saying. He may be your best friend today – but if something fucked up happens where he gets fucking jammed up in here, he ain't your best friend no more. He'll fucking dime you out. So I want to keep it me and you.

[20:10]

JR: I got, um, [IA]. Nick Pitas.

UC1: You have to at least let me know – I want his name and like what – so he stole two cars from you?

JR: Yeah.

UC1: So –

JR: Nick.

UC1: Nick? Nick what? I gotta know.

JR: Pitas. P-I-T-A-S.

UC1: P-I-T-N-S?

JR: A-S.

UC1: Pintas? Pint-ass! [Laughs]. P-I-N-T-A-S.

JR: No not Pint-ass. C'mon. Pitas. P-I-T-A-S.

UC1: P-I-T-A-S. Okay. Okay, no problem, I got it.

JR: Yeah – fucking guy.

UC1: Does the fucking guy live like in, um, here or do I have to go travel?

7

JR: Here.

UC1: Oh, piece of cake. Okay, so what'd he just fucking rip you off? What'd he do?

JR: He uh –

UC1: Were they, were they nice rides?

JR: He was doing work on my cars, right?

UC1: Okay.

JR: He was working for years on one of my cars. Got a '67 Fastback.

UC1: Nice car.

JR: And I got a –

UC1: Was it like all redone and shit?

JR: The '68 was in the middle of work. I, uh, I owed him money on that but I kept paying him, and we were doing work and doing work. And he did work on my '68 Camaro –

UC1: Right.

JR: -- and then he didn't finish the work one day, and I said "Look. We still got more work to do. When I fly back to Florida, can you do the work?"

UC1: Okay.

JR: He says, he says "All right."

UC1: Okay.

JR: I get arrested. He shows up at my house with a flatbed and takes the car to his shop. Next to the back of my house, brings it to his shop. My wife says "Hey, your brother called. He says that, uh, Nick picked up the car." He says, uh, he says, "Well," he says "Well, what did, um" – my brother's a big Yankee fan too.

UC1: Is he a lawyer?

JR: Huh?

UC1: Is he a fucking lawyer or something?

8

JR: Um, so he picks up, ah –

UC1: She wants your wallet she said.

JR: Huh?

UC1: She wants your wallet, she just said. [Laughs].

JR: Yeah. This is what they do. This is what they want. So, she uh, this guy, uh, this guy goes and, ah, picks up the car. My brother tells me he seen this. He took the car. I figure all right, he's gonna do work on it. I had my wife call him, and he says "Oh no, those are my cars." What do you mean those are your cars? "Those are my cars," he says, "I'm keeping them. I put a mechanic's lien on them. You owe me money, and I want my money right now." I send my partner over there, and he wants like $70,000. He says "Why do I want to give you a Camaro that I can get $30,000 for?" I said "Because it's mine – you stole it. I owe you $2,000 on the car and you didn't even finish the work I paid you to do."

UC1: Fucking joke.

JR: Piece of shit. Piece of shit.

UC1: All right. So what do you – smack him up? Beat him up? Smack him up?

JR: Beat him.

UC1: That's it though?

JR: [IA].

UC1: Bad?

JR: [IA] bad.

UC1: Okay, okay.

JR: I hate the fucking guy.

UC1: Okay. Do you know –

JR: It's the only way I can touch him. I can, I can write a lawsuit. What am I going to do? I'm gonna write a lawsuit and have my people handle all, have all these fucking attorneys steal my money again?

UC1: I, I agree with you. Sometimes –

9

GA151

JR:     I got fifteen [IA].

UC1:    Okay. So anyway. So things are good in here? Things are cool? I mean –

JR:     Terrible. [Laughs].

UC1:    [Laughs]. I mean, you know at least you got AC in here because Rikers is fucking – Rikers is like 110 degrees in that place when it's, you know, the sun's out.

JR:     You know, my dorm don't have air conditioning.

UC1:    Ah, so it's nice in here.

JR:     Yes.

UC1:    So this is a break.

JR:     This is beautiful. I was like "Who the fuck is visiting me so early?"

UC1:    Yeah, yeah, well, I, I –

JR:     You looked like my brother. I looked from over there and I said "Why's my brother look pissed off?"

UC1:    [Laughs]. Oh I look angry now, is that it?

JR:     You were like this. I was like "Why's my brother look pissed off?"

UC1:    Who likes coming to these places, you know what I'm saying? Either, you know –

JR:     Torturous, right?

UC1:    Yeah, that's the whole thing, you know what I mean? I only like being on this side. You know what I mean? But, ah –

JR:     Yeah, but I'm all right here. I mean, these guys, ah, these guys are all a bunch of pussies. You know.

UC1:    Yeah.

JR:     All mouth. All mouth. That's all they are, you know.

UC1:    Yeah, so you know how it is, so you seem like a guy who's been around the block so, that's cool.

10

GA152

JR: Yeah. You know, it's, it's – I'm almost 50.

UC1: You don't need these -- you don't need these games.

JR: No. I sit there, and I listen to these kids sometimes, and I'm just like "C'mon, you're not a tough guy, right?" Tough guy. I mean, c'mon, are you kidding me?

UC1: Yeah. You just try to get through it.

JR: This is what I got. I got [IA]. That they really do.

UC1: Right, right. Well, that's kind of what I thought. I thought there was a more serious thing but –

JR: There is one.

UC1: Okay.

JR: There is one.

UC1 So we're going to build a little relationship.

JR: Yeah.

UC1: That's cool – I'm down with that. I want to make some fucking money.

JR: Immediately. Immediately. Now the way, the way I – you tell me how we're going to do this is, uh – how are you going to get paid?

UC1: Well how – who can you get outside to give the money? Outside.

