# 14-1588-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

DEJVID MIRKOVIC, AKA Dave Mirkovic,
AKA David Mirkovic, AKA Dejuid Mirkovic,

*Defendant,*

JOSEPH ROMANO,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

# REPLY BRIEF FOR DEFENDANT-APPELLANT

DANIEL S. NOOTER, ESQ.
*Attorney for Defendant-Appellant*
1380 Monroe Street, NW #427
Washington, DC 20010
(202) 215-0512

# TABLE OF CONTENTS

Table of Authorities .......... iii

Argument

POINT I

AGENTS COX AND HESLIN ACTED INTENTIONALLY TO UNDERMINE THE *MIRANDA* WARNINGS BY DUPING MR. ROMANO INTO BELIEVING HE WAS COOPERATING IN ORDER TO OBTAIN SELF-INCRIMINATING ADMISSIONS FROM HIM. .......... 1

A. The Government Misstates the Applicable Standard of Review. .......... 4

B. The Phony Cooperation Agreement Prepared by Agent Heslin for Mr. Romano's Signature Demonstrates that the District Court Clearly Erred in Determining There Was "No Evidence Whatsoever of Deceit by the Agents." .......... 6

C. Mr. Romano Was Deprived of His Right Against Compelled Self-Incrimination When Agents Cox and Heslin Acted Intentionally to Undermine the Effect of the *Miranda* Warnings, Leading Mr. Romano Falsely to Believe He Was Entering into a Cooperation Agreement. .......... 8

D. Even Under a "Totality of the Circumstances" Test, the District Court Erred in Declining to Suppress Mr. Romano's Statement. .......... 12

POINT II

IN LIGHT OF *JACOBSON V. UNITED STATES*, IT WAS ERROR TO REQURE MR. ROMANO TO PROVE THE INDUCEMENT PRONG OF HIS ENTRAPMENT DEFENSE BY A PREPONDERANCE OF THE EVIDENCE .......... 15

A. The Government Cannot Rely on Cases Decided Decades Prior to *Jacobson* to Assert that Binding Precedent Controls This Court's Application of that Case. .......... 18

B. The Government's Argument Concerning How Mr. Romano's Entrapment Defense Might Fare Were He Required to Prove Different Sets of Elements in Different Circuits Is Speculative and Irrelevant. ........... 20

C. Mr. Romano Easily Satisfies a Production Burden of Showing "Some Evidence" of Inducement. ........... 23

D. The Jury Instruction Was Not Harmless Beyond a Reasonable Doubt. ........... 26

Conclusion ........... 29

Certificate of Compliance ........... 30

# TABLE OF AUTHORITIES

Cases


*Baraket v. Holder,*
632 F.3d 56 (2d Cir. 2011) .......................................................... 18

*Dickerson v. United States*,
530 U.S. 428 (2000)........................................................................ 9

*Jacobson v. United States*,
503 U.S. 540 (1992)...................................................................... *infra*

*Jones v. Murphy,*
694 F.3d 225 (2d Cir. 2012) ............................................................ 4

*Miranda v. Arizona*,
384 U.S. 436 (1966)...................................................................... *infra*

*Missouri v. Seibert*,
542 U.S. 600 (2004)............................................................ 4–12, 15

*People v. Dunbar*,
24 N.Y.3d 304 (N.Y. 2014) ....................................................... 8, 11

*United States v. Brand,*
467 F.3d 179 (2d Cir. 2006) ........................................... 15–16, 18, 24

*United States v. Braver*,
450 F.2d 799 (2d Cir. 1971) .......................................................... 19

*United States v. Capers,*
627 F.3d 470 (2010) ........................................................................ 6

*United States v. Gaines*,
295 F.3d 293 (2d Cir. 2002) ................................................... 12–13

*United States v. Kopstein*,
759 F.3d 168 (2d Cir. 2014) ....................................................... 20–22

*United States v. Kozeny,*
667 F.3d 122 (2d Cir. 2011) .......................................................................29

*United States v. Sherman*,
200 F.3d 880 (2d Cir. 1952) ..................................................................19, 24

*United States v. Williams*,
681 F.3d 35 (2d Cir. 2012) .........................................................................6

Statutes

28 U.S.C. § 1291 ..................................................................................................23

Other

Sand, *Modern Federal Jury Instructions*, Instruction 8-7 ............................16, 20–21

Defendant-Appellant Joseph Romano, through undersigned counsel, respectfully submits this brief in reply to the government's brief dated May 6, 2015.

## ARGUMENT

### POINT I

AGENTS COX AND HESLIN ACTED INTENTIONALLY TO UNDERMINE THE *MIRANDA* WARNINGS BY DUPING MR. ROMANO INTO BELIEVING HE WAS COOPERATING IN ORDER TO OBTAIN SELF-INCRIMINATING ADMISSIONS FROM HIM.