JR: I have, I have people. I have people.

UC1: Um, so your wife comes in and visits you and shit.

JR: Mm-hmm.

UC1: So your wife comes in – she's cool? She comes in to visit you?

JR: She's not cool, and I don't involve her in anything.

UC1: No, no, I mean come in and visit you. This guy's just looking at us.

JR: Oh. You know, they're all a bunch of fucking scumbags.

11

GA153

UC1:    Yeah – yeah, I can imagine. [IA] They treating you [noise] They're decent? I'm assuming you seem like a decent guy so is everyone treating you decent?

JR:     Yeah. Yup. I am a decent guy, it's that, you know, I went my whole life – this is what I did. I went to work. Right? I'm a pilot. I fly planes.

UC1:    Cool.

JR:     Helicopters.

UC1:    Nice.

JR:     Served in the military.

UC1:    Okay, cool.

JR:     No it ain't. I'm a no bullshit guy.

UC1:    Right, I can see that.

JR:     So I bust it up a little bit.

UC1:    Yeah – you got some.

JR:     I don't, I don't – I don't go out of my way but –

UC1:    Right, you stand up for yourself.

JR:     Yeah.

UC1:    I got you.

JR:     So then this fucking shit – I'm like – and now I'm like – and I realized my brothers are a bunch of pussies. My wife's incapable of doing it. My brothers are all big fucking guys, you know? They're a bunch of fucking pussies.

UC1:    [Laughs].

JR:     So now I got to stand up for myself, so I'm in the courtroom and I'm fighting with the fucking judge. They're all afraid, they're all afraid to, to challenge the judge. Fuck you! Who are you to me?

UC1:    Right.

JR:     I fly an airplane upside down, pal – I don't fucking – I'm not scared of you. So he says things and I say, I tell him "No." I says "Absolutely not. That's wrong,

you're out of line." "Well this is my court room." I said "I know it's your courtroom. It's your game." I says "The whole thing is rigged, and that's all there is to it." But you have to fight.

UC1: Yeah.

JR: So people tell me "Why don't you try and find a lawyer? Why don't you try and find a lawyer that's, ah —"

UC1: Well, you said they fucking ripped you off.

JR: They fucking rip you off. A million dollars. A million dollars. You know, um, one of them — one of them is a real piece of shit. Do you know Charles Carnesi?

UC1: No, I don't know that name.

JR: Represented Junior Gotti.

UC1: No.

JR: The guy that got Junior Gotti off.

UC1: Oh.

JR: Fucking came here, pretended that he was going to do everything, took fucking 250 thousand, did fucking nothing. Sold me out.

UC1: Well we'll —

JR: Can't cross-examine a fucking rat?

UC1: But we'll take care, we'll take care of business, there's no bullshit. You know what I'm saying? If we work something out.

JR: I like you. Go. Bingo. Done.

UC1: Okay.

JR: And my people will pay you.

UC1: Okay.

JR: Listen — my word is —

[End of #1]

13

GA155

JR: I don't expect anyone to take my word. You say when, and my people will show up.

UC1: Okay – well how – do you, can you give me like a phone – do you want me to call somebody? Do you want to call? I don't know how this place works. I know some places you gotta have a list of people you can call. I ain't on your list. Some places are like that, you know what I mean? I've been around, you know.

JR: Um, no – there's no list that I can call. You can call anybody. So do you have a number?

UC1: Do you want me to –

JR: Do you want me to call you?

UC1: Well do you want me to call someone? Like – do you want to call somebody and then have me call?

JR: I'd rather not. I don't want to involve them to a degree of knowing, of knowing anything. I want –

UC1: Well how are they going to get you the money?

JR: This is how they work. "Go to this guy, and give him this."

UC1: Okay.

JR: Period, the end. My people will not ask me questions. They know this is my money and just go and fucking do what I want you to do. And I can send – and you know what? I got some loyal girls.

UC1: Okay.

JR: I trust them more than guys, you know? Guys I have a little bit of a problem with, you know, so I can, you know –

UC1: Okay. All right, because, you know, we can do this. We can work this out and my guys are cool. We're all good. Um –

JR: [IA]

UC1: Your brothers? Right.

JR: [IA].

14

GA156

UC1: Right. Are they in here with you?

JR: No. I'm the only one.

UC1: They didn't get arrested or nothing? I mean, I don't know what happened.

JR: Everybody's on bail.

UC1: Okay. Except you?

JR: They gave me bail. They gave everyone a million dollars bail. I put up my end of the money and then about fourteen months later they said I broke my bail conditions. They said that I, uh – well, I did break my bail conditions. They told me to go and, uh – they told me to not get involved in the business that I was in, and I consulted for a company. Fuck you – I have to earn.

UC1: Right.

JR: What am I supposed to do? Watch everything crumble?

UC1: You got three kids and a wife, what are you gonna do.

JR: I mean I'm not starving but, you know, I'm not gonna, I'm not gonna watch everything crumble. I had to go to work.

UC1: You gotta bring home the bacon, brother. Um, so, um, all right, so this guy Nick, Nick

JR: Right.

UC1: I need, I don't know, three grand, fuck him up? You good with that?

JR: Easy.

UC1: You give me three grand –

JR: Yeah.

UC1: -- and me and my guys will fucking, we'll do this thing, and we'll fuck him up.

JR: You understand – you do this thing, I'll give you the money.

UC1: All right, so how do you want to work it? I mean I'm down with it. You got a deal.

15

JR: Yeah, as a matter of fact, for three grand I might as well, ah – let's do, let's do the first one, fuck him up. Let's do the first one. And remember, he didn't send me to jail.

UC1: Right. Okay. [IA].