As explained in Mr. Romano's initial brief, "the most compelling evidence that Heslin and Cox sought to trick Romano into thinking he was entering into a cooperation agreement" was a handwritten statement, entered into evidence as GX-101, that Agent Heslin composed and which Mr. Romano signed while the agents were interrogating him following his October 9, 2012 arrest. (Def. Br. at 29.) That handwritten statement, in its entirety, reads as follows:

> I. My name is Joseph Romano, DOB [redacted], SSN [redacted].
>
> II. I have signed an Advice of Rights form which is attached to this statement and incorporated by reference.
>
> III. *I have agreed to cooperate with the FBI and provide statements about crimes I know about and crimes in which I was personally involved.*
>
> IV. I and at least one other, including but not limited to Dejvid Mirkovic, conspired to murder Federal District Court Judge Joseph Bianco and Assistant United States Attorney Lara Gatz.

> V. *I am willing to provide information* I acquired while incarcerated concerning a double murder in Freeport, NY.
>
> VI. *I am willing to provide information* about other prisoners who approached me and offered to perpetrate violent acts on my behalf.
>
> VII. *I am willing to provide information* about individuals who may be connected to organized crime groups.

(JA 160–61; emphasis added.)

This statement is relevant to two issues in this appeal. First, the statement demonstrates on its face that Mr. Romano believed he was cooperating with the FBI when he confessed to committing the crime. Not only does paragraph III state, "I have agreed to cooperate with the FBI," but paragraphs V through VII identify specific additional criminal activity, perpetrated by other individuals. about whom Mr. Romano believed he could provide information. The statement compels the finding that Mr. Romano believed he was engaged in a cooperation process when he made confessions to law enforcement.

The statement is also compelling evidence of a second issue, however, which is that Agents Heslin and Cox had engaged in extended and detailed conversation with Mr. Romano concerning his potential cooperation in connection with Mr. Romano incriminating himself. Agent Cox's uncontroverted testimony at the suppression hearing was that he had brought up the subject of cooperation with Mr. Romano both before and after Mr. Romano was read his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). (JA 41–42.) He also testified that both

he and Agent Heslin had advised Mr. Romano to cooperate with the government. (JA 30, 42–43.) But most saliently, he testified that Agent Heslin had left the room where Mr. Romano was being interrogated and had composed the self-incriminating statement outside of Mr. Romano's presence. (JA 36.) For Agent Heslin to have been able to include specific details in the statement, it is apparent that he and Agent Cox must have had conversations with Mr. Romano that did not merely touch upon the *general suggestion* that Mr. Romano could benefit his case by cooperating, but that were detailed enough to elicit *specific information* from Mr. Romano about, for example, Mr. Romano's ability to cooperate concerning the Freeport, New York homicides referred to in paragraph V of the statement. These are not details Agent Heslin could simply have made up; they were incidents about which Agent Heslin could only have obtained knowledge through the agents' ongoing discussion with Mr. Romano while convincing him to cooperate with law enforcement.

Mr. Romano presented Agent Heslin's statement as the single most compelling piece of evidence supporting his claim that the FBI had intentionally deceived him into believing he was cooperating in fool him into incriminating himself. Yet the government barely responds to the document in its own brief. Thus, not once does the government even *acknowledge* Mr. Romano's statement that "I have agreed to cooperate with the FBI and provide statements about crimes

I know about and crimes in which I was personally involved" —notwithstanding that one section of the government's brief is entitled, "Romano Did Not Believe He Was Cooperating With The Government." (Gov't Br. at 33.)

As detailed below, the government's discussion of the suppression issue is unreliable in its presentation of the facts and unpersuasive in its analysis of the law. It also relies upon an incorrect statement of the standard of review. This Court should instead find that Agents Cox and Heslin acted intentionally to undermine the effect of the *Miranda* warnings, and that the district court erred in declining to suppress Mr. Romano's resulting self-incriminating admissions.

A. The Government Misstates the Applicable Standard of Review.

As a threshold matter, the government mistakenly asserts that the applicable standard of review is "plain error." (Gov't Br. at 25–26.) Mr. Romano anticipated that the government would argue as such in his initial brief, yet explained that the salient question in determining whether an issue has been preserved for review is whether the issue was sufficiently raised to permit the district court to make the requisite factual findings. *See Jones v. Murphy,* 694 F.3d 225, 247 (2d Cir. 2012). An issue is not waived merely because the appellant "applie[s] a slightly different label to what is essentially the same claim." *See id.*

Although Mr. Romano's trial attorneys did not cite *Missouri v. Seibert* by name, they raised the very issue presently raised on appeal: whether the

government intentionally engaged in deceptive conduct to undermine the *Miranda* warnings and obtain a confession. Indeed, Mr. Romano's post-suppression-hearing brief devotes nine pages to his argument that "The evidence suggests that Romano was coerced into making incriminating statements by the belief that he was cooperating with the Government's investigation and that he was doing so pursuant to a written and signed cooperation agreement." (GA 31–39.) Pages 24 through 26 of the brief, in particular, explicitly address the phony cooperation agreement, as well as the agents' efforts to use this document trick Mr. Romano into believing he was cooperating. (GA 33–35.) Indeed, Judge Keenan explicitly acknowledged the nature of Mr. Romano's claim — "the defense argues that the agents tricked Defendant into making admissions by leading him to believe that he was entering into a formal cooperation agreement with the Government" — yet denied the claim based on his factual determination that "there is simply no evidence whatsoever of deceit by the agents." (JA 63.) Accordingly, the issue was indeed raised in and adjudicated by the district court and is preserved for this Court's review.