JR: I have a hearing I'm told on September, on September 13th, so I'm here for a month.

UC1: Oh, I'm going to take care of this right away. I want the money. Like yourself, I want to fucking, you know. I mean I'm ready to fucking go.

JR: You wanna write this down. You wanna write down –

UC1: You can't bring nothing in here.

JR: Yeah, they give me a pen and paper.

UC1: Ah shit, really? They let you fuckin'? Nice. Huh? Okay.

JR: Yeah. You go get this done, and I'll have them deliver. I'll have them, so let me –

UC1: I mean, are you opposed –

JR: - and then I pay you.

UC1: - are you opposed – I mean I'm a no bullshit guy. I'm a fucking straight up guy. Whoever you know in here hooked, hooked this up. I don't know who you know in here, but he knows my guy Harold, and I mean if Harold came to me, it's got to be somebody he's fucking tight with, because out here, he knows I'm – he ain't calling me for nonsense. I mean he ain't sending me in here for nonsense. Um.

JR: Tell me where you have [IA].

UC1: Um, could you give me like – could you give me a thousand up front just to get my guys happy and shit? I'll take care of business. I'll come talk to you, and you give me the other two thousand bucks?

JR: Yeah.

UC1: Because we gotta, we're going to develop a relationship. If you got more work for me, I'll do this same – I'll do it for the three, if you're going to give me something else.

JR: I'm going to have, uh, someone –

16

UC1: You gonna have – I mean, I'm doing this as a discount. You know what I mean?

JR: Someone will call you from a private number. Now where are you – umm, where are you, uh – good places to meet? Are you in Nassau or are you a Brooklyn guy?

UC1: I'll go anywhere. I mean like not – I'll go anywhere, like western Suffolk, Nassau county. Brooklyn's cool. Bronx is all right. Staten Island's good too.

JR: Someone called you on a – someone called you and said "Listen, I need to, ah – listen, I'm ah, I'm Joe's friend." Would you meet them like that?

UC1: Yeah. I mean I might be involved with something else. You know I might be in Jersey doing something. I mean like, you know, I could be – but yeah, I mean we can make it happen.

JR: Well you could tell the person "Uh, listen, could we do it tonight?"

UC1: Within a few hours. As long as I'm not tied up or something.

JR: Because you know what they –

UC1: As long as I'm not at Yankee Stadium getting bombed out, you know what I mean, [laughs] liquored up.

JR: And, and, and then like I said, I'm going to have, I have a whole bunch more.

UC1: Okay.

JR: Start the relationship then I have a whole bunch more.

UC1: Yeah. Because, I mean, I'm giving you a – I'll do the right thing, but I'm hoping – I'm doing this so we can build a rapport, and we can establish some shit.

JR: I have, I have two or three people more [IA].

UC1: Okay.

JR: You understand?

UC1: Sure – more money. That's the way I look at it. All right.

JR: There's some guys that I got that, ah – I'm going to just wait for this guy to come over here and then I'll give him the, uh –

17

GA159

UC1: He's cool?

JR: Yeah, they're all all right. You know? But I don't trust nobody. You know what I mean? But I mean he'll give me a pen and a piece of paper.

UC1: Yeah. I don't know what the rules are in this fucking place. You know, everyplace is different. I got to be straight with you.

JR: Yeah. This is the first guy that, ah –

UC1: Okay. Now, did you get the fucking cars back or he's got 'em?

JR: No, he's got 'em. You know how they fucking, they fucking screw you – so many people. You come in here and you think, you know. The people in here know my story.

UC1: Mm-hmm.

JR: And that I'm a wealthy guy, or at least I was.

UC1: I was just going to say I should charge you more. [Laughs].

JR: [Laughs]. There you have it. Yeah. Listen, there's, there's plenty of work.

UC1: Okay.

JR: There's plenty of work. This is – if I would have did this beforehand – if I would have did this beforehand, I'd be all right. But [IA], supposed friends that steal from me.

UC1: Okay.

JR: And then, there are certain situations that we can make real nice for you.

UC1: Okay.

JR: We can take a ride down to Florida.

UC1: I'll give you that.

JR: Right? Take a ride down to Florida, right? Nice.

UC1: Yeah – a little vacation is always good.

JR: Enjoy yourself a little bit.

GA160

UC1: I like it.

JR: And then you go and do, you know, something there.

UC1: Some work, okay.

JR: I got enemies everywhere.

UC1: Okay. That sounds good to me.

JR: Enemies everywhere.

UC1: Okay, that's cool. Yeah.

JR: So, um, what about the, uh, the other guy who's going to come in to do some investigating work too.

UC1: I, you know what – he just called me. We keep it short. We keep it, you know – and that's it. He's like "Come meet this guy. He's got something up your alley." You're going to have to speak to whoever you know in here. I don't – we talk, we're done. I mean, like I said, we keep it short, we keep it tight. You don't talk about no shit in here, and I don't talk about no shit out there. And we're done, you know what I'm saying? Then we, then we keep going. When you're a happy man – well, as happy as you can be – me taking care of some business you can't, and I'll take care of it for you, and you take care of me and we're done. And we got a good relationship. But we don't talk to nobody. You know what I mean? And don't talk. This guy in here – I'm, I'm glad he connected us, you know what I'm saying? But –

JR: I can't believe he con – I was sitting here thinking, I was sitting here thinking "Man, what the fuck happened?" I swear to God, and then it was like the whole week went by yesterday, and then yesterday, nothing –

UC1: Things take time.

JR: -- and today they're like "You got a visit," and I was like "Oh, this is strange." I always have a sense when it's, when it's different.