As explained in the initial brief, this issue involves a mixed question of fact and law, to which this Court accordingly employs a mixed standard of review. (Def. Br. at 23.) The district court's factual findings — specifically, its finding that "there is simply no evidence whatsoever of deceit by the agents" — is

reviewed for clear error; in contrast, the legal question of whether, in light of such facts, the government impermissibly undermined the *Miranda* warnings, is reviewed *de novo*. *See United States v. Williams*, 681 F.3d 35, 40 (2d Cir. 2012).

B. The Phony Cooperation Agreement Prepared by Agent Heslin for Mr. Romano's Signature Demonstrates that the District Court Clearly Erred in Determining There Was "No Evidence Whatsoever of Deceit by the Agents."

As explained in Mr. Romano's initial brief, the salient inquiry in *Seibert* is whether a law enforcement practice "was used in a calculated way to undermine the *Miranda* warning." *See Missouri v. Seibert*, 542 U.S. 600, 622 (2004) (opinion of Kennedy, J., concurring); *see also United States v. Capers,* 627 F.3d 470, 476 (2010) (noting the Second Circuit follows Justice Kennedy's *Seibert* concurrence). In determining whether the arresting officers' actions are "sufficiently indicative of a deliberate circumvention of *Miranda* to require that a defendant's statements must be suppressed," courts review "the totality of the objective and subjective evidence surrounding the interrogations." *See Capers*, 627 F.3d at 478–79. The government bears the burden of disproving that its agents acted deliberately to undermine *Miranda*. *See id*. at 479. Accordingly, the factual component of this Court's review concerns whether the district court erred in finding "no evidence whatsoever of deceit by the agents." (JA 63.)

The government's analysis of this question, however, scrupulously avoids any discussion of the key document — the phony cooperation agreement — that

evidences the agents' deceit. Thus, the government asserts, "The mere fact that Agent Heslin suggested during the ride to the FBI offices that Romano could help himself by cooperating does not make *Seibert* applicable to this case." (Gov't Br. at 28.) Later in its discussion, the government again asserts, "the agents did nothing more than inform Romano that it was in his interest to cooperate." (Gov't Br. at 33–34.)

Yet the record demonstrates that the agents did *considerably* more than merely "inform Romano that it was in his interest to cooperate." The phony cooperation agreement is evidence that the agents had engaged in detailed conversations with Mr. Romano about his cooperating with the FBI, even identifying three different subjects (aside from the murder conspiracy charge) about which Mr. Romano could "provide information.' The interrogating officers went so far as to compose a statement for Mr. Romano to sign that states, "I have ***agreed to cooperate*** with the FBI." (JA 160; emphasis added.) Nevertheless, the government urges the Court that "the words 'cooperation agreement' are nowhere to be found" on the document. (Gov't Br. at 34.)

In fairness, the district court, in denying Mr. Romano's claim, *also* failed to discuss the phony cooperation agreement. (JA 63.) In fact, there is no indication the district court considered this evidence at all in finding there was "no evidence whatsoever of deceit by the agents," notwithstanding that it was both the subject of

testimony at the hearing and addressed in Mr. Romano's brief. (JA 36–41; GA 31–39.) Yet even viewed in a light favorable to the government, the phony cooperation agreement clearly constitutes *some* evidence of deceit by the agents, even compelling evidence. And especially since this was a matter on which the government bears the burden of proof, it was clearly erroneous for the district court to ignore the phony cooperation agreement — *prima facie* evidence of the agents' successful effort to deceive Mr. Romano — in determining the agents lacked the intent to undermine *Miranda*.

C. Mr. Romano Was Deprived of His Right Against Compelled Self-Incrimination When Agents Cox and Heslin Acted Intentionally to Undermine the Effect of the *Miranda* Warnings, Leading Mr. Romano Falsely to Believe He Was Entering into a Cooperation Agreement.

A threshold question is whether *Seibert*'s reasoning applies solely in the context of two-step interrogation or, rather, whether its rationale applies whenever arresting officers act deliberately to undermine *Miranda* while nevertheless seeking to obtain a "Mirandized" confession. While *Seibert* unquestionably addressed the specific practice of two-step interrogation, New York's highest court has persuasively explained that the same constitutional considerations at issue regardless of the precise method officers use to deceive an arrestee into waiving his *Miranda* rights. *See People v. Dunbar*, 24 N.Y.3d 304 (N.Y. 2014). This Court should reach the same conclusion.

Three Supreme Court cases establish the applicable legal rule. *Miranda v. Arizona*, 384 U.S. at 479, establishes that confessions obtained during custodial interrogation are generally inadmissible against a defendant unless the defendant was adequately informed about his constitutional rights. *Dickerson v. United States*, 530 U.S. 428, 444 (2000), establishes that *Miranda* is a "constitutional rule," required to give practical effect to an arrestee's Fifth Amendment right against compelled self-incrimination and his Sixth Amendment right to the assistance of counsel. Finally, *Missouri v. Seibert*, 542 U.S. at 600, establishes that law enforcement violates *Miranda*'s constitutional rule when it complies merely with the *form* of *Miranda*, while acting to undermine *Miranda*'s substance. In this case, the agents' trickery in leading Mr. Romano into believing his confessions to law enforcement were part of the process of cooperation directly contradicted *Miranda*'s warning that anything Mr. Romano confessed to law enforcement would be used against him, and thus constitute the same end-run around *Miranda* that *Seibert* found intolerable.