UC1: Also, you know, for me it's a little "I don't know you." I'm getting a call from a guy who I totally trust, and you know, I've done some type of business, so I'm a little – you know. Until I met ya, I don't know, I was a little nervous. What's up with this – I don't really know, but you know, I think this could be good for the both of us. We could be cool. And um –

19

GA161

JR:     Now what do you want to do when we go – okay. When we go – when I go to the feds? They gonna – they'll let you in or no?

UC1:    I, you know, I don't – I think that –

JR:     I gotta talk to them first.

UC1:    I think you might have to put me on the list.

JR:     Right, I know I have to put you on the list but I mean, you'll be able to get in?

UC1:    I'm gonna see. Yeah – I, I shouldn't have a problem.

JR:     Yeah, because they usually have a problem if you, if you're on parole or –

UC1:    Nah, no. If I have something in my past that'll be okay?

JR:     Yeah, they're not worried.

UC1:    All right, so um – I'm going to see what happens, because this is easy. This is right out here? I mean, you know, until we go out east.

JR:     It's twenty minutes away.

UC1:    Piece of cake.

JR:     Twenty minutes.

UC1:    You know where the fucker lives?

JR:     Huh?

UC1:    You know where the fucking guy lives?

JR:     I don't know where he lives. I know where his –

UC1:    Okay, piece of cake.

JR:     I'm giving you his work address. His business address.

UC1:    No problem. I mean it helps, but I –

JR:     Just the only problem with the place is it's a wide open place, it's all wide open and everything. You know when you go to do something –

20

GA162

UC1: Does he have cameras around?

JR: No. No. I mean the thing is, when you go to do something – it always looks worse than what it really is. I mean, if you were going there and getting a soda, it doesn't look so bad, you know?

UC1: I'm not scared – it's what I do. I'll figure the whole thing out, you know what I'm saying.

JR: [IA].

UC1: [Laughs]. I don't know, man.

JR: Terrible, two and a half years.

UC1: Well, do they have them conjugal visits?

JR: No, the Feds.

UC1: The Feds don't? Are you kidding me?

JR: Listen. If you make this thing work –

UC1: Yeah?

JR: I'm telling ya – I have a lot.

UC1: Yeah?

JR: Like, for real. You have to realize how many months I've sat back here.

UC1: Okay.

JR: And you know what – my feelings are [IA] so bad because right now, smacking people around, throw a little red meat on it. That's it. Nobody's interested in him anymore.

UC1: Nah, he'll probably just fuckin' –

JR: Some scumbag got me [IA]. He's a scumbag. Who cares? Cops don't care. Nobody cares. The only one whose going to care is his wife's gonna be happy.

UC1: And you're gonna be happy.

JR: Me? I'm gonna be extremely happy!

21

UC1: All right. These guys, they must either like you or not like you –

JR: Huh?

UC1: They must either like you or not like you – they didn't come down this fucking aisle the whole time.

JR: They gave us a good seat too. This is, this is quiet.

UC1: I gotta tell you – you know I've been in the city and shit, and it's a lot more fucking nonsense. You know what I'm saying? Going through all the shit.

JR: Yeah.

UC1: It's a hassle.

JR: Well this is – my sister's, uh, my sister came to visit me and, uh, she goes in the trailer. And she, uh, sits there for two fucking hours. She's watching what's going on, she's watching, you know? [IA]. They make you wait and wait, no air conditioning, there's pregnant woman in there and stuff. So they like to take the attitude that everyone's an animal that's not them.

UC1: Yeah.

JR: She, ah, she gets in over here, and they say "Uh, your brother's past his visits." You know? You can't –

UC1: Ah, screwed her.

JR: They sent her home.

UC1: Really?

JR: My sister, my sister writes a letter and she finds all these places so I tell her what to do. I mean she's got a PhD, my sister.

UC1: Smart girl.

JR: So, she puts her, her title on there. People start – you know, they start jumping.

UC1: Yeah, yeah.

JR: So she sends me all this stuff, you know, and I'm an educated guy so I, I do a lot of writing and stuff and I said [IA] they have meetings, you know, to try, uh, a

22

GA164

program to try to get your sentence down or something.

UC1: Anything, right?

JR: So I'm in charge of it and they said uh – I said to my, my – I told my buddy, "Let's start a riot." So I started talking to them, explaining things and going on and on. I see these guys yelling, and they're like "Yeah, yeah."

UC1: So you get them fired up.

JR: And he's like "All right, stop."

UC1: You get them fired up.

JR: Yeah, I get them riled, and he says "You're going to start a fucking revolt."

UC1: They'll be wilding in the jail, bro.

JR: [Laughs].

UC1: Yeah, yeah.

JR: That's funny, right?

UC1: It's pretty interesting.

JR: So, yeah, this is, this is what I got. This is what's going on.

UC1: All right, so we'll, you know, we'll do this, we'll – like I said, a little bit up front, like we talked about. A little bit up front, like we talked about.

JR: Yeah.

UC1: And then, um, you know, I'll go take care of it. You call the person and hook it up, then I'll come see ya, and we'll talk again.

JR: How do you want me to know when it's done? You want me to –

UC1: Well, you're going to know. I mean, how are we going to organize it. You're going to take my number, right? You don't want me calling nobody. So you're gonna call – you're going to take my number.

JR: Yeah, so I'd have him call you.

UC1: Right.

23

JR: But you give me your number, right?

UC1: Is somebody else going to call me, or are you going to call me?

JR: No, I'll call you for right now, I can stay in touch with you.

UC1: Right.

JR: I'll put it in someone else's, someone else's account, right?

UC1: Yeah.

JR: And you take it, and you keep it.

UC1: So you'll, you'll have –

JR: All the phone calls are taped, so keep it real light.