The government seeks to distinguish *Seibert* on its facts, arguing that "*Seibert* addressed only the specific practice of intentional two-part interrogations." (Gov't Br. at 29.) Yet the heart of *Seibert* — drawing on *Miranda*'s constitutional rule — is that "the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures

which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *See Miranda*, 384 U.S. at 467. The *Miranda* warnings safeguard against these "inherently compelling pressures" by ensuring an arrestee subject to custodial interrogation is sufficiently apprised of his constitutional rights in order to make an informed decision about whether or not to waive them. *See United States v. Carter*, 489 F.3d 528, 534 (2d Cir. 2007) ("The purpose of the *Miranda* warning is to ensure that the person in custody has sufficient knowledge of his or her constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent, and voluntary.")

Yet when law enforcement acts purposefully to undermine and contradict these warnings, they no longer dispel the inherently coercive atmosphere of custodial interrogation. *See Seibert*, 542 U.S. at 612 (plurality opinion) ("unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda*"); *id.* at 621 (opinion of Kennedy, J., concurring) ("The technique used in this case distorts the meaning of Miranda and furthers no legitimate countervailing interest. The *Miranda* rule would be frustrated were we to allow police to undermine its meaning and effect."). *Seibert* is thus not a case solely about two-step interrogation; it is the Supreme Court's

admonishment to law enforcement that it cannot comply merely with the form of *Miranda* while acting to undermine its substance.

Indeed, that is precisely how New York's highest court applied *Seibert* in *People v. Dunbar*, 24 N.Y.3d 304 (N.Y. 2014), where the New York Court of Appeals found that law enforcement's intentional attempts to vitiate the efficacy of the *Miranda* warnings violated the rule of *Seibert*, even though the practice found unconstitutional in *Dunbar* did not involve two-step interrogation. The government asserts *Dunbar* is "obviously not binding" on this Court, which is true. (Gov't Br. at 29.) Yet the government offers no argument for why *Dunbar*'s straightforward application of *Seibert* — a case which *is*, of course, binding on this Court — is unpersuasive or incorrect.

As the *Dunbar* court explained, the statements made by law enforcement to arrestees served merely to contradict the substance of the *Miranda* warnings. Thus, "The statements to 'give me as much information as you can, that 'this is your opportunity to tell us your story' and that you 'have to tell us now' directly contradicted the later warning that they had the right to remain silent." *See Dunbar*, 24 N.Y.3d at 316. Similarly, "By advising [defendants] that speaking would facilitate an investigation, the interrogators implied that these defendants' words would be used to help them, thus undoing the heart of the warning that anything they said could and would be used against them." *See id.* In this case,

Agents Heslin's and Cox's efforts to dupe Mr. Romano into believing he was cooperating — ultimately drawing up a phony cooperation agreement for Mr. Romano's signature — similarly served to contravene *Miranda*'s warning that Mr. Romano's statements would be used against him if he waived his right to remain silent. Accordingly, the district court ought to have suppressed admissions the agents obtained from Mr. Romano through their purposeful undermining of *Miranda*.

D. Even Under a "Totality of the Circumstances" Test, the District Court Erred in Declining to Suppress Mr. Romano's Statement.

Even were this Court to determine that *Seibert* applies only in the context of two-step interrogation, essentially the same facts concerning the agents' deliberate attempt to make Mr. Romano believe he was cooperating would render his *Miranda* waiver unknowing and involuntary under a totality of the circumstances test. *See e.g., Carter*, 489 F.3d at 534. It is the government's burden "to prove by a preponderance of the evidence that the defendant relinquished his rights voluntarily with a full awareness of the rights being waived and the consequences of doing so." *See United States v. Gaines*, 295 F.3d 293, 297 (2d Cir. 2002). *Gaines* has explained that while "vague promises of leniency for cooperation are . . . one factor to be weighed in the overall calculus" they "generally will not, without more, warrant a finding of coercion." *See id.* at 299. In contrast, however, "certain

other misrepresentations made to a suspect might render a confession involuntary because they overcome his desire to remain silent." *See id.* In this case, the agents' actions in leading Mr. Romano to believe he was actually cooperating with law enforcement go beyond mere "vague promises of leniency" and rather epitomize the "material misrepresentations" that overcome a defendant's right to remain silent.

The government claims that Mr. Romano "never asserted that he believed that he actually had entered into a cooperation agreement with the government," instead stating this assertion "appeared for the first time in defense counsel's post-hearing memorandum." (Gov't Br. at 33.) Yet Mr. Romano indeed evidenced his belief that he had entered into a cooperation agreement when he signed the sworn statement, asserting "I have agreed to cooperate with the FBI." Moreover, at the suppression hearing Mr. Romano's trial counsel cross-examined Agent Cox concerning the fake cooperation agreement, and Agent Cox's responses further supported Mr. Romano's claim that he believed he was cooperating. (JA 36–41.) Thus, the government is wrong to suggest the claim was not raised until after the hearing and lacked evidentiary support in the record.