UC1: So you're just going to say "My friend is going to meet you"?

JR: Yeah.

UC1: And you're going to have them call me?

JR: Then I'll have them call you directly.

UC1: Okay, so –

JR: When this guy comes over here and gives me a pen, I'm going to write the phone number on my arm. I'm going to give you the address.

UC1: Okay, okay, okay, that's cool.

JR: [IA].

UC1: It's easy – easy.

JR: The only, the only problem is some people I don't know where they live.

UC1: All right, piece of cake. That's what I do, man.

JR: Amityville, got somebody in Amityville.

UC1: Really?

24

JR: I know where they live, I mean where they work.

UC1: Good part of Amityville or bad part of Amityville?

JR: Huh?

UC1: Good part of Amityville or bad part of Amityville?

JR: I dunno, why – is there a good part?

UC1: Yeah, by the water there.

JR: Yeah, by the water, you come up to Merrick Road. No, bad part, but right in the middle of town.

UC1: Gotcha. Okay. That's cool. That's a piece of cake.

JR: I'm telling ya', it is so easy. We're talking about lay downs – like guys that like try and take advantage of me – are you fucking kidding me? Like a pussy like you would fucking try some shit?

UC1: I hear you, man. Fuck it.

JR: You're locked up like me, you can't do anything.

UC1: We'll take care of business one way or another, all right? We'll do it.

JR: Can't do anything in this fucking place, you know, except, you know.

UC1: Hang out.

JR: What works –

UC1: Okay, all right. So you're going to call me, you're gonna tell me we're cool and then tell me before to be expecting a phone call. We're going to do this right away, right? I wanna get this done.

JR: We're gonna do it – I'm gonna try and see if I could, you know, give you the money today or tomorrow.

UC1: Okay, cool, that's good. I'd love to wrap it up by the weekend.

JR: Wrap it up this week would be incredible –

UC1: Okay

JR:    -- incredible.

UC1:   All right – um, sounds good.

JR:    It'd be incredible, you know, if that can happen.

UC1:   No, it's done.

JR:    I'll call, I'll call, I'll call them, I'll give them your number, they'll call you –

UC1:   Now do you trust them?  You trust them, right?

JR:    Yeah.

UC1:   No problem.  They're not gonna even know.

JR:    Well – they won't know.

UC1:   You just say "This guy's the guy, I owe him some money and"

JR:    I'm just telling them, the most, that "I owe this guy – I owe this guy a thousand bucks" [IA] just call him on his phone –

UC1:   Okay.

JR:    -- and meet him somewhere.

UC1:   Okay.

JR:    He'll just meet you somewhere that's convenient for both.  That's why I asked where you were at, you know?

UC1:   All right.  All right.

JR:    So all right – in the diner – "Hey, I'm so and so.  Here you go.  Thanks."

UC1:   All right.

JR:    I do that with other business I run sometimes too, so.

UC1:   No, I hear you.

JR:    They don't know anything.

UC1:   Whatever works.

GA168

JR:     Nobody knows anything.

UC1:    Whatever works is cool.

JR:     I like that.

UC1:    Whatever works is good.

JR:     Maybe I have one of my brothers swing by, you know.

UC1:    Okay, that's cool.

JR:     And like I said if we - if this develops –

UC1:    Okay.

JR:     [IA] have other beatings and stuff like that. Understand, they're fucking dirty –

UC1:    Yeah.

JR:     I'm sure you don't know the story but -

UC1:    No. You're in here, but are they, they gonna get in trouble too? Are they?

JR:     The, uh, cooperators – this is funny, I had a court date the other day. And, ah, I go in there, and they got one of the cooperators sitting at my desk. I told the judge, I says "Why is one of the cooperators and his cooperating attorney sitting at my table?" I say "I don't understand that." He says, "Well, we're having a restitution hearing. This is a public hearing and anybody can come." I says "Let them sit in the studio audience." I say "Why are they sitting at my table privy to information?" He says "Well, we're not going to have double and triple restitutions." I says "Why, where – I want it on the record that these attorneys, none of these attorneys are to share any information with those people, because they'll bring it right over to, to the, ah, to the prosecution so they can cooperate to get more time off, and you would give them a break on their time."

UC1:    Yeah.

JR:     "Well, we're not gonna have – like I said, we're not gonna have a d-" I said "I know, I know, we're never gonna do nothing," I says, "but I don't want any information shared with them."

UC1:    Unbelievable.

JR:     Fucked up.

27

GA169

UC1: Yeah, it's [IA]

JR: Let me get a pen.

UC1: It's fucking filled up since we've been in here.

JR: This is – huh?

UC1: It's filled up since we've been in here. We were the like only guys in here.

JR: This is getting really full. I'm so glad you came.

UC1: No man, it's good.

JR: All right.

UC1: It's the end of summer. It's time to get back in work mode. You know what I mean? Winding down.

JR: What'd you do? You do anything good this summer?

UC1: Not a lot, you know. Just hung out. A little work. A little of this, a little of that. Drinking, you know. Fire Island, that shit. It's all good. It always goes fast. You know, the older you get, the faster things go. It's like "Whoa, look at how fast time goes."

JR: Yeah. I had such a fucking great life.

UC1: Yeah.

JR: Basically, basically alone to a certain degree.

UC1: Right.

JR: Go – wherever I'm, you know, wherever I'm going, I used to – you know, I had apartments in Manhattan –

UC1: Nice.

JR: Houses on Long Island –

UC1: Nice.

JR: Houses in Florida. So I lived in Florida most of the time.

UC1: Nice.

28

JR: I fly in here. Get away from my wife and kids for a couple of days. I'm not gonna stay here in Long Island.

UC1: No, I hear you.