The government also asserts Mr. Romano could not possibly have believed he was cooperating with the FBI agents because he is too intelligent to be fooled by law enforcement: "It strains credulity to suppose that a person of his level of

acumen could be easily duped or coerced into waiving his *Miranda* rights."[1] (Gov't Br. at 31.) What instead "strains credulity," however, is that Mr. Romano would sign a document stating that he had "agreed to . . . provide statements about crimes I know about and crimes in which I was personally involved," and indeed, would *actually provide* the FBI with such information about several crimes, and yet nevertheless *not* think he was in the process of cooperating with the government.

The government states Mr. Romano "was not a newcomer to law enforcement encounters" at the time of his October 2012 arrest. (Gov't Br. at 31.) Yet Mr. Romano *was* a newcomer to the process of cooperation. Similarly, the government makes much of the fact that Mr. Romano thus would have seen a fully executed cooperation agreement among the discovery provided to him in his prior coin-fraud case. (Gov't Br. at 34.) But Mr. Romano's having seen one cooperation agreement among his discovery materials hardly renders him an expert about the entire process of cooperation. Indeed, there is no logical reason why Mr. Romano would have waived his rights, made self-incriminating admissions to the

[1] The putative basis for the government's claim that Mr. Romano was too intelligent to be fooled is that he had previously conducted an "elaborate coin fraud scheme" which involved his selling coins "at fraudulently inflated prices, misrepresenting their value to victim customers by falsely claiming that the coins were of particular high grades, when they were actually of a much poorer quality." (Gov't Br. at 3, 31.) Nothing about Mr. Romano's ability to overstate the price of coins, however, renders him a criminal mastermind whose "level of acumen" should evoke the government's awe.

agents, and then signed a document explaining how he had agreed to cooperate with the FBI, unless that is actually what he thought he was doing. Thus, whether this Court analyzes the issue under *Seibert* or under a "totality of the circumstances" test, Mr. Romano did not knowingly and voluntarily waive his right to remain silent before making self-incriminating admissions to the agents during custodial interrogation.

## POINT II

### IN LIGHT OF *JACOBSON V. UNITED STATES*, IT WAS ERROR TO REQURE MR. ROMANO TO PROVE THE INDUCEMENT PRONG OF HIS ENTRAPMENT DEFENSE BY A PREPONDERANCE OF THE EVIDENCE.

*Jacobson v. United States*, 503 U.S. 540, 548–49 (1992), holds that the government bears the burden of proving "beyond a reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents." As explained in the initial brief, however, often the same evidence the government would ordinarily rely on to prove a defendant's predisposition can *also* be asserted by the government simply as evidence that a criminal design did not originate with the government in the first instance, and that the government accordingly did not *induce* the defendant to commit the offense.[2]

[2] For example, the discussion of the inducement prong in *United States v. Brand,* 467 F.3d 179, 189–90 (2d Cir. 2006), demonstrates precisely how intertwined the inducement and predisposition prongs are, since it construes inducement as a

Consequently, rather than having to prove the defendant's predisposition beyond a reasonable doubt, as required by *Jacobson*, the government can defeat an entrapment defense merely by presenting evidence in equipoise with the defendant's evidence concerning whether or not the government induced commission of the offense. At least, that is the consequence if the defendant is required to bear the burden of persuasion on this element. (Def. Br. at 33–40.)

As a result, every Circuit Court of Appeals to issue a holding interpreting the inducement prong since the Supreme Court decided *Jacobson* has reached the conclusion that a defendant raising the defense of entrapment bears merely a *production* burden, not a burden of persuasion, of showing the government's inducement of the offense. (Def. Br. at 36–37.) This is also the conclusion reached by Judge Sand in his *Modern Federal Jury Instructions*, upon which Mr. Romano modeled his proposed jury instruction in the district court. Mr. Romano contends that the district court erred in failing to give Mr. Romano's proposed jury

---

function of the defendant's *mental state*, rather than solely of his actions towards initiating an offense. Thus, in *Brand*, the government argued that the defendant had not satisfied his burden of proving inducement because "Brand's lurking in the chat room 'I Love Older Men,' as well as his unsolicited contact of 'Sara' and 'Julie,' demonstrate that the government did not '***implant in an innocent person's mind the disposition*** to commit a criminal act.'" *See id.* at 189 (emphasis added). Where the inducement inquiry turns on *implanting a disposition in the defendant's mind*, it is clear that the inducement prong and the predisposition prong are hopelessly confounded.

instruction and instead imposing the burden of persuasion on Mr. Romano to prove inducement by a preponderance of the evidence.

The government neither rebuts nor really addresses the analysis and application of *Jacobson* presented in Mr. Romano's opening brief. Rather, the government simply asserts this Court is compelled by its precedent to uphold the instruction the district court gave the jury. (Gov't Br. at 38–40.) Indeed, of the four principle arguments the government raises in response to Point II of Mr. Romano's brief, this is the only one of the four in which the government even attempts to defend the *legal* correctness of the district court's jury charge.