JR: I'm gonna stay in fucking Manhattan, beautiful. Go out and drink. Sit on top of the fucking buildings. I was a hundred pounds lighter then. I was only, I was 240.

UC1: Right, right, right.

JR: I'm like 330 now.

UC1: Yeah, well.

JR: I was in good shape. Now, my fucking hair's falling out.

UC1: It's tough.

JR: It is tough.

UC1: [laughs] Stress, brother. Stress do that to you?

JR: Stress will fuck you. And it's falling out in patches, like, like you're a stressed out dog or something.

UC1: Yeah man. No, ah, is there a gym in here?

JR: Nah, people don't get this - this county thing, you know. There is nothing in here. You go out - you go out for one hour a day. Um, you're in the yard with a fence around it so you can't see no trees or anything. You gotta look at the sky. And then you're in a warehouse. Not even like this. See this has windows and everything. Like a total warehouse.

UC1: Right, right. But they got you up in a dorm or they got you in a cell?

JR: Huh?

UC1: Dorm or cell?

JR: Cell.

UC1: Ah, nice.

JR: Usually sleep, I sleep all day. Then I stay up at night reading.

29

GA171

UC1: Yeah, that's cool.

JR: I got my, uh, my, uh, my work that I gotta do, you know.

UC1: Yeah, no I hear you man, I hear you. Anything that gets you through it, you know. Anything that gets you through it.

JR: Two and a half years.

UC1: That's a long stint.

JR: I'm going crazy. Now I'm going crazy. I wanna get home to Brooklyn. And then also I'm gonna get, uh, they're gonna send me to a dorm or a camp.

UC1: Okay.

JR: So is, is, uh, you wanna stay in touch over there?

UC1: Yeah.

JR: Again, at some, at some level we've established – listen, some of the guys that, that may meet up with you are in prison or they're gonna be.

UC1: Right, right. Okay.

JR: Not in. They're going to be in prison.

UC1: I got you.

JR: So I'll have to have to change it, you know.

UC1: Yeah, but you know, but always –

JR: But always keep it the same way.

UC1: But run past, I got a wide, uh, web.

JR: Huh?

UC1: I got a wide web so I can reach a lot of places.

JR: I don't want – I gotta tell you. I'm a very low-tech guy. I don't want, I don't want no, I don't like any trails.

UC1: I hear you.

GA172

JR:    I don't like telephones, this is how I like – this.

UC1:   You're right, man. That's the way to do it.

JR:    And I, uh, I get nervous even with this.

UC1:   No, believe me, [IA] but like I said, my guy's a top notch guy. And when he calls me, you know, he's locked on. The guy ain't no bullshit, so – hell, you coulda walked outta here by now.

JR:    Huh?

UC1:   You coulda walked outta here by now. They didn't even come down here. Unbelievable.

JR:    I ain't walking outta this joint.

UC1:   No. [Laughs]

JR:    These fuckers will kill you, too.

UC1:   Oh yeah. No. No. No way.

[IA]

JR:    I'm down with this.

UC1:   That's cool. Definitely.

JR:    This guard.

UC1:   Yeah. He's cool?

JR:    Yeah. [Pause]. Need some help. Gonna go get it.

UC1:   Yeah, yeah. Just don't get in trouble, you know.

21:52 [JR walks away, returns at 22:38]

JR:    What's your number?

UC1:   All right, it's, ah, 631-879-2105.

JR:    2145?

31

UC1: 05.

JR: Nick Pitas. P-I-T-A-S.

UC1: Okay. And what's that business location?

JR: 30 Brook Avenue.

UC1: Okay.

JR: Deer Park 11729.

UC1: Okay.

JR: Uh, you need – you don't need the phone number, do you?

UC1: No. Just this. Um, all right, that's good.

JR: I'm gonna um –

UC1: We'll get, you know –

JR: This is 879, right?

UC1: Right. 2105.

JR: This, um – the money's gotta be put on a card so, you want to put 25 dollars on or do you want me to have my people –

UC1: Yeah, I'd rather – you know, like you said about the paper trails and shit? You know, I didn't even want to sign in here, you know? [IA]. So I would rather not bring money, either, you know what I'm saying?

JR: I'm gonna, um - 7105?

UC1: 21.

JR: 21, right?

UC1: 21. Like the good old days, when you were 21.

JR: I'm gonna, uh, I'm gonna have them put it on. So remember: just keep in mind, jail time is slower than real time.

UC1: I got you.

32

GA174

JR: So I'm gonna call my people. Phone won't turn on 'til 10 o'clock. You know, you gotta get in touch with them and now you tell them, "Listen, you pay $25 on this phone," so they'll do it however they do it. They'll call or they'll do it on the computer, and they'll drop money on the phone. Then they'll call and they'll say to pick up the line, you know?

UC1: Okay, cool. Good deal. Um, so I fuck this guy up for you. You give me a thousand up front. You, you'll know what happened, and then we'll finish up. Good deal?

JR: All right, cool.

UC1: But I'm doing it cheap so you'll give me some other shit.

JR: As soon as we finish this one, we'll do another.

UC1: Okay.

JR: That's how we'll do it. And, ah, the more we do this, the less we'll talk.

UC1: Yeah. I got you.

JR: In other words –

UC1: Yeah, yeah, okay.

JR: So that's what's up. And then they'll meet with you.

UC1: That would be perfect.

JR: You know?

UC1: Yeah, yeah, yeah, yeah, yeah.

JR: Like this whole big conversation? We don't even have to have a whole giant conversation.

UC1: Right, right, right. No, I got you. It's cool. We gotta know what's up.

JR: I'm just so glad that my man here is a fucking solid guy, you know.