The government's three additional arguments all urge this Court to affirm Mr. Romano's conviction, but none is directed to the validity of Mr. Romano's *legal* analysis. Rather, each presents a variation on the argument that Mr. Romano would nevertheless lose on the *facts* even if he is correct about the law. Thus, the government's second argument is that Mr. Romano would not have been able to make the requisite showing under either the inducement prong or, alternatively, the predisposition prong had the case arisen in one of several other Circuits where a defendant is required to produce additional evidence to make out an entrapment defense. (Gov't Br. at 40–42, 46–49.) The government's third argument is that Mr. Romano cannot even satisfy a production burden of presenting evidence that the government induced Mr. Romano to commit the offense of conviction in this

case. (Gov't Br. at 43–45.) Finally, the government argues that any error in the district court's jury instruction was harmless beyond a reasonable doubt, since the government's proof of Mr. Romano's predisposition was "overwhelming" and no rational jury could possibly have failed to convict. (Gov't Br. at 50.) None of these arguments has merit.

A. The Government Cannot Rely on Cases Decided Decades Prior to *Jacobson* to Assert that Binding Precedent Controls This Court's Application of that Case.

As acknowledged in the opening brief, several of this Court's opinions since *Jacobson* have assumed that a defendant bears the burden of proving inducement beyond a reasonable doubt. (Def. Br. at 41–45.) Yet in none of those cases was resolution of that issue necessary to the outcome of the case. *See Baraket v. Holder,* 632 F.3d 56, 59 (2d Cir. 2011) ("it is not substantive discussion of a question or lack thereof that distinguishes holding from dictum, but rather whether resolution of the question is necessary for the outcome of the case."). Indeed, the most extended discussion of the matter, in *United States v. Brand,* 467 F.3d 179, 190 (2d Cir. 2006), concluded with the court's explicit statement that "We need not decide the issue." In fact, this Court has not issued any precedential holding since *Jacobson* was decided that resolves the defendant's burden under the inducement prong. In particular, the issue presented in this case of whether the district court's instruction "violated *Jacobson v. United States*, 503 U.S. 540 (1992), and relieved

the government of having to prove Mr. Romano's disposition to commit the offense beyond a reasonable doubt" is still undetermined. (Def. Br. at 1–2.)

The government characterizes Mr. Romano's analysis of this Court's precedent as "laborious" (Gov't Br. at 38); but notably, the government does not contend that his analysis is substantively *wrong* as a legal matter with respect to any of these cases.[3] Rather, the government's sole substantive response is oddly to cite several cases decided well *before* the Supreme Court's 1992 *Jacobson* opinion, in asserting that the question of whether the defendant's burden of persuasion can be squared with *Jacobson* is already a matter of binding precedent. (Gov't Br. at 38–40.) Thus, the government relies chiefly on a 1971 opinion, *United States v. Braver*, 450 F.2d 799 (2d Cir. 1971), and a 1952 case, *United States v. Sherman*, 200 F.3d 880 (2d Cir. 1952), to assert it was already "'late in the day' (as of 1971) for the defendant to argue that this Court had not already approved a jury charge placing the burden of proving inducement on the defendant." (Gov't Br. at 39.) Suffice it to say, neither the *Braver* nor the *Sherman* opinion makes any attempt to harmonize its holding with the Supreme Court's *Jacobson* opinion, since *Jacobson* had not yet been decided — and indeed, would not be decided for decades.

Accordingly, the government does not identify a single precedential holding of this Court that in fact addresses the question posed in this case of whether

[3] *Cf.* Tom Stoppard, ARCADIA 37 (London: 1993) ("A gibe is not a rebuttal.").

imposing a burden on the defendant to prove inducement by a preponderance of the evidence effectively permits the government to skirt its burden of proving "beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents." *See Jacobson*, 503 U.S. at 548–49. This panel is thus authorized to determine the matter for the first time as a holding.

B. The Government's Argument Concerning How Mr. Romano's Entrapment Defense Might Fare Were He Required to Prove Different Sets of Elements in Different Circuits Is Speculative and Irrelevant.

As discussed in Mr. Romano's initial brief, every Circuit that has considered the defendant's burden under the inducement prong has determined that the defendant bears merely a burden of *production*, not one of persuasion. (Def. Br. at 36–37.) Judge Sand has reached the same conclusion. *See* Sand, *Modern Federal Jury Instructions*, Instr. 8-7. While these other Circuits' opinions obviously do not bind this Court, the fact of their unanimity in imposing only a production burden on the defendant ought to be extremely persuasive to this Court in its *de novo* analysis of whether the district court's jury instruction inadequately informed the jury of the law. *See United States v. Kopstein*, 759 F.3d 168, 172 (2d Cir. 2014).

Judge Sand's instruction states in relevant part:

> Your inquiry on this issue should first be to determine if there is ***any evidence*** that a government agent took the first step that led to a

> criminal act. If you find there was no such evidence, there can be no entrapment and your inquiry on this defense should end there.
>
> If, on the other hand, you find ***some evidence*** that a government agent initiated the criminal acts charged in the indictment, then you must decide if the government has satisfied its burden to prove beyond a reasonable doubt that prior to first being approached by government agents, the defendant was ready and willing to commit the crime.

*See id.* (emphasis added) The instruction Mr. Romano requested in the district court tracks the language of Judge Sand's model instruction, instructing the jury that it must find "some evidence that a government agent initiated the murder conspiracies charged in the indictment":

> As such, your inquiry on this issue should first be to determine if there is ***any evidence*** that a government agent took the first step that led to a criminal act, in this case, the conspiracies to murder Judge Joseph F. Bianco and Assistant United States Attorney Lara Treinis Gatz. If you find there was no such evidence, there can be no entrapment and your inquiry on this defense should end there. If, on the other hand, you find ***some evidence*** that a government agent initiated the murder conspiracies charged in the indictment, then you must decide if the prosecution has satisfied its burden to prove, beyond a reasonable doubt, that prior to first being approached by government agents the defendant was ready and willing to commit those specific crimes.