UC1: I don't know him, but if he hooked up with my guy he's gotta be a good man. Because my guy's solid, so -

JR: Trust me, he's a solid guy.

GA175

UC1: Cool. All right, good, man. We're in business.

JR: Got that shit on time, with his mouth shut.

UC1: Okay, good. Don't even tell him about this. Don't even - if he even asks if something happened, then just say -

JR: No, I ain't gonna backtrack on that, obviously.

UC1: He might ask, I don't know. Okay, well cool.

JR: He's gonna say, you know, "did my guy come?" I know he's gonna say that. I'll say, "Yeah, yeah, thanks. Things worked out good."

UC1: Okay.

JR: And I know - you know - his type is he's like "All right, good."

UC1: Okay, good.

JR: He don't want to know my business either.

UC1: Gotcha. That's the way to do it. That's the way to do it.

[START OF THIRD SEGMENT]

JR: All right?

UC1: I'll be back in touch with you soon with, uh, good news.

JR: I'm gonna call these people when I get back to the dorm. They're gonna put the money on the phone.

UC1: Perfect.

JR: Then I'm gonna call you this afternoon. Someone will call you -

UC1: All right, perfect.

JR: - to meet you. And hopefully this will happen, you know, like I said, remember, don't get worried.

UC1: Right.

JR: We're talking about jail time.

34

GA176

UC1:   Right, I got you.

JR:    Today. Tomorrow. You know? People work.

UC1:   Right, right. Okay, cool.

JR:    All right?

UC1:   I'll take care of this boom, boom, boom, on to the next one.

JR:    All right, my friend.

UC1:   Pleasure. Be good.

JR:    All right. I'll see you. Good luck.

[They part]

                                    * * *

[57:53]

Alright, it's a 9:25 hours. Out of the, uh, correctional facility.

35

GA177



Case 14-1588, Document 70, 05/06/2015, 1503393, Page238 of 246

<u>UNITED STATES v. JOSEPH ROMANO</u>
12 CR 691 (JFK)    RT

DATE:              September 5, 2012

TIME:              6:20 PM

TRACK:             951W20IT.v12

PARTICIPANTS:      Joseph Romano:           JR

                   Dejvid Mirkovic:         DM

ABBREVIATIONS:

                   [PH]        PHONETIC
                   [UI]        UNINTELLIGIBLE

GOVERNMENT
EXHIBIT
316T
12 CR 691 (JFK)

*Recording: Global Tel\*Link. This call may be recorded or monitored. I have a prepaid call from Jason, an inmate at Nassau County Jail. Your account balance is $4.85. If you wish to accept this prepaid call, dial 0 and hold. To refuse, dial -- thank you.*

DM: Doggy.

JR: Yo, you gotta put more money on the phone.

DM: Yeah, I just realized, like, fuck. Where does this money go so fucking quick? I just, I just put money on it. God damn.

****

JR: Did you make the phone call to, um, Mr. Soft-?

DM: No, no. I, uh, I'm gonna make, I'm gonna make that phone call right now. [overlapping]

JR: Please, please, I beg of you.

DM: Yeah, no, I'm gonna make it right now. Uh, what am I, what am I gonna say again? I'm sorry. My mind's drawing a blank.

JR: Just say you're calling for Big Joe, and you're gonna be in town on September 14th, your, and you're gonna meet with him then.

DM: Okay.

JR: Alright?

DM: Okay. Very good. I will do that. I will do that.

JR: What else? You leaving the phone with, um, Mumbai (UI)?

DM: Yea, yea, yea. I'm gonna leave the phone. I'm gonna put money on the phone right now. As soon as I get done fucking dropping the turd. I'm gonna go put money on the phone, and, uh, she'll have money on the phone.

JR: Good.

2

Case 14-1588, Document 70, 05/06/2015, 1503393, Page241 of 246

<u>UNITED STATES v. JOSEPH ROMANO</u>
12 CR 691 (JFK)       RT

DATE:            September 25, 2012

TIME:            6:06 PM

TRACK:           9P1W20YV.v12

PARTICIPANTS:    Joseph Romano:          JR

                 Dejvid Mirkovic:        DM

ABBREVIATIONS:

                 [PH]       PHONETIC
                 [UI]       UNINTELLIGIBLE



GOVERNMENT
EXHIBIT
325T
12 CR 691 (JFK)

Case 14-1588, Document 70, 05/06/2015, 1503393, Page242 of 246

*Recording: Global Tel\*Link. This call may be recorded or monitored. I have a prepaid call from James, an inmate at Nassau County Jail. Your account balance is $18.39. If you wish to accept this prepaid call, dial 0 and hold. To refuse, dial – thank you.*

JR: Yo.

DM: Doggie.

JR: What're you doing?

DM: Oh, I'm having, uh, kobe beef sliders and some fries.

JR: Did, uh, my wife make you anything to eat?

DM: No because, uh, she made me coff instead. I, I enjoyed the coffee instead. Because actually, I wanted to go out to the store, and, uh, and it was like funny, cause it was like, I, I, I have no idea where the time goes. It's uh, I was like, "oh my god!"

JR: Yeah, yeah I know.

DM: And then I went up and grabbed something to eat, so, but, uh, but yeah, man, you shoulda– , I got Mikey this super monster Dodge truck.

JR: Really?

DM: You gotta see this thing. It's un-fucking-believable Doggie. He's gonna go nuts.

JR: Oh boy.

DM: Cause you know what, he calls like, he calls my car, he calls my car the sissy car, and then, um, um, my wife, you know, Megan's truck, it's like this big Chevy truck, and he loves Dodges. Every time he sees a Dodge it's like he goes bananas. I don't know why.

JR: Right.