Mr. Romano's proposed instruction also mirrors the language of the inducement instruction in *Kopstein*, 759 F.3d at 173 ("Your inquiry on this issue should first be to determine if there is any evidence that the undercover agent took the first step that led to a criminal act of the defendant transporting and shipping child pornography."). Neither Mr. Romano, nor the government, nor the district court

*sua sponte*, ever raised the issue of whether some *other Circuit's* entrapment instruction should instead be given to the jury.

The government thus mischaracterizes the issue when it states, "Romano seeks to have this Court abrogate its precedent on entrapment and follow the law of other circuits." (Gov't Br. at 40.) To the contrary, no party in this case has asked the district court or this Court to adopt some other Circuit's entrapment instruction. The issues on review is whether the instructions given by the district court "mislead the jury as to the correct legal standard or do not adequately inform the jury of the law." *See Kopstein*, 759 F.3d at 172. Mr. Romano expresses no position about whether the any other Circuit's entrapment instructions are correct or not, other than as regards the one specific issue before this Court.

Indeed, as the government notes, these other Circuits — notwithstanding their unanimity regarding the fact that a defendant does *not* bear a burden of persuasion — actually differ quite substantially from one to another concerning the nuances of exactly what a defendant pleading entrapment has to produce: some Circuits adopt language somewhat more favorable to the defense; other Circuits adopt language more favorable to the prosecution. Thus, the government opines that Mr. Romano might be unable to prove inducement were the exact same evidence adduced at trial, but were the case tried in one of several Circuits that impose additional burdens of production. (Gov't Br. at 41–42.)

Similarly, the government argues that were this case instead to have been tried in a Circuit where the defendant was required to make a threshold showing on both the predisposition prong *as well as* the inducement prong — and yet, where the exact same evidence had been adduced at trial — Mr. Romano would be unable to meet that Circuit's production burden. (Gov't Br. at 46–49.) Respectfully, undersigned counsel declines to speculate about hypothetical trials tried under different hypothetical legal standards, none of which is germane to the district court decision actually on review before this Court.[4] *See* 28 U.S.C. § 1291 (establishing this Court's jurisdiction to review final decisions of U.S. district courts). All undersigned counsel can state with any certainty is that the instruction actually given in the district court, imposing a burden of persuasion on the defendant to prove inducement, constitutes legal error in every Circuit.

C. Mr. Romano Easily Satisfies a Production Burden of Showing "Some Evidence" of Inducement.

The government's third argument is that Mr. Romano would have failed even to satisfy a production burden of presenting some "credible evidence" of inducement. (Gov't Br. at 43–45.) To the contrary, Mr. Romano adduced ample

[4] Of course, it is reasonable to assume that had this case indeed been tried in a different jurisdiction where different evidence must be produced to assert an entrapment defense, the evidence adduced by the parties at trial would *also* be different and, in particular, tailored to the particular law of the particular jurisdiction.

evidence a reasonable juror could believe that the government's cooperator Gerald Machacek and its undercover agent Robert Strecker were involved in "soliciting, proposing, initiating, broaching or suggesting the commission of the offense charged" or "set[ting] the accused in motion." *See Brand,* 467 F.3d at 190 (quoting *Sherman*, 200 F.2d at 883).

The "offense charged" in this case is, specifically, Mr. Romano's conspiring with David Mirkovic to arrange the murders of Judge Bianco and AUSA Gatz. (JA 20–21.) As the record demonstrates, however, Mr. Romano was not involved in any conspiracy with Mirkovic until well after the government's cooperator, Gerald Machacek, had arranged to put Mr. Romano in connection with an FBI agent, Robert Strecker, who was posing as a hitman. Indeed, the first overt act alleged in the Indictment concerning any conspiracy between Romano and Machacek occurs "On or about September 5, 2012," when "ROMANO directed MIRKOVIC to call the UC to set up a meeting." (JA 21.) At this point, the government had been setting the fake murder plot in motion for about a month.[5]

Indeed, on August 10, 2012, in the U.S. Marshals lockup at the federal courthouse in Central Islip, New York, the FBI set up a meeting between

[5] Indeed, notwithstanding that the relevant offense conduct is Mr. Romano's *conspiracy* with Mr. Mirkovic, the government only mentions Mirkovic's name a single time in its discussion of the inducement prong. (Gov't Br. at 44.) That single instance is a reference to Mr. Romano's post-arrest statements to law enforcement in which Romano allegedly "confessed that . . . he had directed Mirkovic regarding how to move the plot forward."

Machacek and Romano, at which Machacek was acting as an agent for the government and wearing recording equipment. (JA 85.) At that meeting, Machacek indicated to Romano that he knew someone outside of the jail, "Harold," who could perform assaults for hire and murder for hire. (JA 76.) The FBI had Officer Robert Strecker — posing as a hitman — visit Romano at the jail to inform him that "Harold" had instructed them to meet. (JA 73, 86.) Strecker proceeded to stage a simulated assault on a auto mechanic, Pittas, who Romano thought had cheated him in order to obtain Romano's trust, so that Romano would hire him to carry out the "murder" of Judge Bianco and AUSA Gatz. (JA 78.)