DM: But, uh, but yeah, so, uh, turns out this, it's like really fucking cool. And while I was driving down Merrick Highway, uh, you know, because that's where all those dealerships, I passed by that Chrysler/Jeep/Dodge place, and then I saw like the duplicate fucking truck of this big monster truck toy I bought Michael. You know. So I had to like, I had to stop. I was like, I stopped and, uh – thank God, thank God K's got like navigation in her car.

JR: When did you, um, yeah, she's got navigation because, uh – oh which is this? Is this her new car?

2

Case 14-1588, Document 70, 05/06/2015, 1503393, Page243 of 246

DM: Yeah, her new car. You know that portable nav?

JR: Yeah, the portable one, that's mine. I'm the one that went out and bought that. The hundred dollar one from Staples. The best.

DM: Oh wow.

JR: It's the best one.

DM: Oh, it was awesome dog, it was awesome.

JR: It's one hundred dollars at Staples. You plug it into your car anywhere and that's it. It picks up everything.

DM: Yeah, it was awesome, 'cause I stopped, I stopped at the, I stopped at the – [Overlapping].

JR: So you went, um, so good, did you buy – ya-, ya-, um, you gonna buy?

DM: I'm gonna buy the truck.

JR: Huh?

DM: No, I wanna buy the truck. Uh, what do you think Doggie? I wanna buy this truck.

JR: Yeah.

DM: I think Mikey will go nuts.

JR: Well, uh, good. When are you, uh, when are you coming back here?

DM: Oh, Tuesday. Tuesday I'm gonna come up.

\*\*\*\*

JR: So, uh, so you're coming again Tues–, you're coming again Tuesday, right?

DM: Yeah, let me tell you about this truck Doggie. It's fu--, it's hot.

JR: So you're really gonna buy, you're really gonna buy this freakin' truck? This is a go?

3

Case 14-1588, Document 70, 05/06/2015, 1503393, Page244 of 246

DM: Yeah, I'm gonna drive it. Yeah, yeah, it's a go [laughs]. Yeah, I got – put it this way: I know I did good, and I know what these lift kits cost – what, what these lift kits cost and all that kind of stuff.

JR: Yeah.

DM: They were asking like, they were asking like fifty-six five, fifty-six nine ninety. And I got him, I beat him up with all the rebates and everything, I got him to forty thousand. And I left him a, I left him a, I left him a, a two thousand dollar deposit. And I told him I'm coming back up. So –

JR: Oh, good.

DM: But it was funny. It was, it was funny 'cause I was like, I was like man a truck? I really [UI] car. You know what was so, uh, you know why I bought it, because it matched the toy. It totally matches the toy, so Mikey's gonna go nuts.

JR: Did you, did you, did you tell him that, did you tell him that your friend was sitting in jail happy because uh, because you're gonna eventually get rid of his truck?

DM: [Laughter] Right, yeah. Exactly, yeah. He's right. No kidding. I'm gonna, I'm gonna get on top of that here dog. I'm sorry –

JR: Nah, nah, nah, nah, I'm not worried about that. I'm just saying, you know, did ya, uh, you know. What else?

DM: That's it Doggie, that's it.

JR: That's good man. I'm so freakin, I'm, I'm happy you came. It was a good productive visit, you know.

DM: Yeah, yeah. No, it really was, it really was. And we talked about some funny stuff. Oh my god.

JR: We were laughing.

DM: Yeah.

[Both laughing]

JR: I gotta tell you man, I just gotta tell you that story again when I see you. You know?

DM: [Laughter]

Case 14-1588, Document 70, 05/06/2015, 1503393, Page245 of 246

JR: I've been fucking – meanwhile, I'm in my cell, I'm fucking dancing around and singing and stuff, you know? And I was just fucking laughing my balls off, thinking about that.

DM: Oh, why?

JR: You know, the story, the whole story, you know, like whatever.

DM: Yeah. I got it. Yeah.

JR: So what are you, so you, so you're eating good, and then your flight's there, and what time do you get in? Nine thirty, ten o'clock?

DM: Yeah. Like, uh, nine fifty-five my flight lands.

JR: And your, and your car's in the long-term?

DM: Yeah, in the long-term.

JR: You take the back way to Isola Bella or you go down ninety-five?

DM: Uh, I take the, um, no, um, ninety-five. I'm going, I'm going to the Egart place.

JR: Oh, ho ho! Oh, that's right. You must be spending the night in New York, huh? I got it. Very good, you fucking piece of crap. Oh, boy.

DM: [Laughter]

**\*\*\*\***

JR: Listen, um, so they were happy that you were gonna buy this truck, right?

DM: Oh, yeah.

JR: All right, good.

DM: They were like, they were like ecstatic you were running around. I mean, I got like, you know, I got a good, good portion off.

JR: Yeah, yeah, yeah, good.

DM: I thought I got a good deal.

Case 14-1588, Document 70, 05/06/2015, 1503393, Page246 of 246

JR: Yeah.

DM: At the end of the, and then at the end of it, at the end I was like, "Hey, you know, you know I used to run these stores?" That was funny.

JR: That's funny. What about, um, what about, um… Good, so I'm, I'm, I'm glad, uh, I'm glad everything worked out. Um –

DM: Oh, me too. Mikey's gonna, Mikey's gonna have a shit when he sees, when he sees that toy truck, and then when I see that big, big truck pull up.

JR: Yeah.

DM: He's gonna, he's gonna go nuts!

JR: Well –

DM: You know.

JR: You know, all right. Good. All right so, I'm gonna, I'll call you tomorrow. Have a good night. Uh, have a safe flight.

DM: Yeah, why don't you call me back? I go-, I still got time. Call me back.

JR: I'll call.

6