In short, a reasonable juror could certainly have found *some* credible evidence that the government had induced Mr. Romano to conspire with Mr. Mirkovic in the commission of the offense.

Further, the fact the government is *also* able to offer its own rebuttal evidence is not relevant to whether Mr. Romano can satisfy his own *production* burden. But it is worth noting that just because the government can assert evidence to rebut Mr. Romano's inducement evidence, does not mean a jury is required to believe it.[6] Thus, a jury could easily choose not to credit the self-serving testimony of the government's cooperator Machacek — an inherently unreliable witness that the government did not even wish to call in its case-in-chief, and whom Mr.

---

[6] The government is not entitled to the benefit of any inferences in its favor on this issue.

Romano thus had to call himself to testify as a hostile witness. Further, the jury could certainly find that Mr. Romano's angry comments to Machacek at the August 10 meeting — which the government had arranged — about wanting to kill Judge Bianco and AUSA Gatz were merely expressions of Mr. Romano's angry venting, but that he had not at this point "set in motion" any actual murder conspiracy. Indeed, a jury could find that Machacek's actions in riling Romano up during this meeting — at which Machacek was wearing a wire and acting as a government agent in order to get a cooperation agreement for himself — were in fact additional evidence of government inducement. In any event, the government is wrong in arguing Mr. Romano cannot satisfy a production burden of "some" credible evidence of inducement.

D. The Jury Instruction Was Not Harmless Beyond a Reasonable Doubt.

Finally, the government asserts that even if the district court erred in instructing the jury concerning the burden of proof on the inducement prong, no reasonable juror could possibly fail to find that the government had proven predisposition beyond a reasonable doubt. (Gov't Br. at 50.) The government does not even attempt to marshal the evidence it believes to be so "overwhelming," however, instead referring vaguely to "reasons previously noted." (Gov't Br. at 50.)

Undersigned counsel lacks the ability (and word count) in this reply brief to attempt to respond to each allegation to which the government might vaguely be referring. The government makes much of the fact that Mr. Romano was anxious to have an auto mechanic beaten up who Romano believed had stolen his car. Yet a reasonable jury could find that just because a person may be predisposed to arrange an *assault* does not mean he also has the predisposition to commit *murder*.

Much of the predisposition evidence upon which the government relies, moreover, involves statements Mr. Romano allegedly made to law enforcement during his post-arrest interrogation on October 9, 2012, when Mr. Romano was duped into believing that he was in the process of cooperating with the government. As addressed in Part I of this brief, these statements should have been suppressed and not in front of the jury at all.

Indeed, even if those statements were properly before the jury, there are still numerous reasons why a reasonable jury could choose to doubt the veracity of Mr. Romano's alleged admissions to law enforcement to the extent that the murder plot was all his idea. These statements were never recorded or written down or otherwise memorialized, even though Officer Heslin took a written statement from Mr. Romano — the phony cooperation agreement —that included other self-incriminating admissions. The jury could reasonably have doubted that Mr. Romano made statements that were incredibly damning and which the agents

somehow *did not document them at all*, even though they obtained a signed confessions from Mr. Romano containing other admissions. Alternatively the jury could believe that Mr. Romano made *some* statements to law enforcement, but that the agents were either misremembering these statements or intentionally exaggerating them (especially since they were not written down or otherwise memorialized and are not independently verifiable). Alternatively, a reasonable jury could have believed that Mr. Romano in fact *did* make the statements the agents attribute to him, but that he was merely exaggerating his role and culpability because he was in the process of cooperating with law enforcement (or so he thought) and wanted to curry favor with the agents.

Other aspects of the evidence the government believes prove predisposition evidence concern Mr. Romano's conduct *on or after* August 10, when he was already under the influence of Machacek and Strecker. As the jury was instructed regarding the predisposition prong, however, "you may rely upon the defendant's conduct after he was first approached by the government agent only if that conduct is independently motivated and not the product of attention that the Government might have directed at the defendant." (JA 158.) A reasonable jury could have found that Mr. Romano's conduct was not "independently motivated."

Indeed, the question of Mr. Romano's intent and predisposition is a uniquely fact-intensive inquiry that should be made by a jury in the first instance, rather than

by this Court on the basis of an appellate record. Because it is not "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error," the erroneous jury instruction is not harmless. *See United States v. Kozeny,* 667 F.3d 122, 130 (2d Cir. 2011). Accordingly, a new trial is required. *See id.*

## CONCLUSION

For the foregoing reasons, the defendant respectfully requests this Court vacate his conviction and remand the matter for a new trial.

Respectfully submitted,

/s/ Daniel S. Nooter
Daniel S. Nooter
*Attorney for Appellant*
1380 Monroe Street, N.W., #427
Washington, DC 20010
(202) 215-0512

Date: May 20, 2015

## CERTIFICATE OF COMPLIANCE

Undersigned counsel hereby certifies:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,989 words, excluding the parts of the brief excepted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

/s/ Daniel S. Nooter
Daniel S. Nooter